I4hWcha1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            17 Cr. 396 (WHP)

5    JOHN CHAMBERS,

6              Defendant.                    Trial

7    ------------------------------x

8                                           New York, N.Y.
                                            April 17, 2018
9                                           9:00 a.m.

10   Before:

11                   HON. WILLIAM H. PAULEY III

12                                           District Judge
                                              and a jury

13

14

15                       APPEARANCES

16   GEOFFREY S. BERMAN
          Interim United States Attorney for the
17        Southern District of New York
     ALEX ROSSMILLER
18   PAUL M. MONTELEONI
          Assistant United States Attorneys
19

20   GALLET DREYER & BERKEY LLP
          Attorneys for defendant
     BY:  ROGER LEE STAVIS
21        JARED B. FOLEY
          – and –
22   STEVEN L. BROUNSTEIN

23

     Also Present:
24        Michael Buscemi, Special Agent FBI
          Yolanda Bustillo, Paralegal Specialist USAO
25
```

I4hWcha1

1          (Trial resumed)

2          THE COURT:  Good morning.  Please be seated.

3          Yesterday afternoon, at the conclusion of the taking

4     of evidence, defense objected to certain remarks by the

5     government alluding to the role of the NYPD license division's

6     procedures in keeping New Yorkers safe.  On further reflection

7     and a review of the transcript, this Court overrules

8     defendant's objection.

9          In a case about gun licensing matters, questions of

10    safety are unavoidable.  The remarks in question were not so

11    prominent as to inject collateral issues into this case, nor

12    were they so inflammatory or egregious in content as to

13    unfairly prejudice the jury, a point underscored by counsel's

14    failure to contemporaneously object.  *Cf. United States v.*

15    *Modica*, 663 F.2d 1173 at 1180 to 1181 (2d Cir. 1981).  There,

16    the Second Circuit explained that a prosecutor should not use

17    arguments calculated to inflame the passions or prejudices of

18    the jury, and a prosecutor's remarks are improper when their

19    only conceivable purpose was to prejudice the jury.

20          This Court explicitly instructed the jury that

21    statements by counsel, including opening statements, are not

22    evidence.  That instruction will be repeated in the final

23    charge to the jury.  This Court is confident that the jury will

24    follow these instructions and decide the case solely on the

25    evidence.  *See United States v. Reyes*, 18 F.3d 65, 71-72 (2d

I4hWcha1

1    Cir. 1994).

2           Now, with respect to the government's motion *in limine*

3    to admit two email chains, Government Exhibits 408 and 430,

4    does the defense wish to be heard further with respect to that

5    application by the government?

6           MR. STAVIS:  Your Honor, very briefly.

7           There are many, many emails, scores and scores of

8    them.  We narrowed down the areas of difference between the

9    government and defense, and we're left with these two, both of

10   which are from an attorney to an attorney concerning referral

11   fees.  Under Rule 403, we already have enough emails.  We

12   already have enough emails showing intent.  We already have

13   enough of that, without confusing the jury and adding more on

14   top of it.

15          That was the basis for my Rule 403 objection.

16          THE COURT:  Anything further from the government?

17          MR. MONTELEONI:  Your Honor, we do certainly agree

18   that we intend to be presenting significant evidence.  However,

19   these are the two emails that are of this character.  There are

20   various other types of evidence of the defendant's intent, but

21   these are the emails where he is soliciting directly from

22   outside parties business on the basis of representations about

23   his practice, so we certainly don't think they're cumulative on

24   that point.

25          THE COURT:  With respect to the government's

I4hWcha1

1    application to introduce Government Exhibits 408 and 430, the

2    government seeks to offer them as bearing on his intent and

3    motive to commit bribery.  The defense objects on the basis

4    that the emails are at most puffery related to Mr. Chambers's

5    legal practice, and separately, their introduction would

6    unfairly prejudice Mr. Chambers by suggesting that he engaged

7    in an ethical violation related to lawyer referral fees.

8            Having reviewed these two email chains, this Court

9    concludes that they are admissible because they're probative as

10   to the conduct charged in the case.  While the defense proffers

11   an alternative interpretation, such an argument's really

12   directed to the weight of the email chains as opposed to their

13   admissibility.  *See United States v. Prevazon Holdings Ltd.*,

14   319 F.R.D. 459 at 463 n. 2 (S.D.N.Y. 2017).

15           This Court does not find that whatever prejudice

16   Mr. Chambers may suffer from the emails substantially outweighs

17   their probative value under Rule 403.  He's not on trial for

18   any ethics violations, nor does this Court intend on providing

19   any instructions relating to ethics.  The risk that the jury

20   would infer some unethical behavior is minimal, and this Court

21   will be certain to police the government's examination.

22   They've already indicated they will not tread into that area,

23   and I'll be here to enforce that assurance from the government.

24           Now, what about the submission from the defense of

25   NYPD license division documents?

I4hWcha1

1          Mr. Stavis.

2          MR. STAVIS:  Yes, your Honor.

3          All of these documents involve the witness on the

4     stand.  They were all signed by him, with his signature.  On

5     page 70 of yesterday's trial transcript, beginning at line 4,

6     the witness who is on the stand, Inspector Barreto, was asked:

7     "Q.  What happens if a license is not approved?"

8          He testified:

9     "A.  If it's not approved, the applicant has a right to appeal.

10    They'll do appeal through the mail and they appeal to the

11    director of the license division."

12         Then on page 84, this witness, Inspector Barreto,

13    testified, beginning at line 4:

14    "Q.  After the final decision has been made on an incident

15    investigation, what happens next?

16    "A.  If it is a continuation, that means the licensee gets his

17    license back and he is licensed to carry his firearm, whatever

18    the type of license he has.  If it is a suspension or

19    revocation, basically he gets a letter with my signature" --

20    what your Honor has before you -- "basically illustrating the

21    reason why his license is either suspended or revoked."

22         Now, these particular documents demonstrate the work

23    that Mr. Chambers did at the police license division.  It

24    depicts the kinds of issues he worked with, the clients he

25    worked with, his legal work.  It separates him from the

I4hWcha1

1    expeditors, like the Lichtensteins of the world, which were the

2    subject of the scandal that Inspector Barreto took over from.

3          The statement that the government made yesterday, that

4    it's outside the period of the scope of the indictment, well,

5    your Honor, the entire testimony of Inspector Barreto is

6    outside the scope of the indictment, and on cross-examination,

7    and as a matter of having a constitutional right to present my

8    defense, I believe that something that's specifically referred

9    to in the direct examination of this particular witness, that

10   bears his signature, the defense should be permitted to

11   introduce into evidence.

12          THE COURT:  All right.  Mr. Rossmiller.

13          MR. ROSSMILLER:  Your Honor, a couple things here.

14          The first is that the government's general concern

15   with documents of this type are that they could lead to a juror

16   inference that the document suggests that because Mr. Chambers

17   was doing other work and not paying bribes during that work,

18   that he wouldn't have or couldn't have been paying bribes

19   before.  We understand for the first time this morning that

20   these documents are being submitted to show that Mr. Chambers

21   does legal work and is a lawyer, which is fine, except that --

22   which is fine, and it's not a disputed issue in the case.

23   We're just wary of how these documents will come in, what their

24   purpose will be, in part, because the government isn't

25   disputing that Mr. Chambers is a lawyer, that he does this

I4hWcha1

work.

I don't believe the government used the word "expeditor" or "consultant" in its opening. I don't believe those words have come up except perhaps for the witness to generally refer to the scandal previously. We are, in fact, going to call a witness, who not only was represented by Mr. Chambers in connection with gun license processes, but is still currently now being represented by Mr. Chambers, so there simply is no argument from the government that Mr. Chambers isn't a lawyer, that he doesn't do productive things as a lawyer for his clients during the period and now. The government elicited from its very first witness the types of things that a lawyer could and might do in these processes and that, in fact, Mr. Chambers has done those things.

To the extent that these documents are being offered to sort of bolster the witness's testimony that Mr. Chambers is involved, I suppose that's fine, but what we want to avoid is a sort of collateral inference that because these processes are occurring without bribes, that others must have too. It's a little bit of a fine line, but that's our concern, your Honor.

I should add, your Honor, that there's an additional document we received last night from the defense, which is a portion of a license file that the government produced, again from 2017, that involves a separate individual, separate client of Mr. Chambers, who had a domestic incident that gave rise to

I4hWcha1

1   an investigation that was adjudicated by the witness who will

2   be on today, which we think sort of similarly gives rise to

3   these issues, that if that's being offered to show that there

4   was a sort of semi-similar process that came out a different

5   way and so the first one wasn't a problem, we think that's an

6   issue, your Honor.

7            MR. STAVIS:  Your Honor, there are scores and scores

8   of license division files that the government is going to be

9   introducing.  For the government to state, Well, it's not

10  really an issue, we're entitled on our side to state what an

11  issue is and to prove it the way we want to prove it.  We

12  opened on this, your Honor.  We opened on his legal work.

13           The government, when they get rolling on their case,

14  is going to show that everything was smoke and mirrors and

15  bribing and glad-handing, and we are going to show the hard

16  work and the successful work of an attorney, which is a

17  different picture than the picture that the government wants to

18  paint before this jury.  And for the government to say, Well,

19  we're not contesting it, Of course he's a lawyer, talk is

20  cheap.  They're going to prove, or try to prove, what a sleazy

21  lawyer he is, what a corrupt lawyer he is.

22           He's on trial here on a federal indictment, and we

23  have a witness on the stand who signed documents and worked on

24  these cases and referred to it in the page citations that I

25  gave to your Honor.

I4hWcha1

1          Now, for Mr. Rossmiller to say, Well, we're concerned

2     that the defense might possibly argue -- possibly argue --

3     that, Hey, he didn't do bribes in these cases, that's not our

4     argument.  The concern is not sufficient to preclude the

5     introduction of evidence by defense counsel in a criminal case.

6     The right to present evidence, obviously, your Honor, is of

7     constitutional dimension, and the concerns of the government,

8     which are unfounded, can't trump our right to introduce this

9     evidence.

10          MR. ROSSMILLER:  Just very briefly, your Honor.

11          The government hasn't moved to preclude these pieces

12     of evidence.  We've simply brought up the issue so that it is

13     teed up should it sort of venture into that realm.

14          Defense counsel has worked productively with the

15     government on issues of exhibits.  We have had an open line of

16     communication about this, and we obviously moved with respect

17     to other evidence in connection with our concern about defense

18     propensity evidence.  We have similar concerns about this that

19     we haven't moved to preclude because there may, in fact, be

20     appropriate reasons to introduce this evidence, but what would

21     not be appropriate would be to suggest that because

22     Mr. Chambers had other clients with whom there was no bribe or

23     other interactions with the NYPD where there weren't bribes,

24     that wouldn't be appropriate.

25          THE COURT:  All right.  Look, during Inspector

I4hWcha1

1    Barreto's direct examination, the government elicited testimony

2    from him about all his dealings with the licensing division,

3    denials, appeals, his interactions with Mr. Chambers.  As I

4    understand it, these are exhibits that the defense proposes to

5    offer on cross-examination of Mr. Barreto.  I think it is

6    entirely fair game for the defendant with respect to these

7    documents.

8             I'm going to be watchful about the government's

9    concern about the defense making some larger argument that is

10   being disclaimed now, but I think it's perfectly appropriate,

11   given Inspector Barreto's testimony that he was brought in to

12   clean up the licensing division.  He's portrayed as essentially

13   the white knight, and these documents suggest that some of his

14   decisions might have been arbitrary and capricious.

15             MR. ROSSMILLER:  Thank you, your Honor.

16             MR. STAVIS:  Your Honor, just as a logistical matter,

17   if I have eight sets of these, I have them separately marked,

18   to save time, I would give all seven of them?

19             THE COURT:  Absolutely.

20             MR. STAVIS:  Yes?

21             THE COURT:  That's fine.

22             Are there any other issues that counsel want to raise

23   this morning?

24             MR. ROSSMILLER:  No, your Honor.

25             MR. BROUNSTEIN:  No, sir.

I4hWcha1

1          THE COURT:  It's a little warm in here so I'm lowering

2     the temperature a degree.  We'll see how that works.

3          MR. BROUNSTEIN:  Thank you, Judge.

4          THE COURT:  Sometimes air-conditioning -- or heat --

5     is like water in the Colorado River.  If you've got it, you

6     don't want to give it up.

7          As soon as the jury is here, we'll bring them out.

8     You can have Inspector Barreto come into the courtroom.  He

9     doesn't have to sit up here at the moment, but so that we've

10     got him and we're set to go.

11          MR. ROSSMILLER:  He's here, your Honor.

12          THE COURT:  I think I saw him pop his head in and then

13     pop out.

14          MR. ROSSMILLER:  Thank you, your Honor.

15          THE COURT:  We've got nine of the jurors here.  We

16     should proceed, hopefully, in a few minutes.

17          (Recess)

18          THE COURT:  The jury is all here.  You can bring in

19     Inspector Barreto.

20          Also, a reminder to counsel that you should be

21     preparing an exhibit list of exhibits received in evidence,

22     because that's what I send in to the jury, and then await a

23     request from the jurors for a particular exhibit, and we'll

24     need a verdict sheet as well.

25          Bring in the jury.

1           (Jury present)

2           THE COURT:  Everyone may be seated.

3           Good morning, members of the jury.  Thank you very

4    much for your punctuality this morning.  We all appreciate it.

5    Everybody on trial here is raring to go, so we're going to get

6    right to it.

7           Inspector Barreto, would you step up, sir.  Take a

8    seat, please.  Do you understand that you continue to be sworn

9    as a witness under oath in this proceeding on trial?

10          THE WITNESS:  Yes, I do, sir.

11          THE COURT:  Members of the jury, we'll continue with

12   Mr. Stavis's continued cross-examination of Inspector Barreto.

13    MICHAEL BARRETO, resumed.

14          You may proceed, Mr. Stavis.

15          MR. STAVIS:  Thank you, your Honor.

16   CROSS-EXAMINATION CONTINUED

17   BY MR. STAVIS:

18   Q.  Inspector Barreto, yesterday we left off with you

19   testifying about a scandal in the license division before you

20   arrived there in May of 2016.  Do you recall that?

21   A.  Yes, sir.

22   Q.  Now, the scandal was one month prior to your arrival, in

23   April of 2016, is that correct?

24   A.  Yes, sir.

25   Q.  And a person named David Villanueva, who was the --

1    withdrawn.

2       David Villanueva was the sergeant in charge of the incident

3    section at the license department before you took over,

4    correct?

5    A.  That's correct, sir.

6    Q.  And there was someone named Alex Lichtenstein, also known

7    as "Shaya", and he was an expediter of pistol licenses, is that

8    correct?

9    A.  Yes.

10   Q.  And both David Villanueva and Alex "Shaya" Lichtenstein,

11   one month prior -- in April, one month prior to you taking

12   over, both men were indicted here in the United States District

13   Court for the Southern District of New York, correct?

14   A.  Yes, sir.

15   Q.  And that indictment was United States of America v. David

16   Villanueva and Alex Lichtenstein, a/k/a "Shaya," correct?

17   A.  Yes, sir.

18   Q.  And the scandal was about Alex Lichtenstein, a/k/a "Shaya,"

19   paying money to Sgt. Villanueva of the licensing division to

20   get permits for the people that Alex "Shaya" Lichtenstein

21   represented, correct?

22   A.  Yes, sir.

23   Q.  Now, you were asked yesterday by Mr. Rossmiller what type

24   of individual might assist someone with a licensing issue or a

25   license with the police department, and you answered at page 66

I4hWcha1                          Barreto - Cross

1   of the transcript, "an attorney."  Do you recall that?

2   A.  Yes, sir.

3   Q.  There's also something called expeditors, is that correct?

4   A.  Yes.

5   Q.  And an expeditor is a nonattorney, correct?

6   A.  That's correct.

7   Q.  And expeditors -- what is your understanding of what

8   expeditors do?

9   A.  My understanding is they assist the applicant in processing

10  the application.

11  Q.  They don't do Article 78s, do they?

12  A.  No.

13  Q.  And Article 78 is a lawsuit that's brought by a lawyer

14  against the decision of the NYPD license division, is that

15  correct?

16  A.  That's correct, sir.

17  Q.  In other words, a lawyer would actually have to draft a

18  complaint, start a whole separate action in the New York

19  Supreme Court, the New York trial court, against the police

20  department; that's what an Article 78 is?

21  A.  Yes, sir.

22  Q.  And an expeditor can't do that?

23  A.  That's correct.

24  Q.  And you sometimes in the license division have hearings, is

25  that correct?

I4hWcha1                        Barreto - Cross

1    A.   That's correct, sir.

2    Q.   And at the hearings, there would be witnesses and the

3    taking of testimony from these witnesses?

4    A.   That's correct, sir.

5    Q.   And an expeditor cannot do hearings either, can an

6    expeditor?

7    A.   That's correct, sir.

8    Q.   And also, once a decision is made and you, the commanding

9    officer of the license division, might make a decision to

10   revoke a license in an incident-type case, there is an appeal

11   process, which you testified about yesterday, is that correct?

12   A.   That's correct, sir.

13   Q.   OK.  Now, getting back to expeditors, are you familiar with

14   the website from the license division?

15   A.   Yes.

16   Q.   And you, as the commanding officer of the license division,

17   had something to do with the content of the website.  Is that

18   fair to say?

19   A.   The new part of it.  The new part --

20   Q.   Yes.

21   A.   Yes.

22   Q.   I'm showing you what is marked as Defense Exhibit A for

23   purposes of identification.  Inspector, I'd ask you to take a

24   look at that, and when you're finished looking at that, look up

25   and I'll have additional questions for you.

1    Now, Inspector Barreto, does Defense Exhibit A for purposes

2    of identification appear to be the download instructions, the

3    current download instructions for people with the license

4    division of the New York City Police Department?

5    A.  That's correct, sir.

6            MR. STAVIS:  Your Honor --

7            THE COURT:  Counsel, if you'd be kind enough to step

8    back to the podium.  Thank you.

9            MR. STAVIS:  Your Honor, I would offer what has been

10   previously marked as Defense Exhibit A for purposes of

11   identification into evidence as Defense Exhibit A.

12           THE COURT:  Any objection?

13           MR. ROSSMILLER:  No objection.

14           THE COURT:  Defense Exhibit A is received in evidence,

15   and you may publish it if you wish.

16           (Defendant's Exhibit A received in evidence)

17           MR. STAVIS:  If this device wishes, then I will.

18           May I have that back.

19           THE WITNESS:  Sure.

20           THE COURT:  Lawyers are always permitted to walk and

21   talk at the same time in the courtroom.  It saves time.

22           MR. STAVIS:  And I know there's no chewing gum, right?

23           THE COURT:  That's true.

24   BY MR. STAVIS:

25   Q.  Defense Exhibit A now, "As of January 1, 2018, the New York

City Police Department license division will only be accepting

online applications for handguns" -- this is the first line

there -- "rifle/shotgun permits and renewals.  Applications on

paper will no longer be accepted."  Do you see that?

A.  Yes, sir.

Q.  And that was part of what you did, Inspector Barreto, to

change --

A.  That's correct.

Q.  And this is one of the changes that you effectuated after

the Lichtenstein-Villanueva gun permit scandal of 2016?

A.  That's correct.

Q.  Now, toward the end of this download for people who are

interfacing with the NYPD license division is a section called

working with handgun-license consulting firms.  Do you see

that?

A.  Yes, sir.

Q.  Can you please read that to the jury?

A.  "Consulting companies are not required to be used to apply

for New York City handgun license or rifle/shotgun permits.

These firms cannot obtain a handgun license or rifle/shotgun

permit for you if you do not qualify, nor can they expedite

your application.  As an applicant, you should be aware that

such services are not required or endorsed by the New York City

Police Department and that only an attorney licensed by the

state of New York can represent you before the license

I4hWcha1                         Barreto - Cross

division.  You should also understand that any fees you pay to

a consulting firm are in addition to those required by law and

collected by the license division.  Neither the license

division nor the consulting companies can guarantee the

issuance of a handgun license or rifle/shotgun permit to any

person.  Each application is reviewed on its merits and under

the qualifying criteria set forth by the law."

Q.  Thank you.  Now, the consulting firms, some of them are

also known as expeditors, that's who we're referring to?

A.  That's correct, sir.

Q.  Not who we are, but this is who the license division is

referring to?

A.  That's correct, sir.

Q.  And there's reference and it's blocked in bold letters,

"only an attorney licensed by the state of New York can

represent you before the license division," correct?

A.  That's correct.

Q.  Being an attorney and interacting with the license division

is something that the license division does?

A.  That's correct.

Q.  There are attorneys for the hearings in the license

division, correct?

A.  That's correct, sir.

Q.  There are attorneys for appeals in the license division, is

that correct?

I4hWcha1                    Barreto - Cross

1    A.   That's correct, sir.

2    Q.   There are attorneys if the decision goes the wrong way to

3    commence the actions in state Supreme Court, Article 78?

4    A.   That's correct, sir.

5    Q.   Now, one of the innovations or let me call them reforms

6    that you instituted, Inspector, when you came in in May of

7    2016, in the wake of the Lichtenstein-Villanueva gun permit

8    scandal is to make sure that expeditors could no longer attend

9    the interview that took place in the license division, correct?

10   A.   That's correct.

11   Q.   And yesterday, you testified that these interviewers get

12   the information from the applicant, am I correct, either for

13   the issuance of a license to begin with?  Correct?

14   A.   Yes.

15   Q.   Or in an incident issue, where there is a potential

16   revocation, correct?

17   A.   That's correct.

18   Q.   But the rules still apply, the new rules that you

19   instituted in the wake of the Lichtenstein-Villanueva gun

20   permit scandal, the new rules permit an attorney to attend

21   those interviews still, is that correct?

22   A.   That's correct, sir.

23   Q.   Now, one of the issues that you tried to address when you

24   took over the license division in the wake of the scandal with

25   David Villanueva and Alex Lichtenstein was that carry permits

I4hWcha1                          Barreto - Cross

1   had been issued the same day by David Villanueva on behalf of

2   the expeditor Alex "Shaya" Lichtenstein, is that correct?

3   A.   Yes.

4   Q.   And by David Villanueva, the sergeant in charge of the

5   incident section -- by the way, the incident section is

6   different from the section in the NYPD license division, the

7   incident section where Sgt. Villanueva was, is different from

8   where a carry permit would be issued; it's a different branch

9   of the division, is it not?

10  A.   That's correct, sir.

11  Q.   OK.   So then as part of his scandal, David Villanueva was

12  crossing over into another area of the NYPD license division in

13  order to give Alex "Shaya" Lichtenstein what he wanted?

14  A.   That's correct.

15  Q.   And what he wanted was carry permits, correct?

16  A.   Yes.

17  Q.   Among other things?

18  A.   That's correct.

19  Q.   And carry permits are the most difficult kind of permit, as

20  you've testified yesterday?

21  A.   That's correct, sir.

22  Q.   Because you could just put it, I think you said, underneath

23  your jacket or sweater?

24  A.   You conceal it.

25  Q.   And you could go anywhere with it?

I4hWcha1                          Barreto - Cross

1    A.  Within New York State, that's correct.

2    Q.  And for money paid by Lichtenstein to David Villanueva,

3    Sgt. David Villanueva, Lichtenstein's clients got these the

4    very same day with no investigation?

5    A.  That's correct.

6    Q.  And you testified yesterday about the computer system, and

7    there was an old computer system called ALPS?

8    A.  That's correct.

9    Q.  And one of the problems with ALPS -- by the way, there's a

10   new computer system that you've instituted?

11   A.  Yes.

12   Q.  And one of the reasons you had to do that when you took

13   over in the wake of the Lichtenstein-Villanueva gun permit

14   scandal was that someone like Villanueva, who was in the

15   incident section, because he was a supervisor, could issue

16   permits, which was in a completely different area, because he

17   could get right into the computer?

18   A.  That's correct, sir.

19   Q.  Anyone with a supervisor could log into the computer under

20   the ALPS system?

21   A.  That's correct.

22   Q.  By the way, let's see.  ALPS, not like the Swiss ALPS, is

23   the automatic license pistol section.  Is that what ALPS stands

24   for?

25   A.  According to the actual -- because we still use it to just

I4hWcha1                        Barreto - Cross

1   to read only, it stands for automatic license permit section.

2   Q.  Permit section, OK.  So you had to end this, correct?

3   A.  Yes.

4   Q.  Because it was abused by David Villanueva, correct?

5   A.  Well, the reason why, because I wanted to control --

6   everybody had access to issuing licenses, and I just wanted to

7   have one person do it.

8   Q.  OK, but you took over after the scandal, correct?

9   A.  Yes.

10   Q.  And part of the scandal was Villanueva going into the ALPS

11   system because he was a supervisor?

12   A.  Yes.

13   Q.  You testified yesterday about an appeal process, and you

14   testified that a letter with your signature is the final say

15   before an appeal, which explains to the licensee, the holder of

16   the license, whether they were being continued, meaning allowed

17   to continue the license, whether it was being revoked; yours

18   was the final say before appeal?

19   A.  That's correct, sir.

20   Q.  I'm showing you a group of determinations by the New York

21   City police license division and decisions on appeals, and

22   they're marked for purposes of identification Defendant's

23   Exhibit B, Defense Exhibit C, Defense Exhibit D, Defense

24   Exhibit E, Defense Exhibit F, and Defense Exhibit G, Defense

25   Exhibit H, Defense Exhibit I.

I4hWcha1                      Barreto - Cross

1        Please take a look at these records from the police license

2   division.  When you finish, please look up and I'll have an

3   additional question for you.

4   A.   OK.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1       I4HJCHA2                    Barreto - Cross
2       Q.   Inspector, are Defense Exhibits B through I part of the
3       records of the New York City Police Department License
4       Division?
5       A.   Yes, they are.
6       Q.   Are they matters that you worked on?
7       A.   That's correct.
8       Q.   Were these records prepared in the regular course of
9       business of the New York City Police Department License
10      Division?
11      A.   Yes.
12              MR. STAVIS:  Your Honor, at this time I would offer
13      what has been previously marked for identification as Defense
14      Exhibits B through I into evidence as Defense Exhibits B
15      through I.
16              THE COURT:  Any objection?
17              MR. ROSSMILLER:  No, your Honor.
18              THE COURT:  Defense Exhibits B, C, D, E, F, G, H and I
19      are received in evidence.
20              (Defendant's Exhibits B through I received in
21      evidence)
22              THE COURT:  And you may publish them as you see fit,
23      Mr. Stavis.
24              MR. STAVIS:  Thank you, your Honor.
25      BY MR. STAVIS:
```

1    Q.  Okay, now, drawing your attention to Defense Exhibit B in

2    evidence, this is a letter to a Mr. John Adragna in Staten

3    Island about the revocation of his retired law enforcement

4    handgun license.  Do you see that?

5    A.  Yes, sir.

6    Q.  The reason why it was revoked -- oh, by the way, that is

7    your signature on the bottom, Inspector Michael Barreto?

8    A.  Yes, sir.

9    Q.  The reason why you ordered this revoked is that Mr. Adragna

10   was arrested for assault on February 14th, 2014, correct?

11   A.  That's correct, sir.

12   Q.  And he was subsequently convicted for disorderly conduct,

13   correct?

14   A.  That's correct.

15   Q.  And he was the subject of an order of protection which

16   prohibited him from possessing firearms until November 30th,

17   2016, correct?

18   A.  That's correct.

19   Q.  He also failed to notify the License Division that he was

20   the subject of an order of protection, correct?

21   A.  That's correct, sir.

22   Q.  And he failed to cooperate with the License Division's

23   investigation, correct?

24   A.  That's correct.

25   Q.  So it would be fair to say that Mr. Adragna did just about

1  everything wrong that a person could do?

2          MR. ROSSMILLER:  Objection, your Honor.

3          THE COURT:  Sustained as to form.

4  BY MR. STAVIS:

5  Q.  These are a lot of the violations of the rules, these are

6  five separate violations of the known rules that govern having

7  a gun permit or license?

8  A.  Yes.

9  Q.  Now, this particular matter went up on appeal.  Is that

10  correct?

11  A.  Yes, sir.

12  Q.  And you testified yesterday that when you come to a

13  decision in this case, Government Exhibit B, Mr. Adragna, you

14  come to a decision to revoke, that then there could be an

15  appeal, correct?

16  A.  That's correct, sir.

17  Q.  An appeal goes to someone called the director -- withdrawn.

18  A.  What happens is as it states in the bottom of this letter,

19  they have a right to appeal to the director if they write a

20  letter requesting a hearing.

21          They request a hearing, and then we have two separate

22  hearing officers under the direction of the director, and they

23  have a hearing, they bring witnesses, they could bring an

24  attorney, and the hearing officer hears the case, makes a

25  recommendation, and they make a recommendation to the director

1    of the License Division.  I either can concur with their

2    findings or he can make his own decision.

3    Q.  In this particular instance, the determination -- by the

4    way, is the director of the License Division an attorney or a

5    police officer?

6    A.  He is an attorney.

7    Q.  In this particular instance, Jonathan David is the director

8    of the License Division?

9    A.  That's correct, sir.

10   Q.  And he overruled your revocation.  Is that correct?

11   A.  Yes.

12   Q.  And he made sure that Mr. John Adragna had his license and

13   his firearm returned to him?

14   A.  That's correct, sir.

15   Q.  The attorney for Mr. Adragna was John Chambers, Esquire.

16   Is that correct?

17   A.  That's correct, sir.

18   Q.  Moving on to Defense Exhibit Number C, this is another

19   instance with Mr. Anastopoulos, who was applying for a handgun.

20   It wasn't an incident.  It was just an application, correct?

21   A.  That's correct, sir.

22   Q.  That is your signature on the bottom of Defense Exhibit C

23   in evidence, correct?

24   A.  Yes, sir.

25   Q.  And you disapproved him for that permit, correct?

1    A.   That's correct.

2    Q.   Because he had a driving while intoxicated arrest and a

3    guilty plea to driving while impaired, correct?

4    A.   That's correct, sir.

5    Q.   Then as we said, the appeals process with Jonathan David,

6    the director, resulted in his application being approved.  Is

7    that correct?

8    A.   That's correct.

9    Q.   Now, you've testified that one of the grounds to deny a

10   handgun license are domestic violence incidents between

11   individuals, correct?

12   A.   That could be a factor, yes.

13   Q.   And that is a recurring factor that you see as the

14   commanding officer of the New York City Police Department

15   License Division, correct?

16   A.   What do you mean recurring?  Can you clarify that?

17   Q.   It happens more than once, happens frequently,

18   infrequently?

19   A.   Yes.

20   Q.   You say frequently?

21   A.   Yes.

22   Q.   So here Defense Exhibit D is Patrick Conway, also of Staten

23   Island, and that is your signature on the bottom, correct?

24   A.   That's correct, sir.

25   Q.   And you disapproved the license for him on May 3, 2017,

1   which was about a month into your tenure as the commanding

2   officer of the -- that was '16.

3   A.  Yes.

4   Q.  More than a year into your tenure?

5   A.  That's correct, sir.

6   Q.  The circumstances are a prior domestic incident, and again

7   your decision was reversed by Jonathan David, the director, and

8   the license was approved, correct?

9   A.  That's correct.

10  Q.  Now, Defense Exhibit E is a gentleman named Carmine

11  Belmonte, this is October 28th, 2016, and this was an actual

12  incident case.  Is that correct?

13  A.  That's correct, sir.

14  Q.  And that's your signature on the bottom of defense --

15  A.  Yes, it is.

16  Q.  -- Exhibit E?

17  A.  Yes, sir.

18  Q.  And he was arrested for menacing in the second degree with

19  a firearm?

20  A.  That's correct.

21  Q.  And so you decided that his license should be revoked?

22  A.  That's correct.

23  Q.  And again this particular person, Carmine Belmonte,

24  appealed, and Jonathan David overruled you, correct?

25  A.  That's correct, sir.

1    Q.   And so that the license continued, correct?

2    A.   That's correct.

3    Q.   And the lawyer for Mr. Belmonte was John Chambers, correct?

4    A.   That's correct.

5    Q.   Now, here's a disapproval of yours for a gentleman --

6    Defense Exhibit F -- Mr. Hanley of the Bronx, and he was an

7    applicant for a pistol license, right, correct?

8    A.   That's correct, sir.

9    Q.   And you disapproved it because he was arrested for felony

10   criminal possession of a weapon in the second degree, correct?

11   A.   That's correct, sir.

12   Q.   And he was convicted for that crime as a juvenile offender,

13   correct?

14   A.   That's correct, sir.

15   Q.   He was also issued some traffic infractions, but you

16   disapproved him, that is your signature on the bottom, in light

17   of his conviction of a felony criminal possession of a weapon

18   in the second degree, correct?

19   A.   That's correct, sir.

20   Q.   That's one of the most, would it be fair to say that is one

21   of the most important factors in denying someone a license, the

22   conviction for criminal possession of a weapon in the second

23   degree?

24   A.   Yes.

25   Q.   And then it was overturned on appeal and approved by

1      Jonathan David, the director, correct?

2      A.   Yes.

3      Q.   And the notice of the approval went to Mr. Hanley's lawyer,

4      it was addressed to Mr. Hanley's lawyer, John Chambers?

5      A.   That's correct, sir.

6      Q.   Defense Exhibit H is a notice of disapproval of 1-25-17 for

7      Anna Chan, Jamaica, New York, and she was arrested for a

8      felony.   Is that correct?

9      A.   That's correct, sir.

10     Q.   For the felony of promoting gambling, and she was actually

11     convicted but of a misdemeanor, correct?

12     A.   That's correct.

13     Q.   She applied for a handgun and was disapproved by you as the

14     director, correct?

15     A.   (multiple voices)

16     Q.   As the commanding officer?

17     A.   That's correct, sir.

18     Q.   That is Defense Exhibit H, and then there was an appeal

19     that she thought that she should have a license despite her

20     criminal conviction, and she appealed to Jonathan David, the

21     director, and was approved, correct?

22     A.   That's correct, sir.

23     Q.   And the notice of that approval went not to Ms. Chan, but

24     to her attorney, John Chambers, correct?

25     A.   That's correct.

1    Q.   You testified yesterday that you were introduced to John

2    Chambers by the prior director of the License Division in May

3    or June of 2016.  That was on Page 42 of the transcript.  Do

4    you recall that?

5    A.   Yes, sir.

6    Q.   The prior director was a man by the name of Thomas Prasso,

7    correct?

8    A.   That's correct, sir.

9    Q.   And he was an attorney?

10    A.   Yes.

11    Q.   And the director position is a position for an attorney?

12    A.   That's correct.

13    Q.   And so Thomas Prasso would be like Jonathan David is now,

14    the person that is overturning --

15    A.   Correct.

16    Q.   -- the commanding officer's decision?

17    A.   John David replaced Tom Prasso when he retired in August of

18    2016.

19    Q.   Right.  And the commanding officer, in the time of -- and

20    when you say the director introduced you to Mr. Chambers, that

21    was Thomas Prasso who introduced you?

22    A.   That's correct, sir.

23    Q.   And there was also a commanding officer by the name of

24    Michael Endall, correct?

25    A.   Yes.

1    Q.  And you testified yesterday that Michael Endall, the

2    commanding officer, that you replaced --

3    A.  No.  I replaced Inspector Moore.

4    Q.  Inspector Moore?  Okay.  So Michael Endall was an

5    inspector?

6    A.  Deputy inspector, yes.

7    Q.  Right.  During his time in the License Division, you

8    testified yesterday, at Page 95 of the transcript, that Deputy

9    Inspector Endall expedited Mr. Chambers' gun matters?

10            MR. ROSSMILLER:  Objection, your Honor.

11            THE COURT:  Overruled.

12   BY MR. STAVIS:

13   Q.  You may answer the question.

14   A.  What I testified, looking at the email, it illustrated when

15   there was cases that were what I call creme puffs, he would say

16   easy cases, there was no issues with the applicant, Mr.

17   Chambers would notify Inspector Endall and Inspector Endall

18   would request him to wrap up the case, and he verified, he

19   expressed in the email cases that were four weeks' old.

20   Q.  Right.  So you were aware that Mr. Chambers had a

21   relationship with Deputy Inspector Endall?

22   A.  Yes, Mr. Chambers told me that.

23   Q.  Now, you have the rank of inspector, correct?

24   A.  Yes, sir.

25   Q.  That is a, fair to say, a very, very high rank in the New

1  York City Police Department?

2  A.  Yes, sir.

3  Q.  The next one below would be a deputy inspector?

4  A.  That's correct.

5  Q.  And the next one below would be a captain?

6  A.  That's correct, sir.

7  Q.  The captain is a very high rank in the New York City Police

8  Department also?

9  A.  Yes, sir.

10 Q.  And then below a captain would be a lieutenant?

11 A.  That's correct.

12 Q.  And then below a lieutenant would be a sergeant?

13 A.  That's correct.

14 Q.  So Sergeant Villanueva, at the Incident Section of the

15 License Division, was very much on a lower level than the

16 commanding officer, who would be a deputy inspector?

17 A.  That's correct, sir.

18 Q.  Now, you testified yesterday that you have spoken either in

19 person or on the telephone to Mr. Chambers something less than

20 10 times, correct?

21 A.  That's correct.

22 Q.  You testified yesterday that you had email exchanges with

23 Mr. Chambers about 50 times, correct?

24 A.  He emailed me about 50 times.

25 Q.  And you answered those emails?

1    A.   Some of them I did, and the rest of them I would refer them

2    to different people within the License Division that would be

3    assisting him on whatever questions he had.

4    Q.   So you would forward his emails?

5    A.   That's correct.

6    Q.   Of the 50 emails, some you answered and some you forwarded?

7    A.   That's correct, sir.

8    Q.   But you didn't ignore them, did you?

9    A.   No, I don't ignore nobody's email.

10   Q.   It was part of your job to either answer those, or you

11   viewed it as part of your job to either answer those emails or

12   forward them?

13   A.   That's correct, sir.

14   Q.   And you would accommodate Mr. Chambers' request if you were

15   able or if you felt it appropriate?

16   A.   Correct.

17   Q.   And if you felt it appropriate for another individual at

18   the License Division to accommodate his request, you would

19   forward it to that individual?

20   A.   Correct.

21   Q.   That was part of your job, correct?

22   A.   That's correct.

23   Q.   Mr. Chambers was there, or you were aware prior to your

24   changing of policies that Mr. Chambers was at the License

25   Division quite often, correct?

1    A.   Yes.

2    Q.   And had a lot of cases?

3    A.   That's correct, sir.

4    Q.   You testified yesterday that he was very professional and

5    polite?

6    A.   Yes, sir.  To this day, he is.

7    Q.   And you have a good relationship with Mr. Chambers,

8    correct?

9    A.   I guess, yes, yes.

10   Q.   Now, the first meeting, you testified your first meeting

11   with John Chambers in May or June of 2016, when you took over

12   in the wake of the Lichtenstein-Villanueva gun permit scandal,

13   in your first meeting you told him that if he wants, if he has

14   any concerns about cases, that he should tell me he has

15   concerns and just email you, correct?

16        And you viewed that as part of your job?

17   A.   That's correct.

18        (Off-the-record discussion)

19   BY MR. STAVIS:

20   Q.   I am showing you, Inspector, an email exchange marked

21   Defense Exhibit J for the purposes of identification and ask

22   you to take a look at that.

23   A.   Okay.  (Pause)

24   Q.   Inspector, is that an email exchange that involves John

25   Chambers, someone named Iqbal and yourself?

1    A.  That's correct, sir.

2         MR. STAVIS:  At this time, I would offer what has been

3    previously marked as Defense Exhibit J for the purposes of

4    identification into evidence as Defense Exhibit J.

5         MR. ROSSMILLER:  No objection, your Honor.

6         THE COURT:  Defense Exhibit J is received in evidence,

7    and you may publish it.

8         (Defendant's Exhibit J received in evidence)

9    BY MR. STAVIS:

10   Q.  Now, this email exchange is dated -- starts off on March

11   10th of 2017, correct?

12   A.  That's correct, sir.

13   Q.  And you have just testified that after your meeting with

14   Mr. Chambers, you had an open line of email communication,

15   sometimes you forwarded the emails and sometimes you answered

16   them, correct?

17   A.  That's correct, sir.

18   Q.  And this one, Mr. Chambers is writing to you about his

19   renewals, correct?

20   A.  That's correct, sir.

21   Q.  He says good afternoon.  I have submitted renewal

22   applications on the following individuals, and they take much

23   longer than they have been taking.  I have instructed my

24   clients to lock up their registered handguns after their CB or

25   LC license is expired and be patient.  Here are the names and

1   dates brought down to HQ.  Thank you, thanks very much, hope

2   all is well, John Chambers, correct?

3   A.  That's correct, sir.

4   Q.  And when you received that email, a short time later you

5   forwarded it to somebody named Assif Iqbal, and Linda Sarapika

6   and Christopher Gonzalez.  Who are Iqbal, Sarapika and

7   Gonzalez?

8   A.  Iqbal is executive officer of the License Division, Linda

9   Sarapika and Christopher Gonzalez are the supervisors that deal

10  with the renewal application, processing them.

11  Q.  You say FYI, so you wanted them to look into the requests

12  that John Chambers was making of you in March 2017, correct?

13  A.  That's correct.

14  Q.  This is one of the examples where, instead of answering it,

15  you forwarded it to the people who might be able to assist John

16  Chambers with his License Division issues?

17  A.  Yes.

18  Q.  Then Captain Iqbal gave you the status of each of the

19  individuals that Mr. Chambers had inquired about?

20  A.  That's correct.

21  Q.  And then you forwarded those answers back to Mr. Chambers?

22  A.  That's correct, sir.

23  Q.  You testified yesterday, at Page 97, you said obviously he

24  was right about one thing, there was a lot of stale cases.  Do

25  you recall that testimony yesterday?

1    A.   That's correct, sir.

2    Q.   And so you were trying to make the stale -- I was going to

3    say expedite -- you were trying to make the stale cases go in a

4    normal channel, at a normal speed?

5    A.   I was inquiring about it, yes.

6    Q.   Now, you testified yesterday, at pages 90 and 91 of the

7    record, about that first meeting with Mr. Chambers in May or

8    June of 2016 after you took over the police License Division in

9    the wake of the Lichtenstein-Villanueva gun permit scandal,

10   correct?

11   A.   Yes.

12   Q.   One of the things that day was Mr. Chambers -- this is your

13   testimony -- told you that the previous commanding officer, not

14   the immediate commanding officer, I think we're talking about

15   Deputy Inspector Endall?

16   A.   That's correct, sir.

17   Q.   Would issue renewals of licenses basically on the spot?

18   A.   That's correct.

19   Q.   So these are people who already have licenses?  A license

20   lasts three years?

21   A.   That's correct, sir.

22   Q.   So these people already have licenses, they've already gone

23   through the investigatory process and they have no incidents?

24   A.   Correct.

25   Q.   But they have to renew, and there is a certain process, but

1  the process between Mr. Chambers, when Deputy Inspector Endall

2  was the commanding officer, was that Mr. Chambers would just

3  give him the renewal, sign off on it and send him to the other

4  area of the License Division or the NYPD to get the renewals

5  immediately, correct?

6  A.  He stated this is the agreement he had.

7  Q.  Yes.

8  A.  That was not the actual process of it.

9  Q.  The process is different.  This was what happened before

10  you took over?

11  A.  Correct.

12  Q.  You said you wouldn't do that, there would be no favoritism

13  with you, correct?

14  A.  Correct, yes.

15  Q.  But you did tell him that you might be able to see to it in

16  the ordinary course that his renewals are processed within two

17  weeks.  Is that correct?

18  A.  Two weeks?

19  Q.  Yes.

20  A.  I didn't say that.

21  Q.  How many weeks did you say?

22  A.  I didn't give a timeline.

23  Q.  Okay.  But you did your best on some of the stale cases to

24  see that Mr. Chambers' license issues were --

25  A.  As you looked at the last exhibit, it shows the reasons why

1    those cases -- those are renewal applications.  They're

2    different than the regular new applications for the process.

3            You can see there was reasons why those cases weren't

4    processed.  It was missing documents.  So that is why those --

5    if the case is not completed, I am a not going to -- and the

6    onus is on the licensee to get that information, I my policy is

7    not to expedite anything.

8    Q.  Correct.  Everything had to go according to the --

9    A.  Correct.

10   Q.  -- procedures and no one was going to be treated more

11   favorably?

12   A.  Correct, and everything has to go to liaison supervision,

13   the Sergeant in renewal section, they review it and it comes to

14   me and I'll sign off on it.

15   Q.  But if something was stale and it should have been signed

16   off on earlier, you would assign it to the person or the party

17   at the License Division that could see that everything, the

18   procedures were corrected and whatever would be the decision

19   would be made in due course?

20   A.  Correct, sir.

21   Q.  Following Mr. Chambers' arrest in April of 2017, you

22   continued to speak to him.  Is that correct?

23   A.  We had, after he got indicted, we still exchanged emails on

24   inquiries he had, but we did have a conversation on the phone.

25   I believe this was probably our last conversation because

I4HJCHA2                      Barreto - Redirect

1    obviously he is still, he was still allowed to practice his

2    profession.

3    Q.   Yes.

4    A.   So I was totally against him representing his clients in

5    the same office where these accusations were made against him.

6            After speaking to my immediate supervisors, we had a

7    conference call with Mr. Chambers, myself, Mr. Chambers,

8    Director David, and we came up with an agreement to have him

9    continue representing his clients but in a different venue than

10   1 Police Headquarters and the venue was 2 Lafayette, and he

11   could continue to represent his clients.

12   Q.   In matters before the New York City Police Department

13   License Division?

14   A.   Yes.

15   Q.   And he is still representing clients before the New York

16   City Police Department License Division today.  Is that

17   correct?

18   A.   That's correct, sir.

19            MR. STAVIS:  I have no further questions, your Honor.

20            THE COURT:  Redirect examination, Mr. Rossmiller?

21            MR. ROSSMILLER:  Yes, your Honor.  Just briefly.

22   REDIRECT EXAMINATION

23   BY MR. ROSSMILLER:

24   Q.   Just a few questions, Inspector Barreto.

25   A.   Okay, sir.

1  Q.  Do you recall being asked to list some of the ranks in the

2  NYPD sort of top to bottom, down to sergeant?

3  A.  Yes, sir.

4  Q.  When you listed all those ranks, were there people with all

5  of those ranks in the License Division at once?

6  A.  No.

7  Q.  You were also asked some questions about decisions that

8  were made that were then appealed.  Do you remember those

9  questions?

10  A.  Yes.

11  Q.  Do you remember looking at those documents?

12  A.  Yes.

13  Q.  Without seeing any information about the appeal or the

14  hearing, can you tell why any of those appeal decisions were

15  made?

16  A.  No, I can't tell at all.

17  Q.  You were asked a number of questions about attorneys

18  representing clients at different stages in the License

19  Division.  Do you remember that?

20  A.  Yes.

21  Q.  Is it right that attorneys can represent clients really at

22  any stage?

23  A.  Yes.

24  Q.  Is it required for attorneys to represent clients at any

25  particular stage?

1    A.   No.

2    Q.   Do some people go through the process without an attorney?

3    A.   Yes.

4    Q.   Finally, do you remember being asked some questions just a

5    few minutes ago about the scandal that occurred before you

6    joined the License Division?

7    A.   Yes.

8    Q.   Before this morning, had you ever heard that referred to as

9    the Lichtenstein-Villanueva gun permit scandal?

10   A.   Yes, from jargon, from people talking.

11   Q.   Was that scandal listed to just Mr. Lichtenstein and

12   Mr. Villanueva?

13   A.   No.

14   Q.   Without asking you to name everyone that was involved,

15   approximately how many individuals and officers were either

16   arrested, charged, fired or transferred as a result of the

17   overall scandal, would you say?

18   A.   I would say about seven.

19            MR. ROSSMILLER:  Just one moment, your Honor.

20            (Off-the-record discussion)

21            MR. ROSSMILLER:  No further questions.

22            THE COURT:  Any recross?

23            MR. STAVIS:  No, your Honor.

24            THE COURT:  All right.  Inspector Barreto, you're

25   excused as a witness.  You may step down.

I4HJCHA2

1                    (Witness excused)

2                    THE COURT:  Would the government call its next

3      witness.

4                    MR. ROSSMILLER:  At this time, the government would

5      like to read a few stipulations.

6                    THE COURT:  All right.  Members of the jury, remember

7      a stipulation is an agreement among counsel concerning certain

8      matters.  I don't know what we're going to find out in a

9      moment, but you can consider this as evidence in the case.

10                   MR. ROSSMILLER:  Just as a preview, the government

11     will be reading what has been marked as Government Exhibits

12     2001, 2006, 2005, and 2004.

13                   Starting with what has been marked --

14                   THE COURT:  You can just have a seat in the gallery,

15     all right?

16                   MR. ROSSMILLER:  We are trying to keep things

17     efficient, your Honor.

18                   THE COURT:  That is fine.

19                   MR. ROSSMILLER:  Starting with Government Exhibit

20     2001.

21                   THE COURT:  He can remain in the courtroom, but just

22     take a seat in the gallery.  Thank you, sir.

23                   MR. ROSSMILLER:  Starting with government marked as

24     Government Exhibit 2001.

25                   It is hereby stipulated and agreed by and between the

I4HJCHA2

United States of America, by Geoffrey S. Berman, United States

Attorney, Alex Rossmiller and Paul Monteleoni, Assistant United

States Attorneys, of counsel, and John Chambers, the defendant,

by his counsel, Roger L. Stavis, Esquire, Steven L. Brounstein

and Jared Foley, Esquire that:

If called to testify, a qualified and knowledgeable

representative of the New York City Police Department, NYPD,

would testify as follows:

Documents marked as Government Exhibits 601, 602, 603,

604, 605, 606, 607, 608 and 609 are true and correct copies of

files maintained by any NYPD License Division, including files

for the relevant indicated licenses as the files existed in

NYPD License Division records as of in or about 2017 and 2018

and were so stored by the NYPD in the ordinary course of its

business.

Documents marked as Government Exhibits 701, 702, 703,

704, 705, 706, 707, 708, and 709 are true and correct copies of

extracts of electronic data from NYPD License Division

electronic files, including electronic data extracts for the

individuals described in those files as they existed only the

NYPD systems as of in or about 2018 and were so stored by the

NYPD in the ordinary courses of its business.

Documents marked as Government Exhibits 801, 802, 803,

804, 805, 806, 807, 808 and 809 are true and correct copies of

electronic data from the NYPD's automated license processing

I4HJCHA2

system, including ALPS data, for the individuals described in
that data as they exhibited as of in or about 2018 and were so
stored by the NYPD in the ordinary course of its business.

If called to testify, a qualified and knowledgeable
representative of the Nassau County Police Department, NCPD,
would testify as follows:

Documents marked as Government Exhibits 901, 902, 903
and 904, are true and correct copies of files made main by NCPD
pistol license section, including files for the relevant
indicated licensees as the files existed in NCPD pistol license
section records as of about in or about 2017 and were so stored
by NCPD in the ordinary course of its business.

Documents marked Government Exhibits 1001, 1002, 1003,
1004 are true and correct copies of extracts of electronic data
from NCPD Pistol License Division electronic files, including
electronic data extracts for the individuals described in those
files as they existed on the NCPD systems as of in or about
2017 and 2018 and were so stored by the NCPD in the ordinary
course of its business.

No party will raise any objection under Federal Rule
of Evidence 802, 901 or 1002 with respect to any exhibit number
set forth above.

It is further stipulated and agreed that this
stipulation marked as Government Exhibit 2001 may be received
in evidence at the trial in the above referenced matter.  The

I4HJCHA2

1   government offers the stipulation itself, Government Exhibit

2   2001.

3          MR. STAVIS:  No objection.

4          THE COURT:  All right.  Government Exhibit 2001 is

5   received in evidence.

6          (Government's Exhibit 2001 received in evidence)

7          MR. ROSSMILLER:  Pursuant to that stipulation, the

8   government offers Government Exhibits 601, 603 and its subsets,

9   604 and its subsets, 605, 606 and its subsets, 607 and its

10  subsets, 608 and its subsets, 609 and its subsets.

11         MR. STAVIS:  No objection, your Honor.

12         THE COURT:  All right.  Government Exhibits 601, 603

13  and its subsets, 604 and its subsets, 605, 606 and its subsets,

14  607 and its subsets, 608 and its subsets, and 609 and its

15  subsets are received in evidence.

16         (Government's Exhibits 601, 603, 604, 605, 606, 607,

17  608 and 609 received in evidence)

18         MR. ROSSMILLER:  Turning to what is marked as

19  Government Exhibit 2006, which reads:

20         It is hereby stipulated and agreed by and between the

21  United States of America, by Geoffrey S. Berman, United States

22  Attorney, Alex Rossmiller and Paul Monteleoni, Assistant United

23  States Attorneys, of counsel, and John Chambers, the defendant,

24  by his counsel, Roger L. Stavis, Esquire, Steven L. Brounstein,

25  Esquire and Jared Foley, Esquire, that:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4HJCHA2

1          If called to testify, a qualified and knowledgeable

2     representative of Yahoo would represent as follows:

3          Documents marked with a control number within the

4     ranges of Chambers 016336 through Chambers 017336, and Chambers

5     022454 through Chambers 023392, consist of true and correct

6     copies of data from Yahoo, including emails and attachments to

7     emails associated with the email accounts

8     jurisdoctorjsc@yahoo.com.  J-U-R-I-S, D-O-C-T-O-R, JSC at Yahoo

9     dot-com, and proudly patriotic, as they existed on Yahoo's

10    systems.  The subscriber records of email accounts

11    jurisdoctorjsc@yahoo.com and proudlypatriotic@yahoo.com reflect

12    those email address were each registered using the name John

13    Chambers.

14         Documents marked with the control number Chambers

15    017744 consist of true and correct copies of data from Yahoo,

16    including emails and attachments to emails associated with the

17    email account wafer74@yahoo.com as they existed on Yahoo

18    systems.  The subscriber records of email account

19    wafer74@yahoo.com reflect it was registered using the name

20    David Villanueva.

21         If called to testify, a qualified and knowledgeable

22    representative of Google would testify as follows:  The

23    documents marked with a control number within the range of

24    Chambers 015223 through Chambers 015224, consist of true and

25    correct copies of data from Google, including emails and

I4HJCHA2

attachments to emails associated with the email account

Villanueva David 1 at Gmail dot com as they existed on Google

systems.  The subscriber records of e-mail account Villanueva

David 1 at Gmail dot com reflect it was registered using the

name David Villanueva.

If called to testify, a qualified and knowledgeable

representative of the New York City Police Department, NYPD,

would testify as follows:

Documents marked with a control number Chambers

OOO058, and within the range of Chambers 015190 through

Chambers 015222, consist of true and correct copies of data

from the NYPD, including emails and attachments to emails

associated with email accounts used by members of the NYPD.

Government Exhibits 401 through 404, 416 through 442

and 424 through 467 consist of certain emails and attachments

from the documents marked with a control numbers set forth

above.  No party will raise any objections under Federal Rule

of Evidence 901 or 1002 with respect to any exhibit containing

a control number within the ranges set forth above.

Additionally, no party will raise any objection under

Federal Rule of Evidence 802, 901 or 1002 with respect to

Government Exhibits 401 through 414, 416 through 422 and 424

through 467.

It is further stipulated and agreed that this

stipulation marked as Government Exhibit 2006 may be received

I4HJCHA2

1    in evidence at the trial in the above referenced matter.  Your

2    Honor, the government offers this government exhibit, 2006.

3              THE COURT:  Any objection?

4              MR. STAVIS:  No objection.

5              THE COURT:  Government Exhibit 2006 is received in

6    evidence.

7              (Government's Exhibit 2006 received in evidence)

8              MR. ROSSMILLER:  The government asks permission to put

9    the stipulations up on the screen as I read them.  I should

10   have asked that before.

11             THE COURT:  You may.

12             MR. ROSSMILLER:  Pursuant to Government Exhibit 2006,

13   the government offers what have been marked as Government

14   Exhibits 301 through and including 350, 403 and 404, 408

15   through 414, 416, 419 through 421, 425 and -- sorry -- 424 and

16   425, 427, 430 through 438, 440 through 458, 460 and 61, 463

17   through 467.

18             THE COURT:  Any objection?

19             MR. STAVIS:  No objection.

20             THE COURT:  Government Exhibits 301 through and

21   including 350, 403 and 404, 408 through 414, 416, 419 through

22   421, 424 and 425, 427, 430 through 438, 440 through 458, 460

23   and 61, 463 through 467 are received in evidence.

24             (Government's Exhibits 350, 403-404, 408-414 received

25   in evidence)

I4HJCHA2

1            (Government's Exhibits 416, 419-421, 424-425, 427

2      received in evidence)

3            (Government Exhibits 430-438, 440-458, 460-461,

4      463-467 received in evidence)

5            MR. ROSSMILLER:  Moving on to two shorter

6      stipulations, if we could please put up Government Exhibit

7      2005.  Government Exhibit 2005 reads:

8            If called to testify, qualified and knowledgeable

9      representatives of the United States Attorney's Office and the

10     Federal Bureau of Investigation, respectively, would testify as

11     follows:

12           Documents marked with a control number within the

13     range of Chambers OOO112 and Chambers OO8457 consist of a true

14     and correct copy of a report that accurately reflects and

15     contains the downloaded contents of an Apple iPhone 5 smart

16     phone recovered from and previously owned and used by David

17     Villanueva.  The Villanueva phone report.

18           Government Exhibits 201, 202, 203, 204 and 205, are

19     portions of the Villanueva phone report.  No party will raise

20     any objections under Federal Rule of Evidence 901 or 1002 with

21     respect to any exhibit containing a control number within the

22     range set forth under Paragraph 1 or any objections under

23     Federal Rule of Evidence 802 with respect to the empty a data

24     set forth in any such exhibit.

25           Additionally, no party will raise any objection under

I4HJCHA2

1    Federal Rule of Evidence 802, 901 or 1002 with respect to

2    Government Exhibits 201, 202, 203, 204 and 205.  It is further

3    stipulated and agreed that this stipulation marked as

4    Government Exhibit 2005 may be received in evidence at the

5    trial in the above referenced matter.  The government offers

6    what has been marked as Government Exhibit 2005.

7              THE COURT:  Any objection?

8              MR. STAVIS:  No objection.

9              THE COURT:  Government Exhibit 2005 is received in

10   evidence.

11             (Government's Exhibit 2005 received in evidence)

12             MR. ROSSMILLER:  Pursuant to that exhibit, your Honor,

13   the government offers Government Exhibits 201, 202, 203, 204

14   and 205.

15             MR. STAVIS:  No objection, your Honor.

16             THE COURT:  Government Exhibits 201, 202, 203 and 204

17   and 205 are also received in evidence.

18             (Government's Exhibits 201-205 received in evidence)

19             MR. ROSSMILLER:  Our final stipulation for the moment,

20   your Honor, is marked as Government Exhibit 2004.  It reads:

21   If called to testify, a qualified and knowledgeable witness

22   would testify as follows:

23             Documents marked as Government Exhibit 1201 are a true

24   and correct list of clients represented by John Chambers, the

25   defendant, in connection with gun license matters in the years

I4HJCHA2

1    2010 through 2017 as provided by the law offices of John S.

2    Chambers pursuant to lawfully issued subpoena.  Documents

3    marked as Government Exhibit 1202 are true and correct copies

4    of the publicly accessible content of the web site of the law

5    offices of John S. Chambers as the web site existed in or about

6    November 2017.  No party will raise any objection under Federal

7    Rule of Evidence 802, 901 or 1002 with respect to government

8    exhibits 1201 and 1202.

9              It is further stipulated and agreed that this

10   stipulation marked as Government Exhibit 2004 may be received

11   in evidence at the trial in the above-referenced matter and the

12   government offers Government Exhibit 2004.

13             MR. STAVIS:  No objection.

14             THE COURT:  Government Exhibit 2004 is received in

15   evidence.

16             (Government's Exhibit 2004 received in evidence)

17             MR. ROSSMILLER:  Pursuant to Government Exhibit 2004,

18   the government also offers what has been marked as Government

19   Exhibits 1201 and 1202.

20             MR. STAVIS:  No objection.

21             THE COURT:  Government exhibits 1201 and 1202 are

22   received in evidence.

23             (Government's Exhibits 1201 and 1202 received in

24   evidence)

25             MR. MONTELEONI:  The government calls Special Agent

1    Bard Hubbard.

2     BARD HUBBARD,

3          called as a witness by the government,

4          having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. MONTELEONI:

7    Q.  Good morning.  Are you currently employed?

8    A.  I am.

9    Q.  Where do you work?

10   A.  Federal Bureau of Investigation.

11   Q.  What is your title at the FBI?

12   A.  Special agent.

13   Q.  How long have you been at the FBI?

14   A.  Approximately 9 years.

15   Q.  What did you do before the FBI?

16   A.  I was a pilot for the United States Navy.

17   Q.  How long were you a pilot for the US Navy?

18   A.  Nine years.

19   Q.  What was your first long-term assignment at the FBI?

20   A.  My first long-term assignment was as a surveillance pilot

21   for the FBI.

22   Q.  How long did you do that?

23   A.  Three and a half years.

24   Q.  What is your current assignment in the FBI?

25   A.  I work on a squad designated C4 that focuses on public

1   corruption.

2   Q.   How long have you been assigned to Squad C4 at the FBI?

3   A.   Approximately four years.

4   Q.   Have you ever heard of an individual named John Chambers?

5   A.   Yes.

6   Q.   Have you participated in an investigation involving John

7   Chambers?

8   A.   I have.

9   Q.   What is John Chambers' line of work?

10  A.   He is an attorney.

11  Q.   What is the nature of his practice?

12  A.   He focuses on clients that have needs regarding pistol

13  licenses, whether they are first-time applicants, renewals,

14  incidents, that kind of thing.

15  Q.   Have you ever heard of an individual named Dave Villanueva?

16  A.   I have.

17  Q.   In the approximately 2010 to 2015 time period, where did

18  David Villanueva work?

19  A.   New York Police Department, License Division.

20  Q.   Have you participated in an investigation involving David

21  Villanueva?

22  A.   I have.

23  Q.   What was the outcome of the investigation into Villanueva?

24  A.   We found that he was suspected of bribery, and he pled

25  guilty to those charges.

I4HJCHA2                         Hubbard - Direct

1    Q.   Did he plead guilty pursuant to a cooperation agreement

2    with the government?

3    A.   He did.

4    Q.   Since he began to cooperate with the government, about how

5    much contact have you had with Mr. Villanueva?

6    A.   I would average approximately once a month.

7    Q.   Do you have that contact in person?

8    A.   Yes.

9    Q.   When you met with him, has he ever provided you with

10   anything?

11   A.   He has.

12   Q.   What did you do with the things that he provided?

13   A.   I took the items that he provided to us and brought them

14   back to the office and submitted into evidence.

15   Q.   In connection with your investigations of Villanueva and

16   Chambers, did you review files from the NYPD licensing

17   division?

18   A.   I did.

19        MR. MONTELEONI:   Now, I'd like to show you in your

20   binder and ask Ms. Bustillo to show you and opposing counsel

21   the document that is actually in evidence as Government Exhibit

22   608-2.

23        Your Honor may we publish to the jury as well?

24        THE COURT:   You may, Mr. Monteleoni.

25        (Pause)

I4HJCHA2                         Hubbard - Direct

1    BY MR. MONTELEONI:

2    Q.   Looking at the first page of Government Exhibit 608-2, this

3    document is on letterhead.  Could you please read the

4    letterhead starting from the words Police Department.

5    A.   Police Department License Division Incident Section, 1

6    Police Plaza, Room 110-A, New York, New York, 100038.

7    Q.   Who is this document addressed to in the first line of the

8    first paragraph?

9    A.   Edward Ticheli.

10             MR. MONTELEONI:  Ms. Bustillo, could you show a little

11   more of the page, just the top half of the page, please.

12   BY MR. MONTELEONI:

13   Q.   Special Agent Hubbard, what is the title of this document?

14   A.   The title is, "Notice of Determination."

15   Q.   What is the subtitle?

16   A.   Subtitle states, "Interim determination to suspend during

17   investigation."

18   Q.   Could you please read the first sentence of the letter

19   starting with Dear Edward Ticheli?

20   A.   Dear Edward Ticheli:  In accordance with 38 RCNY Section

21   5-30 and 38 RCNY Section 3-05, this letter is to advise you

22   that your carry business, premise business, premise residence,

23   handgun license and rifle shot gun permit are suspended.  These

24   are temporary suspensions while the circumstances surrounding

25   the following incidents are investigated.  You were involved in

1    a domestic incident that occurred in Manhattan on August 11,

2    2012 and you failed to notify the License Division of this

3    incident.

4    Q.   Turning to the second page, the bottom half of the second

5    page, could you please read the directives starting you are

6    hereby directed and the first numbered item.

7    A.   "You are hereby directed to immediately surrender all

8    firearms at your local precinct."

9    Q.   Turning back to the first page, what is the date on this

10   letter?

11   A.   The date is April 15th, 2013.

12   Q.   So I'd like to show you Government Exhibit 608-6.  So

13   directing your attention to the center top of the page, what is

14   the title of this page?

15   A.   "NYPD Domestic Incident Report."

16   Q.   Directing your attention to the box beneath the title

17   saying date of occur, what is the date of occur?

18   A.   Date of occur, August 11, 2012.

19   Q.   Is that the date of the alleged domestic incident described

20   in 6082 that we just looked at?

21   A.   They're the same date.

22   Q.   A little further down the page, who does Government Exhibit

23   608-6 list in the second half of the page as the suspect?

24   A.   Suspect is Edward Ticheli.

25   Q.   Turning your attention to the second page, directing your

I4HJCHA2                          Hubbard - Direct

attention to the field that is called results of investigation

and basis of action taken, in the first sentence where it says

TPO, are you familiar with the acronym TPO?

A.   I am.

Q.   What does TPO stand for?

A.   Time place occurrence.

Q.   Are you familiar with the acronym CV?

A.   Yes.

Q.   What does CV mean?

A.   Complainant victim.

Q.   Is characterizing someone as a complainant victim saying

what they're saying is necessarily true?

A.   No.

Q.   Could you please read the narrative of the results of

investigation and basis of action taken.

A.   At TPO, CV states she is going through a divorce with her

husband there.  There has been verbal disputes where she has

felt in fear for her safety.  CV also states he has threatened

to hit her when he is angry.  CV also states he does have two

guns at location, UT does have carry handgun permit, License

No. 2009OO477.  No injuries being reported at this time.  Def

took guns with him upstate to his other home.

Q.   I would like to somehow Government Exhibit 608-5.

         On the first page could you please read who this fax

cover sheet is directed to who is the person transmitted to

I4HJCHA2                          Hubbard - Direct

1    listed?

2    A.  Transmitted to Sergeant David Villanueva.

3    Q.  Who does it say it is from?

4    A.  From the law officers of John S. Chambers.

5    Q.  What is the re line?

6    A.  Regarding Edward Ticheli.

7    Q.  Directing your attention to the second page, who does the

8    letter say it is signed by?

9    A.  Signed by John S. Chambers, Esquire.

10   Q.  Directing your attention to the letterhead at the top, can

11   you please read the name and the address of the letterhead.

12   A.  The letterhead states John S. Chambers, attorney at law, 89

13   5th Avenue, Suite 801, New York, New York, 10003.

14   Q.  Directing your attention to the bottom of the page, below

15   the signature line, in the bottom-left corner, could you please

16   read the address after the word email.

17   A.  Address states juris doctor JSC at Yahoo dot com.

18   Q.  What is a juris doctor?

19   A.  That is a lawyer.

20   Q.  What are John Chambers' initials?

21   A.  JSC.

22   Q.  In connection with the investigation, did the FBI obtain a

23   certain warrant on certain email accounts used by John

24   Chambers?

25   A.  Yes.

I4HJCHA2                         Hubbard - Direct

1    Q.  Have you seen some of the emails obtained pursuant to that

2    search warrant?

3    A.  I have.

4              MR. MONTELEONI:  May we publish other exhibits that

5    have been admitted into evidence pursuant to the stipulations?

6              THE COURT:  Yes, you may.  Identify by exhibit number

7    as you're publishing.

8              MR. MONTELEONI:  Absolutely your Honor.  Ms. Bustillo,

9    if you could publish Government Exhibit 306.  This is a

10   multipage document.  I would like to go to the last page, to

11   the bottom of the email chain.  All right.  So the second to

12   last page, I guess.

13   BY MR. MONTELEONI:

14   Q.  At the bottom of the email chain, the last email, what is

15   the display name of the sender of that email?

16   A.  The display name of sender John Chambers, Esquire.

17   Q.  What is email address?

18   A.  Juris doctor JSC at Yahoo dot com.

19   Q.  How does that compare to the email address on the

20   letterhead weigh just saw?

21   A.  They're the same.

22   Q.  In Government Exhibit 306, what is the display name of the

23   person receiving the first email?

24   A.  Display named Ed Ticheli.

25             MR. MONTELEONI:  Ms. Bustillo, I think you're one

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

I4HJCHA2                          Hubbard - Direct

1    email up.

2    BY MR. MONTELEONI:

3    Q.  What is the email address of the recipient of the first

4    email?

5    A.  Ed Ticheli at AOL dot com.

6    Q.  What is the subject line of the email that the user with

7    display name John Chambers, Esquire is sending?

8    A.  Waiting photos.

9    Q.  Is there any text in the body apart from the signature?

10   A.  There is not.

11   Q.  When was this sent?

12   A.  May 30, 2013.

13   Q.  What time?

14   A.  2:10 pm.

15   Q.  When is this email from the John Chambers, Esquire using to

16   the Ed Ticheli user in comparison to Government Exhibit 608-2,

17   the License Division letter to Edward Ticheli, notifying him

18   his licenses were suspended?

19   A.  The notification of suspension occurred approximately one

20   and a half months prior to the email.

21   Q.  So now in Government Exhibit 306, going to the next email

22   up in the chain, who is the sender of that next email up?

23   A.  Ed Ticheli at AOL dot com.

24   Q.  Could you please read the body text of that reply.

25   A.  Body text read:  Sorry, Johnny.  We just got our shipment

1    and I am settling W my wife today.  On their way in a few.

2    You're the best, ed.  I really value your friendship for these

3    years.

4    Q.  Now skipping up past the next email to the one in the

5    middle of this page, the 3:22 pm email, what is the address is

6    the 3:22 email from?

7    A.  Ed Ticheli at AOL dot com.

8    Q.  Who is it to?

9    A.  Juris doctor JSC at Yahoo dot com.

10   Q.  Please read the body of this email.

11   A.  I have three nice steel ones coming.  They're large watches

12   ranging from 5300 to 8500.  They're handsome and nice looking.

13   Please see.  They're large, nice men's watches.

14   Q.  Going up to the next response at 3:30 pm on the preceding

15   page, which user sends the next response?

16   A.  Juris doctor JSC at Yahoo dot com.

17   Q.  Please read the body of this email.

18   A.  "Pictures or can I find them on line with maker and model?"

19   Q.  Going up to the next response, which user is it sent by?

20   A.  Ed Ticheli at AOL dot com.

21   Q.  What does that response say?

22   A.  Coming right now.

23          MR. MONTELEONI:  Ms. Bustillo, if you could publish

24   Government Exhibit 307.

25   BY MR. MONTELEONI:

1    Q.   Special Agent Hubbard, when was Government 307 sent?

2    A.   May 30th, 2013.

3    Q.   What time?

4    A.   At 5:40 pm.

5    Q.   So about when is this email, Government Exhibit 307, sent

6    in relation to Government Exhibit 306, the last email chain we

7    were reviewing?

8    A.   307 was sent approximately two hours after the last email

9    we reviewed.

10   Q.   In 307, what is the display name of the sender?

11   A.   John Chambers.

12   Q.   What is the email of the sender?

13   A.   Proudly patriotic at Yahoo dot com.

14   Q.   What is the BCC, who is BCC to this email?

15   A.   Juris doctor JSC at Yahoo dot com.

16   Q.   What is BCC?

17   A.   That stands for blind carbon copy.  It essentially shields

18   anyone who is on the distribution of this email to see that,

19   can't see who else the email has been sent to.

20   Q.   How does this BCC email addressed to juris doctor JSC at

21   Yahoo dot com compare to the email address that had been

22   corresponding with Ed Ticheli at AOL dot com in the previous

23   email?

24   A.   The same.

25   Q.   In 307, what is the display name of the recipient of the

1    email?

2    A.   David Villanueva.

3    Q.   What is email address linked to David Villanueva?

4    A.   Wafer74@yahoo.com.

5    Q.   What is the subject line of the email?

6    A.   Here is a link to the Paul Picot watch.

7    Q.   Please read the whole email except for the hyperlink inside

8    it?

9    A.   Hi, Dave.  The manner in which it was sent to me.  In that

10   file.  I can't send you the photo of the exact watch, but this

11   is the model, stunning.  Should have it in hand tomorrow.

12   John.

13   Q.   Are there attachments to the email?

14   A.   Yes.

15         MR. MONTELEONI:  Ms. Bustillo, could you please show

16   the witness each of these at attachments in order.

17   BY MR. MONTELEONI:

18   Q.   Going back to the first attachment, Special Agent Hubbard,

19   have you ever seen a watch that looks like that?

20   A.   Yes.

21   Q.   Showing you the item that has been marked for

22   identification as Government Exhibit 101, have you ever seen

23   this item before?

24   A.   I have.

25   Q.   Where did you first see it?

I4HJCHA2                        Hubbard - Direct

1   A.  Mr. Villanueva provided it to us.

2   Q.  When did he do that?

3   A.  After he became a cooperator for the government.

4   Q.  What did you do with it when he provided it to you?

5   A.  I took it back to the office to put it into evidence.

6            MR. MONTELEONI:  At this time we offer Government

7   Exhibit 101 as well as Government Exhibit 101-1 through 11

8   which are photos of 101 in evidence.

9            MR. STAVIS:  May I see the exhibit.

10           THE COURT:  Show the exhibit to counsel, Mr.

11  Monteleoni.

12           (Pause)

13           MR. STAVIS:  I have no objection, your Honor.

14           THE COURT:  Government Exhibit 101 and 101-1 through

15  101-11 are received in evidence.

16           (Government's Exhibits 101 and 101-1 through 101-11

17  received in evidence)

18           MR. MONTELEONI:  Ms. Bustillo if you could publish to

19  the jury Government Exhibit 101-6.

20  BY MR. MONTELEONI:

21  Q.  So Special Agent Hubbard, Government 101 is a box.  Could

22  you open the box, please.

23  A.  (Pause)

24  Q.  Could you show the jury what is inside the inner box.

25  A.  (Pause)

1   Q.   So there is a watch in that box.  Was the watch in that box

2   when Villanueva gave it to you?

3   A.   Yes.

4   Q.   Directing your attention to the watch that's part of

5   Government Exhibit 101, could you please compare it to the, I

6   guess the first photograph in the attachment to Government

7   Exhibit 307, the email from the user display name John Chambers

8   with the user displayed name David Villanueva.

9          MR. MONTELEONI:  Ms. Bustillo if you could publish

10   again the first attachment to Government Exhibit 307.

11   BY MR. MONTELEONI:

12   Q.   Approximately how do they compare?

13   A.   Very similar.

14   Q.   Can you tell the manufacturer of the watch?

15   A.   Yes.

16   Q.   What is the manufacturer of the watch that is contained

17   within Government Exhibit 101?

18   A.   Paul Picot.

19   Q.   How does the condition of that physical watch now compare

20   with the condition of the watch when Villanueva gave it to you?

21   A.   The same.

22   Q.   Could you please take it out from the box and take it out

23   from the pillow, this blue plastic on the watch buckle and

24   various tags on it.  Were those there when Villanueva gave it

25   to you?

I4HJCHA2                          Hubbard - Direct

1    A.  Yes.

2             MR. MONTELEONI:  Now, Ms. Bustillo, if you could

3    publish Government Exhibit 101-7.

4    BY MR. MONTELEONI:

5    Q.  Special Agent Hubbard, I would like to direct your

6    attention to the tag right next to the buckle of Government

7    Exhibit 101.  There is a bar code on one side.  Could you

8    please read the number on under the bar code?

9    A.  8500.OO.

10   Q.  Now, turning for a moment back to Government Exhibit 306,

11   on the second page, looking at the 3:22 pm email from Ed

12   Ticheli at AOL dot com to juris doctor JSC at Yahoo dot com,

13   could you please read the first three lines of that email.

14   A.  "I have three nice steel ones coming.  They're large

15   watches ranging from 5300 to 8500."

16   Q.  Now, turning to Government Exhibit 308, which is an email

17   thread, which email address is this thread between?

18   A.  Juris doctor JSC at Yahoo dot com and Ed Ticheli at AOL dot

19   com.

20   Q.  Going back from, the first email sent in the thread

21   chronologically, who sent that?  What is the email address of

22   the sender?

23   A.  Juris doctor JSC at Yahoo dot com.

24   Q.  When was that one sent?

25   A.  May 30, 2013.

I4HJCHA2                          Hubbard - Direct

1    Q.  At what time?

2    A.  6:10 pm.

3    Q.  When is that time in relation to the sending of Government

4    Exhibit 307, the email sending the pictures of the watch?

5    A.  The email sending the watch occurred less than an hour

6    before the email that you're presenting now.

7    Q.  So returning to the email being presented now, what does

8    this bottom email in Government Exhibit 308 say?

9    A.  It states, "We are looking good for next week.  What time

10   can I expect you tomorrow?"

11   Q.  Now, going to the next reply in the chain, who send the

12   next message?

13   A.  Ed Ticheli at AOL dot com.

14   Q.  Please read that reply.

15   A.  "Please tell me which watch.  Also I am lawyer's now

16   settling.  Can I please let you know when I finish.  I am alone

17   at work tomorrow."

18   Q.  Now on the next message up, could you please read the reply

19   sent by juris doctor JSC at Yahoo dot com.  That reply overlaps

20   two pages, so if we can start with the first page of that

21   reply.

22   A.  "Yes, that's fine.  I just want to make sure we see each

23   other tomorrow and settle up.  I spent a great deal of time

24   today mending fences, making sure next week would be a go.

25   With two guns to stay on your carry as well.

I4HJCHA2                         Hubbard - Direct

1                    (Continued on next page)

I4hWcha3                         Hubbard - Direct

1    Q.  And --

2    A.  Sorry.

3        "It's the classic 42MM, the one in the middle, the second

4    watch.  Two tone with the 5 diamonds."

5    Q.  Now, returning to the watch contained in Government Exhibit

6    101 --

7            MR. MONTELEONI:  And Ms. Bustillo, you could publish

8    Government Exhibit 101-6.

9    Q.  -- apart from the medal, how many colors are on the watch

10   face?

11   A.  Two.

12   Q.  Do you see any things that look like diamonds on the watch?

13   A.  I do.

14   Q.  How many?

15   A.  Five.

16   Q.  Now, returning to Government Exhibit 308, could you please

17   read edticheli@aol.com's response on the second page in the

18   9:53 p.m. email, from the beginning down to the smiley symbol?

19   A.  "I knew you would like that one.  It's so cool.  I just got

20   home.  Everything is done.  Let's email in the a.m. and will

21   tell you.  I will deliver watch and $$ sign but will need to

22   ship you box and papers as I just got my shipment."  Smiley

23   face.

24   Q.  Showing you Government Exhibit 311, it's a multipage

25   document.  If you can just flip through until you can answer

I4hWcha3                          Hubbard - Direct

1    whether this is a different portion of the same email thread.

2    A.  It is.

3    Q.  All right.  Directing your attention to the third page, on

4    the May 31, 2013, 10:15 a.m. email in the thread, who is it

5    from?

6    A.  Edticheli@aol.com.

7    Q.  Could you please read it?

8    A.  "OK, great.  And about when do you think?  Also, will

9    Darren give me back?  Thanks.  Ed."

10   Q.  Directing your attention to the next email in the thread,

11   the 10:18 a.m. email, who is that from?

12   A.  Jurisdoctorjsc@yahoo.com.

13   Q.  Could you please read just the first paragraph?

14   A.  "Yes, it will be done next week.  Darren can only give them

15   back to you when I give you your LIC back as well as two

16   purchase authorizations for the two carry guns."

17   Q.  Do you know of anyone named Darren associated with the gun

18   business.

19   A.  I do.

20   Q.  Who is the Darren associated with the gun business you

21   know?

22   A.  Yeah, he works at a gun range called Westside Pistol & Gun

23   or Gun & Pistol.

24   Q.  Returning to the email, could you please read the second

25   paragraph of the 10:18 p.m. email?

I4hWcha3                          Hubbard - Direct

1   A.   "When do you think you would have the box/papers for the

2   watch?  It's not pre-owned, right?"

3   Q.   I apologize.  I interrupted your answer just to correct my

4   question.  I called it a 10:15 p.m. email.  It's a 10:15 a.m.

5   email.

6       All right.  Now, going to the next email in the chain, what

7   is edticheli@aol.com's response?

8   A.   The response from edticheli@aol.com:  "Brand-new within a

9   week on box and papers.  Do I have to go to gun inspection

10  again?  Ugh.  Thanks.  Ed."

11  Q.   Now, going up to the 1:03 p.m. email in the chain, who

12  sends that?

13  A.   Edticheli@aol.com.

14  Q.   What date was that sent, by the way?

15  A.   May 31, 2013.

16  Q.   And when is that date in relation to the date of Government

17  Exhibit 307, the email in which the Chambers user sends the

18  Villanueva user the pictures of the watch?

19  A.   That would be the next day.

20  Q.   Could you please read the 1:03 p.m. email in Government

21  Exhibit 311?

22  A.   "Rio is dropping off boxes til around 3-ish.  Then his next

23  stop is you.  W watch and 2, 2 for you.  And 2 got me ASAP.  I

24  just made my deposit from LV show and am doing the big watch

25  deal today.  Need you, please."

I4hWcha3                          Hubbard - Direct

1    Q.  Going to the most recent email in the thread, could you

2    please read the response from jurisdoctorjsc@yahoo.com?

3    A.  "I know, and when I get watch in hand, I'm going to let

4    'them' know a light reminder about next week."

5    Q.  Are there any words in that email in quotation marks?

6    A.  Yes.

7    Q.  Which word?

8    A.  "Them."

9    Q.  Now, showing you Government Exhibit 322, directing your

10   attention on the first page to the May 31, 2013, 1:40 p.m.

11   email, who sent that email?

12   A.  Jurisdoctorjsc@yahoo.com.

13   Q.  Could you please read that email?

14   A.  "Possible to have the box and papers by the end of the

15   week?  Can that be expedited?  Don't want to give the watch

16   without them.  I think it makes the watch look that much richer

17   with box and papers, don't you?"

18   Q.  Showing you Government Exhibit 318, what is the date and

19   time of the most recent message in the thread?

20   A.  May 31, 2013, at 4:08 p.m.

21   Q.  About when is that in relation to the message we just

22   looked at?

23   A.  That message is roughly half an hour prior to the message

24   we just read.

25   Q.  Sorry.  The --

1    A.  I'm sorry.

2    Q.  Going back to Government Exhibit 322, the request for box

3    and paper is not the last email in the thread.  The "request

4    for box and papers" email that we just read, what time was that

5    sent?

6    A.  That was May 31, 2013, at 1:40 p.m.

7    Q.  That's in Government Exhibit 322, right?

8    A.  Yes.

9    Q.  All right.  When is the email in Government Exhibit 318?

10   A.  That email is May 31, 2013, at 4:08 p.m.

11   Q.  All right.  What user is sending this email?

12   A.  In 322?

13   Q.  Sorry.  In 318.

14   A.  That would be jurisdoctorjsc@yahoo.com.

15   Q.  To which user?

16   A.  To edticheli@aol.com.

17   Q.  Could you please read the email?

18   A.  "Looks good.  Text and sent photo of watch.  He loves it.

19   Looking like we are on the right road.  BTW, did you tell me

20   how fast you can get the box and papers?"

21   Q.  Showing you Government Exhibit 320, turning to the first

22   page, in the second email down, the May 31, 2013, 4:20 p.m.

23   email in the thread, who sent it?

24   A.  Jurisdoctorjsc@yahoo.com.

25   Q.  And could you please read the second paragraph of that

I4hWcha3                        Hubbard – Direct

1    email?

2    A.  "Yes.  The watch is beautiful and very classy.  Will work

3    wonders to repair the damage done as well as get us on the

4    track we need to be on for you."

5    Q.  And in the final email in the thread, what is the response

6    of edticheli@aol.com?

7    A.  "Thanks."

8    Q.  Showing you Government Exhibit 333, who is this thread

9    between?

10   A.  Edticheli@aol.com and jurisdoctorjsc@yahoo.com.

11   Q.  Going back to the chronologically first email in the

12   thread, who sent that first email?

13   A.  Jurisdoctorjsc@yahoo.com.

14      I'm sorry.  There's more at the bottom I did not see.

15   Q.  Who sent that first one?

16   A.  First one was edticheli@aol.com.

17   Q.  What day did he send that email?

18   A.  June 7, 2013.

19   Q.  When is June 7, 2013, in comparison to the date of

20   Government Exhibit 320, the last email we were just discussing?

21   A.  This email was sent approximately one week later.

22   Q.  What is the subject line of the email that

23   edticheli@aol.com sends in the first email in Government

24   Exhibit 333?

25   A.  "What time should I come by?"

I4hWcha3                        Hubbard - Direct

1    Q.  Now turning to the response, could you please read just the

2    first two lines of the response sent by

3    jurisdoctorjsc@yahoo.com?

4    A.  "Not happening today.  Sergeant couldn't be there.  He was

5    sent out."

6    Q.  What rank did David Villanueva hold in the NYPD in 2013?

7    A.  Sergeant.

8    Q.  In what section of the license division?

9    A.  He was in incidents.

10   Q.  All right.  And turning to the most recent email in the

11   chain, could you please read edticheli@aol.com's response?

12   A.  "You are still in possession of my package Rio dropped,

13   correct?  Thanks.  Ed."

14   Q.  Turning back to Government Exhibit 311, the second email

15   down, what was the name of the person that Ed Ticheli described

16   was coming to visit Chambers?

17   A.  Rio.

18   Q.  Showing you Government Exhibit 339, who is this thread

19   between?

20   A.  Jurisdoctorjsc@yahoo.com and edticheli@aol.com.

21   Q.  And the most recent message in the thread, at the top, who

22   sent that most recent message?

23   A.  Jurisdoctorjsc@yahoo.com.

24   Q.  What's the date of that message?

25   A.  June 11, 2013.

I4hWcha3                    Hubbard - Direct

1    Q.  And at what time?

2    A.  8:53 a.m.

3    Q.  What is the subject line?

4    A.  "Regarding pushing."

5    Q.  Could you please read the message?

6    A.  "If I can only get one gun back immediately, which one?"

7    Q.  Showing you Government Exhibit 344, who is this thread

8    between?

9    A.  Jurisdoctorjsc@yahoo.com and edticheli@aol.com.

10   Q.  Now, turning down to the third page, the 8:59 a.m. email,

11   what date was that sent on?

12   A.  June 11, 2013.

13   Q.  When was this June 11, 2013, 8:59 a.m. email sent in

14   relation to the email that we just read in Government Exhibit

15   339?

16   A.  This email was sent roughly six minutes after.

17   Q.  In this email in Government Exhibit 344, could you please

18   read what edticheli@aol.com wrote?

19   A.  "There were supposed to be two.  That was the deal we made.

20   If I can get one, I will take the Glock.  I need both guns."

21   Q.  Now, directing your attention to the reply by

22   jurisdoctorjsc@yahoo.com, could you first please read just the

23   first sentence of that message?

24   A.  "If we were dealing with the captain, a deal would be 100

25   percent done deal."

I4hWcha3                        Hubbard - Direct

1   Q.  Can you read the remainder of the sentence, until the "deal

2   closed"?

3   A.  "Because it's the sergeant, who is not happy about the way

4   this came down, if you remember.  I am jumping through hoops to

5   even get this deal closed."

6   Q.  And turning to edticheli@aol.com's reply to that message,

7   what is the subject line of that reply?

8   A.  "Regarding deal with NYPD."

9   Q.  Could you please read the entire reply?

10  A.  "We were guaranteed today, two guns, carry.  I did my part.

11  Please advise.  Thanks.  Ed."

12  Q.  Going to the reply by jurisdoctorjsc@yahoo.com, could you

13  please read the first two sentences?

14  A.  "This is the police department you are dealing with, not

15  another jeweler.  Guarantee is not a word used in this

16  parlance."

17  Q.  Showing you Government Exhibit 345, who sent this most

18  recent email?

19  A.  Jurisdoctorjsc@yahoo.com.

20  Q.  To whom?

21  A.  Edticheli@aol.com.

22  Q.  When?

23  A.  June 11, 2013.

24  Q.  At what time?

25  A.  11:55 a.m.

1    Q.  What is the subject line?

2    A.  "Finally."

3    Q.  Could you please read the body?

4    A.  "Get some cash from the back for me, LOL.  Deal done.  Do

5    you want me to take care of inspection and submission of

6    completed POs?  Meaning you do not have to appear at HQ with

7    guns for inspection.  If so, fee is $850 cash.  Plus I expect

8    'tip' that we discussed at your discretion.  This has been the

9    slightest of nightmares.  Plus this is a miracle.  Trust me."

10   Q.  Are any words in quotation marks?

11   A.  Yes.

12   Q.  Which word?

13   A.  "Tip."

14   Q.  Showing you Government Exhibit 347, who is this thread

15   between?

16   A.  Jurisdoctorjsc@yahoo.com and edticheli@aol.com.

17   Q.  Going down to the bottom, chronologically the first email

18   in this thread, who sent that?

19   A.  Jurisdoctorjsc@yahoo.com.

20   Q.  On what date?

21   A.  June 12, 2013.

22   Q.  And when is that compared to the date of the previous

23   email?

24   A.  This is the day after.

25   Q.  So what is the subject line of -- going back up to the top

1    of the thread, what's the subject line at the top of the

2    thread?

3    A.   "Have license and purchase authorization."

4    Q.   And going back down to that first email in the thread,

5    could you please read the text of that?

6    A.   "Come to office.  If you want me to deal with 'inspection'

7    and you don't have to appear at HQ at all, fee is $850.  Please

8    bring that if you want me to deal with this aspect and 'tip' we

9    spoke of."

10   Q.   Are any words in quotation marks?

11   A.   Yes.

12   Q.   Which words?

13   A.   "Inspection" and "tip."

14   Q.   Going to the response by edticheli@aol.com, could you

15   please read that response out?

16   A.   "John, you are a wonderful person.  I have never bargained

17   with you ever.  Could you please help me on this?  Please?

18   Tell me.  I have spent well over 10,000 now, and I do

19   appreciate it.  Please tell me what you need and be as gentle

20   as possible.  Thank you.  Ed."  Smiley face.

21   Q.   Could you please read the response from

22   jurisdoctorjsc@yahoo.com?

23   A.   "Ed, all that was done for you was a miracle.  No other

24   lawyer could have saved you from revocation, let alone got your

25   concealed carry reinstated almost immediately.  850 is my last

I4hWcha3                          Hubbard - Direct

1    fee to bring your paperwork back to the supervisor so to save

2    you the headache.  Tip I leave in your discretion.  Just know

3    many were involved to get all of this done and done so quickly.

4    Honestly, any other lawyer would have charged you more and been

5    unsuccessful, and no other lawyer would be allowed to do what

6    I'm doing for you, allowing you to avoid reinspection of the

7    weapons.  John."

8    Q.  When was that response sent?

9    A.  June 12, 2013.

10   Q.  At what time?

11   A.  10:43 a.m.

12   Q.  Showing you Government Exhibit 349, who is this thread

13   between?

14   A.  Jurisdoctorjsc@yahoo.com and edticheli@aol.com.

15   Q.  Going to the bottom email of this thread, who sent it?

16   A.  Edticheli@aol.com.

17   Q.  When did he send it?

18   A.  June 12, 2013.

19   Q.  At what time?

20   A.  2:50 p.m.

21   Q.  How does that compare to the time of the email we just

22   looked at?

23   A.  It compares -- it's roughly four hours after the last email

24   we reviewed.

25   Q.  All right.  And what is the subject line of the bottom

I4hWcha3                        Hubbard - Direct

1    email in Government Exhibit 349?

2    A.   "Headed by work then you."

3    Q.   And what is Chambers's response?

4    A.   "Let me know when you're close, please."

5    Q.   Now, I'd like to show you the first page of Government

6    Exhibit 608-1.  Have you seen this document before?

7    A.   Yes.

8    Q.   Have you reviewed it prior to testifying?

9    A.   Yes.

10   Q.   On the first page, could you please read its title?

11   A.   License division, incident investigation, final report.

12   Q.   Who is the licensee?

13   A.   Edward Ticheli.

14   Q.   How many gun licenses or permits does it say he has?

15   A.   Four.

16   Q.   Who is listed as the case investigator?

17   A.   Patsy Brewster.

18   Q.   Who is listed as the case supervisor?

19   A.   Sgt. Villanueva.

20   Q.   Directing your attention, in part 1, general case

21   information, to the word "incident" with a colon after it, what

22   does it say after the word "incident"?

23   A.   Domestic incident.

24   Q.   In part 2, where it says firearms recovered, could you

25   please read what it says after that?

1   A.  "No.  Licensee sold firearms W/O permission to Westside

2   Rifle & Pistol range."

3   Q.  By the way, when you mentioned you were aware that someone

4   named Darren worked for a gun range, what range did Darren work

5   for?

6   A.  Westside Rifle & Pistol.

7   Q.  Now, directing your attention to the date case assigned in

8   section 1, what is that date?

9   A.  April 12, 2013.

10  Q.  When's that in comparison to all these emails we've just

11  been reviewing?

12  A.  Before the emails we've been reviewing.

13  Q.  How does that April 12, 2013, date compare to the date of

14  Government Exhibit 608-2, the letter advising Ticheli that his

15  licenses were temporarily suspended?

16  A.  The investigation final report was published three days

17  prior to the letter.

18  Q.  Sorry.  Going back to the investigation final report, when

19  you said that it was published then, what date were you

20  referring to on it?

21  A.  I apologize.  Date of final report was June 18.

22  Q.  All right.  So the date of final report was on June 18.

23  What was the date case assigned?

24  A.  I'm sorry.  That's April 12, 2013.

25  Q.  All right.  Now, you mentioned that the date of final

1    report is listed as June 18, 2013.  Could you please turn to

2    the last page.  On the last page, where it says signature of

3    case investigator, what is the date listed after that

4    signature?

5    A.  June 18, 2013.

6    Q.  And now let's turn back to Government Exhibit 347, the

7    chain with the subject line "have license and purchase

8    authorization," what is the date of that chain, of all the

9    emails in that chain?

10   A.  June 12, 2013.

11   Q.  How does that compare to the date of final report for the

12   investigation?

13   A.  Six days prior to the date of final report.

14   Q.  Now, let's return to Government Exhibit 608-1, the final

15   report.  You said that you had reviewed this report.  Did you

16   find anything in it that mentions that the licensee's lawyer

17   had received the license and purchase authorization six days

18   before the report was completed?

19   A.  No.

20   Q.  Turning to the second-to-last page, could you please read

21   the recommendation?

22   A.  "Revocation of the license."

23   Q.  Could you please read the rest of the bolded text following

24   the words "revocation of the license"?

25   A.  "Licensee failed to comply with the license division rules

I4hWcha3                          Hubbard - Direct

and regulations.  Licensee did not notify the license division

of his domestic incidents that occurred on August 11, 2012;

August 15, 2012; September 26, 2012; December 24, 2012; and

December 27, 2012.  Licensee failed to comply with the

directives of the suspension letter.  Licensee did not request

permission to sell his firearms."

Q.  Now, on the next page, under the signature of case

investigator, there's a space for case supervisor's comments

and recommendations, and some handwriting.  First, do you

recognize the signature right under the words "case

supervisor's"?

A.  Yes.

Q.  Whose signature is that?

A.  Sgt. Villanueva.

Q.  From the front page of the report, who is the case

supervisor?

A.  Sgt. Villanueva.

Q.  Going back to the last page, can you read the handwriting

right under the signature that you recognize as Sgt.

Villanueva's?

A.  Not quite.

Q.  All right.  Can you read the handwriting in the middle of

that line?

A.  Yes.

Q.  What does that say?

I4hWcha3                          Hubbard - Direct

1    A.   "Cont PR CB."

2    Q.   Now, going back to the second page of Government Exhibit

3    608-1, what are the four types of licenses that Edward Ticheli

4    is listed as having?

5    A.   Premise business, rifle and shotgun permit, premise

6    residence and carry business.

7    Q.   What two-letter acronyms would you form for these types of

8    license?

9    A.   Premise business, PB; rifle and shotgun permit, RS; premise

10   residence, PR; carry business, CB.

11   Q.   Does this report list the license numbers for each of these

12   four types of licenses?

13   A.   It does.

14   Q.   Showing you Government Exhibit 608-4, and directing your

15   attention to the top half of the page, there is a circled box

16   before the words "this letter is to advise you that your," and

17   some uncircled boxes.  After that, the next paragraph has a

18   circled box.  Can you please read that paragraph?

19   A.   "Has been continued after a review of the facts and

20   circumstances surrounding your incident.  You must contact your

21   investigator, Sgt. Villanueva or Sgt. Villanueva at (646)

22   610-5154 within 30 days of the date of this letter to reclaim

23   your license or it will be canceled."

24   Q.   And there are two references to Sgt. Villanueva there.  Is

25   the first one handwritten?

I4hWcha3                          Hubbard - Direct

1    A.  Yes.

2    Q.  Now, at the top of the page, on the line after reference

3    number, there are two handwritten numbers.  Turning to the

4    first, CB2009000477, does that correspond to any of the license

5    numbers from Government Exhibit 608-1, the final investigation

6    report?

7    A.  It does.

8    Q.  To which license number?

9    A.  The carry business license.

10   Q.  And what about the second one, PR100050359?

11   A.  It does.

12   Q.  What does that correspond to?

13   A.  The premise residence.

14              THE COURT:  Mr. Monteleoni, is this an appropriate

15   place to take a short, midmorning recess?

16              MR. MONTELEONI:  Yes, your Honor.  Thank you.

17              THE COURT:  All right.  Members of the jury, that's

18   exactly what we're going to do.  We'll take a short recess.

19   Keep an open mind, come to no conclusions, and please don't

20   discuss the case.

21              Please recess the jury.

22              (Jury not present)

23              THE COURT:  Special Agent Hubbard, you may step down.

24              (Witness not present)

25              THE COURT:  Everyone may be seated.

I4hWcha3                        Hubbard - Direct

1                  Are there any issues that counsel want to raise?

2                  MR. ROSSMILLER:  No, your Honor.

3                  MR. STAVIS:  No, your Honor.

4                  THE COURT:  All right.  We'll take a short recess.

5                  (Recess)

6                  (Jury present)

7                  THE COURT:  Everyone may be seated.

8                  Members of the jury, we'll resume with

9     Mr. Monteleoni's continued direct examination of Special Agent

10    Hubbard.

11                 MR. MONTELEONI:  Your Honor, with the Court's

12    permission, I'd like to publish Government Exhibit 101 to the

13    jury for them to inspect as I continue with my next question.

14                 THE COURT:  That's fine.

15                 MR. MONTELEONI:  Thank you.

16                 THE COURT:  You may do so.

17                 MR. MONTELEONI:  Ms. Bustillo, if you could bring up

18    Government Exhibit 608-4 once more.

19    Q.  Special Agent Hubbard, directing your attention to the left

20    side of Government Exhibit 608-4, could you please read what's

21    handwritten and highlighted there?

22    A.  "No letter."

23                 MR. MONTELEONI:  And Ms. Bustillo, if you could

24    actually just remove the electronic highlighting.

25    Q.  Is there actually highlighting on the document itself?

I4hWcha3                          Hubbard - Direct

1   A.  There is.

2   Q.  Going back to Government Exhibit 608-1, the final

3   investigation report, on the last page, after the handwritten

4   notation "Cont PR CB" in the space after the case supervisor's

5   comments and recommendations, what is the handwritten date next

6   to that?

7   A.  July 15, 2013.

8   Q.  In connection with this investigation, did the FBI obtain a

9   cell phone from David Villanueva?

10  A.  We did.

11  Q.  Was a forensic review of that cell phone completed?

12  A.  Yes.

13  Q.  Have you inspected some extracts from that forensic review?

14  A.  Yes, I have.

15  Q.  I'd like to show you Government Exhibit 201.  What is

16  Government Exhibit 201?

17  A.  It's a forensic report of the cell phone from

18  Mr. Villanueva.

19  Q.  And looking down about midway down the page to the field

20  owner name, who does it list the device's owner as?

21  A.  David V.

22  Q.  And where it says MSISDN, what is the number listed?

23  A.  1-516-690-1520.

24  Q.  Do you recognize the format of that number?

25  A.  I do.

I4hWcha3                          Hubbard - Direct

1   Q.   What type of format is that?

2   A.   Common telephone number usage for United States telephones.

3   Q.   Now, a little lower down the page, in the tethering

4   section, where it says Apple ID, what does it say is the Apple

5   ID?

6   A.   Wafer74@yahoo.com.

7   Q.   How does that address compare to the email address for

8   David Villanueva in Government Exhibit 307 in which John

9   chambers sent him the pictures of the watch?

10  A.   The same.

11  Q.   I'd like to show you Government Exhibit 203, at the page

12  marked 509, and directing your attention to the third text down

13  on page 509 and the next few texts, the third -- what is the

14  number of the sender of the third text down?

15  A.   The number is 1-347-583-9002.

16  Q.   And what is the parenthetical description after that

17  number?

18  A.   John Cham.

19  Q.   What day is the third text down sent?

20  A.   July 15, 2013.

21  Q.   Could you please read that text?

22  A.   "Morning, Dave.  Will text you later whether I am bringing

23  the tickets for this Saturday's game down to you or sending

24  them out to your house.  Still same address, right?"

25  Q.   And who does the phone describe the next text as sent by?

I4hWcha3                              Hubbard - Direct

1   A.  John Cham.

2   Q.  Could you please read the next text?

3   A.  "Also wondering about Giuseppe Grippi and Hanna

4   Yurkovetskaya."

5   Q.  Is the text after that sent by the number described as John

6   Cham or by some other number?

7   A.  Another number.

8   Q.  What number is that?

9   A.  The one designated for David Villanueva.

10  Q.  Is that designation based on the phone report that we just

11  saw?

12  A.  It is.

13  Q.  Could you please read the text sent by Villanueva?

14  A.  "Yes.  Still same address and just officially closed out

15  your client's, the watch guy, case."

16  Q.  What day did Villanueva send that text?

17  A.  July 15, 2013.

18  Q.  How does that July 15, 2013, date compare to the date of

19  the case supervisor's comments and recommendations on the last

20  page of Government Exhibit 608-1?

21  A.  They're the same date.

22  Q.  Now, staying on this last page of Government Exhibit 608-1,

23  can you read the handwriting under the commanding officer's

24  comments and recommendations?

25  A.  I can read most of it.

I4hWcha3                          Hubbard - Direct

1   Q.  What can you read?

2   A.  "I concur.  W" slash.  I can't make out the next word, and

3   "continue."

4   Q.  When is that signed?

5   A.  August 7, 2013.

6   Q.  Now, was Villanueva ever arrested?

7   A.  Yes.

8   Q.  When was he arrested?

9   A.  Approximately two years ago.

10  Q.  So that would be in 2016?

11  A.  Yes.

12  Q.  About what month in 2016?

13  A.  I believe it was June 2016.

14  Q.  Was Chambers ever arrested?

15  A.  Yes.

16  Q.  When was he arrested?

17  A.  Approximately April 2017.

18  Q.  Was Chambers subsequently released on bail?

19  A.  Yes.

20  Q.  Now, showing you Government Exhibit 350, who sent the top

21  email in this chain?

22  A.  Top email is sent by jurisdoctorjsc@yahoo.com.

23  Q.  To what email address?

24  A.  Edticheli@gmail.com.

25  Q.  When did Chambers send this?

1    A.   May 9, 2017.

2    Q.   When was that in comparison to when Chambers was arrested?

3    A.   This email was sent after he was arrested.

4    Q.   Could you please read the second paragraph of this email?

5    A.   "I need to know what your cost would be on a Paul Picot,

6    what it is the cheapest possible cost that you might be lucky

7    enough to find it at.  You gave me one, and I couldn't wear it

8    because I can only wear gold.  Allergic to all else.  Gave it

9    away.  Now it is coming back to haunt me.  They say the value

10   is $8,000, but I know you buy pennies on the dollar in some

11   cases.  What would be the lowest you might be able to buy this

12   at.  I do not have the model number."

13   Q.   All right.  Now, a few minutes ago you read a text in which

14   Chambers was mentioning Giuseppe Grippi.  I'd like to go back

15   to that.  If you could turn back to Government Exhibit 203,

16   page 509, and could you please tell me which user sends the

17   second-to-last text on that page?

18   A.   Listed as John Cham.

19   Q.   And could you please read the series of texts, starting at

20   the second-to-last text on this page, going down to the, on the

21   next page, including the text that starts, "I didn't re-review

22   his folder," and attribute those to the users that sent them?

23   A.   John Cham:  "Can I pick up Grippi permit this week?"  David

24   Villanueva:  "I thought they were going from rev to

25   cancellation."  John Cham:  "Yes, Hanna is."  John Cham:  "100

I4hWcha3                         Hubbard - Direct

1    percent."  John Cham:  "But we talked about just giving

2    Giuseppe his RS back now so he can hunt."  David Villanueva:

3    "I didn't re-review his folder.  Have to get back to you on

4    Grippi."

5    Q.  What was the date of these texts?

6    A.  July 17, 2013.

7    Q.  Now, I'd like to show you Government Exhibit 604-1.  Could

8    you please read the title of this document?

9    A.  License division, incident investigation, final report.

10   Q.  What is the licensee name?

11   A.  Giuseppe Grippi.

12   Q.  What is the name of the case investigator?

13   A.  Patsy Brewster.

14   Q.  What is the name of the case supervisor?

15   A.  Sgt. Villanueva.

16   Q.  According to the report, how many licenses does Giuseppe

17   Grippi have?

18   A.  Two.

19   Q.  Which licenses?

20   A.  Premise residence and rifle and shotgun permit.

21   Q.  Now, what is the date of final report listed on this page?

22   A.  May 2, 2013.

23   Q.  How does the date of final report on this report compare to

24   the date of the texts that we just read?

25   A.  The texts were sent after the date of final report.

I4hWcha3                          Hubbard - Direct

1    Q.  Now, turning to the last page of this report, could you

2    please read --

3            MR. MONTELEONI:  Just the last page of 604-2,

4    Ms. Bustillo.

5            Let me do it using the Elmo.  Oh, it's up?  OK.

6    Q.  On the last page of this report, could you please read what

7    follows after recommendation?

8    A.  "Revocation of the license.  Licensee failed to comply with

9    the license division rules and regulations.  Licensee did not

10   notify the license division of his arrest that occurred on May

11   1, 2011.  While the first arrest was still pending, licensee

12   was arrested again and was charged with DWI on February 11,

13   2012.  Licensee pled guilty to DWAI on July 5, 2011, and on

14   April 23, 2013.  Licensee demonstrated poor judgment in the

15   operation of a potentially dangerous instrument while

16   intoxicated endangering the lives of others by his actions."

17   Q.  What is DWI?

18   A.  Driving while intoxicated.

19   Q.  Looking at the case supervisor's comments and

20   recommendations, can you read anything other than the signature

21   and date?

22   A.  No.

23   Q.  Can you tell whose signature it is?

24   A.  I can.

25   Q.  Whose?

1    A.  Sgt. Villanueva.

2    Q.  And looking at the commanding officer's comments and

3    recommendations, can you read the handwriting?

4    A.  Yes.

5    Q.  What does it say?

6    A.  "I concur.  Revoke."

7    Q.  What is the date next to the signature under commanding

8    officer's comments and recommendations?

9    A.  May 15, 2013.

10   Q.  When is that in comparison to the texts we were just

11   discussing regarding Grippi?

12   A.  The signature is the day -- approximately one or two days

13   before the texts we were reviewing.

14   Q.  Well, if you could look at Government Exhibit 203, pages

15   509 and 510, those are the texts I was referring to.

16   A.  I'm sorry.

17       It's approximately two months prior to the texts we were

18   reviewing.

19   Q.  Showing you Government Exhibit 604-3, the first page.

20            MR. MONTELEONI:  May I have a moment?

21            THE COURT:  Yes.  Take your time.

22   Q.  Directing your attention --

23            MR. MONTELEONI:  Ms. Bustillo, can we publish the Elmo

24   to the witness and the jury.

25   Q.  Directing your attention to Government Exhibit 604-3, could

1   you please read the letterhead?

2   A.   Letterhead states Police Department, License Division,

3   Commanding Officer, One Police Plaza, Room 110A, New York, New

4   York 10038.

5   Q.   Who is this document addressed to?

6   A.   Giuseppe Grippi.

7   Q.   Could you please read the first sentence?

8   A.   "Dear licensee, this is to advise you that your premises

9   residence handgun license and rifle/shotgun permit have been

10  revoked after a review of the facts and circumstances

11  surrounding your incident."

12  Q.   What is the date?

13  A.   June 6, 2013.

14  Q.   Now, if we could go back to the texts that we were

15  discussing on Government Exhibit 203, page 510, when are these

16  texts in relation to the letter informing Grippi that his

17  licenses have been revoked?

18  A.   The letter is dated prior to the texts.

19  Q.   All right.  So now going a little farther down the page,

20  could you read from the text that starts "let me get his folder

21  back" down to and including this text that starts "was going to

22  UPS them" near the bottom of the page and attribute the texts

23  to the users that sent them?

24  A.   David Villanueva:  "Let me get his folder back.  I will

25  text you after I look at it."  John Cham:  "OK."  John Cham:

I4hWcha3                         Hubbard - Direct

"Thanks."  David Villanueva:  "No problem.  I will get folder

back from Jackie."  John Cham:  "OK.  So I'll tell him getting

canceled instead of revocation and trying to get RS permit

continued, but the pistol LIC is gone for now.  Can reapply in

a year or two, right?"  David Villanueva:  "Yes."  John Cham:

"OK.  Thank you."  John Cham:  "Hey.  I'll be down to HQ

tomorrow to bring you tix to Nets 1 p.m. game on Sat," smiley

face.  David Villanueva:  "Awesome."  John Cham:  "Was going to

UPS them because I've got some things for the kids but couldn't

get to it this week.  Hopefully I'll get this to them next

week."

Q.  When was that last text in which the John Cham user says "I

was going to UPS them because I've got some things for the

kids" sent?

A.  July 18, 2013.

Q.  I'd like to show you the box that's marked for

identification as Government Exhibit 102.  Have you seen this

box before?

A.  I have.

Q.  Where have you seen it before?

A.  That was provided to me by David Villanueva.

Q.  When was that?

A.  After he became a cooperator with the government.

Q.  Have you maintained it in evidence since then?

A.  Yes.

I4hWcha3                         Hubbard - Direct

1    Q.   If you could look at the shipping label, who is it

2    addressed to?

3    A.   Shipping label is to David Villanueva.

4    Q.   And showing you the return label, can you tell who the

5    listed sender is?

6    A.   Yes.

7    Q.   What's that?

8    A.   John S. Chambers, Esq.

9    Q.   Is there any organizational affiliation listed for the

10   return address?

11   A.   There is.

12   Q.   What?

13   A.   Law office of John S. Chambers, Esq.

14            MR. MONTELEONI:  We offer Government Exhibit 102 as

15   well as 102-1 through 102-15, which are photos of 102 and its

16   contents, in evidence.

17            MR. STAVIS:  No objection.

18            THE COURT:  Government Exhibits 102 and 102-1 through

19   102-15 are received in evidence.

20            (Government Exhibits 102 and 102-1 through 102-15

21   received in evidence)

22            THE COURT:  And you may publish them as you see fit.

23            MR. MONTELEONI:  Thank you, your Honor.

24   Q.   You mentioned that this box is addressed to David

25   Villanueva.  Is it addressed to him at One Police Plaza?

I4hWcha3                          Hubbard - Direct

1   A.  No, it's not.

2   Q.  Could you please open the box and show the jury what's

3   inside.

4           MR. MONTELEONI:  With the Court's permission, if you

5   could, I suppose, stack them up in front of the jury.

6           THE COURT:  Yes.  Agent Hubbard can step down.

7           MR. MONTELEONI:  Thank you.

8   A.  Two display cases for baseballs; a baseball that appears to

9   be signed by Carlos Beltran, with a certificate of authenticity

10  in the box; another baseball signed by José Valentin and

11  certificate of authenticity in the box; another baseball,

12  signed by David Wright, with a certificate of authenticity;

13  another baseball, signed by Willy Randolph with "let's go Mets"

14  signed on the bottom, with a certificate of authenticity;

15  another baseball signed by Ron Guidry, with associated

16  certificate of authenticity; Mickey Mantle photograph, with an

17  autograph on a wood placard; picture of Alex Rodriguez, with

18  signature and a letter of authenticity on the back; Silver

19  Royale Barbie and Celebration Barbie; and a half-torn priority

20  mail from USPS.

21  Q.  Special Agent Hubbard, if I could ask you just to inspect,

22  on the box itself, the small label that's diagonally placed on

23  the top, does that list a date on it?

24  A.  Yes.

25  Q.  What's that date?

1   A.  August 19, 2013.

2   Q.  All right.  Now, you can put that box down and resume the

3   witness stand.  Thank you.

4           MR. MONTELEONI:  Ms. Bustillo, if I could ask to show

5   the witness and the jury Government Exhibit 203 at page 520.

6           MR. STAVIS:  Your Honor, can the items that are in

7   evidence, if they've been viewed, be moved?

8           THE COURT:  Right.  Why don't you just take them down,

9   Mr. Monteleoni.  I was concerned about the Barbie boxes, which

10  are teetering on the jury rail.

11          Thank you, Mr. Monteleoni.

12  BY MR. MONTELEONI:

13  Q.  Directing your attention to the fifth text down --

14          MR. STAVIS:  What exhibit is this, Mr. Monteleoni?

15          MR. MONTELEONI:  Government Exhibit 203, page 520.

16  Q.  Special Agent Hubbard, when was this text sent?

17  A.  August 21, 2013.

18  Q.  And you testified a moment ago that the label on the box

19  was August 19, 2013?

20  A.  Yes, sir.

21  Q.  Could you please read that text and attribute it to its

22  sender?

23  A.  David Villanueva:  "Kids loved the collectibles.  Brandon

24  wants his room themed baseball and Madie wants her Barbie.

25  LOL."

I4hWcha3                         Hubbard - Direct

1    Q.  When you looked at the Barbie dolls in Government Exhibit

2    102, did they appear to have been opened?

3    A.  No.

4    Q.  I'd like to return to Giuseppe Grippi.  Could we turn back

5    to Government Exhibit 203, page 512, and fourth text down on

6    the page.  When was this text sent?

7    A.  July 26, 2013.

8    Q.  Could you please read this text and the next two texts and

9    attribute them?

10   A.  John Cham:  "Good morning, Dave.  Can I or Tina come down

11   and get Giuseppe letter and permit?"  David Villanueva:  "No

12   RS.  Lunetta is not allowing us to issue or activate any.

13   Investigating a few permits that Endall issued.  He's over

14   there now."  David Villanueva:  "Have to give time for it to

15   cool down."

16   Q.  Special Agent agent Hubbard, in 2013, do you know who the

17   commanding officer of the license division was?

18   A.  I do.

19   Q.  Who was that?

20   A.  That would be Deputy Inspector Lunetta.

21   Q.  And who was the executive inspector at the time?

22   A.  Capt. Endall.

23   Q.  What's Capt. Endall's first name, by the way?

24   A.  Michael.

25   Q.  Now, turning to page 519, directing your attention to the

1    text starting, "Sorry John, found sticky," a little past

2    halfway down the page, when was that text sent?

3    A.   July 26, 2013.

4    Q.   Now, could you please read the texts starting with that

5    text and continuing down through the text that starts, "No way

6    can I spin it," attributing them to their users?

7    A.   David Villanueva:  "Sorry, John.  Found sticky for this

8    case.  You asked to cancel pistol and give back RS.  He had two

9    DWI.  Pled guilty to DWI for first and driving while impaired

10   on second.  Driver's license revoked, and he took a

11   conditional."  John Cham:  "Yes, that's right."  John Cham:

12   Dave, he's not about to get in any other trouble."  John Cham:

13   Now that the wife is out the door, LOL."  David Villanueva:

14   "No way I can spin it.  Best that can happen is a suspension.

15   Continuance I can't explain if anyone ever looks at file.

16   Anyone with similar circumstances will get revoked or long

17   suspension.  I can meet you halfway and give a short

18   suspension.  Then no one will ever question."

19   Q.   Now, could you read the next text and on down the next page

20   through the text starting "excellent," and attribute them?

21   A.   John Cham:  "That's fair enough.  How much suspension

22   time?"  David Villanueva:  "October 1."  John Cham:  "Sept.

23   15?"  John Cham:  "LOL."  John Cham:  "This would be for both,

24   right?"  David Villanueva:  "Sept. 16, and yes."  John Cham:

25   OK.  Perfect.  Can I get a letter to show him today?"  David

I4hWcha3                          Hubbard - Direct

1    Villanueva:  "Today, if you want."  John Cham:  "Excellent.

2    That will work."

3             MR. MONTELEONI:  Ms. Bustillo, could you see if we can

4    use the computer system to show Government Exhibit 604-02.

5    Q.  Looking at Government Exhibit 604-02, what organization is

6    this letter from?

7    A.  The New York Police Department.

8    Q.  What unit of the police department?

9    A.  License division.

10   Q.  To whom?

11   A.  To Giuseppe Grippi.

12   Q.  And what's the date of the letter?

13   A.  July 26, 2013.

14   Q.  How does that date compare to the date of the texts that we

15   were just reading?

16   A.  They're the same date.

17   Q.  Could you please read the first sentence of the letter?

18   A.  "Dear licensee, this letter is to advise you that after

19   review of the facts and circumstances surrounding your

20   incident, your premise residence handgun license and

21   rifle/shotgun have been suspended for a period ending August

22   16, 2013."

23   Q.  Does anything in this letter mention the fact that the

24   license division sent a letter in June revoking Grippi's

25   license?

1            MR. STAVIS:  Objection as to form, your Honor.

2            THE COURT:  Sustained.

3            MR. MONTELEONI:  Sorry.

4    Q.  Does anything in this letter reflect that in June the

5    license division sent a letter revoking Grippi's licenses?

6    A.  No.

7            MR. MONTELEONI:  Ms. Bustillo, could you please show

8    Government Exhibit 604-03 side by side with 604-02, if that's

9    possible.

10   Q.  Special Agent Hubbard, can you please compare these

11   letters?

12   A.  OK.

13   Q.  About how similar are they?

14   A.  They are -- they're very similar.

15   Q.  What, if any, differences do you notice?

16   A.  Aside from the date, the signature at the bottom right-hand

17   corner of the letter, and essentially the body of the -- the

18   body of the paragraph -- or the body of the letter, excuse me,

19   has two different statements.

20   Q.  Do you recognize the signature above the name Andrew

21   Lunetta on Government Exhibit 604-2?

22   A.  I do.

23           MR. MONTELEONI:  604-2, Ms. Bustillo.

24   Q.  Whose signature do you recognize that as?

25   A.  Sgt. Villanueva.

I4hWcha3                        Hubbard - Direct

1   Q.  Now, just looking at Government Exhibit 604-2, this letter

2   says that the, lists the suspension for a period ending 8/16,

3   2013.  Going back to the texts that we just read on page 514 of

4   Government Exhibit 203, in the text just before Chambers says,

5   "OK, perfect, can I get a letter to show him today," what date

6   does David Villanueva say?

7   A.  September 16.

8   Q.  Going to midway down this page, could you read and

9   attribute the text starting, "Hey, just looked at Grippi

10  letter" to "Anytime"?

11  A.  John Cham:  Hey, just looked at Grippi letter.  You made it

12  until August 16.  Should I keep it like that?  I can make the

13  eight a nine if you need me to."  David Villanueva:  "You can

14  keep it like that.  Just make appointment for beginning of

15  September.  LOL.  Once again, meet you halfway.  LOL."  John

16  Cham:  "OK.  Thanks."  David Villanueva:  "Anytime."

17  Q.  Now, showing you Government Exhibit 403, when was this

18  email sent?

19  A.  August 6, 2010.

20  Q.  What is the display name of the user sending the top email?

21  A.  Display name, John Chambers.

22  Q.  At what email address?

23  A.  Proudlypatriotic@yahoo.com.

24  Q.  What's the display name of the user receiving the email?

25  A.  Dave.

I4hWcha3                    Hubbard - Direct

1    Q.   What is the subject line?

2    A.   "Forward:  Membership form acknowledgment."

3    Q.   Could you please read the email.

4    A.   "Here is the acknowledgment for the sustaining membership I

5    got for you today.  Go to the website.  It will give you a list

6    of the benefits.  Enjoy, bro.  John."

7    Q.   Now, going down to the forwarded email, what's the display

8    name of the sender of the forwarded email?

9    A.   National Baseball Hall of Fame.

10   Q.   What's the email address of the recipient of the forwarded

11   email?

12   A.   Email address recipient is proudlypatriotic@yahoo.com.

13   Q.   And what is the display name listed for

14   proudlypatriotic@yahoo.com in this email?

15   A.   David Villanueva.

16   Q.   Moving to the second page, what are the dues for

17   membership?

18   A.   Dues for membership is $100.

19   Q.   Now, returning to Government Exhibit 203 at page 517,

20   directing your attention to the text that starts, "Hey, Dave,"

21   in the top half of the page, when was that text sent?

22   A.   August 2, 2013.

23   Q.   Could you read that text?

24   A.   "Hey, Dave.  Can you use tix to tomorrow's Mets game?"

25   Q.   Now, could you read and attributed the texts starting from

1    "Hi, John" to "cool"?

2    A.   David Villanueva:  "Hi, John.  Tomorrow is Cinderella day.

3    LOL.  You got us the tix.  LOL."  John Cham:  "Well, your lady

4    will love it."  John Cham:  "Hahahaha."  David Villanueva:

5    "LOL.  Hahahaha."  John Cham:  "Cool."

6    Q.   Showing you the document that's been marked for

7    identification as Government Exhibit 109, have you seen this

8    document before?

9    A.   I have.

10   Q.   Where have you seen it before?

11   A.   That was provided to me by Mr. Villanueva.

12   Q.   When did he do that?

13   A.   After he became a cooperator with the government.

14   Q.   What did you do with it?

15   A.   I put it into evidence.

16            MR. MONTELEONI:  We offer Government Exhibit 109 into

17   evidence.

18            MR. STAVIS:  Can I see the exhibit?

19            MR. MONTELEONI:  It was produced in the binder.

20            We can put it up, just to counsel.

21            MR. STAVIS:  No objection, your Honor.

22            THE COURT:  Government Exhibit 109 is received in

23   evidence.

24            (Government Exhibit 109 received in evidence)

25            THE COURT:  And you may publish it.

1              MR. MONTELEONI:  Thank you.

2    Q.  What type of document is this?

3    A.  It's an email.

4    Q.  What's the date of the email?

5    A.  April 20, 2013.

6    Q.  What address is it addressed to?

7    A.  Wafer74@yahoo.com.

8    Q.  Please read the text of the email.

9    A.  "See attached.  I hope she enjoys it.  Got really great

10   reviews.  J."

11   Q.  According to this printout, can you read the file name for

12   the attachment?

13   A.  File name, Davetix.PDF.

14   Q.  What is attached?

15   A.  Three tickets.

16   Q.  To what production?

17   A.  Cinderella.

18   Q.  Where is the theater?

19   A.  Broadway Theatre, address 1681 Broadway, between West 52nd

20   and 53rd Street.

21   Q.  What is the date of the show?

22   A.  August 3, 2013.

23   Q.  And turning back for a moment to Government Exhibit 203,

24   page 517, what date was it when Villanueva wrote the text

25   "Tomorrow is Cinderella day"?

I4hWcha3                          Hubbard - Direct

1    A.  August 2, 2013.

2    Q.  Now, going back to the tickets in Government Exhibit 109,

3    you said there were three tickets.  What is the price listed on

4    each ticket?

5    A.  Each ticket, $137.

6    Q.  And who is listed as the purchaser of the ticket?

7    A.  John Chambers.

8    Q.  Now, showing you Government Exhibit 455, who is this email

9    thread between?

10   A.  Jurisdoctorjsc@yahoo.com and wafer74@yahoo.com.

11   Q.  Going down to the chronologically first message, who sends

12   the first message?

13   A.  Jurisdoctorjsc@yahoo.com.

14   Q.  Can you please read that message?

15   A.  "Dave, can you do an upgrade to a carry and a PO for the

16   following:  Salvatore Campisi Jr.?  See attached.  Can you do

17   it in the early a.m. and Tina pick it up later in the morning?

18   Maybe you can leave envelope with Debbie.  Thanks, man.  Tina

19   can bring tix if you're be there, but if you won't be there,

20   we'll probably send them to you.  Don't want to necessary leave

21   them with anyone.  Thanks again.  J."

22   Q.  Can you please read the response?

23   A.  "No problem.  I will do it early in the a.m.  Let me know

24   when Tina is on her way so I can let you know if I'm there."

25   Q.  Showing you Government Exhibit 104, have you seen

I4hWcha3                          Hubbard - Direct

1    Government Exhibit 104 before?

2    A.  I have.

3    Q.  When did you see it?

4    A.  When Mr. Villanueva provided it to us.

5    Q.  When did he do that?

6    A.  After he became a cooperator with the government.

7    Q.  Have you maintained it in evidence since then?

8    A.  Yes.

9              MR. MONTELEONI:  We offer Government Exhibit 104 as

10   well as 104-1 through 5, which are photos of 104, in evidence.

11             And Ms. Bustillo, if you could publish to defense

12   counsel Government Exhibits 104-1 through 5.

13             THE COURT:  Any objection?

14             MR. STAVIS:  No objection.

15             THE COURT:  Government Exhibits 104 and 104-1 through

16   5 are received in evidence.

17             (Government Exhibits 104 and 104-1 through 104-5

18   received in evidence)

19             (Continued on next page)

20

21

22

23

24

25

I4hWcha3                         Hubbard - Direct

1    I4HJCHA4                        Hubbard - Direct

2    Q.  So if you could just hold up Government Exhibit 104.  What

3    is Government Exhibit 104?

4    A.  A playbill for Spiderman Turn Off the Dark.

5    Q.  Is there anything inside the playbill?

6    A.  Yes, there is an envelope inside the playbill.

7    Q.  Let's take a look at the envelope.  What is printed on the

8    envelope?

9    A.  JSC and John S. Chambers, Attorney at Law, 89 5th Avenue

10   Suite 801, New York, New York 10003.

11   Q.  What is handwritten on the envelope?

12   A.  "Dave."

13   Q.  Is there anything inside the envelope?

14   A.  There is.

15   Q.  What is inside?

16   A.  Two tickets are inside.

17   Q.  Were these tickets in the envelope when you got it?

18   A.  Yes.

19   Q.  Now, you said there were two tickets.  To what show?

20   A.  Spiderman, Turn Off the Dark.

21   Q.  What is the date of the show?

22   A.  March 4th, 2011.

23   Q.  What does it say after purchased by?

24   A.  "John Chambers."

25   Q.  And what is the price listed on each ticket?

I4hWcha3                          Hubbard - Direct

1    A.  142.

2    Q.  Showing you Government Exhibit 420, who is the top email of

3    Government Exhibit 420 from and what is the display name?

4    A.  Top email?

5    Q.  Yes.

6            MR. MONTELEONI:  Ms. Bustillo, if you could publish

7    Government Exhibit 420.

8    BY MR. MONTELEONI:

9    Q.  What user sent the top email?

10   A.  John Chambers.

11   Q.  And to whom?

12   A.  Wafer74 at Yahoo dot com.

13   Q.  When was it sent?

14   A.  November 14th, 2012.

15   Q.  What does this email say?

16   A.  "Here you are, enjoy."

17   Q.  Now, further down the page in the forwarded email, after a

18   set of texts it says you purchased two tickets to.  What show

19   us listed after you purchased two tickets to?

20   A.  Wicked, New York.

21           MR. MONTELEONI:  Ms. Bustillo, if you could expand the

22   selection a little bit to go down a little farther.

23   BY MR. MONTELEONI:

24   Q.  Who does it say the order is for?

25   A.  John Chambers.

I4hWcha3                              Hubbard - Direct

1    Q.   What does it say the total charges?

2    A.   Total charge $509.20.

3    Q.   What is the date of the show?

4    A.   November 16th, 2012.

5    Q.   Now, showing you Government Exhibit 204, Page 1295,

6    directing your attention to the text that begins get her a tee.

7    When was that text sent?

8              MR. STAVIS:  Our monitor is off.

9              MR. MONTELEONI:  Ms. Bustillo, if you could publish

10   this to the jury.

11             (Off-the-record discussion)

12             MR. MONTELEONI:  It is not on the public's screen.

13             (Off-the-record discussion)

14   BY MR. MONTELEONI:

15   Q.   So this text that begins get her a tee, when was it sent?

16   A.   May 9th, 2014.

17   Q.   Could you please read and attribute both that text and the

18   next three texts through intermission time.

19   A.   John Cham.  Get her a tee or sweatshirt from us if she

20   likes any.  John Cham.  LOL.  David Villanueva.  Great play so

21   far.  David Villanueva, intermission time, ha ha.

22   Q.   What time was that last text sent at?

23   A.   9:17 pm.

24   Q.   Showing you Government Exhibit 463.  Who sent this email?

25   A.   Proudly patriotic at Yahoo dot com.

I4hWcha3                          Hubbard - Direct

1    Q.  To what address?

2    A.  ATTY JSC at Gmail dot com.

3    Q.  What are the JSC initials?

4    A.  JSC.

5    Q.  What is his profession?

6    A.  Attorney.

7    Q.  What is the subject line of this email?

8    A.  Dave and Jess plays theater.

9    Q.  What are the first three lines of the body?

10   A.  Dave and Jess plays theater, May 6, Jess, March 7, Dave.

11   Q.  Looking down near the bottom of the email, do you see a

12   line that references May 6 again?

13   A.  I do.

14   Q.  What does it say?

15   A.  "Jess birthday May 6."

16   Q.  I am not asking you to read the whole, mail but generally?

17   A.  Titles of Broadway productions.

18   Q.  We saw an email with tickets for Wicked before.  Is Wicked

19   listed there?

20   A.  It is.

21   Q.  We saw an email with tickets and playbill for Spiderman

22   turn off the dark.  Is that musical listed here?

23   A.  Yes.

24   Q.  Showing you the items marked for identification as

25   Government Exhibits 111, 112 and 113, have you seen these

I4hWcha3                        Hubbard - Direct

1    before?

2    A.  I have.

3    Q.  Where did you see them before?

4    A.  We were given them by Mr. Villanueva.

5    Q.  When?

6    A.  After he became a cooperator with the government.

7    Q.  Have you maintained them in evidence?

8    A.  Yes.

9             MR. MONTELEONI:  We offer governments Exhibit 111, 112

10   and 113 as well as 111-1 through 2, 112-1 through 2 and 1131

11   through 3, which are photographs of those in evidence.

12            THE COURT:  Any objection?

13            (Off-the-record discussion)

14            MR. STAVIS:  No objection.

15            THE COURT:  Government Exhibits 111, 112, 113 and

16   111-1-2, 112-1-2 and 113-1-3 are received in evidence.

17            (Government's Exhibits 111, 112, 113, 111-1-2,

18   112-1-2, 113-1-3 received in evidence)

19   BY MR. MONTELEONI:

20   Q.  If you could look at and sort of show the jury Government

21   Exhibit 113.  What is this?

22   A.  Playbill for The Adams Family.

23   Q.  What is inside the playbill?

24   A.  Tickets.

25   Q.  How many tickets?

I4hWcha3                          Hubbard - Direct

1   A.  Two.

2   Q.  Who do the tickets say who they were purchased by?

3   A.  John Chambers.

4   Q.  How much does each ticket say it costs?

5   A.  $69.

6   Q.  The Adams Family, is that one of the plays that was listed

7   in Government Exhibit 463, the email with the listed plays?

8   A.  Yes.

9   Q.  Now, showing you Government Exhibit 434, who sent the most

10  recent email in Government Exhibit 434?

11  A.  Proudly Patriotic at Yahoo dot com.

12  Q.  To who?

13  A.  Proud Patriotic at Yahoo dot com.

14  Q.  On what date?

15  A.  February 28th, 2014.

16  Q.  The top email forwards an earlier email.

17          What is the display name of the sender of the earlier

18  email?

19  A.  Telecharge Offers dot com.

20  Q.  What is attached to this email?

21  A.  PDF of tickets.

22  Q.  Turning to the attachment, how many tickets are there?

23  A.  Two.

24  Q.  To what show?

25  A.  The Bridges of Madison County.

I4hWcha3                         Hubbard - Direct

1    Q.   How much does each ticket say it costs?

2    A.   $141.00.

3    Q.   Turning to Government Exhibit 463, is the Bridges of

4    Madison County listed there?

5    A.   It is.

6    Q.   Showing you Government Exhibit 111, if you could inspect it

7    and show the jury.  What is Government Exhibit 111?

8    A.   It is a playbill for Billy Elliott, the Musical.

9    Q.   Is Billy Elliott, the Musical one of the plays?

10   A.   Yes, it is.

11   Q.   Just to complete the record, is Billy Elliott, the Musical

12   one of the plays listed in Government Exhibit 463 listing the

13   plays?

14   A.   Yes, it is.

15   Q.   Showing you Government Exhibit 112, if you could show that

16   to the jury as well.  What is Government Exhibit 112?

17   A.   A playbill for Phantom of the Opera.

18   Q.   Is Phantom of the Opera one of the plays in Government

19   Exhibit 463?

20   A.   Yes.

21   Q.   Now, showing you Government Exhibit 204, on Page 1311,

22   directing your attention down the page to the text that starts

23   do you have tix in the bottom corner of the page.  When was

24   that text sent?

25   A.   July 29, 2014.

1    Q.  Please read and attribute that text on the next two.

2    A.  John Cham.  Do you have tix to Marvel Universe live at

3    Nassau Coll.  John Cham.  I would need to make sure he's not

4    with Angie that weekend.  John Cham.  Would the girls want to

5    go, too, or just you and Brandon.

6    Q.  Turning to the next page, directing your attention to the

7    second text on the page, please read and attribute.

8    A.  David Villanueva.  They'll all love that.  I have the kids

9    99 percent of the time LOL.

10   Q.  Now directing your attention to the text starting okay,

11   we'll text you.  Could you read and attribute that text.

12   A.  John Cham.  Okay.  We'll text you when I get back in my

13   office in a few for dates, okay.  Ah, they all love it.  LOL.

14   So I'll get five tickets.

15   Q.  Now, on the next, Page 1313, directing your attention to

16   the text starting 23rd, 11:00 am, could you please read that

17   text and then the text down through my pleasure and attribute

18   them.

19   A.  John Cham.  23rd, 11:00 am, Marvel Universe live for five.

20   John Cham.  Sat.  David Villanueva, that is great.  TY.  John

21   Cham.  My pleasure.

22   Q.  What day were these text sent?

23   A.  July 30th, 2014.

24   Q.  Now, turning to Page 1322 of the same document, directing

25   your attention to the text starting BTW, how was the show?

I4hWcha3                            Hubbard - Direct

1            Who sent that?

2    A.  I am sorry?  Can you repeat the question.

3    Q.  In the first half of the page, the phrase BTW, how was the

4    show?  Who sent that text?

5    A.  John Cham.

6    Q.  Could you please -- well, you know, I am not going to ask

7    you to read it all out.  Generally on the rest of this page,

8    what do the David Villanueva and John Chambers discuss?

9    A.  August 28, 2014.

10   Q.  What do they discuss generally on this page?

11   A.  Apparently they're talking about a show and whether the

12   kids enjoyed it.

13   Q.  Could you read the last two texts on the page and attribute

14   them.

15   A.  David Villanueva:  LMAO, thanks again.  It was a great day

16   out.  John Cham.  Always my pleasure, bro, always.

17   Q.  So I want to turn to another subject other than tickets.

18          Showing you Government Exhibit 412, who is this email from?

19   A.  Juris doctor JSC at Yahoo dot com.

20   Q.  Can you tell who it is to?

21   A.  There is a single -- no, I cannot.

22   Q.  What is the sent date?

23   A.  The sent date, January 11, 2012.

24   Q.  What is the subject line?

25   A.  "Dave."

I4hWcha3                        Hubbard - Direct

1    Q.  What does the text say?

2    A.  Dave.  16.5 X 34-35, wafer74 at man dot com.

3    Q.  Are the numbers in the middle in any kind of format that

4    you recognize?

5    A.  Yes.

6    Q.  What format?

7    A.  They're commonly attributed to the measurement for a dress

8    shirt.

9           MR. STAVIS:  Objection, your Honor.

10          THE COURT:  Sustained.

11   BY MR. MONTELEONI:

12   Q.  So showing you Government Exhibit 432, who sent this email?

13   A.  I do not reply at W gift card dot com.

14   Q.  Under what display name?

15   A.  Applebee's.

16   Q.  To which address?

17   A.  Proudly patriotic at Yahoo dot com.

18   Q.  When was it sent?

19   A.  December 4th, 2013.

20   Q.  What is the subject?

21   A.  Applebee's receipt for purchase, 208, 3081110.

22   Q.  Directing your attention to the billing information, what

23   address is that?

24   A.  89 5th Avenue, Suite 801, New York, New York, 10003, United

25   States.

I4hWcha3                          Hubbard - Direct

1   Q.  Is that John Chambers' office address?

2   A.  Yes.

3   Q.  Could you please read the item description for the first

4   item.

5   A.  To David Wafer74 at Yahoo dot com from John and Tina,

6   proudly patriotic at Yahoo dot com.

7   Q.  Can you read the price.

8   A.  $150.

9   Q.  I am showing you Government Exhibit 456.

10          Now, directing your attention to the forwarded

11   message, who is it from?

12   A.  The forwarded message?

13   Q.  The lower-down message, the one that later gets forwarded?

14   A.  Do not reply at W gift card dot com.

15   Q.  Who is it to?

16   A.  Wafer74 at Yahoo dot com.

17   Q.  By the way, what is the display name of the sender of the

18   forwarded message?

19   A.  Applebee's.

20   Q.  When was it sent?

21   A.  December 5th, 2014.

22   Q.  How does that compare to the last Applebee's related email

23   we just saw, Government Exhibit 432?

24   A.  This email occurred roughly one year later than the

25   previous email.

I4hWcha3                              Hubbard - Direct

1   Q.   What is the subject line?

2   A.   John and Tina sent you an Applebee's digital gift card.

3   Q.   What is the amount of this gift card?

4   A.   $50.00.

5   Q.   Showing you Government Exhibit 425.  Who sent this email?

6   What is the display name?

7   A.   The display name True Lux Seafood and Steak & Crab House.

8   Q.   To whom?

9   A.   Wafer74 at Yahoo dot com.

10  Q.   When was it sent?

11  A.   June 19th, 2013.

12  Q.   Could you please read the first two sentences.

13  A.   Dave Villanueva.  A gift card has been purchased by John

14  Chambers on your behalf.  The E-gift card was purchased for use

15  at True Lux seafood, steak & Crab House.

16  Q.   Now, showing you Government Exhibit 203, at the first page,

17  page 506, now directing your attention to about the middle of

18  the page, the first text that is listed as being sent on July

19  2nd, 2013, who sent that text?

20  A.   You said July 2nd?

21  Q.   Yes?

22  A.   2013?

23  Q.   Yes?

24  A.   David Villanueva.

25  Q.   What does it say?

I4hWcha3                        Hubbard - Direct

1    A.  "We thank you and Tina for dinner.  Smiley face."

2    Q.  Now, could you please read the text starting from the first

3    text after the purchase down through the text that says perfect

4    and attribute them?

5    A.  John Cham.  How was it?  John Cham?  Our pleasure.  David

6    Villanueva.  Great upscale place.  Awesome food.  John Cham.

7    Perfect.  How was the trip?  Kept checking the weather for SD.

8    You guys had two beautiful days.

9    Q.  Showing you Government Exhibit 410, what is the display

10   name of the sender of his email?

11   A.  The display name is Toys-R-Us.

12   Q.  Who is it sent to?

13   A.  Proudly patriotic at Yahoo dot com.

14   Q.  When was it sent?

15   A.  November 25th, 2011.

16   Q.  What is the body of the email?

17          Can you summarize what is happening in the body of

18   this email without having to read every word?

19   A.  It's talking about a gift card with, saying Dear David

20   Villanueva, hooray, and he has been given a gift card by John

21   and Tina.

22   Q.  What is the amount of the gift card?

23   A.  $200.00.

24   Q.  What is the message included after the Dear David

25   Villanueva hooray?

1    A.  John and Tina has given you an E-gift card from Toys-R-Us

2    dot com and Babies-R-Us, dot com.  Merry Christmas to Brandon

3    and Madison.  Hope they enjoyed it.  With love, J and T.

4    Q.  I want to talk a little about Chambers' law practice.  I

5    would like to show you what is in evidence as Government

6    Exhibit 1202.  Do you recognize this?

7    A.  I do.

8    Q.  Have you reviewed it before testifying?

9    A.  Yes.

10   Q.  In general terms, what is on Government Exhibit 1202?

11   A.  It is a web site NY Gun dot com.

12   Q.  What business is it a web site for?

13   A.  For John Chambers and talking about pistol licenses.

14   Q.  In general terms, what kind of material is found on the web

15   site files that you reviewed on that disc?

16   A.  It describes services provided by the law firm as well as

17   testimonials and examples of what the law firm has been able to

18   do for clients.

19   Q.  What do you mean by testimonials?

20   A.  There are people who have submitted on the web site, it

21   appears people have written statements to the law firm to

22   explain how much they appreciate and like their services they

23   received.

24   Q.  What do you mean when you say examples as distinct from

25   testimonials?

1    A.  They're from clients --

2            MR. STAVIS:  Objection, your Honor.  The item is in

3    evidence.

4            MR. MONTELEONI:  It thought it would be simpler to

5    have him summarize.

6            THE COURT:  Overruled.

7    BY MR. MONTELEONI:

8    Q.  In general, do you mean by examples?

9    A.  Of clients who have used the law services or the services

10   of the law firm and what their previous experience in trying to

11   deal with pistol licenses and what the end result was when they

12   used the law firm.

13   Q.  So if you could look at the document marked for

14   identification as Government Exhibit 1202-1.

15           MR. MONTELEONI:  Ms. Bustillo, if you could show that

16   to defense counsel.

17   BY MR. MONTELEONI:

18   Q.  Special Agent Hubbard, have you seen that document before?

19   A.  Yes.

20   Q.  Is that a printout of one of the files on Government

21   Exhibit 1202?

22   A.  It is.

23   Q.  How does the content of Government Exhibit 1202-1 compare

24   to the content of that page in Government Exhibit 1202?

25   A.  It is approximately the same.

1   Q.  How does the formatting of the printout Government Exhibit

2   1202-1 compare to the formatting in Government Exhibit 1202?

3   A.  It is a little bit different for the sake of graphic user

4   interface when you look at a web site versus a web --

5            MR. MONTELEONI:  We offer 1202-1 in evidence.

6            MR. STAVIS:  No objection.

7            THE COURT:  Government Exhibit 1202-1 is received in

8   evidence.

9            (Government's Exhibit 1202-1 received in evidence)

10           MR. MONTELEONI:  Ms. Bustillo, if you could publish

11   that to the jury.

12   BY MR. MONTELEONI:

13   Q.  Looking at the header of the document, could you please

14   read the words in the very top.

15   A.  Why us?  NY Gun calling law offices of John S. Chambers.

16   Q.  Going down to the lines below the question why choose us to

17   handle your gun license matter, please read the first bullet

18   point.

19   A.  "200 plus gun licensing cases litigated."

20   Q.  Turning to the next page, could you please read the top

21   bullet point on that page.

22   A.  "Chambers, a former Assistant District Attorney, is the

23   only lawyer specializing in gun licensing exclusively."

24   Q.  Could you please read the last bullet point.

25   A.  Regularly at Police Headquarters NYC.  John S. Chambers has

I4hWcha3                        Hubbard - Direct

1    been regularly appearing for clients at 1 Police Plaza since

2    1986.  As a young attorney, he recognized the value in delving

3    into each project and knowing the personnel within the Pistol

4    License Division in order to get a better sense of the living

5    law, and not just the handgun licensing statute and the

6    ordinances, rules of the city in this regard.

7    Q.  Showing you Government Exhibit 1201, what is this?

8    A.  The only one I have --

9    Q.  Showing you on the screen Government Exhibit 1201, have you

10   reviewed this document before?

11   A.  I have.

12   Q.  What is it?

13   A.  A list of clients who have used the services of John

14   Chambers' law firm.

15   Q.  How many pages is it?

16   A.  About 15 pages.

17   Q.  Showing you Government Exhibit 414, who is this email from?

18   A.  Juris doctor JSC at Yahoo dot com.

19   Q.  Who is it to?

20   A.  To the email address, P messing at N Y post dot com, R

21   Fredericks at NY post dot com.

22   Q.  When was it written?

23   A.  January 17, 2012.

24   Q.  What is the subject line?

25   A.  Article gun licensing today.

I4hWcha3                         Hubbard - Direct

1   Q.  Directing your attention to the paragraph starting not only

2   are you in correct, can you please read that paragraph and the

3   next two.

4   A.  Not only are you incorrect in terms of your statement about

5   my practice and the statement made about Mr. Levine being

6   considered the gun lawyer, I am the only lawyer in NYC, NYS who

7   exclusively practices in this area with regard to litigation,

8   and I am also the only lawyer who makes regular appearances at

9   Police Headquarters specifically for pistol licensing related

10  issues only.  I have always been a friend to the New York Post

11  and I have gone out of my way to provide accurate statements.

12      However, needless to say, I am most dismayed about the

13  mischaracterization about my practice versus someone who

14  dabbles in this arena.

15  Q.  Going to the next page, directing your attention to the

16  paragraph starting three of the top lawyers.  Please read that

17  paragraph.

18  A.  Three of the top lawyers in the city, high profile lawyers

19  who have represented high profile and celeb clients and are all

20  over the TV and other media, who:  One, retained me to procure

21  their concealed carry licenses; and, two, always refer gun

22  cases to me.  Even though they could handle it themselves, they

23  would never do it.  It is too much of a nest of uncertainty at

24  1 PP.

25  Q.  Showing you Government Exhibit 408, directing your

I4hWcha3                          Hubbard - Direct

1    attention to the bottom email, the first email in the thread,

2    Special Agent Hubbard, if I could ask you to look at the

3    version on the screen.  The first email on the thread on the

4    second to last page, I guess, who is that email from?

5    A.  Juris doctor JSC at Yahoo dot com.

6    Q.  I think on the version on that page the sender is redacted,

7    but when was this sent?  First of all, the recipient is

8    redacted.  When did Chambers send this message?

9    A.  February 22, 2011?

10   Q.  What is the subject line?

11   A.  One more thing.

12   Q.  Can you please read the first paragraph.

13   A.  Essentially I'll accept this case and put it at the head of

14   the line, so to speak.  This will be expedited for --

15   redacted -- of course, I would not put this within the

16   retainer, but this is precisely how I will handle the case.

17   Again, when I do magic within the Pistol License Division for

18   any client, all the stars must be aligned.

19   Q.  Are any words in what you just read in quotes?

20   A.  Yes.

21   Q.  Which words?

22   A.  "Magic" and "stars."

23   Q.  If you could skip over the next paragraph and go down to

24   read the one that starts naturally a little farther down on the

25   next page.

1    A.   Naturally, the case for redacted would never be years.  I

2    just give you the example above in order to highlight the

3    necessity to be mindful of the way the stars are aligned within

4    the PLD.  Everything has to be in place and almost perfect for

5    serious accomplishments to ensue.  It is not only about my

6    litigation skills and significant wins, settlements against the

7    agency, it is much more.

8    Q.   Could you please go to the next email in the chain, the

9    response to that, and could you please read that email.

10   A.   Believe me, John, I know and appreciate all that.  Your

11   stature and your magic-making abilities are not in any way

12   questioned, nor are they underappreciated.

13            That is why I brought this important client to you.

14   You explained all of this and made the same promises just as

15   vigorously for 10 K.  Again when you expected only $8,250.00 on

16   the 12.5.  Nothing has changed since you made those promises,

17   except you're getting more money than you initially thought you

18   would.  So that's why I am having a hard time understanding the

19   problem.  Again we'll discuss it more tomorrow.  Thanks.

20   Q.   Going up to the top email in this chain, could you please

21   read the first sentence, read the first paragraph.

22   A.   Just to clarify for the record, my absolute bottom line was

23   10 K, and I told you this.  I would never have accepted this

24   case for anything less.  Your dollar sign portion of the case

25   would simply be added to the 10 K.  Excuse me.  10.

1        Just before you added -- redacted -- to the conference

2    call, I did not really get an answer from you as to whether you

3    expected a referral fee, so I assumed maybe and added $2,500 to

4    the 10 just in case.

5    Q.   Now showing you the document marked for identification as

6    Government Exhibit 122, have you seen this before?

7    A.   I have.

8    Q.   Where did you see it?

9    A.   This was provided to us by David Villanueva.

10   Q.   When did he do that?

11   A.   After he became a cooperator for the government.

12   Q.   Have you maintained it in evidence since then?

13   A.   Yes.

14           MR. MONTELEONI:  We offer Government Exhibit 122 in

15   evidence.

16           MR. STAVIS:  One moment.

17           (Pause)

18           MR. STAVIS:  No objection.

19           THE COURT:  Government Exhibit 122 is evidence in

20   evidence.

21           (Government's Exhibit 122 received in evidence)

22           MR. MONTELEONI:  Could you please publish.

23   Q.   Who is this email from?

24   A.   Juris doctor JSC at Yahoo dot com.

25   Q.   Who is it to?

I4hWcha3                          Hubbard - Direct

1    A.  Wafer74 at MSN dot com.

2    Q.  When was it sent?

3    A.  January 19th, 2012.

4    Q.  Could you please read the first three lines.

5    A.  Hey, Dave.  Here's the info on that Nassau Co. guy.  His

6    name is Joseph A Listrito.

7    Q.  Could you please read the paragraph that starts he is only

8    paying me.

9    A.  He is only paying me if he gets his license renewed.  I

10   will, in turn, pay you as my consultant on the case as we

11   talked about.  Smiley face.

12   Q.  Are any words in quotation marks?

13   A.  Yes.

14   Q.  Which?

15   A.  "Consultant."

16   Q.  Could you please read the next paragraph.

17   A.  Let's talk once you get this.  I don't want him to think

18   that the renewal has happened magically.  I am going to tell

19   him to keep his mouth shut when he goes to get his license, not

20   to mention me or anything, just go and get it, period.  I need

21   to know how it's going to happen so he is aware that we are

22   doing it and it didn't happen for any other reason than he

23   retained us.

24   Q.  Are any words in quotation marks?

25   A.  Yes.

1    Q.  Which?

2    A.  "Magically."

3    Q.  Showing you Government Exhibit 1003, on the first page

4    could you read the organization listed.

5    A.  "Police Department County of Nassau, New York, Pistol

6    License Section."

7    Q.  Who is the listed name?

8    A.  Last name Listrito, first name Joseph.

9    Q.  How does that name compare to the name of the individual

10   mentioned in Government Exhibit 122?

11   A.  They're the same.

12   Q.  Turning to the 5th page, the page full of text, please read

13   the last line of the text on the 5th page.

14   A.  January 31st, 2012, license renewed, Sergeant S M.

15   Q.  When is the January 31st, 2012 date for license renewed in

16   comparison to the date of the email we just saw, Government

17   Exhibit 122?

18   A.  The email happened before the license renewed line.

19   Q.  About how long before?

20   A.  Maybe a week and a half.

21   Q.  Showing you Government Exhibit 416, who is this email from?

22   A.  Juris doctor JSC at Yahoo dot com.

23   Q.  Who is it to?

24   A.  Wafer74 at Yahoo dot com.

25   Q.  When was it sent?

I4hWcha3                          Hubbard - Direct

1   A.  March 13th, 2012.

2   Q.  Please read the subject line.

3   A.  Dave, it's me, John Chambers.  Proposal, investigated

4   findings.

5   Q.  Please read the bottom of the email.

6   A.  Just wish this case would close already.  Almost six months

7   is a long time and he has been so harassed by Patsy.  Let me

8   know what you think.  Dave.

9   Q.  Now, turning to the attachment, can you please read the

10  title of the attachment.

11  A.  Title of the at meant, letter to Villanueva for --

12  (inaudible).

13  Q.  Turning to the second page --

14        MR. STAVIS:  416.

15  Q.  -- turning to the attachment on the second page, not the

16  file name for the attachment reproduced on the first page, but

17  the title listed on the bottom of the attachment on the second

18  page.  What is that title?

19  A.  "Investigative findings."

20  Q.  Please read the bottom paragraph of the page.

21  A.  Based upon a review of all of the documents and the fact

22  the licensee did, indeed, violate the License Division rules

23  and regulations regarding his limited carry license,

24  investigator recommends suspension, six months, until March

25  29th, 2012.

I4hWcha3                        Hubbard - Direct

Q.  To be clear, was John Chambers an NYPD investigator in

2012?

A.  No.

Q.  How does the March 29th, 2012 date that it says

investigator recommends suspension be until, how does that date

compare the date this email was sent?

A.  The date for suspension completion is to be two weeks after

the email was sent.

Q.  Now, showing you Government Exhibit 430, directing your

attention to the second page, the lower-down email on that

page, who sent that?

A.  Juris doctor JSC at Yahoo dot com.

Q.  When was it sent?

A.  October 3, 2013.

Q.  Could you please read the email starting from you should

make your Nassau Co. contracts.

A.  You should make your Nassau Co. contracts very tight.  You

should take good care of Nassau clients because NC doesn't give

a crap about what anything including applicants.

        All applicants are now being made to wait a very long

time, even with clean records.  If you come across a big fish,

and I am talking about big fish, there may be a way around it

but I use that limitedly.

Q.  Turning to the top email in the chain, who wrote the top

email in the chain?

I4hWcha3                          Hubbard - Direct

1    A.   Juris doctor JSC at Yahoo dot com.

2    Q.   Please read the emails starting from seriously.

3    A.   Seriously, if you have someone with the money and he is

4    willing to part with the money for license, or if he has an

5    incident on a current license which is under suspension, we can

6    assist.  You would have to refer him directly to us and say no

7    more, no fee approximation, et cetera.  Generally I will do a

8    paid consultation over the phone during which I will quote a

9    price, a high price.

10        You will be nicely compensated for workup sheet delineating

11   the facts and circumstances if he retains us.  Give you an

12   example.  Guy with sportsman LIC wants carry for his business.

13   He goes to Nassau Co., and they tell him if he is going to get

14   it, it could take up to a year and a half.  Guy verifies with

15   friends who are in the system.  He comes to us.  He has his

16   upgrade to a full carry in three weeks in Nassau County.  I

17   can't stand them out there.

18        However, on a limited basis for high rollers, I can get

19   things done, guaranteed and quick, but again few and far

20   between as I never believe in wearing out your welcome, if you

21   get my drift.

22             MR. MONTELEONI:  Your Honor, I am about to move on to

23   a new topic now.

24             THE COURT:  Let's keep going.

25   BY MR. MONTELEONI:

I4hWcha3                          Hubbard - Direct

1    Q.  So I want to talk about a different aspect of Nassau

2    County, Nassau County was mentioned in the last email.  Showing

3    you Government Exhibit 440, who sent this email?

4    A.  Juris doctor JSC at Yahoo dot com.

5    Q.  To who?

6    A.  Wafer74 at Yahoo dot com.

7    Q.  When was it sent?

8    A.  August 12, 2014.

9    Q.  Please read the first paragraph.

10   A.  "David.  I am sending you their Nassau County licenses.

11   They want to continue their carry licenses, don't want to

12   downgrade to target sportsman.  They want to be able to carry

13   all the guns they own under a license throughout the state,

14   with the exception of NYC and they downgrade to a target

15   sportsman in Nassau.  The NYC carry they have means they can

16   only carry two guns statewide.

17   Q.  Read the subject line.

18   A.  Nassau Co. license amendments.

19   Q.  Could you please read the paragraph starting they want.

20   A.  They want to transfer their Nassau County carry licenses

21   from Victoria package -- Victoria packaging to Aquilina

22   Industries.

23   Q.  Can you read the two paragraphs toward the end starting

24   with dude.

25   A.  Dude, this is a big one.  Hopefully, we can get this one

I4hWcha3                         Hubbard - Direct

1   done together.  Anything else for the change needed?  They're

2   willing to do whatever it takes.

3   Q.  Now, showing you Government Exhibit 204, at Page 1316,

4   directing your attention to the text about a third of the way

5   down the page at 2:50 pm on August 13, 2014, please read and

6   attribute that text.

7   A.  Just the single text?

8   Q.  Yes, just that one?

9   A.  John Cham.  Anything on Nassau yet?

10  Q.  When is this text in relation to the email we just saw?

11  A.  That was Government Exhibit 440?

12  Q.  Yes.

13  A.  This text was sent the day after the email.

14  Q.  A little past halfway down the page, please read and

15  attribute the text starting we'll let them know?

16  A.  John Cham.  We'll let them know.  How is your relationship

17  going out there?  Do you think we have a shot at this?

18  Q.  Can you skip down to the text that starts I will try and

19  read and attribute that one, and all the way down to the text

20  on the next page that reads yes, fingers crossed.

21            MR. STAVIS:  What page is this?

22            MR. MONTELEONI:  Page 1317, I believe of -- 1316 of

23  Government Exhibit 204.

24  A.  David Villanueva.  I will try my best.  LOL.  John Cham.

25  Okay.  Have you been doing things for him?  John Cham.  LOL.

I4hWcha3                         Hubbard – Direct

1    Any gut feeling?  David Villanueva.  I will let you know what

2    feeling I get out of it after I talk to him.  John Cham.  Well,

3    that's good at least, building a relationship.  David

4    Villanueva.  Yeah, a little thing, nothing major.  David

5    Villanueva.  Yes.  Fingers crossed.

6    Q.  Now turning to Page 1320 of the same document, directing

7    your attention to the text that starts hi, Dave, near the top

8    of the page, when was that text sent?

9    A.  August 27, 2014.

10   Q.  When is that in comparison to the text you just read?

11   A.  Approximately two weeks later.

12   Q.  Could you please read the text, read and attribute the text

13   starting from that one and going through the text that says

14   104.

15   A.  John Cham.  Hi, Dave.  Just checking in about Aquilina.

16   Love to get them in the office with docs and pima maybe on

17   Friday.

18       I am holding off to hear confirmation from you.  It's fine

19   if it will take a couple of weeks, just want to make sure you

20   contact, looked at files and everything is a go before I get

21   dollar, sign dollar, sign dollar, sign cash.  John Cham.  No

22   worries.  But do you know if it is absolutely a go?  David

23   Villanueva.  Only one problem.  Tom is on vac and so am I until

24   next week.  So we'll prob. get done next week.  John Cham.

25   Okay.  Just so I'm clear.  We do not have a green light yet for

1  Nassau County.  David Villanueva.  Tom told me no worries, but

2  you and I know until we don't see it, it's not done.  John

3  Cham.  Right.  Do you think I should get the money?  John Cham.

4  Did Tom look at the files?  David Villanueva.  I just texted

5  him.  Give me a few.  John Cham.  Perfect.  David Villanueva

6  Tom Houghton Nassau Pistol.  John Cham.  10-4.

7              THE COURT:  Is this an appropriate place?

8              MR. MONTELEONI:  Absolutely.

9              THE COURT:  Members of the jury, we are going to take

10  our luncheon recess at this time.  Keep an open mind.  Come to

11  no conclusions and don't discuss the case.  We'll resume at

12  2:00 o'clock promptly, so please be back here ready to go.

13              Please recess the jury.

14              THE CLERK:  All rise.  Jury exiting.

15              (Jury excused)

16              THE COURT:  Special Agent Hubbard, you're excused

17  until 2:00 o'clock.

18              THE WITNESS:  Thank you, sir.

19              (The witness left the witness stand)

20              THE COURT:  Everyone may be seated.  Any issues?

21              MR. ROSSMILLER:  Not from the government, your Honor.

22              MR. STAVIS:  No, your Honor.

23              THE COURT:  How much longer do you have you have on

24  direct?

25              MR. MONTELEONI:  At least an hour.  It could be a

I4hWcha3                          Hubbard - Direct

1    little more, a little less.

2              THE COURT:  I am not holding you.  I want to get some

3    sense.  All right.  Have a good lunch, everyone.  I'll see you

4    at 2:00.

5              (Luncheon recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I4hWcha5                          Hubbard - Direct

                              AFTERNOON SESSION

1

2                                  2:00 p.m.

3              (Jury present)

4              THE COURT:  All right.  Everyone may be seated.

5              Good afternoon, members of the jury.

6              JURORS:  Good afternoon.

7              THE COURT:  That sounds a little weak.  You just had

8    lunch.  You're fortified and ready to go.  All right?

9              We're going to resume where we left off before the

10   luncheon recess with Mr. Monteleoni's continued direct

11   examination of Special Agent Hubbard.

12             You may proceed.

13             MR. MONTELEONI:  Thank you, your Honor.

14   Q.  Special Agent Hubbard, before the break, we read a series

15   of texts on Government Exhibit 204, page 1520.

16             MR. MONTELEONI:  Could we just pull up that page

17   again.

18   Q.  The texts that you just read ended with a text from John

19   Chambers saying "10-4."  Could you please read starting from

20   the next text, which starts, "You worked out the details" down

21   through the text on the next page that begins "I told them it's

22   not like NYC," and attribute those texts?

23   A.  David Villanueva:  "You worked out the details with the

24   brothers?"  John Cham:  "Bring me cash on Saturday to my

25   office.  Maybe we can do dinner next Friday."  John Cham:

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

I4hWcha5                          Hubbard - Direct

1    "They will pay two-thirds now and the rest when the permits are

2    in hand."  John Cham:  "Is it Tom that knows Ben?"  John Cham:

3    "I told them it's not like NYC.  Nassau County is sticky and

4    we're going to do it as fast as we can, but they have to have a

5    little more patience."

6    Q.  Now, if you could skip down a little farther to the text

7    that starts, "OK, perfect," could you please read and attribute

8    that text and down through the next page, the text that starts,

9    "Sounds like a plan"?

10   A.  I'm sorry.  You said the text that begins --

11   Q.  So beginning with the text that starts, "OK, perfect"?

12   A.  John Cham:  "OK.  Perfect.  We'll touch base about that

13   next week.  Glad you found a friend out there."  John Cham:

14   "Ah, sweet doors too.  LOL."  David Villanueva:  "LOL.  Opens

15   doors for us.  LOL."  David Villanueva:  "LOL.  So, so, so

16   true."  John Cham:  "I know you can never overload him, but

17   when you get closer, we will have some other money guys who

18   need help out there.  Maybe not quite as rich as these two men

19   are, but well-off nonetheless, and they will want to either get

20   a license or keep a license."  David Villanueva:  "We have to

21   spread them out so, as you said, we won't overload them."  John

22   Cham:  "Yes, and hopefully he will seek something from you in

23   the meantime."  David Villanueva:  I'm sure he will need

24   something from me soon."  John Cham:  "As soon as that happens,

25   let me know, and we will let a little time go by and we will do

I4hWcha5                          Hubbard - Direct

1   another project.  LOL."  David Villanueva:  "Sounds like a

2   plan.  LOL."

3            (Recess)

4            THE COURT:  Next question, Mr. Monteleoni.

5            MR. MONTELEONI:  Thank you, your Honor.

6   Q.  Could you turn to page 1323, and directing your attention

7   to the text about a third of the way down the page, starting,

8   "We'll probably work a little tomorrow," can you please read

9   and attribute that?

10  A.  John Cham:  "We'll probably work a little tomorrow and then

11  see the Aquilinas tomorrow.  BTW, do you still need their

12  licenses emailed to you?  The new licenses should be exactly

13  the same as ones they have now except Aquilina Industries, LLC,

14  at the same address."

15  Q.  Could you please read the text midway down the page from

16  John Cham at 4:17:24 p.m. on 8/30, 2014?

17  A.  "The eagle has landed."

18  Q.  Turning to page 1329, what's the date of the first text on

19  the page?

20  A.  September 4, 2014.

21  Q.  Could you please read and attribute from that text down

22  through the text that starts, "I am so happy"?

23  A.  John Cham:  "In the meanwhile, what's going on with Nassau

24  County?  Any word from Tom?  Can we push him at all?  I know he

25  was out Mon. and Tues. for the holiday, but since the eagle

1   landed, I'm hoping we can get this moved forward."  John Cham:

2   OK.  Good.  And BTW, both Gerry and Ben have given me

3   passport-type photos if those can be used.  Don't know if they

4   have scanning ability or not, instead of having the guys go to

5   Nassau Co HQ."  David Villanueva:  "I will reach out to him

6   later.  That I'm not worried about.  It's a done deal."  John

7   Cham:  "That would be great."  David Villanueva:  "OK.  I will

8   check with Tom."  David Villanueva:  "This was a huge step

9   forward with Nassau."  John Cham:  "I am so happy.  There are

10   plenty of cases out there.  We can be picky and only take those

11   willing to pay the fare, but it would be nice to be able to do

12   a handful a year together.  Of course, not all are as wealthy

13   as the Aquilina brothers, but most are willing to pay pretty

14   well to get things done.  If we have a 'friend' there, yes,

15   that's excellent."

16   Q.  Were there any quotation marks around any of the words in

17   the last texts?

18   A.  Yes.

19   Q.  Which?

20   A.  Friend.

21   Q.  Now could you read and attribute from the next text down

22   through the text that starts, "If we play our cards right"?

23          MR. STAVIS:  Also on page 1324?

24          MR. MONTELEONI:  1329, yes.

25   A.  David Villanueva:  "Yes, we def have a friend.  Let's see

1    how far we can stretch him.  LMAO."  John Cham:  "I think we

2    should do the guy with the family hair salons next.  They've

3    got like seven or eight with lots of cash.  Really is a ground

4    ball.  He's got no arrests or DIRs, etc.  He's been waiting

5    since last year when everything went to hell after Mistretta

6    left.  He's ready to go when we are ready."  David Villanueva:

7    "K.  We will try to push him next."  John Cham:  "Good.  That's

8    why if we can get Gerry and Ben done, we can exhale a few

9    minutes and then approach him on this guy.  Forgot his name,

10   but he was referred by a friend, so I'll be able to touch base

11   with him again when you're ready."  John Cham:  "Perfect."

12   David Villanueva:  "That sounds like a plan."  John Cham:  "If

13   we play our cards right, you could potentially be looking at an

14   extra 10K in cash in a 12-month period, give or take, just for

15   being my Nassau Co 'consultant.'"

16   Q.  Were there any quotation marks around any of the words in

17   that last text?

18   A.  Yes.

19   Q.  Which?

20   A.  Consultant.

21   Q.  Could you please read and attribute the next text and the

22   first three texts on the next page?

23   A.  John Cham:  "Not a bad thing, considering you're getting

24   married in October.  Hopefully Tom will work out well."  David

25   Villanueva:  "LMAO, not a bad gig at all."  David Villanueva:

I4hWcha5                              Hubbard - Direct

"Funny, all I thought was wedding money.  LMAO."  John Cham:

"LOL."

Q.  Turning to page 1332, about midway down, directing your

attention to the text that starts, "Hey, Dave," when was that

one sent?

A.  August 8 -- sorry.  September 8, 2014.

Q.  Please read and attribute from that text through the text

that starts "tomorrow."

A.  John Cham:  "Hey, Dave.  Wondering when do you think you

will have the Nassau licenses for Aquilinas in our hands?"

David Villanueva:  "John, everything is hold for today cause of

that case front page Post."  David Villanueva:  "He's a

licensee in Nassau."  John Cham:  "The crack-dealing thug cop?"

John Cham:  "OK, but they paid 50 percent with final payment

when renewed license is handed to them, and they paid cash.  I

have a payment in hand for your consultation services, $1,500,

with your final $1,500 when renewals are in hand.  Today is no

good.  I understand that.  But can I give them some kind of

time frame?"  David Villanueva:  "Tomorrow the change will be

done."

Q.  Turning to the top of the next page, when was the first

text sent?

A.  September 8, 2014.

Q.  Please read and attribute that text.

A.  David Villanueva:  "Hey, John.  Did you send me the exact

I4hWcha5                            Hubbard - Direct

1   name and address of new business for the brothers?  Tom is

2   working on it."

3   Q.  Could you read and attribute the text that starts "Aquilina

4   Industries LLC"?

5   A.  John Cham:  "Aquilina Industries LLC, 313 West Old Country

6   Road, Hicksville.  Address stays the same as old license."

7   Q.  Showing you the first page of Government Exhibit 1002,

8   could you please read the title at the top of the page?

9   A.  Police Department, County of Nassau, New York, Pistol

10  License Section.

11  Q.  Could you please read the first and last name listed?

12  A.  Gerald Aquilina.

13  Q.  Turning to the fifth page, there's a series of entries on

14  this page.  Could you please read the date of the top entry?

15  A.  September 8, 2014.

16  Q.  How does that compare to the date of the texts we just

17  read?

18  A.  Same date.

19  Q.  Now, could you please read the associated comment?

20  A.  "Business name changed from Victoria Packing to Aquilina

21  Industries LLC.  Address is still the same.  TH."

22  Q.  Showing you Government Exhibit 1001, on the first page,

23  could you please read the first and last name?

24  A.  Benjamin Aquilina.

25  Q.  Turning to the 16th page, could you please read the date of

I4hWcha5                        Hubbard - Direct

1    the top entry on the list of entries on the 16th page?

2    A.  September 8, 2014.

3    Q.  How does that compare to the date of the last texts we

4    read?

5    A.  Same date.

6    Q.  Could you please read the comment?

7    A.  "Name changed from Victoria Packing to Aquilina Industries

8    LLC.  Address remains the same.  TH."

9    Q.  Now, turning back to Government Exhibit 204, page 1349,

10   directing your attention to the text near the top starting,

11   "Hey, I was talking," when was that sent?

12   A.  September 13, 2014.

13   Q.  Could you please read and attribute that text and the next

14   one?

15   A.  David Villanueva:  "Hey, I was talking to Tom on a case in

16   Nassau today.  What's the deal with the brothers?"  John Cham:

17   "They want to pick up their new plastic licenses with the new

18   name on next week if possible.  Remember, one is renewed in

19   April; the other one not until Sept. of year from now."

20   Q.  Now, near the bottom of the page, directing your attention

21   to the text starting, "Thurs. is good," when was that sent?

22   A.  September 16, 2014.

23   Q.  Could you read and attribute the text starting, "Thurs. is

24   good" and keep reading on to the next page to the text saying,

25   "Tom Houghton"?

I4hWcha5                        Hubbard - Direct

1    A.  David Villanueva:  "Thurs. is good for Tom if the brothers

2    want to go."  John Cham:  "Can they go Thurs.?"  David

3    Villanueva:  "Yes, they can go."  John Cham:  "Title?  Is he in

4    pistol area?"  John Cham:  "Cool."  John Cham:  "Perfect.  Who

5    do they see?"  David Villanueva:  "Tom Houghton."

6    Q.  Now, could you please skip down a little to a little below

7    the middle of page, the text starting, "How much do they

8    actually know," and read that text and the one after it?

9    A.  John Cham:  "How much do they actually know about you?  I

10   mean, if they are seeing Tom, they should know you are sergeant

11   at PLD in NYC, right?  They already obviously know your name,

12   LOL, but how much more do you think is necessary?"  David

13   Villanueva:  "They know me from the city, and we have mutual

14   friends, like Endall.  Tom doesn't know me on a personal

15   level."

16   Q.  Showing you Government Exhibit 446, directing your

17   attention to the bottom email on the first page, who is it

18   from, to and when?

19   A.  It's from jurisdoctorjsc@yahoo.com to name Gerry Aquilina,

20   September 16, 2014.

21   Q.  And how does that date compare to the date of the text we

22   just read?

23   A.  Same date.

24   Q.  Could you please read the first two paragraphs?

25   A.  "Word finally came down.  You can go on Thursday.  You are

1    seeing Police Officer Tom Houghton."

2    Q.  Could you please read the paragraph that starts "David

3    Villanueva"?

4    A.  "David Villanueva, your very good friend, you met through a

5    lieutenant who used to be down at the pistol license division a

6    couple years back named Lt. Mike Martin.  Just say he is a

7    really great guy.  Tom doesn't know Martin at all and does not

8    know Villanueva personally.  I know you can handle it."  Smiley

9    face.

10   Q.  Now going back to Government Exhibit 204, turning to page

11   1351, what date is the text near the top of the page that

12   starts, "Have a few more"?

13   A.  September 18, 2014.

14   Q.  Could you please read and attribute that text and the next

15   two.

16   A.  John Cham:  "Have a few more baseball things for Brandon.

17   Is he still into it?"  David Villanueva:  "LOL.  Yes, he is."

18   John Cham:  "Cool."

19   Q.  On the next page, page 1352, directing your attention to

20   the text that starts, "Also spoke," about a third of the way

21   down the page, when was that sent?

22   A.  September 20, 2014.

23   Q.  Please read and attribute that.

24   A.  David Villanueva:  "Also spoke to Tom from Nassau.  All is

25   good with the brothers.  It worked out better than what you and

1    I expected."

2    Q.  Turning to page 1360, directing your attention to the

3    second text down, what day was that sent?

4    A.  September 27, 2014.

5    Q.  Could you please read and attribute the texts starting from

6    that one through the texts starting, "LMAO, hahahaha"?

7    A.  David Villanueva:  "FYI, as of Monday, Anthony Clemente

8    will be assigned, and I should be getting draws back also.

9    This week is a short week.  I need a break, so going to Bahamas

10   Thursday.  Had to use credit card, but need a break from work.

11   LOL."  John Cham:  "Hey, that's for you.  Enjoy."  John Cham:

12   "You know, I have that 1,500 in an envelope in my office for

13   you so you can pay off the credit card."  John Cham:  "No

14   message?"  David Villanueva:  "LMAO.  Hahahaha.  I'm so

15   mentally tired with work, I forgot all about that.  Hahahaha."

16   Q.  Going back to page 1339 on Government Exhibit 204,

17   directing your attention to the third text down on the page,

18   when was that sent?

19   A.  Sorry.  You said third text down?

20   Q.  Yes.

21   A.  September 11, 2014.

22   Q.  About when is that in relation to the time period when

23   Chambers and Villanueva were discussing the Aquilinas in the

24   texts we just read?

25   A.  About the same time.

I4hWcha5                         Hubbard - Direct

1    Q.  Could you please read and attribute that text and down

2    through the text starting, "Yeah, but it can become a gray

3    line"?

4    A.  David Villanueva:  "I got a call from an NJ attorney to

5    hire me as a consultant for one of his billionaire clients.

6    Guy is moving to Nassau and wants a license.  Attorney rather

7    not travel to NY.  Offered me 8Ks and travel expenses.  LOL,

8    but I had to decline.  Wanted to pay me up front."  David

9    Villanueva:  "No.  He's off til Monday."  John Cham:  "Wow."

10   John Cham:  "Why decline?  Not NYC."  David Villanueva:

11   "Exactly.  LOL."  David Villanueva:  "Yeah, but it can become a

12   gray line, so rather not deal with it especially I don't know

13   them on a personal level."

14   Q.  Could you please read and attribute from the next text all

15   the way down this page and through the next page with the text

16   that starts, "As long as Tom"?

17   A.  John Cham:  "Why not send them through me?"  David

18   Villanueva:  "He got my name from a dealer."  David Villanueva:

19   "First thing he told me when I said I was out was doesn't want

20   an attorney or just anyone.  Wants someone who works or worked

21   license."  John Cham:  "OK, but I'm not just an attorney, and

22   if you sent him to me, he would probably figure out why."  John

23   Cham:  "LOL."  David Villanueva:  "Kept telling me his client

24   will pay for your travel expenses.  LOL.  He's like if you take

25   a helicopter there, they will pay for it.  LMAO."  David

1  Villanueva:  "He's calling me again later.  Wants me to tell

2  him the app process."  John Cham:  "No, Dave.  Listen to me.

3  If he say call Chambers, he will understand that it's really

4  you doing it.  Know what I mean?  I would change him 10K, no

5  expenses, LOL, and we could split it.  You don't have to lose

6  this entirely."  John Cham:  "As long as Tom is working for

7  you."

8  Q.  Can you read and attribute from the text that starts,

9  "Never want to let" through the text that starts, "Absolutely,

10 I will try"?

11 A.  John Cham:  "Never want to let a big fish go."  David

12 Villanueva:  "LOL.  True."  John Cham:  "You just say Chambers

13 will take care of you.  He's not like most lawyers.  He's also

14 a friend.  At that point he will realize -- wink, wink -- it

15 will be you doing it with me being retained so you don't have

16 to deal with the gray area."  John Cham:  "So your hands are

17 clean."  John Cham:  "You need say nothing else."  David

18 Villanueva:  "Absolutely.  I will try to sell him that point.

19 Sounds like a plan to me.  Have to get him to bite."

20 Q.  Skipping to the next page, page 1341, please read and

21 attribute from the text that starts, "I would charge more"

22 through the text that says, "It's a no-go."

23 A.  John Cham:  "I would charge more.  You can do this fast,

24 right?  If you can, it is worth more."  John Cham:  "Thinking

25 15."  John Cham:  "If you did self, might take more than a year

1   and get denied." David Villanueva:  "I'm calling him back in a

2   few." John Cham:  "OK." David Villanueva:  "It's a no-go."

3   Q.  We've been reviewing some emails and texts relating to

4   licenses in Nassau County.  Now I'd like to return to New York

5   City matters.  Showing you Government Exhibit 204, page 1333,

6   directing your attention to the text about midway down the

7   page, starting, "Dave, when you get a chance," when was that

8   sent?

9   A.  September 9, 2014.

10  Q.  About when was that in relation to the time period of the

11  texts we've seen about the Aquilinas?

12  A.  Approximately the same time.

13  Q.  Could you please read and attribute that text and the rest

14  of the texts on the page down to the text saying, "I feel your

15  pain"?

16  A.  John Cham:  "Dave, when you get a chance, can you finish

17  Travis Melendez?  That's the kid who inadvertently used his

18  kids' MetroCard.  ACD ended two weeks ago or so.  I gave you

19  dispo." David Villanueva:  "Can't make promises when they have

20  me doing everything except my work." David Villanueva:  "LOL."

21  John Cham:  "I know." John Cham:  "I feel your pain."

22  Q.  Showing you Government Exhibit 448, what address is the top

23  email in the chain from?

24  A.  Jurisdoctorjsc@yahoo.com.

25  Q.  Who is it to, and what's the date?

I4hWcha5                          Hubbard - Direct

1    A.   Wafer74@yahoo.com, September 20, 2014.

2    Q.   When is that in comparison to the text we just looked at?

3    A.   It's approximately 11 days after the text.

4    Q.   So looking down at the first email in the chain with the

5    reference to the name Travis Melendez, how does that compare to

6    the name discussed in the text we just looked at?

7    A.   They're the same.

8    Q.   Directing your attention to, in the top message, the

9    sentence starting, "You told me to wait," could you read the

10   rest of the email from that sentence down?

11   A.   "You told me to wait and do nothing else.  This is now

12   making me look really, really, really, really bad, but this is

13   not fair to me.  My clients are getting second notices, when

14   you and I have spoken about the case and I brought all the

15   documents required, like the first dispo and final dispo and

16   the affidavit of description.  Based on our conversations, I

17   thought everything was under control.  Otherwise I would have

18   had the licensee call directly.  I'll have Melendez call Patsy

19   on Monday, but this is not fair to me."

20   Q.   Showing you Government Exhibit 449, there are three emails

21   on that page.  Directing your attention to the middle email on

22   the page --

23           MR. MONTELEONI:  If you could pull out, Ms. Bustillo,

24   a moment.

25   Q.   -- what's the middle email responding to?

I4hWcha5                           Hubbard - Direct

1    A.   The email I just read.

2    Q.   All right.  Now focusing on the middle email, who is

3    sending it?

4    A.   Wafer74@yahoo.com.

5    Q.   Could you please read it?

6    A.   "What's not fair is that I have a ton of work and bend over

7    backwards to help you all the time.  What's not fair to me is

8    that I have cases over one and a half old and have to get them

9    done also.  What's not fair to me is that I have two

10   investigators.  What you don't realize that Nassau became your

11   priority and don't realize how difficult it was.  I did all the

12   work with Nassau and made you look good and told makes things

13   worse.  I'm taking him out to lunch Monday as a thank you for

14   his help.  So let's not start with what's fair."

15   Q.   Could you please read the reply to that message?

16   A.   "Nassau County is separate and benefits both of us big

17   time.  As far as fair, I would have told Travis to call Patsy

18   if we had not talked many times about him and you had not asked

19   to bring you dispo, affidavit, etc., to you.  Makes me look

20   like I'm just blowing smoke when a client gets a second notice

21   when we have been talking.  Making me look like I'm lying."

22   Q.   Showing you Government Exhibit 450, looking at the 8:52

23   p.m. email in this chain -- sorry, the 8:39 p.m. email, below

24   that, is that responding to the same email that started this

25   chain?

I4hWcha5                              Hubbard - Direct

1    A.   Yes.

2    Q.   All right.  Could you please read the 8:39 -- in fact,

3    could you please read the 8:39 email and then each of the

4    replies and starting there and working up in time?

5    A.   From wafer74@yahoo.com:  "Monday, I will give the

6    investigators every piece of paper needed that you have

7    forwarded to me, and I will have all cases done on first-come

8    basis.  Then we don't have to worry and we both know they will

9    be treated like any other case in rotation."

10        Jurisdoctorjsc@yahoo.com replies, "That's fine."

11        Wafer74@yahoo.com writes, "OK.  So from this point on, all

12   incident cases will be just that, rotation cases."

13        Jurisdoctorjsc@yahoo.com replies, "What you say."

14        Wafer74@yahoo.com replies, "K."

15   Q.   Looking down to the bottom of this page on Government

16   Exhibit 450, what's the date and time that the email that

17   started this whole chain was sent?

18   A.   September 20, 2014, 7:44 p.m.

19   Q.   Oh, sorry.  The first one from Chambers to Villanueva, on

20   the bottom of the first page.

21   A.   Sorry.

22        September 20, 2014, at 8 p.m.

23   Q.   Now showing you Government Exhibit 204, page 1353, can you

24   see on that the date and time of a first text message that is

25   sent after that September 20, 2014, 8 p.m. email we just saw

1    that started the chain?

2    A.  Yes.

3    Q.  All right.  What's that date and time?

4    A.  September 24, 2014, at 8:42 a.m.

5    Q.  Could you please read and attribute that text?

6    A.  David Villanueva:  "FYI, your MetroCard guy is finished.

7    Just don't see the voucher.  Need voucher to type up release

8    tomorrow.  Tomorrow is my only day in office this week."

9    Q.  This text mentions a MetroCard guy.  Looking back to

10   Government Exhibit 448, can you please read the first sentence

11   of the second paragraph, up until the dash?

12   A.  "This is the guy who used the MetroCard.  He had both his

13   daughter's MetroCard and his son's that he was holding for them

14   because they always lose their cards."

15   Q.  Now, back to page 1353 of Government Exhibit 204, could you

16   read from the text that starts, "Between the BS inspections"

17   and down through the text that says, "No jokes," and attribute

18   them?

19   A.  David Villanueva:  "Between the BS inspections and details

20   I'm never in, that's why I want you to understand I've and will

21   always bends backwards for you, but I can't do much if Paul has

22   me running around."  John Cham:  "That is fucked up."  John

23   Cham:  "I know you do and I appreciate it always."  David

24   Villanueva:  "No joke."

25   Q.  On page 1354 of Government Exhibit 204, directing your

1   attention to the text beginning with, "You know I love you,

2   man," when was that sent?

3   A.  September 24, 2014.

4   Q.  Could you please read and attribute the texts from that one

5   through to the next page, the text that starts with, "John, you

6   know I love you, bro"?

7   A.  John Cham:  "You know I love you, man, and I'm always there

8   for you too."  John Cham:  "And I'm sorry about the fight.  I'm

9   sorry about my part in the fight."  David Villanueva:  "John, I

10  felt terrible, and I'm deeply sorry.  It had nothing to do with

11  you.  You just become my outlet of the nonstop frustration I'm

12  going through.  I'm sorry I took it out on you.  Not personal

13  one bit."  David Villanueva:  "It was the frustration building

14  up.  Hey, I made Patsy close out MetroCard guy.  LMAO."  David

15  Villanueva:  "John, you know I love you, bro.  Known each other

16  for over 12 years."

17  Q.  Could you please read and attribute the text about a third

18  of the way down the page starting with, "Yeah, if you can get

19  me"?

20  A.  David Villanueva:  "Yeah, if you can get me voucher for

21  Metro guy, I will do release tomorrow."

22  Q.  I'd like to return to Nassau County.  Showing you

23  Government Exhibit 453, what's the display name and the user

24  that sent this email?

25  A.  John S. Chambers, Esq.

I4hWcha5                          Hubbard - Direct

1   Q.  What's the display name of the recipient?

2   A.  David Villanueva and family.

3   Q.  When was it sent?

4   A.  Tuesday, November 4, 2014.

5   Q.  About when is that in relation to the texts that we just

6   saw about the argument over Travis Melendez?

7   A.  It's approximately two months after.

8   Q.  What's the subject line?

9   A.  "Any possibility of seeing whether David Jimenez can avoid

10  an Article 78?"

11  Q.  Could you please read the paragraph that starts, "For a

12  quick $500 cash"?

13  A.  "For a quick $500 cash, maybe you can see if Tom would be

14  willing to grant this license.  Jimenez has done all the work,

15  and his application is already in.  And the file should be

16  really thick from when I worked with him while Sal was CO."

17  Q.  Could you please read the last sentence starting "also"?

18  A.  "Also, Brandon should be expecting a box before Friday."

19  Q.  Showing you Government Exhibit 454, scrolling down, is this

20  a thread responding to the email that we've just looked at?

21  A.  Yes.

22  Q.  All right.  On the second page, at the bottom of the second

23  page, could you read the date and time and sender of the bottom

24  email?

25  A.  November 4, 2014, 5:29 p.m., from wafer74@yahoo.com.

1   Q.   Could you read the message?

2   A.   "I actually spoke to Tom today.  He's off til Friday.  I

3   will see what he tells me on Friday.  You're spoiling Brandon.

4   LOL."

5   Q.   Could you please read the response?

6   A.   The response:  "Hey, Dave.  Just a reminder about Jimenez.

7   Thanks."

8   Q.   And what's the response to that?

9   A.   "LOL.  NP.  Will call tomorrow."

10  Q.   Now, on the bottom of the first page, who writes the next

11  email in the chain?

12  A.   Jurisdoctorjsc@yahoo.com.

13  Q.   Could you please read it?

14  A.   "I'm supposed to see him on Saturday.  I told him be

15  prepared to bring the $1,000 in cash, LOL, but of course, I did

16  not give him a guarantee.  Fingers crossed.  Hmmm, maybe toes

17  too.  Hahahahaha."

18  Q.   Skipping up to the most recent email, who sent that?

19  A.   Wafer74@yahoo.com.

20  Q.   What does he say?

21  A.   "Yeah, I spoke to Tom.  Will get back to me next week.  Has

22  to locate folder first."

23  Q.   Showing you Government Exhibit 457, who sent this email?

24  A.   Jurisdoctorjsc@yahoo.com.

25  Q.   To whom?

I4hWcha5                          Hubbard - Direct

1   A.  Wafer74@yahoo.com.

2   Q.  About when was this sent -- I'm sorry.  What's the date it

3   was sent?

4   A.  December 24, 2014.

5   Q.  When is that in relation to the last email we looked at?

6   A.  Sorry.  Can you give me the exhibit number?

7   Q.  Government Exhibit 454.

8   A.  This is about a month and a half after the emails we just

9   read.

10  Q.  What's the subject of this email?

11  A.  Custom shop.

12  Q.  What does the email say?

13  A.  "As promised, Dave.  BTW, any luck with Jimenez or our hair

14  salon guy.  Merry Christmas to you guys."

15  Q.  Turning to the attachment, what is it?

16  A.  A gift card.

17  Q.  From what company?

18  A.  The Custom Shop Clothiers.

19  Q.  What's the value of the gift card?

20  A.  $500.

21  Q.  Showing you Government Exhibit 458, when was this sent?

22  A.  December 24, 2014.

23  Q.  And when in relation to the last email we saw?

24  A.  Same date.

25  Q.  All right.  Just later in the day?

I4hWcha5                          Hubbard - Direct

1    A.  Yes.

2    Q.  What's the subject line?

3    A.  Second attempt.

4    Q.  And what's attached?

5    A.  Custom Shop PDFs and a gift card from Custom Shop

6    Clothiers.

7    Q.  Is that the same that we just saw?

8    A.  It appears to be.

9    Q.  Showing you Government Exhibit 460, directing your

10   attention to the chronologically first email in the thread, who

11   is that from?

12   A.  Display name or email address?

13   Q.  What's the display name?

14   A.  Display name is David Jimenez.

15   Q.  When was it sent?

16   A.  February 3, 2015.

17   Q.  Could you please read that email?

18   A.  "John, I have a feeling this was of your doing and working

19   your magic, but I got a message from Officer Mascara from the

20   NCPD pistol license.  He said I missed my appointment for

21   fingerprinting on 1/23/15.  I called him back and told him that

22   I had gone there a few months ago to bring documents, and I was

23   told I would be rejected and not to bother.  So I had taken the

24   matter to you.  He said remembers me well and my case.  He said

25   I could come in for fingerprinting.  I asked him what changed,

1    and he said that there is new management and he is under new

2    superiors.  He asked that I get fingerprinted and we would take

3    it from there.  I don't know what to believe anymore, but

4    nevertheless, I have the appointment for next Tuesday morning,

5    the 10th.  I will keep my fingers crossed.  Regards, David

6    Jimenez."

7    Q.  Going one email up in the chain, who sends the response?

8    A.  Jurisdoctorjsc@yahoo.com.

9    Q.  Could you please read the first paragraph?

10   A.  "David, I told you I've been working very hard on this

11   matter and have one more legal trick up my sleeve.  Evidently,

12   it must have worked.  This law firm sent a huge package to both

13   the police commissioner and the county executive on your

14   behalf.  Remember, it was Sgt. Mistretta who played these

15   wicked games with us.  A year ago, he was forced to retire

16   under a big black cloud.  Mindful of this and following

17   guidance and instinct, I decided that before my Article 78 gets

18   filed on your behalf that I would do this package."

19   Q.  On the next page, could you read the paragraph that starts,

20   "When you go to HQ"?

21   A.  "When you go to HQ, don't do a lot talking about the whys

22   and wherefores.  Just be very polite, as I know you always are,

23   and very thankful that it looks like we are seeing the light at

24   the end of the proverbial tunnel."

25   Q.  Could you please read the next paragraph?

I4hWcha5                         Hubbard - Cross

1    A.  "Upon receipt of the license -- see how confident I am --

2    you will bring final payment to the law firm of $2,850 in cash

3    and we shall finally be able to put this to bed.  It's been

4    long enough, for sure."

5    Q.  Going up to the response to this -- sorry.  The response at

6    the top of the second page, who wrote it?

7    A.  Display name, David Jimenez.

8    Q.  Could you please read it?

9    A.  "John.  Oh, my.  Certainly I will be polite and not say a

10   word.  OK.  I will keep you posted.  God, I hope this finally

11   happens.  Yes, I will bring you payment in cash.  No problem.

12   David."

13              MR. MONTELEONI:  No further questions.

14              THE COURT:  Cross-examination, Mr. Stavis.

15              MR. STAVIS:  Yes, your Honor.

16   CROSS-EXAMINATION

17   BY MR. STAVIS:

18   Q.  Special Agent Hubbard, you were asked questions on direct

19   examination about -- you were asked about a lot of different

20   exhibits, but I'm going to ask you about Government's Exhibit

21   6081.  This was the one with the licensee Edward Ticheli,

22   correct?

23   A.  Yes, sir.

24   Q.  And Mr. Monteleoni showed you the signature page, and over

25   here, you identified that as the signature of Sgt. David

 1  Villanueva, correct?

 2  A.  Yes, sir.

 3  Q.  Along with his recommendation, and his recommendation was

 4  dated 7/15/13, correct?

 5  A.  That's correct.

 6  Q.  That's not the end of the document, is it?

 7  A.  No, it's not.

 8  Q.  There's another signature below that, isn't there?

 9  A.  Yes.

10  Q.  And that other signature and that other writing is under a

11  section, commanding officer's comments and recommendations,

12  correct?

13  A.  Yes.

14  Q.  And under there, in handwriting, I think you could make out

15  part of it.  You made out the part that says, "I concur,"

16  correct?

17  A.  Yes.

18  Q.  And "W," correct?

19  A.  Yes.

20  Q.  And then I think you said you couldn't make out the next

21  word.  Does it look like cancellation?

22  A.  It could.

23  Q.  And then after that is continuation.  That you did testify

24  about, the last word?

25  A.  Yes, sir.

I4hWcha5                           Hubbard - Cross

1    Q.  And then below, below that, you have the signature.  Can

2    you make out the signature?

3    A.  I believe so.

4    Q.  Yes?  Whose signature is that?

5    A.  Appears to be Capt. Michael Endall.

6    Q.  Thank you.  And Capt. Endall signed this document, 608-1,

7    on 8/7 of 2013, correct?

8    A.  That's correct.

9    Q.  About three weeks after Sgt. Villanueva signed the

10   document, correct?

11   A.  Yes.

12   Q.  And it was Capt. Endall that gave the final approval of

13   this cancellation and continuation, is that correct?

14   A.  It appears so, yes, sir.

15   Q.  You were asked questions concerning Government's Exhibit

16   102.  That was the big box with the Barbies.  And when you were

17   asked that question, you testified that you received the big

18   box with the Barbies and baseballs.  You received that after

19   Sgt. Villanueva began cooperating with the government.  Is that

20   correct?

21   A.  That's correct.

22   Q.  Not before, but after?

23   A.  That's correct.

24   Q.  Were you involved in the arrest of Sgt. David Villanueva

25   on, I think it was June 20 of 2016?

I4hWcha5                          Hubbard - Cross

1    A.  I was not.

2    Q.  But you were aware of his arrest, correct?

3    A.  Yes.

4    Q.  You were working with a team of agents at that time on the

5    investigation, correct?

6    A.  That's correct.

7    Q.  And at the same time, you're aware that an Alex "Shaya"

8    Lichtenstein was also arrested at that time, correct?

9    A.  I believe he was arrested prior to that date, sir.

10   Q.  And the two of them, Lichtenstein and Villanueva, were

11   indicted by the grand jury in the case of United States of

12   America v. David Villanueva and Alex Lichtenstein, a/k/a

13   "Shaya," is that correct?

14   A.  I believe so.

15   Q.  Now, the cooperation that you referred to with the exhibits

16   that were provided to you, like Government's Exhibit 102, that

17   began how long after the arrest of David Villanueva on June 20

18   of 2016?

19   A.  Excuse me.  The part in which he provided the material to

20   us?  Is that what you're referring to, sir?

21   Q.  No.  I'm asking, When did the cooperation, the formal

22   cooperation, of David Villanueva start in relation to his

23   arrest on June 20 of 2016?

24   A.  I believe -- I believe it was a few months after, but I'm

25   not familiar with the exact date.

I4hWcha5                          Hubbard - Cross

1    Q.  One of the jobs of an FBI special agent -- by the way, I

2    always ask this.  All agents of the FBI are special agents;

3    there's no such thing as just plain agent?

4    A.  At the FBI, that's correct.  Yes, sir.

5    Q.  OK.  You're all special.

6    A.  That's what the badge says.

7    Q.  OK.  What is the job, role of a special agent?  There's

8    something called a report, a 302 report, is that correct?

9    A.  Yes.

10   Q.  And what is a 302 report?

11   A.  It's a write-up of an interview, proffer, anything that

12   would be considered evidentiary for a case we're working on.

13   Q.  How does a special agent prepare -- where does the number

14   302 come from?

15   A.  Bureaucracy.

16   Q.  It's the number of the form --

17   A.  Yes, sir.

18   Q.  -- you use?

19   A.  It is.

20   Q.  What is your method of preparing a 302 report?

21   A.  Method is when the interview begins, individual writing the

22   notes will take notes of the entire event, and when the event

23   is complete, go back to the office and type up everything based

24   on the notes that were written.

25   Q.  And it's very important to take accurate notes, correct?

I4hWcha5                        Hubbard - Cross

1    A.   It is.

2    Q.   Because it's very important to have an accurate 302 report,

3    correct?

4    A.   Yes.

5    Q.   And it's very important to have all the material, important

6    facts in your notes, correct?

7    A.   I'm sorry.  Can you repeat the question?

8    Q.   It's very important to have all of the material and

9    important facts in your notes, correct?

10   A.   The facts, yes.  The material, I'm not sure what you're

11   referring to.

12   Q.   No, I don't mean material.  I mean -- let me just rephrase

13   the question.

14   A.   OK.

15   Q.   You want to get all of the important facts in your notes,

16   correct?

17   A.   Yes, sir.

18   Q.   And you want to get all of the important facts in your 302

19   report based on those notes, correct?

20   A.   Yes.

21   Q.   And when you are about to -- by the way, have you ever

22   testified before at a trial like this?

23   A.   This is my first time.

24   Q.   But you've testified, not where, in other -- have you

25   testified other than in a trial like this before?

I4hWcha5                         Hubbard - Cross

1   A.  I have.

2   Q.  And do you use the 302 reports to refresh your

3   recollection --

4   A.  I do.

5   Q.  -- when getting -- please let me finish.

6        -- when you're getting ready to testify?

7   A.  Yes.

8   Q.  You testified, again, that David Villanueva provided

9   various exhibits, like Government's Exhibit 102, the box with

10  the Barbies and the baseballs, after he began to cooperate,

11  correct?

12  A.  Yes.

13  Q.  And the Spider-Man playbill with the tickets inside, with

14  the John Chambers envelope date, that was provided after

15  cooperation also, is that correct?

16  A.  Yes.

17  Q.  What is the procedure before, if you're aware, before a

18  person enters into a cooperation agreement with the government?

19  A.  There are a couple of what they call, I guess, meetings

20  between the U.S. district, in this case, Southern District of

21  New York, and at least one FBI agent, who is part of the case,

22  or -- and then the person in question and an attorney,

23  typically.

24  Q.  OK.

25  A.  But the actual mechanics of it I'm not entirely familiar

1    with.

2    Q.  Just the general lay of the land is what I was asking.

3    A.  Uh-huh.

4    Q.  And that's called, when the person and their lawyer meets

5    with the prosecutors, that's called a proffer?

6    A.  Yes.

7    Q.  Are you familiar with that term, "proffer"?

8    A.  I am.

9    Q.  And so there had to be a proffer with David Villanueva

10   before he ultimately became a cooperating witness and provided

11   the items that you've been testifying about?

12   A.  I believe so, yes.

13   Q.  I'm showing you what has been marked as Defendant's Exhibit

14   K for purposes of identification, and I ask you to take a look

15   at it.  When you finish taking a look at it, look up and I'll

16   have another question for you.

17   A.  OK.

18   Q.  Is Defense Exhibit K for purposes of identification an

19   email that you wrote on September 30 of 2016?

20   A.  Yes.

21          MR. STAVIS:  Your Honor, at this time I would offer

22   what has been previously marked as Defendant's Exhibit K for

23   purposes of identification into evidence as Defendant's Exhibit

24   K.

25          THE COURT:  Any objection?

1            MR. MONTELEONI:  No, your Honor.

2            THE COURT:  Defendant's Exhibit K is received in

3   evidence.

4            (Defendant's Exhibit K received in evidence)

5            THE COURT:  You may publish it, Mr. Stavis.

6            MR. STAVIS:  OK.

7   Q.  So this is an email you sent on your FBI email account,

8   correct?

9   A.  Yes.

10  Q.  On September 30, 2016, at 1:43 p.m., correct?

11  A.  Yes.

12  Q.  And you sent it to Jared Witmier.  Is Jared Witmier also a

13  special agent?

14  A.  He was my supervisor at the time.

15  Q.  But he's an FBI agent, correct?

16  A.  Yes, sir.

17  Q.  And it was an update.  Read the text of the email that you

18  wrote to your supervisor, Jared Witmier, on September 30, 2016.

19  A.  It appears to be cut off.  Could you widen it to the right

20  a little bit?

21  Q.  Yes.  Sorry.

22  A.  Thank you.

23       "Looks like we have a proffer session with Villanueva set

24  up for next Thursday.  I think the calls we have between him

25  and Shaya made him rethink his situation.  Will keep you

I4hWcha5                          Hubbard - Cross

1    posted.  Bard."

2    Q.  What were you referring to when you wrote "calls we have

3    between him and Shaya"?

4    A.  We had gathered evidence as part of this case where we had

5    phone calls that were recorded between the individual named

6    Shaya and with Mr. Villanueva.

7    Q.  And where did you obtain those calls from?

8    A.  It was from a search warrant.

9    Q.  And it was from a search warrant for Shaya?

10   A.  That's correct.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I4HJCHA6                          Hubbard - cross

Q.  And Shaya is also the name of Alex Lichtenstein.  Is that
correct?

A.  That is correct.

Q.  And Alex Lichtenstein was the individual who was the
co-defendant with David Villanueva in the indictment United
States of America versus David Villanueva and Alex
Lichtenstein, a/k/a Shaya, which you testified about, correct?

A.  I believe so, yes.

Q.  What are you referring to when you wrote to your
supervisor, Agent Witmier, that Villanueva, the phone calls
made Villanueva, "rethink his situation"?

A.  In reference to the context of some of the calls we
received from the search warrant based on Shaya, some of the
calls appeared incriminating when it comes to Mr. Villanueva's
role at License Division.

        I believe, if memory serves me correctly, I believe he
and his attorney were privy to some of that information, and my
thoughts were that might convince him to maybe cooperate or
just plead and maybe figure out where he stood.

Q.  Because there was very strong evidence that you had
uncovered against Sergeant Villanueva, correct?

A.  That's correct.

Q.  And those were on tapes that were, or recordings between
him and Shaya Lichtenstein, correct?

A.  Yes.

1   Q.  And this was, would it be fair to say that you're advising

2   your supervisor this was an important development in the case?

3   A.  Yes.

4   Q.  So let's get to the proffer -- withdrawn.

5       By the way, from your work on this case, do you know if the

6   proffer that was held was the first meeting between you law

7   enforcement agents and Sergeant Villanueva, or was there an

8   earlier meeting?

9   A.  I can't recall.

10  Q.  Do you know if Agent Downes spoke to David Villanueva at

11  his home, 27 Skidmore Place, Valley Stream?

12  A.  I can't recall.

13  Q.  So you attended the proffer on October 5th, 2016 where

14  David Villanueva was going to be speaking to the prosecutors,

15  correct?

16  A.  I'm not sure if I was attending that particular proffer,

17  sir.

18  Q.  I am going to show you what is marked as Defense Exhibit L

19  for the purposes of identification and see if that -- I ask you

20  to take a look at that, and when you've had a chance to look at

21  it, please look up and I'll ask you additional questions.

22  A.  (Pause)  Yes, I believe I was there.

23  Q.  Is Defense Exhibit K for the purposes of identification --

24  having reviewed Defense Exhibit K for the purposes of

25  identification, does that refresh your recollection of what

I4HJCHA6                          Hubbard - cross

1   transpired at the proffer of David Villanueva on October 5th of

2   2016?

3   A.  Do you mean Exhibit L, sir?

4   Q.  Did I say K?  Oh, K -- yes, Exhibit L.

5   A.  I have to read over all seven pages of it to get fully

6   recollected, but it does strike a memory right now.

7   Q.  Excuse me?

8   A.  It does strike a memory right now.

9   Q.  That you were there?

10  A.  Yes, sir.

11  Q.  Do you recall who else was there?

12  A.  According to what the paperwork tells me.

13  Q.  That is your paperwork, isn't it?

14  A.  It is.  Assistant U.S. Attorneys --

15          MR. MONTELEONI:  Is the witness testifying from memory

16  or are you asking him to read it?

17          MR. STAVIS:  I'll offer it if he can identify it.  I

18  will offer it in evidence.

19          THE COURT:  Any objection?

20          MR. MONTELEONI:  Yes, 802.

21          THE COURT:  Isn't it hearsay?

22  BY MR. STAVIS:

23  Q.  Is it in the regular course of business that you should

24  make a 302 report?

25  A.  It is.

I4HJCHA6                        Hubbard - cross

1   Q.  Was that 302 report with your name on the bottom of it made

2   in the regular course of business?

3   A.  It appears to be, yes.

4           MR. STAVIS:  I offer it, your Honor.

5           MR. MONTELEONI:  Your Honor, business records

6   exception doesn't apply to this.  There is hearsay within

7   hearsay.

8           THE COURT:  Sustained.

9   BY MR. STAVIS:

10  Q.  Why don't you look at that report and see if it refreshes

11  your recollection fully so I can ask you questions about it.

12  A.  Well, sir, reading this from -- you're asking who was

13  there?  Refreshing my recollection, I don't remember every

14  single individual, but this will tell me who, when I wrote it,

15  should have been there.

16  Q.  Well, wasn't this report, Defense Exhibit L, for the

17  purposes of identification?  It is your report, right?

18  A.  Yes, sir.

19  Q.  Based on your notes, correct?

20  A.  That's correct.

21  Q.  And you took the notes while you were there, correct?

22  A.  Yes.

23  Q.  So I would like to ask you a few questions about -- well,

24  withdrawn.

25          Did you look at Defense Exhibit L to prepare your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4HJCHA6                         Hubbard - cross

1    testimony?

2    A.  No, I did not.

3    Q.  You did not?

4    A.  No.

5    Q.  You testified a few minutes ago that you used 302 reports

6    to refresh your recollection before you testified?

7    A.  That's correct.

8    Q.  But you didn't use this 302 report marked as Defense

9    Exhibit L for the purposes of identification to refresh your

10   recollection before you testified here today?

11   A.  No, sir, I didn't.

12   Q.  Or this week?

13   A.  I did not.

14   Q.  What do you recall about the proffer at the U.S. Attorney's

15   Office on October 5th, 2017 with David Villanueva?

16   A.  I recall from memory nothing much specific, sir.

17   Q.  But it was, as you previously testified, it was a very

18   important development in the case, wasn't it?

19   A.  I would say it was important, yes, sir.

20   Q.  It was so important that you, Defense Exhibit K in

21   evidence, you told your supervisor, Jared Witmier, that it

22   looks like we have a proffer session with Villanueva set up for

23   next Thursday, right?

24   A.  Well, the proffer sessions happen all the time.  That is

25   not what I was trying to emphasize with my supervisor on that

1   note, sir.

2   Q.  But proffer sessions didn't happen all the time with David

3   Villanueva, did they?

4   A.  I can't recall, sir.

5   Q.  You can't recall?

6   A.  If they happened all the time, I am not entirely sure what

7   you mean by all the time.

8   Q.  Wasn't this the first proffer session with David

9   Villanueva?

10  A.  I don't recall if this was the first session or not, sir, I

11  don't remember.

12  Q.  So the proffer session that we're talking about is a

13  proffer session on October 5th, 2016, correct?

14  A.  I believe so, yes.

15  Q.  Less than a week earlier, on September 30th, 2016, you're

16  sending an email to your supervisor, Jared W. Witmier, "Looks

17  like we have a proffer session with Villanueva set up for next

18  Thursday.  I think the calls have, we have between him and

19  Shaya made him rethink his situation."

20      You previously testified about that, correct?

21  A.  Yes.

22  Q.  You testified that that was an important development in the

23  case, correct?

24  A.  Yes.

25  Q.  And you don't recall anything about the proffer session

I4HJCHA6                         Hubbard - cross

1   that occurred on October 5th, less than a week later.  Is that

2   your testimony?

3   A.  Yes, sir.

4   Q.  Do you recall if at the proffer of October 5th, 2016 that

5   you attended, the name John Chambers was never mentioned?

6   A.  I'd have to look at the 302 to verify it, but that's

7   possible.

8   Q.  Here's Defense Exhibit L for the purposes of

9   identification.  Please take a look at that and take your time.

10  A.  (Pause)  Okay.

11  Q.  Have you reviewed your 302 report?

12  A.  Regarding the mention of John Chambers, yes, I did.

13  Q.  There is no mention of John Chambers in your 302 report.

14  Is that correct?

15  A.  That's correct.

16  Q.  Now, you were asked questions by the prosecutor on direct

17  examination about Government's Exhibit 410 which I'll put on

18  the screen because it's in evidence.  This is the Toys-R-Us

19  gift certificate, correct?

20  A.  Yes.

21  Q.  It is for $200.00, correct?

22  A.  Yes.

23  Q.  And on the bottom it says Dear David Villanueva.  Hooray,

24  John and Tina has given you an E-gift card from Toys-R-Us and

25  Babies-R-Us dot com.  Merry Christmas to Brandon and Madison.

I4HJCHA6                          Hubbard - cross

1    I hope they enjoy, with love, J and T.

2         Who is Tina?

3    A.  I believe Tina is John's wife.

4    Q.  That would also be T, the T in J and T?

5    A.  That's how I would interpret it.

6    Q.  And they were both, both John and Tina Chambers were on

7    this gift where it says Merry Christmas on Government's Exhibit

8    410, correct?

9    A.  Yes.

10              MR. MONTELEONI:  Objection.

11   BY MR. STAVIS:

12   Q.  And on 411, which is the Applebee's, Applebee's, it also

13   says to David from John and Tina.  That, too, Government

14   Exhibit 432, would be referring to my client, John Chambers,

15   and his wife, Tina Chambers, correct?

16   A.  I believe so, yes.

17   Q.  And this is from December of 2013, correct?

18   A.  Yes.

19        (Off-the-record discussion).

20   BY MR. STAVIS:

21   Q.  I am approaching the witness with Defendant's Exhibit M for

22   the purposes of identification and ask him to, I would ask you,

23   sir, to take a look at that, and after you've had a chance to

24   take a look at it, look up and I'll ask you another question.

25   A.  (Pause)

I4HJCHA6                         Hubbard - cross

1   Q.  Are you finished?

2   A.  I have.

3   Q.  Is that an email that you sent on -- may I just have it

4   back for a moment -- that you sent on February 27th, 2017 to a

5   U.S. Attorney?

6   A.  Yes.

7   Q.  That was during the course of your work with regard to this

8   investigation, correct?

9   A.  That's correct.

10              MR. STAVIS:  I would offer what has been previously

11  marked as Defense Exhibit M for the purposes of identification

12  into evidence as Defense Exhibit M.

13              MR. MONTELEONI:  Objection.

14              THE COURT:  Come on up to the sidebar.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           MR. MONTELEONI:  The basis of the objection is, first

3     of all, the email is hearsay.  We don't object to the photos

4     certainly, but the email's hearsay not within an exception and

5     it is very hard for me to understand how this is not covered by

6     the ruling by the undercover visit.

7           MR. STAVIS:  The court's ruling was we could not call

8     the undercover officer, and the court's ruling covered the

9     undercover, the undercover officer as well as the video and

10    indicated that Ms. Chambers might be a witness and it would

11    present a different issue if there were testimony or something

12    else.

13          With regard to hearsay, there is nothing in there that

14    is offered for the truth.  There is no assertive statement -- I

15    should keep my voice down -- there is no assertive statement

16    that is offered for the truth or anything like that.  It was

17    said, it was transcript, it was transcribed by somebody else.

18    It is not hearsay.

19          THE COURT:  The government is not objecting to the

20    photos.  They're objecting to the email.  What is it in the

21    email that is of such consequence that it should overcome a

22    hearsay objection?

23          MR. MONTELEONI:  It does make statements.  It says Gun

24    Permits, Inc. goes back to Chambers when you Google it.  UC was

25    informed by the doorman that Chambers only sees clients with an

I4HJCHA6                        Hubbard - cross

1    appointment.  That is hearsay.

2              MR. STAVIS:  It transfers the photographs.

3              THE COURT:  Why don't you show him the email, and

4    we'll deem the photographs marked Defendant's Exhibit M-1, and

5    then if you want, you can put the photographs into evidence.

6              MR. STAVIS:  Very well.  I should be able to question

7    him about having sent the --

8              THE COURT:  You can question him about how he sent it,

9    but you just can't get this email itself into evidence.

10             MR. STAVIS:  Understood.

11             MR. MONTELEONI:  The one other issue, if he intends to

12   elicit there was an undercover operation, it strikes me that

13   the only relevance that might have is to create the good acts

14   inference that this Court has already ruled is improper.

15             THE COURT:  I ruled that's improper and is not going

16   to be going there.  I expect the government will object if he

17   does.  We'll deem the two photographs marked collectively M-1.

18   He will offer them in front of the jury.

19             MR. STAVIS:  I know you don't want me to say

20   "undercover," but there was an investigator who was working,

21   part of the investigation.

22             THE COURT:  I am not saying you can't say,

23   "undercover."

24             MR. STAVIS:  I thought that you had.

25             THE COURT:  No, no.  I am saying -- I am not saying

I4HJCHA6                          Hubbard - cross

1     that you can't say -- you can question him about how he got

2     these photographs, okay?

3               MR. STAVIS:  Okay.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Members of the jury, the objection is

3   sustained in part, all right?  There is an email and then there

4   are two photographs attached to the email.  The objection is

5   sustained with respect to the email.  The photographs have been

6   deemed marked as Defendant's Exhibit M-1.  Are you offering

7   them?

8           MR. STAVIS:  Yes, I am, your Honor.

9           THE COURT:  Any objection?

10          MR. MONTELEONI:  To the photographs, no.

11          THE COURT:  Defendant's Exhibit M-1 is received in

12  evidence.

13          (Defendant's Exhibit M-1 received in evidence)

14  BY MR. STAVIS:

15  Q.  Agent Hubbard, I am showing you the two photographs,

16  Defendant's M-1, that are associated with the email that you

17  sent on February 27th, 2017.  I'll ask you a question about

18  them.

19  A.  Okay.

20  Q.  Were these the photographs that were taken by an NYPD

21  undercover officer who went to Chambers' office?

22  A.  I believe they were.

23  Q.  And those photographs depict the outside of John Chambers'

24  law office?

25  A.  That's what I was told, yes, sir.

I4HJCHA6                        Hubbard - cross

1    Q.  Once you obtained these photographs -- by the way, did you

2    obtain them directly from the undercover officer or did someone

3    else give them to you?

4    A.  I believe they were sent to me electronically first.

5    Q.  And then you, in turn, you, in turn, sent the photographs

6    to an Assistant U.S. Attorney.  Is that correct?

7    A.  Yes, sir.

8            MR. STAVIS:  I have no further questions, your Honor.

9            THE COURT:  Redirect examination?

10           MR. MONTELEONI:  No, your Honor.

11           THE COURT:  All right.  Special Agent Hubbard, you're

12   excused as a witness, sir.  You may step down.

13           (Witness excused)

14           THE COURT:  Members of the jury, we'll take a short

15   mid-afternoon recess at this time.  Keep an open mind.  Come to

16   no conclusions and please don't discuss the case.  Please

17   recess the jury.

18           THE CLERK:  All rise.  Jury exiting.

19           (Jury excused)

20           THE COURT:  Everyone may be seated.  We'll take a

21   10-minute recess, and if the government would have their next

22   witness here on the stand when we resume so we can move ahead.

23           MR. MONTELEONI:  Yes, your Honor.  Thank you.

24           (Recess)

25           THE COURT:  All right.  Let's bring in the jury.

I4HJCHA6                           Villanueva - Direct

1              (Jury present)

2              THE COURT:  All right.  Everyone may be seated.  Would

3      the government call its next witness?

4              MR. MONTELEONI:  Yes, your Honor, the government calls

5      David Villanueva.

6       DAVID VILLANUEVA,

7           called as a witness by the government,

8           having been duly sworn, testified as follows:

9              THE COURT:  You may inquire, Mr. Monteleoni.

10             MR. MONTELEONI:  Thank you.

11     DIRECT EXAMINATION

12     BY MR. MONTELEONI:

13     Q.  Are you currently employed?

14     A.  No, I am not.

15     Q.  Have you ever been employed?

16     A.  Yes, I have.

17     Q.  What was your last employer?

18     A.  My last employer was Diamond Security.

19     Q.  When were you employed by Diamond Security?

20     A.  I was employed from September of 2016 to February 2017.

21     Q.  What was your position at Diamond Security?

22     A.  Assistant administrator.

23     Q.  Prior to Diamond Security, what was your last employer?

24     A.  The NYPD.

25     Q.  What was your rank in the NYPD when you left?

```
1    A.  Sergeant.

2    Q.  What was the last unit that you were assigned to at the

3    NYPD before you left?

4    A.  I was assigned to the auto pound in Brooklyn.

5    Q.  When did you start working at the auto pound in Brooklyn?

6    A.  April of 2016.

7    Q.  Where were you before you were transferred to the auto

8    bound pound?

9    A.  I was assigned to the License Division.

10   Q.  What unit in the License Division?

11   A.  The incident Section.

12   Q.  Was your transfer to the auto pound voluntary?

13   A.  No, it was not.

14   Q.  Why were you transferred?

15   A.  I was under investigation.

16   Q.  When did you leave the NYPD?

17   A.  I left in August of 2016.

18   Q.  You said you were under investigation.  What was the result

19   of the investigation?

20   A.  I was ultimately arrested.

21   Q.  What were you arrested for?

22   A.  I was arrested for conspiracy to commit bribery, bribery,

23   and the making false statements to the FBI.

24   Q.  What happened with your court case?

25   A.  I pled guilty.
```

1    Q.  To what?

2    A.  I pled guilty to conspiracy to commit briber, bribery and

3    also making false statements to the FBI.

4    Q.  Why did you plead guilty?

5    A.  I was guilty.

6    Q.  You said you pled guilty to bribery.  Was that giving

7    bribes or accepting bribes?

8    A.  Accepting bribes.

9    Q.  Who did you accept bribes from?

10   A.  I accepted bribes from a couple of people.  It was John

11   Chambers, a person I knew as Shaya whose name is Alex

12   Lichtenstein, a person known as Frank Soohoo and another person

13   known as Dominic Calendrella.

14   Q.  Turning to the person you knew as Shaya, what was his line

15   of work?

16   A.  He was what was called a pistol expediter.

17   Q.  What is an expediter?

18   A.  He would come into 1 Police Plaza on behalf of clients and

19   get the licenses done literally ASAP.

20   Q.  What bribes did Shaya give you?

21   A.  He gave me money.

22   Q.  About how much money?

23   A.  In total, it was around $20,000.

24   Q.  Did he give you anything other than money?

25   A.  He gave me his credit card once to purchase Broadway

1    tickets.

2    Q.  Did he give you anything else?

3    A.  Yes.  On two different occasions he gave me limousine

4    rides, and one time he actually purchased airline tickets to

5    San Diego with a credit card points.

6    Q.  Did he give anything to any of your family members?

7    A.  To my wife's grandmother menorah for the holidays.

8    Q.  Did he give anything to your children?

9    A.  He did give money to my children.

10   Q.  How much money?

11   A.  He gave my children $500.00 each for a trip to Disney that

12   we had planned.

13   Q.  During what time period did Shaya give you these things?

14   A.  It started late 2012 till late 2015.

15   Q.  For what?

16   A.  To have his licenses expedited for his clients.

17   Q.  When you say to have his licenses expedited for his

18   clients, what would you do?

19   A.  My role was, when he had clients come in, I would make sure

20   the process of getting started would begun ASAP, meaning they

21   didn't have to wait outside to get fingerprinted, they would

22   get fingerprinted and actually get put into the system without

23   having to wait like a normal person who was applying, and as

24   soon as the prints came back, I would just do the second

25   recommendation, and literally the license would be issued

I4HJCHA6                          Villanueva - Direct

1    before the paperwork was even in.

2    Q.  About how much of a turnaround time would that be for those

3    licenses that you were issuing on behalf of Shaya?

4    A.  Sometimes not even a month.

5    Q.  What's the normal turnaround time for the type of licenses

6    that you were issuing for Shaya if they had been issued to

7    people other than Shaya's clients?

8    A.  Usually it can take for a carry business license, can take

9    anywhere between six months to a year, sometimes even more.

10   Q.  You mentioned carry business licenses.  Was that the type

11   of license you would typically issue for Shaya?

12   A.  Yes.

13   Q.  What was your role in the issuance process?

14   A.  I would do what is called the, the investigator would do

15   the first recommendation, I would do the second recommendation.

16       After the license would issue, the folders would come

17   back to me.  They would literally bear missing paperwork, and

18   my role was to actually obtain the paperwork after the licenses

19   were issued.

20   Q.  So, first of all, you mentioned an investigator who would

21   do a first recommendation.  Who was that?

22   A.  That was a Police Officer Richard Ochetal.

23   Q.  You said you did a second recommendation for these

24   licenses, was that the final stage or were there others?

25   A.  There was one more stage after that, the actual approval.

1   Q.  Who would give the approval to licenses issued on behalf of

2   Shaya?

3   A.  At that point it was my executive officer who was a

4   captain, Michael Endall.

5   Q.  Now about how many licenses did you participate in

6   approving on behalf of Shaya?

7   A.  My estimate would be approximately 100, between 2012 and

8   '15.

9   Q.  Of the licenses whose issuance you participated in

10  approving, about how many did you believe were actually

11  qualified to have carry licenses?

12  A.  Due to the fact most of the documents were missing, I would

13  say none.

14  Q.  You mentioned that you would gather paperwork for the files

15  of these licenses after the fact.

16      What did you do to get paperwork in those files?

17  A.  In the beginning around 2012 to 2013, only a couple of,

18  handful of people coming in through Shaya.  I was able to

19  obtain paperwork through Shaya himself or actually the

20  licensee.

21          As time went by, more people started coming in, so the

22  caseload was getting bigger and bigger, so the problem was I

23  cannot obtain paperwork any more from Shaya or his applicants.

24  They would call me, so I would have to go into the folder and

25  find out what paperwork was in there and create what is called

1   a letter of necessity based on whatever information I had in

2   the folder.

3   Q.  Who was the letter of necessity supposed to be from?

4   A.  The licensee.

5   Q.  And who actually would create the letter of necessity?

6   A.  I began creating it.

7   Q.  Did you ever give anyone else anything on Shaya's behalf?

8   A.  Yes.  I gave two different parties.  I gave money to Shaya

9   left on my desk to give to them.

10  Q.  Who were the people who you gave money to on behalf of

11  Shaya?

12  A.  My police officer, investigator Richard Ochetal and

13  Lieutenant Paul Dean.

14  Q.  How much did you give to Ochetal on Shaya's behalf?

15  A.  He left on my desk once 300 to give to Richard Ochetal.

16  Q.  How much money did you give to Dean on Shaya's behalf?

17  A.  A thousand dollars.

18  Q.  You also mentioned an individual named Frank Soohoo.  What

19  did Frank Soohoo give you?

20  A.  He did vacations with Frank Soohoo, vacations.

21  Q.  How many vacations did you do with Frank Soohoo?

22  A.  I would say approximately four.

23  Q.  Who went on those vacations?

24  A.  It was Richard Ochetal, his wife, my fiance at the time,

25  myself and Frank Soohoo and his wife.

I4HJCHA6                              Villanueva - Direct

1    Q.  Who paid for the vacations?

2    A.  Frank Soohoo did.

3    Q.  What did he pay for?

4    A.  He paid for the airlines and lodging.

5    Q.  Did he pay for food and drink on the vacations as well?

6    A.  Three out of the four, it was all-inclusive.

7    Q.  Of the three all-inclusive vacations, where were those

8    vacations?

9    A.  Bahamas, Mexico and Dominican Republic.

10   Q.  And for the fourth vacation, where was that?

11   A.  Hawaii.

12   Q.  How long were those vacations?

13   A.  The one excluding Hawaii would be from Thursday to Sundays,

14   and the Hawaii was I believe -- I believe was a week.

15   Q.  Apart from the food and drink that he provided you in the

16   all-inclusive vacations, did Frank Soohoo provide you any other

17   kind of refreshments?

18   A.  Yes, Frank Soohoo had a store in Queens, and he would do

19   parties for us and provide liquor.

20   Q.  When you say he would do parties for us, was this during

21   the day or at night?

22   A.  It was both.  Most of the time it was during the day, but a

23   couple of times it was at night.

24   Q.  How many times did you visit his store during the day?

25   A.  I don't recall.  It was numerous times.

I4HJCHA6                          Villanueva - Direct

1    Q.   About how regularly would you do that?

2    A.   We were averaging at least once a week or once every other

3    week.

4    Q.   When you went to his store during the day, what would he

5    provide you?

6    A.   He would have liquor for us and he also he will provide us

7    with sushi Sashimi.

8    Q.   Was his store a store that made sushi?

9    A.   No.  It was a cigar shop.

10   Q.   Where would the sushi or sashimi come from?

11   A.   He would have it catered.

12   Q.   About how expensive was the caterer?

13   A.   A couple hundred dollars.

14   Q.   You also mentioned he provided you parties at night.

15        How many parties at night did Frank Soohoo provide

16   you?

17   A.   Three.

18   Q.   In addition to food and drink, did he provide any other

19   forms of entertainment at any of those parties?

20   A.   Yes, two out of the three, he had prostitutes attend the

21   party.

22   Q.   Did you patronize the prostitutes on occasions when you

23   attended the parties?

24   A.   No, I did not.

25   Q.   Did any of the other attendees at the parties patronize the

1   prostitutes?

2   A.   Yes.

3   Q.   In addition to the trips, the meals, the parties, did

4   Soohoo give you anything else?

5   A.   On two different occasions Soohoo gave me $500.00 for each

6   occasion.

7   Q.   During what time period was Soohoo giving you these various

8   things?

9   A.   He was from like 2013 also to '15.

10  Q.   What did you do for Soohoo?

11  A.   I helped approved one upgrade and helped approve another

12  one, another license.  I am sorry.

13  Q.   When you say you helped approve an upgrade, what upgrade

14  did you approve on behalf of Soohoo?

15  A.   One of his clients had what is called limited carry, and I

16  upgraded it to a full carry.

17  Q.   What did you do to process that?

18  A.   I just had to go into the -- and change the classification

19  for the license.

20  Q.   Do you believe that individual qualified for the full

21  carry?

22  A.   That individual I did for Soohoo, yes.

23  Q.   What, if any, special treatment did that individual receive

24  if they were getting a license they were entitled to?

25  A.   The time-frame.

I4HJCHA6                    Villanueva - Direct

1   Q.  What was the time-frame?

2   A.  Less than a week.

3   Q.  You said there was a different license that you

4   participated in approving for Soohoo.  What was that?

5   A.  There was one time in the so-called parties we had, Soohoo

6   came, and the party I attended it was also Richard Ochetal,

7   Lieutenant dean and another officer called Bobby Espinal.

8       Frank told us he had a client that was willing to pay big

9   dollars, but the problem was he was federally barred, he would

10  not be able to obtain a pistol license because he was federally

11  barred.

12      So an idea brewed at this party that if he has a brother

13  who will get his brother approved first, and then approve the

14  person who is barred, and through the Safe Act, sell the

15  firearm from one brother to the other brother; and, therefore,

16  bypassing a NICS check.

17  Q.  You mentioned the Safe Act.  What is the Safe Act?

18  A.  That was full background checks for us, it was making tough

19  to get licenses.  There were a lot of restrictions.

20  Q.  You said that approving a license for someone's brother and

21  then having the brother sell them the firearm would bypass a

22  NICS check.  What is a NICS check?

23  A.  Every time you're going to purchase a firearm, the federal

24  government also does a background check to make sure you're not

25  federally barred.

1    Q.  Whose idea was it to circumvent this background check by

2    doing a brother-to-brother sale?

3    A.  In this occasion Lieutenant Paul Dean.

4    Q.  What was your role?

5    A.  My role was approve the original brother, the one that

6    wasn't able to get the license.

7    Q.  What, if any, role did you have in transferring the gun

8    from the brother you approved to the other one?

9    A.  Once I approved the brother who was able to get a license

10   and the one who was not -- federally barred, when both were

11   approved, my role was to take the firearm and transfer it from

12   the one who was able to have a firearm to the one who wasn't

13   allowed to have a firearm.

14   Q.  So you also mentioned an individual named Dominic

15   Calendrella.  What did Dominic Calendrella give you?

16   A.  Dominick Calendrella gave me money.

17   Q.  How much money did he give you?

18   A.  He was averaging around a thousand dollars per license.

19   Q.  During what time period would he be giving you this money?

20   A.  2014 to '15.

21   Q.  You said there was a thousand dollars per license.  What

22   would you do with respect to licenses with relation to

23   Calendrella?

24   A.  For him, it was a little different.  I would actually go to

25   his place of business and whoever he has potential client, I

1    would sit down with them and I will speak to them first, tell

2    them all the documents they needed, and then I will actually

3    type up their applications for them and I will have them come

4    to 1 Police Plaza usually an hour before we opened up and

5    process for them and eventually will obtain their license.

6    Q.   What type of license did Calendrella's clients typically

7    have?

8    A.   Special carries.

9    Q.   What is a special carry?

10   A.   A special carry is licenses that has already been approved

11   in counties outside the City of New York, so they already have

12   a full carry in Nassau, Suffolk or any other counties, but they

13   can't come into the city because their license is not good in

14   the city.

15       So a special carry is just an amendment to the license they

16   already have that allows them to come into the city.

17   Q.   About how many special carry licenses did you participate

18   in approving in relation to Dominic Calendrella?

19   A.   I would say around approximately around 15.

20   Q.   Approximately how much money do you think you got from

21   Dominick Calendrella?

22   A.   Approximately 15,000.

23   Q.   Of these approximately 15 licensees, about how many of

24   these did you believe were qualified to have special carry

25   licenses?

1  A.  As I recall, most of them did not have any business to come

2  into the city, so I would say zero.

3  Q.  Did you ever hear anything about Calendrella's background?

4  A.  There were indications that he had ties to what we call a

5  crime family.

6  Q.  Do you know anything about whether that was accurate?

7  A.  I never followed up on it.

8  Q.  You also mentioned John Chambers.  Do you see John Chambers

9  in court here today?

10  A.  Yes.

11  Q.  Could you please point to him and identify him by an

12  article of clothing?

13  A.  Yes, he is wearing a gray suit that I can see from here.

14          THE COURT:  The record should reflect that Mr.

15  Villanueva has identified the defendant.

16  BY MR. MONTELEONI:

17  Q.  What did John Chambers give you?

18  A.  John Chambers, what I received was numerous articles from

19  Broadway tickets, articles of clothing, I received two

20  different watches.  I received money from him and gift cards

21  also.

22  Q.  What did you do for Chambers?

23  A.  Well, it didn't start as what I call major things for him.

24  I was doing expediting the closing of incident cases.  I was

25  not doing new applications for him.  What I was helping him

1   with was incidents.

2   Q.  In addition to incidents, did you also help him with

3   upgrades?

4   A.  I did help him with upgrades a couple of times, yes.

5   Q.  What about renewals, did you do anything for him in

6   connection with renewals?

7   A.  There were several times he needed help with renewals, and

8   I would renew them for him, yes.

9   Q.  Did you do anything for Chambers in relation to licenses

10  issued outside of the NYPD?

11  A.  Yes, I did help him with Nassau County pistol licenses.

12  Q.  During what time period did you receive these things from

13  Chambers?

14  A.  From around 2006 to 2015.

15  Q.  You said you pled guilty to accepting bribes from the

16  person you knew as Shaya, Frank Soohoo, Dominick Calendrella

17  and John Chambers.  Of these people, who was the first to bribe

18  you?

19  A.  John Chambers.

20  Q.  You also said you pled guilty to false statements.  Did

21  there come a time you were approached by the FBI?

22  A.  Yes.

23  Q.  When was that?

24  A.  That was in April of 2016.

25  Q.  Where did they approach you?

1    A.  It was a Sunday at my house.

2    Q.  Did you talk to them?

3    A.  Yes, I did.

4    Q.  What did they ask?

5    A.  They asked me had I received any gifts from Shaya or Frank

6    Soohoo.

7    Q.  What did you tell them?

8    A.  I told them no.

9    Q.  Was that honest?

10   A.  That was not honest.

11   Q.  Why did you tell them that?

12   A.  At this point, that was the question that was going to

13   tumble this deck of cards.

14   Q.  Why did you lie?

15   A.  To protect everyone involved and myself.

16   Q.  You testified that you pled guilty.  Have you been

17   sentenced yet?

18   A.  No, I have not.

19   Q.  What is your understanding of the maximum sentence that you

20   could face based on the crimes you pled guilty to?

21   A.  I understand that the maximum I can get is 50 years.

22   Q.  After your arrest, but before your plea, did you begin to

23   cooperate with the government?

24   A.  Yes.

25   Q.  As part of your cooperation, have you provided information

I4HJCHA6                         Villanueva - Direct

1   about your conduct and the conduct of others?

2   A.  Yes.

3   Q.  In connection with your guilty plea, did you enter a

4   cooperation agreement with the government?

5   A.  Yes.

6           MR. MONTELEONI:  If I could ask you to turn to the

7   back of your binder, to look at what has been marked for

8   identification as Government Exhibit 1401 and publish it to

9   counsel and the court and the witness.

10          (Off-the-record discussion)

11  BY MR. MONTELEONI:

12  Q.  Do you recognize this document?

13  A.  Yes.

14  Q.  What is this document?

15  A.  This is the agreement that I signed.

16          MR. MONTELEONI:  We offer Government Exhibit 1401 in

17  evidence.

18          MR. BROUNSTEIN:  No objection.

19          THE COURT:  Government Exhibit 1401 is received in

20  evidence and you may publish it.

21          (Government Exhibit 1401 received in evidence)

22  BY MR. MONTELEONI:

23  Q.  Now, this is the first page of a multipage document.  Is

24  this multipage document your entire agreement with the

25  government?

I4HJCHA6                        Villanueva - Direct

1    A.  This is my agreement that I signed, but besides this, there
2    are other things that I have to do.
3    Q.  Are all those things contained actually in the agreement?
4    A.  Oh, yes.
5    Q.  Has the government or anyone else made any promises to you
6    other than those contained in the agreement?
7    A.  No promise else.
8    Q.  What is your understanding of your obligations under the
9    agreement?
10   A.  First of all, I have to tell the truth, provide any
11   information that I have, meet up with the U.S. Attorney's
12   Office and stay out of trouble, no arrests.
13   Q.  What is your understanding of what the prosecutors will do
14   if you comply with the agreement?
15   A.  I will have a letter written on my behalf for sentencing.
16   Q.  Who will write the letter?
17   A.  The prosecutor.
18   Q.  Who will receive the letter?
19   A.  The judge.
20   Q.  What is the purpose of the letter?
21   A.  Just to tell my involvement and it will state everything
22   that I've done wrong and also everything I have cooperated, all
23   the information I have given during cooperation.
24   Q.  Will the government make any recommendation about what
25   specific sentence you should receive in this letter?

I4HJCHA6                         Villanueva - Direct

1    A.  No.

2    Q.  Who determines what your sentence will be?

3    A.  The judge during my sentencing.

4    Q.  If the government sends the letter, what is the maximum

5    sentence that you could face?

6    A.  50, 5-0 years.

7    Q.  What do you hope to receive by cooperating with the

8    government?

9    A.  No jail time.

10   Q.  Has anyone from the government or anyone else made any

11   promise to you about what your sentence will be?

12   A.  No.

13   Q.  If you violate the terms of your cooperation agreement,

14   will the government still write the letter to the judge?

15   A.  No.

16   Q.  If you violate the terms of your cooperation agreement, do

17   you get to take back your guilty plea?

18   A.  No.

19   Q.  If you lie during your testimony today, what is your

20   understanding of what can happen as a result?

21   A.  I will be prosecuted for perjury.

22   Q.  When did you start with the NYPD?

23   A.  June 30th, 1995.

24   Q.  When did you join the Pistol License Division?

25   A.  I joined the Pistol License Division April of 2001.

1    Q.   What was your role with the License Division at first?

2    A.   When I originally got to the License Division, I was an

3    investigator for new applications.

4    Q.   What was your rank at the time?

5    A.   I was a police officer.

6    Q.   What were your responsibilities as a police officer in the

7    new applications?

8    A.   To do investigations for people applying for pistol

9    licenses.

10   Q.   What would you do as an officer in the new applications

11   section at the conclusion of your investigations?

12   A.   I would close the case out, type up what is called a final

13   report and do the first recommendation.

14   Q.   What would happen to the recommendations that you made in

15   that position?

16   A.   Once a recommendation, I do a recommendation of approval or

17   disapproval, it will go to my supervisors, which usually was a

18   sergeant.

19   Q.   Did you come to meet the defendant during this time period?

20   A.   Yes.

21   Q.   How did you come to meet the defendant?

22   A.   I might have been one or two cases that belonged to the

23   defendant -- I mean to John.

24   Q.   What were your interactions with the defendant like during

25   this time period?

1   A.   Professional.

2   Q.   How much, if any, social interactions did you have with the

3   defendant during this time period?

4   A.   Zero.

5   Q.   How long did you stay in that position?

6   A.   I stood in new applications till 2002.

7   Q.   What happened in 2002?

8   A.   I was moved from new applications to incidents.  I was an

9   investigator with the Incidents Section.

10   Q.   What was your role as an investigator in the Incident

11   Section?

12   A.   I was doing investigations for people who already had

13   pistol licenses, and for one reason or the other, their license

14   was suspended.

15   Q.   What are the steps in the incident investigations that you

16   conducted?

17   A.   Once a licensee's license is suspended, it gets assigned to

18   an investigator, which was me at the time.  I will look through

19   the folder, do what is called a notice that the license is

20   suspended with directives.  I will mail it out, and there are

21   certain directives the licensee must follow.

22   Q.   What would you do after sending the notice of suspension

23   and directions?

24   A.   I will wait to meet up with the actual licensee and I will

25   do a full investigation to determine if the person should get

1   their license back or not.

2   Q.   What would you do at the conclusion of your investigation?

3   A.   I will do a final report once again and I will have a

4   recommendation whether the person's license should be

5   continued, suspended or revoked.

6   Q.   What is revocation?

7   A.   Revocation is that we found enough evidence that the person

8   did something wrong and we're taking away their license

9   permanently.

10  Q.   What is a suspension?

11  A.   A suspension is when a person doesn't need the license any

12  more and they request the license to be suspension.

13  Q.   What were you describing just now?

14  A.   Cancellation.  I threw myself off track.

15  Q.   A cancellation is when the person doesn't need their

16  license any more and requests for it to be taken away?

17  A.   Correct.

18  Q.   What is a suspension?

19  A.   Suspension, we found you did something wrong and we're

20  suspending your license for a period of time.  Once that period

21  of time ends, you'll get your license back.

22  Q.   Are there different lengths of suspension?

23  A.   Yes.  We have short suspension and long suspensions.

24  Q.   What is continuation of a license?

25  A.   Continuation is we found you did nothing wrong or something

1    minor and we're giving you your license back as soon as we

2    conclude the investigation.

3    Q.  You mentioned cancellation a moment ago.  Is cancellation

4    one of the dispositions that can be imposed as a result of an

5    incident investigation?

6    A.  For incidents, we only have revocation, continuance or

7    suspension.

8    Q.  How long did you stay in the Incident Section as an

9    investigator?

10   A.  Till April of 2003.

11   Q.  What happened in 2003?

12   A.  In 2003, I was promoted to sergeant.

13   Q.  Did you stay in the same position when you became a

14   sergeant?

15   A.  No.  I was moved out of License Division.

16   Q.  Where were you moved to?

17   A.  I was transferred to Transit.

18   Q.  What is Transit?

19   A.  I was in charge of patrolling the subway system.

20   Q.  Did you ever come to return to the License Division after

21   going to transit?

22   A.  Yes, April of 2004.

23   Q.  How did that happen?

24   A.  I received a phone call that there was an opening in the

25   Incident Section.  The sergeant who was sitting there had left,

I4HJCHA6                          Villanueva - Direct

1   so they asked me if I wanted to come back.

2   Q.   What was your response?

3   A.   "Yes."

4   Q.   How long were you ultimately incident sergeant until?

5   A.   Until April of 2016.

6   Q.   What is the incident sergeant?

7   A.   Oversees all the investigations that his investigators

8   have.

9   Q.   What is the role of the incident sergeant in determining

10   the outcome of an incident investigation?

11   A.   Once the investigator has finished his or her case, it goes

12   to the incident sergeant.  It is my job to review the entire

13   folder, make sure all the documents we requested is in there

14   and either concur with the investigation, the recommendation or

15   change the -- do my second recommendation, which I can actually

16   change the recommendation of the investigator.

17   Q.   Just to be clear about the levels of recommendation, when

18   you get an incident investigation report to review, does it

19   already have a recommendation in it?

20   A.   It has the recommendation from the investigator.

21   Q.   Then you said that you get the second recommendation.  What

22   happens to the second recommendation?

23   A.   After I am done with the second recommendation, the folder

24   goes to my supervisors.

25   Q.   Who were your supervisors be in the incident investigation?

1    A.   It's usually the captain who is in charge of overseeing

2    incidents.

3    Q.   Who is that captain or what position in the License

4    Division does that captain have?

5    A.   He was the executive officer, Michael Endall.  He was a

6    captain at the time.

7    Q.   Where does the executive officer fall within the License

8    Division's hierarchy?

9    A.   He is the second in charge for uniformed members of the

10   service.

11   Q.   Who is the first in charge for uniformed members of the

12   service?

13   A.   The commanding officer.

14   Q.   Now, as a practical matter, how much weight does the

15   recommendation of the incident sergeant usually have in

16   determining the outcome of an incident investigation?

17   A.   It has a lot of weight.

18   Q.   About how much weight does the recommendation of the

19   incident investigator usually have?

20   A.   It has a little, but it usually comes down to the

21   sergeant's recommendation.

22   Q.   Now, did you see the defendant at all when you returned as

23   an incident sergeant?

24   A.   Yes.

25   Q.   How would you describe the interactions that you had with

1    the defendant when you started as an incident sergeants?

2    A.   At first it, was all professional.

3    Q.   Did that change over time?

4    A.   It came from professional became a little bit social.

5    Q.   Who initiated the social side of it?

6    A.   John will come to my desk and we'll start talking about TV

7    shows and sports.

8    Q.   Did you ever meet with Chambers outside of work?

9    A.   Yes.

10   Q.   What's the first time that you met with Chambers outside of

11   work?

12   A.   It was in 2005.

13   Q.   At what event did you meet him?

14   A.   I had invited John to my wife's baby shower at the time.

15   Q.   How did you come to invite him to your baby shower?

16   A.   I usually don't speak a lot about myself, but I am always

17   bragging about my kids.  I was talking about my son and had

18   another baby on the way, and he took a liking to my kids, and I

19   invited him to the baby shower.

20   Q.   Did he say anything about the baby shower before you

21   invited him?

22   A.   He asked me he would love to come to the baby shower.

23   Q.   What was your response?

24   A.   I invited him.

25   Q.   At the time that you invited to the baby shower, had he

1    ever been to your house before?

2    A.  No.

3    Q.  Did you invite anyone else at all to the baby shower?

4    A.  Friends and family.

5    Q.  Of the other people who you invited to the baby shower, how

6    many of them had been to your house before you invited them?

7    A.  Most of them.

8    Q.  What happened at the baby shower?

9    A.  John came to the baby shower and he stood there for a

10   little while.  He participated in the events we had and I

11   introduced him to my son.

12   Q.  How old was your son at the time?

13   A.  My son was four years' old.

14   Q.  About how long did Chambers talk to your son?

15   A.  A typical four-year old wouldn't want to talk much.  It was

16   hi and back into the house.

17   Q.  Did Chambers come with anyone?

18   A.  Yes, he came with his wife.

19   Q.  What is his wife's name?

20   A.  Tina.

21   Q.  After the baby shower, did you ever invite Chambers to meet

22   you outside of work other than that?

23   A.  No.

24   Q.  Did he ever invite you to meet him outside of work?

25   A.  Yes.

1   Q.   What was the first time that he invited you to meet him

2   outside of work?

3   A.   It was for my birthday, he invited me out.

4   Q.   In what year?

5   A.   2006.

6   Q.   What month is your birthday?

7   A.   March.

8   Q.   What day of the month?

9   A.   8th.

10  Q.   Where did you go for your birthday in 2006?

11  A.   We met up at a restaurant called Carmine's in midtown.

12  Q.   Who met there?

13  A.   It was John, his wife Tina, my wife at the time and myself.

14  Q.   What happened at the dinner?

15  A.   John gave me a gift which included, I believe it was a

16  shirt, a piece of article of clothing, and tickets for a

17  Broadway show following the dinner.

18  Q.   What did you say about the Broadway show?

19  A.   Broadway show tickets and it was following, immediately

20  following dinner.

21  Q.   Before showing up at the dinner, had you known you would be

22  receiving any gifts?

23  A.   No.

24  Q.   Had you known you would be receiving tickets to any show?

25  A.   No.

I4HJCHA6                          Villanueva - Direct

1  Q.  Did you accept the clothing?

2  A.  I accepted everything.

3  Q.  By the way, who paid for the dinner?

4  A.  John did.

5  Q.  So who went to the show?

6  A.  My wife and I.

7  Q.  Did Chambers or his wife go to the show?

8  A.  No.

9  Q.  At the time, why did you think he took you out to dinner?

10         MR. STAVIS:  Objection.

11         THE COURT:  Sustained.

12 BY MR. MONTELEONI:

13 Q.  What was your reaction to the dinner?

14 A.  It was my first time out in a long time.

15 Q.  Now, was that birthday in 2006 the only time that Chambers

16 invited you out or were there others?

17 A.  There were others.

18 Q.  What was the next time?

19 A.  It was for my wife's birthday, the same year.

20 Q.  What did you do for your wife's birthday in 2006?

21 A.  The same thing, we met at Carmine's restaurant, we sat

22 there for a while, gifts were given to my wife that included

23 tickets to Broadway immediately following again the dinner.

24 Q.  What was your reaction to the second dinner?

25 A.  To the second dinner, things -- I knew things were going to

1    change a little after the --

2              MR. STAVIS:  Objection, your Honor.

3              THE COURT:  Overruled.

4    BY MR. MONTELEONI:

5    Q.  What do you mean?

6    A.  When we got to Carmine's, before we sat down, we had couple

7    beers at the bar and John started telling me I should be the CO

8    one day of the License Division and there was more talk about

9    work, unlike the first time there was no talk about work.

10   Q.  What kind of talk about work was there the second time?

11   A.  He was telling me how I should be the CO and he started

12   telling mow me how incidents were taking a long time to close.

13   Q.  What was your reaction to that?

14   A.  I was kind of figuring sooner or later I was going to be

15   asked a favor.

16   Q.  Did you take the gift and the tickets the second time?

17   A.  Yes.

18   Q.  By the way, what was your financial situation in 2006?

19   A.  Financially in ruin.

20   Q.  Why were you in ruin?

21   A.  My wife and I got married at an early age and we did the

22   whole marriage and apartment on credit cards.

23   Q.  So what were you doing to deal with your financial

24   situation in 2006?

25   A.  I was taking what they call pension loans to float the

1    debt.

2    Q.  About how often were you going to Broadway shows apart from

3    the fact Chambers gave you tickets to?

4    A.  I wasn't.

5    Q.  Jumping ahead for a moment, what eventually happened to

6    your debt?

7    A.  In 2008, I declared bankruptcy.

8    Q.  Going back to 2006, you mentioned that your reaction was

9    that you were going to get asked for favors.  Did that happen?

10   A.  Eventually, yes.

11   Q.  How what was the first thing that happened along those

12   lines?

13   A.  It was something as simple as can you take a look at these

14   cases, they're taking a long time.

15   Q.  Who asked you that?

16   A.  John did.

17   Q.  About when did he do that?

18   A.  He did that right before, I think before the end of the

19   Year 2006.

20   Q.  What do you mean when he asked you to look at the cases, in

21   your mind?

22   A.  Incident Section was, my investigators were holding

23   approximately 100, to 120 cases each so it was normal for cases

24   to just be in a drawer for months if not a year.  So what I

25   would do, what I did was, whatever names he gave me, I had my

I4HJCHA6                    Villanueva - Direct

1   investigators pull them out and work on them.

2   Q.  What, if anything, did that do to the amount of time that

3   the cases took to close?

4   A.  Now we are shorting the amount of time.

5   Q.  Why would a licensee want a case closed more quickly?

6   A.  Because if a licensees license is suspended for a long

7   period of time, that is as long they can't go hunting, can't go

8   shooting, so they don't have their license, don't have the

9   right to have their firearms.

10  Q.  Did you, in fact, ask your investigators to close those

11  cases more quickly?

12  A.  Yes.

13  Q.  Was your then wife's birthday in 2006 the last time

14  Chambers offered you tickets to anything, or were there others?

15  A.  No.  In the same year he got me tickets to Radio City Music

16  Hall.

17  Q.  When did he give you those tickets?

18  A.  2006 was the first once.

19  Q.  About when in the year?

20  A.  It was, if I recall, between September and October.

21  Q.  Where was he when he gave you those tickets?

22  A.  At 1 PP.

23  Q.  That is 1 Police Plaza?

24  A.  1 Police Plaza by my desk.

25  Q.  Were others in a position to see he was giving you tickets?

1   A.  They could see, but they wouldn't be able to see who was

2   giving me tickets.

3   Q.  Why not?

4   A.  They were always in stationery marked envelopes from work.

5   Q.  Had he discussed that show with you at all prior to giving

6   you the tickets?

7   A.  Yes.

8   Q.  What was the nature of that discussion?

9   A.  He had told me he goes every year with his wife, and if I

10  had ever gone, and I told him no, I had not gone to see the

11  show.

12  Q.  What was your response when he offered those tickets?

13  A.  I took them.

14  Q.  Showing you the items marked for identification Government

15  Exhibits 103 and 127, do you recognize those?

16  A.  Yes.

17  Q.  How do you recognize them?

18  A.  Those are the playbills from the Christmas Spectacular show

19  I attended.

20  Q.  Have you seen those recently?

21  A.  Yes.

22  Q.  When did you see those?

23  A.  When I turned them over to the FBI.

24          MR. MONTELEONI:  We offer Government Exhibits 103, 127

25  and as well as Governments 103-1 to 5 and Government Exhibit

I4HJCHA6                        Villanueva - Direct

1    127-1 which are photos of those two exhibits in evidence.

2              MR. BROUNSTEIN:  Have a brief voir dire?

3              THE COURT:  You may.

4    VOIR DIRE EXAMINATION.

5    BY MR. BROUNSTEIN:

6    Q.  Mr. Villanueva, I have a couple of questions about those

7    two documents.  You indicated that you gave them over to the

8    FBI.  Is that correct?

9    A.  Correct.

10   Q.  And you had stored them before.  Is that correct?

11   A.  Yes.

12   Q.  And where did you keep them?

13   A.  In the garage.

14   Q.  You kept memorabilia there?

15   A.  I became apparently a hoarder when I found these.

16   Q.  At some point you turned them over to the FBI.  Was that

17   before you were arrested?

18   A.  No.  This was after.

19   Q.  Was it after you were arrested and before you began to

20   cooperate or when you began to cooperate?

21   A.  Once I started to cooperate.

22   Q.  That would be after you pled guilty?

23   A.  Yes.

24   Q.  Do you remember the date when you turned it over?

25   A.  I don't remember the exact date, no.

1              MR. BROUNSTEIN:  No further questions.  No objection.

2              THE COURT:  All right.  So Government Exhibits 103 and

3       127, and 103 1 to 5 and 127-1 are received in evidence.

4                  (Government Exhibits 103, 127, 103 1-5 and 127-1

5       received in evidence)

6       DIRECT EXAMINATION continued

7              MR. MONTELEONI:  Directing your attention to

8       Government Exhibit 127 and I ask Ms. Bustillo to publish

9       Government Exhibit 127-1.

10      BY MR. MONTELEONI:

11      Q.  Mr. Villanueva, could you tell us what show this is a

12      playbill for?

13      A.  This is for the Radio City Christmas Spectacular Show.

14      Q.  Of what year?

15      A.  The one I am holding is for 2006.

16      Q.  Prior to attending in 2006, had you ever been to the Radio

17      City Christmas show before?

18      A.  No.

19      Q.  Who got you the tickets for you to go to the show that

20      resulted in this playbill?

21      A.  John Chambers.

22                  (Continued on next page)

23

24

25

1   BY MR. MONTELEONI:

2   Q.  Who went to the show?

3   A.  My wife, my son and I.

4   Q.  Did you meet Chambers at the show?

5   A.  No.

6   Q.  Did you meet him for dinner beforehand?

7   A.  No.

8   Q.  See him at all that evening?

9   A.  No.

10  Q.  You mentioned that the other playbill, Government Exhibit

11  103, was also for a show that you attended, so showing you

12  Government Exhibit 103, what is it?

13  A.  This is a playbill for the Christmas Spectacular, for the

14  2007 show.

15  Q.  If you open it, what's inside it?

16  A.  The tickets that I received for the actual show.

17  Q.  Who did you receive those tickets from?

18  A.  From John Chambers.

19          MR. MONTELEONI:  If I could ask, Ms. Bustillo, for you

20  to publish Government Exhibit 103-1.

21          How about 103-2?  Sorry.

22          103-3.

23  Q.  All right.  Showing you the blacked-out portions on these

24  tickets where it says purchased by, and a few other places on

25  the ticket, did you do that?

1    A.  No.

2    Q.  Where did you first see those blacked-out portions?

3    A.  As soon as we moved them out of the envelope, they were

4    already marked.

5    Q.  And you mentioned an envelope.  What type of envelope were

6    they in?

7    A.  They were like his stationery from work.

8    Q.  And how many tickets are there?

9    A.  There are three.

10   Q.  Who went?

11   A.  My wife, my son and I.

12   Q.  Did you meet Chambers at the show on that occasion?

13   A.  No.

14   Q.  Did you see him at all that evening?

15   A.  No.

16   Q.  So after the tickets -- after your wife's birthday in 2006,

17   did you have outings with Chambers like that again?

18   A.  Excuse me.  I was like --

19   Q.  Sorry.  After you had a birthday outing on your wife's

20   birthday in 2006, did you have any outings that were similar to

21   that again?

22   A.  We continued with the outings for the birthdays, for my

23   birthday and wife's birthday, for many years.

24   Q.  Until when?

25   A.  That's including my new wife.  We -- the last one was May

I4hWcha7                          Villanueva - Direct

```
1    of 2015.
2    Q.  And about how often did they happen?
3    A.  It was my birthday and my wife's birthday, every -- twice a
4    year.
5    Q.  I think you said a moment ago that you ultimately divorced
6    and remarried.  Did that affect the frequency of these birthday
7    outings?
8    A.  No.  When I divorced and I had my new wife, which was my
9    girlfriend at the time, she just went out.
10   Q.  And what month is your wife's birthday?
11   A.  My current?
12   Q.  Yes, your current wife's birthday.
13   A.  May.
14   Q.  And what month was your ex-wife's birthday?
15   A.  July.
16   Q.  What did these outings involve?
17   A.  Dinner, gifts and Broadway tickets.
18   Q.  What types of gifts were given at the dinner?
19   A.  It would be anywhere from clothing to -- one time it was a
20   watch.
21   Q.  What kind of watch was it, at the dinner?
22   A.  It was a strap Giorgio Armani watch.
23   Q.  And who attended the dinners?
24   A.  My wife and I and John and his wife.
25           MR. MONTELEONI:  I'd like to show the witness and
```

I4hWcha7                          Villanueva - Direct

1    counsel the document marked for identification as Government

2    Exhibit 126.

3    Q.  What type of document is this?

4    A.  A picture.

5    Q.  Did you take the picture?

6    A.  No.

7    Q.  Are you in the picture?

8    A.  Yes.

9    Q.  Does this picture accurately represent the things it

10   depicts?

11   A.  Yes.

12              MR. MONTELEONI:  We offer Government Exhibit 126 in

13   evidence.

14              MR. BROUNSTEIN:  No objection, your Honor.

15              THE COURT:  Government Exhibit 126 is received in

16   evidence.

17              (Government Exhibit 126 received in evidence)

18              MR. MONTELEONI:  If you could publish it.  Thank you.

19   Q.  Where was this photo taken?

20   A.  Carmine's.

21   Q.  Where were the dinners, typically?

22   A.  Most of the time it was Carmine's.

23   Q.  From left to right, who is in the photo?

24   A.  It would be me, my wife, Tina and John.

25   Q.  And where was this photo taken?  Sorry.  You said that

1     already.

2          Who took the photo?

3     A.   Our waiter.

4     Q.   Whose idea was it to take the photo?

5     A.   John always took pictures, yes.

6     Q.   Then you said these outings would involve tickets.  When

7     were the shows that the tickets were for?

8     A.   They were always immediately following dinner.

9     Q.   And who went to the shows?

10    A.   My wife and I.

11    Q.   Did Chambers or his wife ever go to the shows?

12    A.   No.

13    Q.   Now, we've talked about two Radio City Christmas

14    Spectacular playbills.  Were those the only time that you went

15    to the Christmas Spectacular or were there others?

16    A.   No.  It was every, every year till, till 2014.

17    Q.   Who went?

18    A.   At first, it was just my wife, my son and I.  Then, as my

19    daughter was born and she got older, it became my daughter, my

20    son, my wife and I.  After I divorced, I gained another

21    daughter through marriage, so it would be my two daughters, my

22    son, my wife and I.

23    Q.   Who provided the tickets?

24    A.   John.

25    Q.   Did he provide anything else?

1    A.   A few times he would give money for the kids to get

2    souvenirs.

3    Q.   How much money would he give?

4    A.   Basically, it was like $100 for my son, $100 for my

5    daughter.

6    Q.   How did he give you that money?

7    A.   With the tickets, inside the envelope.

8    Q.   How would he give you the tickets?

9    A.   Usually it was at my desk.

10   Q.   What did you do with the cash?

11   A.   I gave it to the kids and let them buy their souvenirs.

12   Q.   When you met with Chambers outside of work, who would

13   typically be there?

14   A.   Just -- it would be my wife, myself, John and his wife.

15   Q.   Apart from when he attended your baby shower, do you ever

16   remember an occasion where you saw Chambers outside of work

17   when anyone other than those people were present?

18   A.   I don't recall seeing him again.

19   Q.   By the way, about how long were you supervisor of the

20   incident section in total?

21   A.   From 2004 till 2016.

22   Q.   About how much of that time did Chambers have business in

23   the incident section?

24   A.   He was representing clients all the time.

25   Q.   And about how often would he typically come by the license

I4hWcha7                         Villanueva - Direct

1    division?

2    A.  He was averaging, I think, at least once a week.

3    Q.  When he came to the license division, would he stay in the

4    areas open to the public?

5    A.  No.  He -- he had free access to just walk around.

6    Q.  About how well did he know the other members of the license

7    division?

8    A.  Well enough that he can actually go hang his jacket in

9    people's office.

10   Q.  About how well did you know the other members of the

11   license division when you were working there?

12   A.  I know them as being their boss.

13   Q.  Were you friends with any of them?

14   A.  I was friends with -- my cops, yes.  I was there for a long

15   time.

16   Q.  To your knowledge, did anyone at the license division

17   during those 12 years that you were incident sergeant know that

18   you were meeting Chambers outside of work?

19   A.  No.

20   Q.  Apart from the birthday outings and the Radio City tickets,

21   did Chambers ever give you any other kinds of gifts?

22   A.  I did get gift cards for dinners.

23   Q.  Did you get any other tickets?

24   A.  I got baseball tickets also.

25   Q.  Were there any other theatrical tickets?

I4hWcha7                       Villanueva - Direct

1  A.  Yes, two -- I recall two times that I got tickets besides

2  the ones that were included with dinner.

3  Q.  When were those times, do you remember?

4  A.  They were not -- nothing -- they weren't for birthdays or

5  anything.

6  Q.  So at times when he would give you tickets other than for

7  your birthdays or the Christmas Spectacular, where would he be

8  physically?

9  A.  Say that again.

10 Q.  Sorry.  Where was he when he gave you the tickets when it

11 was not the Christmas Spectacular or your birthdays?

12 A.  I used to see John all the time when he came through the

13 license division for cases and so on, so he would give it to me

14 at my desk.

15 Q.  Do you think people saw him giving you those tickets?

16        MR. BROUNSTEIN:  Objection, your Honor.

17        THE COURT:  Sustained.

18 Q.  Showing you Government Exhibit 104, which is in evidence,

19 what is this?

20 A.  This is a playbill for the show Spider-Man:  Turn Off the

21 Dark.

22 Q.  And what's inside the playbill?

23 A.  It's the envelope that tickets came in and the tickets for

24 the show.

25 Q.  All right.  When was this showing?

1    A.  This showing was for Friday, March 4 of 2011.

2    Q.  When was your birthday that year?

3    A.  March 8.

4    Q.  Were these tickets for your birthday?

5    A.  No.

6    Q.  Did you also do the birthday outing with Chambers that year

7    as well?

8    A.  Yes.

9    Q.  You saw another Broadway show?

10   A.  Correct.  This one's to take my son.

11   Q.  I'd like you to turn to Government Exhibit 204 at page

12   1295.

13   A.  I'm sorry.  Just give me a second.

14   Q.  It's also up on your screen, for that.

15   A.  OK.

16           MR. MONTELEONI:  Although, could you actually just

17   show the witness that page.

18   Q.  Where Chambers texted you, "Get her a T or a sweatshirt

19   from us, if she likes any," where were you?

20   A.  I was at a Broadway show.

21   Q.  And who was with you?

22   A.  My wife.

23   Q.  Where was Chambers?

24   A.  Actually, this was my fiancée -- I call her wife.  It was

25   my fiancée at the time.

1    Q.  And where was Chambers?

2    A.  I don't know.

3    Q.  Where Chambers says, "Get her a T or sweatshirt from us, if

4    she likes any," if he wasn't there, how could he have bought

5    you something?

6    A.  He would reimburse me.

7    Q.  Had you ever done that before?

8    A.  Once before, with my previous wife.

9    Q.  What did he reimburse you for?

10   A.  She bought a souvenir from one of the shows.

11   Q.  Was Chambers present when she bought the souvenir?

12   A.  No.

13   Q.  Now, on this occasion, in May 2014, shown in these text

14   messages, did you actually buy something and seek reimbursement

15   from him?

16   A.  I did purchase something, but I did not seek reimbursement.

17   Q.  How did Chambers choose what shows to give you tickets to?

18   A.  He had a list of all the shows he was sending me to.

19   Q.  How do you know he had that list?

20   A.  A couple times he will actually open his phone up, and he

21   will have on his phone, actually, all these shows that I've

22   seen.

23   Q.  When would he do that?

24   A.  There were several occasions that, towards the beginning,

25   John and I would disagree on length of suspensions, and

I4hWcha7                        Villanueva - Direct

1    sometimes, just debating back and forth suspension period,

2    there would be a pause and he'll go from track -- from talking

3    about work to talk about shows, and he'll open his phones and

4    goes, Oh, maybe you should go see this show next, and so on and

5    so on.  He had a whole list of all the shows that I had seen

6    from day 1.

7    Q.  When you say you were talking about suspension lengths, who

8    would be receiving these suspensions?

9    A.  Clients.

10   Q.  Clients of whose?

11   A.  Of John Chambers, clients who had their license suspended.

12   Q.  Was this in connection with incident investigations that

13   you were supervising?

14   A.  Yes.  Basically, every time I dealt with John it had to

15   deal with incidents during that period of time.

16   Q.  You say you would have disagreements about the length of

17   suspensions.  As a general matter, in the license division when

18   a licensee has a suspension as a result of an incident, what

19   are common lengths of suspensions?

20   A.  Usually for something minor, three months.  For something

21   great it's a year.  So between three months and a year is the

22   average suspension that a licensee would get.

23              MR. BROUNSTEIN:  Objection, your Honor.

24              THE COURT:  Overruled.

25   Q.  Typically, how long would the suspensions for clients of

I4hWcha7                          Villanueva - Direct

1   Chambers be?

2   A.   I always made between six months -- three months and six

3   months.

4   Q.   How often would Chambers's clients get suspensions of a

5   year?

6   A.   I don't recall ever giving any of his clients a year's

7   suspension.

8   Q.   Why not?

9   A.   It was -- by this time with John Chambers, I have received

10  gifts from John, and I just felt obligated by this point.

11  Q.   You said that there would be disagreements you would have

12  with him over suspension lengths and he would bring up the

13  shows and bring out his phone sometimes.  What types of things

14  would he say?

15  A.   During the conversations, he would just say the shows that

16  I've seen.  He just starts listing the shows that I've seen.

17  Q.   Did he ever talk about your children in those discussions?

18  A.   As I stated earlier, I always brag about my kids, so all

19  the conversations turn into my kids, yes.

20  Q.   How did he refer to himself in relation to your children?

21  A.   Uncle John.

22  Q.   How much time had he spent with your son?

23  A.   Probably a minute or two during 2005.

24  Q.   Had he ever met your daughter?

25  A.   No.

I4hWcha7                         Villanueva - Direct

1   Q.   You mentioned sports tickets.  What kind of sports tickets

2   did Chambers give you?

3   A.   For the New York Mets.

4   Q.   About how often did he give you those?

5   A.   He was giving them periodically during, during the baseball

6   season.

7   Q.   Were those around holidays or special occasions?

8   A.   No.  It was during the regular baseball season.

9   Q.   What did you do with the tickets?

10  A.   I went a couple times, and most of the times I re-gifted

11  them.

12  Q.   If I could ask you to look at the documents marked for

13  identification as Government Exhibits 105 to 108 --

14          MR. MONTELEONI:  Publish those to counsel.

15  Q.   -- what types of documents are these?

16  A.   These are pictures.

17  Q.   Who took the pictures?

18  A.   I did.

19  Q.   How did you take the pictures?

20  A.   With my cell phone.

21  Q.   Do they accurately represent what they depict?

22  A.   Yes.

23          MR. MONTELEONI:  We offer Government Exhibits 105 to

24  108 in evidence.

25          THE COURT:  Any objection?

I4hWcha7                        Villanueva - Direct

1            MR. BROUNSTEIN:  Could I just have a moment, Judge?

2            No objection.

3            THE COURT:  Government Exhibits 105 through 108 are

4     received in evidence.

5            (Government Exhibits 105-108 received in evidence)

6            THE COURT:  You may publish them.

7            MR. MONTELEONI:  Thank you.

8            Ms. Bustillo, could you publish Government Exhibit

9     105.

10    Q.  You said you took these pictures.  When did you take them?

11    A.  I took them at Citifield with my son in June of 2012.

12           MR. BROUNSTEIN:  Could you actually just cycle through

13    the photos for the jury.

14    Q.  What were you doing at Citifield?

15    A.  I was taking -- I had tickets to take my son.

16    Q.  Who got you the tickets?

17    A.  John did.

18    Q.  Was Chambers there?

19    A.  No.

20    Q.  Showing you Government Exhibit 203 at page 517, where

21    Chambers says, "Can you use tix to tomorrow's Mets game,"

22    what's your response?

23    A.  My response back to John, which was on 8/2, 2013:  "Hi

24    John.  Tomorrow's Cinderella today.  You got us the tix.  LOL."

25    Q.  I'd like to show you the item marked for identification as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4hWcha7                          Villanueva - Direct

1   Government Exhibit 110.   Do you recognize that document?

2   A.   Yes.

3   Q.   How do you recognize it?

4   A.   This is from the Broadway show that I took my son and my

5   daughter.

6   Q.   Have you seen it recently?

7   A.   Yes.

8   Q.   When?

9   A.   When I turned it over to the FBI.

10         MR. MONTELEONI:   We offer Government Exhibit 110 as

11   well as Government Exhibit 110-1, photograph.

12         MR. BROUNSTEIN:   Brief voir dire, your Honor, on this.

13         THE COURT:   Certainly.

14         MR. BROUNSTEIN:   Very brief.

15         THE COURT:   Go ahead.

16   VOIR DIRE EXAMINATION

17   BY MR. BROUNSTEIN:

18   Q.   I asked the question before.   Did you turn that over at the

19   same time you turned over the prior items to the FBI?

20   A.   It was during a period of time.   I don't remember if it was

21   the exact same period of time.

22   Q.   But it would be after you were arrested and after you began

23   to cooperate, is that correct?

24   A.   That's correct.

25   Q.   And you had these in your garage, you said?

I4hWcha7                          Villanueva - Direct

 1   A.  Correct.

 2          MR. BROUNSTEIN:  Nothing further.  I have no

 3   objection.

 4          THE COURT:  Government Exhibit 110 is received.

 5          MR. MONTELEONI:  Thank you, your Honor.

 6          THE COURT:  As well as 110-1.

 7          (Government Exhibits 110 and 110-1 received in

 8   evidence)

 9          MR. MONTELEONI:  Thank you, your Honor.

10          Ms. Bustillo, could you publish 110.

11   BY MR. MONTELEONI:

12   Q.  What's 110?

13   A.  This is the playbill.

14   Q.  And if you could look at Government Exhibit 109, looking at

15   the second page of Government Exhibit 109, what's this?

16   A.  Those are the tickets that -- for the show.

17   Q.  So who went to the show?

18   A.  My son, my daughter and I.

19   Q.  Did Chambers go to the show?

20   A.  No.

21   Q.  These are for August 3, 2013.  Is that around some kind of

22   holiday or special occasion?

23   A.  No.

24   Q.  Who bought the tickets?

25   A.  John Chambers.

I4hWcha7                    Villanueva - Direct

1   Q.  Now, you mentioned earlier at some point Chambers gave you

2   articles of clothing.  When did he do that?

3   A.  He gave me one for my birthday, and a second time he

4   actually sent shirts to my house.

5   Q.  What kind of shirts were they?

6   A.  They were shirts from the store Brooks Brothers.

7   Q.  How did he know your measurements?

8   A.  John always said how I should dress sharp for work, and one

9   day he just asked me what my shirt size was, and I told him.

10  Q.  What is your shirt size?

11  A.  16-1/2 by 34-35.

12  Q.  Showing you the item marked for identification as

13  Government Exhibit 114, do you recognize this item?

14  A.  Yes.

15  Q.  How do you recognize it?

16  A.  This was a gift that John Chambers gave me.

17  Q.  Have you seen it recently?

18  A.  Yes.

19  Q.  When was that?

20  A.  When I turned it over to the FBI.

21  Q.  Was that following your entering into a cooperation

22  agreement with the government?

23  A.  Yes.

24          MR. MONTELEONI:  We offer Government Exhibit 114 as

25  well as 114-1 and 2, which are photos of it, in evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4hWcha7                          Villanueva - Direct

1          THE COURT:  Any objection?

2          MR. BROUNSTEIN:  I have no objection.

3          THE COURT:  All right.  Government Exhibits 114 and

4    114-1 and 2 are received in evidence.

5          (Government Exhibits 114, 114-1 and 114-2 received in

6    evidence)

7          MR. MONTELEONI:  Ms. Bustillo, if you could publish

8    Government Exhibit 114-2.

9    Q.   What is Government Exhibit 114?

10   A.   This is a box that John gave me so I could put cuff links

11   for my new shirts.

12   Q.   Where was he when he gave it to you?

13   A.   This he brought to One Police Plaza and gave it to me on my

14   desk.

15   Q.   How was it packaged when he did that?

16   A.   It was in a bag.

17   Q.   What, if anything, did he say about it when he brought it

18   to you?

19   A.   So I could get cuff links.

20   Q.   About how many cuff links did you own when you got this

21   cuff-link case?

22   A.   None.

23   Q.   What did you do when you got the cuff-link case?

24   A.   Went to my garage.

25   Q.   Did Chambers ever give you sports memorabilia?

1    A.  Yes.

2    Q.  When would he do that?

3    A.  He would just send them to the house.

4    Q.  Was there any particular occasion when he would do that?

5    A.  No.

6    Q.  Showing you Government Exhibit 204, page 1351, about four

7    texts down, where Chambers says, "Have a few more baseball

8    things for Brandon, is he still into it," what did you

9    understand him to mean?

10   A.  That he had more stuff for Brandon he was going to send.

11   Q.  And when you say Brandon was still into it, is that true?

12   A.  I wish.  No, my son's not into baseball anymore.

13   Q.  Why did you say it?

14   A.  I always said yes to John.  Not too many nos he received.

15   I usually never said no to John.

16   Q.  Showing you Government Exhibit 102, which is in evidence,

17   I'm not going to ask you to itemize these for the jury, but if

18   you could take a look inside the box, are there sports

19   memorabilia --

20   A.  I'm sorry.

21   Q.  -- and Barbie dolls in there?

22   A.  Yes.

23   Q.  What did you do with them?

24   A.  Just the way it's in the box inside, it was put into my

25   garage.

I4hWcha7                        Villanueva – Direct

1   Q.  Did you give them to your children?

2   A.  No.

3   Q.  Was that box, Government Exhibit 102, the only box that he

4   sent?

5   A.  No.  There were others.

6   Q.  Showing you the items marked for identification as

7   Government Exhibits 129-A and 129-B, do you recognize these

8   items?

9   A.  Yes.

10  Q.  Have you seen them recently?

11  A.  Yes.

12  Q.  When was that?

13  A.  When I turned them over to the FBI.

14  Q.  Was that after you began cooperating with the government?

15  A.  Yes.

16          MR. MONTELEONI:  We offer Government Exhibits 129-A

17  and 129-B as well as 129-1 to -5, which are photographs of

18  those, in evidence.

19          THE COURT:  Any objection?

20          MR. BROUNSTEIN:  No, sir.

21          THE COURT:  Government Exhibits 129-A and 129-B and

22  129-1 through 5 are received in evidence.

23          (Government Exhibits 129-A and 129-B and 129-1 through

24  129-5 received in evidence)

25  BY MR. MONTELEONI:

1  Q.  What is Government Exhibit 129-A?

2  A.  This is a baseball with multi signatures on it.

3  Q.  What's 129-B?

4  A.  This is a letter of authenticity, which means that these

5  signatures are true.

6  Q.  Showing you the item marked for identification as

7  Government Exhibit 120, do you recognize this item?

8  A.  Yes.

9  Q.  Have you seen it recently?

10  A.  Yes.

11  Q.  When was that?

12  A.  When I turned them over to the FBI.

13  Q.  Was that after you began cooperating with the government?

14  A.  Yes.

15          MR. MONTELEONI:  We offer Government Exhibit 120, as

16  well as 120-1, which is a photograph of it, in evidence.

17          MR. BROUNSTEIN:  No objection.

18          THE COURT:  Government Exhibits 120 and 120-1 are

19  received in evidence.

20          (Government Exhibits 120 and 120-1 received in

21  evidence)

22  Q.  What's Government Exhibit 120?

23  A.  This is a signed autograph picture from Carlos Beltran.

24  Q.  It doesn't look like it's in very good condition.  Why is

25  that?

I4hWcha7                           Villanueva - Direct

1   A.  When I received them, like everything else, I just had them

2   in the garage.

3   Q.  Were all the items that Chambers sent you baseball related?

4   A.  No.

5   Q.  Showing you the items marked for identification as

6   Government Exhibits 115, 116, 117, 118, and 119, do you

7   recognize these items?

8   A.  Yes.

9   Q.  Have you seen them recently?

10  A.  Yes.

11  Q.  When was that?

12  A.  When I turned them over to the FBI.

13  Q.  Was that after you began cooperating with the government?

14  A.  Yes.

15          MR. MONTELEONI:  We offer Government Exhibits 115,

16  116, 117, 118, and 119, as well as 115-1 and 2, 116-1, 117-1,

17  118-1, and 119, photographs of those items, in evidence.

18          MR. BROUNSTEIN:  No objection.

19          THE COURT:  All right.  Government Exhibits 115

20  through 119 and 115-1 and 2, 116-1, 117-1, 118-1, and 1191 are

21  received in evidence.

22          (Government Exhibits 115-119, 115-1, 115-2, 116-1,

23  117-1. 118-1, and 119-1 received in evidence)

24  Q.  What are Government Exhibits 115 through 119?

25  A.  We have magazines from the Titanic and DVDs.

I4hWcha7                         Villanueva - Direct

1    Q.  How did you get these?

2    A.  John Chambers sent them to the house.

3    Q.  Did you talk about this at all before he sent them?

4    A.  As I said, I'm always bragging about my kids, and he had

5    taken an interest on the Titanic, I told John once, and he sent

6    over to the house.

7    Q.  What did you do with these things?

8    A.  In the garage.

9    Q.  Did you give them to your children?

10   A.  No.

11            MR. MONTELEONI:  Ms. Bustillo, if you could show

12   Government Exhibit 403.

13   Q.  Showing you Government Exhibit 403, what's this?

14   A.  This is a -- showing me that I have, for the hall of fame,

15   a, I think it's one year's membership.

16   Q.  Who got you this membership?

17   A.  John Chambers.

18   Q.  Why did he get you a membership?

19   A.  I must have had -- I was having a conversation once with

20   John that I was taking my dad to the baseball hall of fame,

21   something he wanted to do all his life.

22   Q.  You mentioned that Chambers gave you gift cards.  What kind

23   of gift cards did he give you?

24   A.  He had given me gift cards to take the kids to Toys "R" Us

25   and also Applebee's, and once I traveled to San Diego and he

1   gave me a gift card for a restaurant called Truluck's.  And I

2   believe the last, one of the gift cards he also gave me was for

3   custom-made shirts from some company that travels, and they

4   make custom-made shirts.

5   Q.  Showing you Government Exhibit 425, what's this?

6   A.  This is the -- for the -- an email, which has a link to the

7   gift card to Truluck's, seafood -- it's a seafood-steak house.

8   Q.  Who gave it to you?

9   A.  John Chambers.

10  Q.  Do you remember how much money was on the gift card?

11  A.  I believe it was approximately $200.

12  Q.  And about when did he give it to you?

13  A.  This was in June of 2013.

14  Q.  Was there any special occasion?

15  A.  I was going to San Diego.  My -- one of my police officer,

16  Richard Ochetal, was getting married, so I was traveling to San

17  Diego.

18  Q.  And is Truluck's in San Diego?

19  A.  Yes.

20  Q.  Does John Chambers know Richard Ochetal?

21  A.  Yes.

22  Q.  To your knowledge, is he friends with Richard Ochetal?

23  A.  Not to my knowledge.

24  Q.  To your knowledge, did he get Richard Ochetal anything for

25  his wedding?

1   A.  Not to my knowledge.

2   Q.  Did you go to the restaurant?

3   A.  Yes.

4   Q.  Who went?

5   A.  My wife and I.

6   Q.  Now, showing you Government Exhibit 457, what's this?

7   A.  This is an email from John to me.

8   Q.  So, what's attached?

9   A.  Gift card to what I stated earlier.  It's a custom shop

10  that you're traveling, they do custom-made shirts.

11  Q.  And how much is it for?

12  A.  500.

13  Q.  Going back to the first page, in the first line of the

14  email where he says, "As promised, Dave," what was that

15  referring to?

16  A.  He had told me in the past that this store was going to

17  come around to Roosevelt Field mall, and he was going to give

18  me a gift card for it.

19  Q.  Did he say why?

20  A.  No.

21  Q.  When he says, "BTW, any luck with Jimenez," who is Jimenez?

22  A.  That was a -- one of his clients.

23  Q.  And he says, "or our hair salon guy"; who is the hair salon

24  guy?

25  A.  That was an individual that John Chambers was trying to get

1   a pistol license for in Nassau County, owned a bunch of hair

2   salon place, and he's willing to pay big bucks to get a

3   license.

4   Q.  Did you use this gift card?

5   A.  No, I did not.

6   Q.  And showing you Government Exhibit 458, what's Government

7   Exhibit 458?

8   A.  It's an email.  It says second attempt.

9   Q.  What's attached to it?

10  A.  The gift card again.

11  Q.  Why -- do you know why he sent you a second attempt?

12  A.  I had told him the first one I had not received it.

13  Q.  Why did you tell him that?

14  A.  I just told him, he kept calling me, did I receive the gift

15  card, I told him no.

16  Q.  Had you received it?

17  A.  Yes.

18  Q.  Did you ever use the card?

19  A.  No.

20  Q.  You mentioned receiving a watch from Chambers at one of

21  your birthday outings.  Did you ever receive a watch from

22  Chambers on any other occasion?

23  A.  Yes.

24  Q.  Was the watch given on your birthday before or after the

25  other watch?

I4hWcha7                        Villanueva - Direct

1   A.  I'm sorry.

2   Q.  So on one occasion you have a birthday outing and you

3   receive a watch then?

4   A.  Correct.

5   Q.  Then there's another occasion when you receive a watch not

6   connected to your birthday.  Was the other occasion before or

7   after the birthday occasion where you got a watch?

8   A.  I still don't get your question.

9   Q.  OK.  Which was the first watch you got?

10  A.  The one for my birthday was the Giorgio Armani.

11  Q.  All right.  Now directing your attention to the second

12  watch, when did you get the second watch?

13  A.  I got it much later, around 2013.

14  Q.  What kind of watch was it?

15  A.  The second one?

16  Q.  Uh-huh.

17  A.  It's -- turns out to be a very expensive watch.

18          MR. BROUNSTEIN:  Objection.  Not responsive, your

19  Honor.

20          THE COURT:  Sustained.  The last answer is stricken.

21  Q.  How much do you know about what kind of watch it is?

22  A.  It was a fancy watch.

23  Q.  So before he actually gave you the watch, did he talk to

24  you about it?

25  A.  Yes.

1    Q.  What did he say?

2    A.  He had a client that was an incident in my section, and I

3    would get the watch if we were able to do the -- give him a

4    favorable outcome for his licensee.

5    Q.  Let me step back.  You said that he had a client who had an

6    incident in your section.  How did you first learn that there

7    was this client with an incident?

8    A.  John called me.

9    Q.  What did he say this first time that you learned of the

10   client?

11   A.  What I learned of the client was that his client did not

12   want to get a revocation, and for -- we could do a cancellation

13   instead.

14   Q.  Did he offer the cancellation the very first time that you

15   learned of the case, that you heard of the case?

16   A.  He wanted a cancellation for -- as soon as I found the

17   case, cancellation, because it was leaning towards a revocation

18   already.

19   Q.  So how did you first learn that the case was leaning

20   towards a revocation?

21   A.  Because when John called me in regards to the case, I

22   actually went and looked at the case.

23   Q.  When you looked at the case, what did you observe?

24   A.  I observed that this individual had multiple domestic

25   violence.

1    Q.  And what did you conclude?

2    A.  With the information that we already had gathered at that

3    time, it was leaning towards a revocation.

4    Q.  Did you have a discussion with Chambers about that?

5    A.  Yes.

6    Q.  What did you say?

7    A.  I told John this was leaning towards a revocation.  That's

8    when the idea of cancelling instead of revocation came about.

9    Q.  Why would a client want a cancellation instead of a

10   revocation?

11   A.  Well, as I testified earlier, a revocation is when we find

12   something you've done, something -- enough evidence to

13   permanently remove the firearm.  And the cancellation is more

14   that they don't really need the firearms, and they can

15   literally apply whenever they want.  A revocation usually takes

16   at least five years before you can reapply.

17   Q.  You said you had a phone discussion about this.  Did he

18   ever ask for the cancellation in writing?

19   A.  Yes.

20   Q.  Was that before or after the phone discussion?

21   A.  This was after.

22   Q.  So if I could show you Government Exhibit 608-5, directing

23   your attention to just the first page, what's this?

24   A.  This was the fax cover sheet from, that was accompanied by

25   the letter, with the letter.  I'm sorry.

I4hWcha7                      Villanueva - Direct

1   Q.  Turning to the second page, what's this letter?

2   A.  This was the letter that John Chambers sent me requesting

3   the licensee to be canceled and the reason why the license

4   should be canceled.

5   Q.  What's the name of the client?

6   A.  Edward Ticheli.

7   Q.  What, if anything, did you know about Edward Ticheli's line

8   of work, by the way?

9   A.  Edward Ticheli, he dealt with high-end watches, distributor

10  for high-end watches.

11  Q.  And directing your attention to the fax header on the top

12  of it, when did you receive this letter?

13  A.  On May 30, 2013.

14  Q.  At what time?

15  A.  10:51 a.m.

16  Q.  What happened after you got this?

17  A.  After I got this, I went straight to Capt. Endall's office,

18  because this was -- this was too much.  There was no gray area.

19  This was, like, literally a revocation, so I went to Endall and

20  I showed him the case.

21  Q.  Sorry.  Are you saying that this is a situation where just

22  cancellation wouldn't be appropriate?

23  A.  Correct.

24          MR. BROUNSTEIN:  Objection, your Honor.  Leading the

25  witness.

 1          THE COURT:  Sustained.

 2   Q.  Did there ever come a time when Chambers asked for any

 3   outcome other than cancellation in this case?

 4   A.  Yes.

 5   Q.  When was that?

 6   A.  It was literally -- it was around the same time frame.

 7   Q.  So when was that in relation to this fax?

 8   A.  It was the same day.

 9   Q.  OK.  Before or after you got the fax?

10   A.  It was after I got the fax.

11   Q.  How did he let you know that he wanted something other than

12   cancellation?

13   A.  I was traveling -- I was going home, and John called me.

14   He -- his licensee did not want cancellation.  He wanted his

15   license back.

16   Q.  So what did Chambers say?

17   A.  Come up with an idea of cancelling two of the licenses and

18   giving two back.

19   Q.  Did he say which two licenses he wanted back?

20   A.  Yes, he did.

21   Q.  Which two?

22   A.  It would have been his premise residence and his carry

23   business.

24   Q.  What would getting the carry business license back enable

25   the licensee to do?

1   A.  To continue carrying concealed weapon.

2   Q.  What, if anything, did Chambers say about why you should

3   authorize this outcome?

4   A.  He sent me, told me that there would be a watch in it for

5   me.

6   Q.  What did he say about where the watch would come from?

7   A.  It would be -- come from Ticheli's collection.

8   Q.  And what did he say about what would have to happen for you

9   to get the watch?

10  A.  Ticheli would have to get his continuance for his carry

11  business and premise residence.

12  Q.  What was your response to Chambers?

13  A.  At first, I said it was going to be hard to spin, but I had

14  to run it through Endall.

15  Q.  So what did you do?

16  A.  I ran it through Endall.

17  Q.  How did that conversation unfold?

18  A.  I went straight to Endall, and I told him this is what

19  John's looking for.  I was willing to do the cancellation, but

20  he wants a two and two.  We call it two and two.  Two and two

21  means two cancellations, two continues, and his back was, Just

22  make it happen.

23  Q.  In general, what was your impression of the relationship

24  between Endall and Chambers?

25          MR. BROUNSTEIN:  Objection.

1          THE COURT:  Overruled.

2     A.  They had a very good relationship.

3     Q.  To what extent were you able to predict what Endall's

4     response would be to requests from Chambers?

5          MR. BROUNSTEIN:  Objection, your Honor.

6          THE COURT:  Sustained.

7     Q.  About how much experience did you have discussing with

8     Endall requests that Chambers would make during your time as

9     supervisor in the incident section?

10    A.  Every time I went in to Endall's office and it dealt with

11    John Chambers, he would either sign the folders direct, but he

12    would never said no.

13    Q.  About how common an occurrence would it be for you to

14    consult with Endall about a request that Chambers would make on

15    a case?

16    A.  If there was no gray areas, I would consult with Endall.

17    Q.  What would you do if there were gray areas?

18    A.  If there were gray areas, I would do it myself.

19    Q.  When you say do it yourself, what would you do?

20    A.  I would show him the amount of suspension or give the

21    license back.

22    Q.  You would agree with Chambers's request?

23    A.  Correct.

24    Q.  So when you discussed this with Endall, in your mind, what

25    did you think an appropriate outcome would have been for the

I4hWcha7                          Villanueva – Direct

1    case of Edward Ticheli?

2              MR. BROUNSTEIN:  Objection.

3              THE COURT:  Sustained.

4    Q.  By the time you reviewed this folder in 2013, how long had

5    you been an incident sergeant?

6    A.  2013, I had been an incident sergeant nine years.

7    Q.  About how many incident final reports had you reviewed

8    during that time period?

9    A.  Thousands.

10   Q.  And about how many recommendations had you made during that

11   time period?

12   A.  Thousands.

13   Q.  Based on your experience, having reviewed the file, what

14   was your conclusion at the time as to what the appropriate

15   outcome would have been for Ticheli's incident investigation?

16   A.  Revocation.

17   Q.  Now, showing you Government Exhibit 307, what's Government

18   Exhibit 307?

19   A.  This is an email that John Chambers sent me.

20   Q.  When did he send it?

21   A.  On 5/30 of 2013 at 5:40 p.m.

22   Q.  When the subject line says, "Here's a link to the Paul

23   Picot watch," what did you understand him to be referring to?

24   A.  This was from the watch that we had spoken about earlier in

25   the day.

I4hWcha7                         Villanueva - Direct

1    Q.   And where Chambers wrote, "I should have it in hand

2    tomorrow," what did you understand him to mean?

3    A.   That he was going to pick it up and have it ready.

4    Q.   Now, what did you do with Mr. Ticheli's incident

5    investigation?

6    A.   Ultimately, what the final outcome was, I did exactly what

7    John Chambers wanted.  I canceled two of the licenses --

8    actually, one license, one permit, and I continued the premise

9    residence and the carry business.

10   Q.   Did Chambers ever, in fact, give you the watch that he had

11   discussed?

12   A.   Yes.

13   Q.   Showing you Government Exhibit 101, what is this?

14   A.   This is the box of the watch that John brought me to my

15   desk.

16   Q.   How was it packaged when he brought it to you?  You can

17   open it.

18   A.   I can open it?

19        It was -- he had it in a bag.

20   Q.   When you first got it, was it open or closed?

21   A.   It was closed.

22   Q.   When was the first time, if ever -- did you ever open the

23   box?

24   A.   When I got home.

25   Q.   What was your reaction when you opened the box?

I4hWcha7                          Villanueva - Direct

1    A.  As soon as I saw it, I cannot wear the watch.

2    Q.  Why was that your reaction?

3    A.  Because as soon as I saw it, I knew that the reason I got

4    it was for something that I did that was --

5              MR. BROUNSTEIN:  Objection, your Honor.

6              THE COURT:  Sustained.

7              MR. BROUNSTEIN:  Strike the answer.

8              THE COURT:  The witness's last answer is stricken.

9    BY MR. MONTELEONI:

10   Q.  Directing your attention to the tags on the watch, how did

11   those tags get there; do you know?

12   A.  They were originally there.

13   Q.  What did you do with the watch?

14   A.  I put it in the garage.

15   Q.  Did you ever wear the watch?

16   A.  No.

17   Q.  Showing you Government Exhibit 608-1, what type of document

18   is this?

19   A.  This is the final report that the investigator types up

20   once he or she has concluded their investigation.

21   Q.  And who does this report relate to?

22   A.  This is for Edward Ticheli.

23   Q.  When does it say that the incident investigation started?

24   A.  It was assigned on 4/12 of '13.

25   Q.  What does this report say that the incidents were?

I4hWcha7                        Villanueva - Direct

1              MR. MONTELEONI:  You can go to the fourth page.

2      A.   This is the reason that it was recommended for revocation.

3      Q.   OK.  What would the revocation mean for the licensee?

4      A.   All his permits and pistol licenses will be taken away from

5      him.

6      Q.   And you said before that your conclusion's that revocation

7      would have been an appropriate disposition.  How close a call

8      was that?

9              MR. BROUNSTEIN:  Objection.

10             THE COURT:  Overruled.

11     A.   With all the information that I gathered, very easy case to

12     say he's revocation.  There was no gray area with this case.

13     Q.   Now, on the last page, under case supervisor's comments and

14     recommendations, whose signature is that?

15     A.   On the case comments, that is my signature.

16     Q.   All right.  And what does the handwriting say right under

17     your signature?

18     A.   I put C-A-N-C, which is short for cancel.  PB, cancel the

19     premise business license.  RS, which is the rifle/shotgun

20     permits.

21     Q.   What does it say next to that?

22     A.   And followed by C-O-N-T, which is short for continuance.

23     PR, continues his premise residence license, and CB, carry

24     business license I continued.

25     Q.   And so what does this recommendation mean in total?

1    A.    That Mr. Ticheli will have his carry business back.

2    Q.    Now, on the signature page, there's a signature under

3    yours.   Whose is that?

4    A.    This was Capt. Endall's.

5    Q.    What was his position in the license division at the time?

6    A.    He was the executive officer.

7    Q.    And what was his decision?

8    A.    Same as mine, cancel the premise business and rifle/shotgun

9    and continue the premise residence and carry business.

10   Q.    Returning back to your recommendation, did you write --

11   sorry.   When did you write that Ticheli's premise residence and

12   carry business should be continued?

13   A.    On July 13 of 2013.

14   Q.    Showing you Government Exhibit 203, at page 509, could you

15   please read the third text down and indicate who sent it?

16   A.    On 7/15, 2013, text from John Chambers:  "Morning, Dave.

17   Will text you later when I'm bringing the tix for this

18   Saturday's game down to you or sending them to your house.

19   Still same address, right?"

20   Q.    What's the next text that you send?

21   A.    The one that I sent was:  "Yes, still same address, and

22   just officially closed your client's 'the watch guy' case."

23   Q.    When did you send that?

24   A.    On 7/15 of 2013.

25   Q.    How does that compare to the date of your signature on

I4hWcha7                        Villanueva - Direct

1   Government Exhibit 608-1?

2   A.  Same day.

3   Q.  What were you referring to when you said this?

4   A.  Mr. Ticheli's license.

5            THE COURT:  Mr. Monteleoni, is this an appropriate

6   place to suspend for evening?

7            MR. MONTELEONI:  Absolutely, your Honor.

8            THE COURT:  Members of the jury, we're going to

9   suspend now until tomorrow morning.  We'll resume promptly at

10  9:30.  If you're here a little early, we'll start a little

11  early.  Once again, tomorrow we'll put in a full day, from 9:30

12  until 5:00, with an hour for lunch and a short, midmorning and

13  midafternoon recess.

14           In the meantime, keep an open mind.  Come to no

15  conclusions.  Don't discuss the case among yourselves or with

16  any of those inquiring minds at home.  Have a great evening and

17  a safe trip home.

18           Please recess the jury.

19           (Jury not present)

20           THE COURT:  Mr. Villanueva, you may step down.  You're

21  excused until tomorrow morning, sir.

22           THE WITNESS:  Thank you.

23           (Witness not present)

24           THE COURT:  All right.  Everyone may be seated.

25           Can the government give me some indication of where

I4hWcha7

1    you are in the progress of the case.

2              MR. MONTELEONI:  Yes, your Honor.

3              I think that we have probably a little more than two

4    more hours of direct testimony from Mr. Villanueva, and then we

5    only have two more witnesses, who we expect to be somewhat

6    briefer.  I think that it's going to ultimately depend largely

7    on the amount of cross-examination that the defendant wishes to

8    do.

9              THE COURT:  All right.  Mr. Stavis or Mr. Brownstein.

10             MR. BROUNSTEIN:  Yes, your Honor.

11             THE COURT:  What lies ahead from the defense?

12             MR. BROUNSTEIN:  Your Honor, obviously I'll be

13   cross-examining Mr. Villanueva.  I really can't predict how

14   long it will take; it's kind of organic.  And then we do

15   anticipate a defense case, your Honor.

16             THE COURT:  All right.  But is it possible, then, that

17   we may conclude the taking of evidence sometime on Thursday

18   morning?

19             MR. BROUNSTEIN:  It's possible, Judge.  I don't know

20   how likely it is.

21             MR. STAVIS:  I don't think so.

22             MR. BROUNSTEIN:  You don't think so?

23             MR. STAVIS:  No.

24             MR. BROUNSTEIN:  Judge, we do anticipate, your Honor,

25   that Mr. Chambers will be testifying.  We think that that will

I4hWcha7

1    probably take a while, so the likelihood of conclusion on

2    Thursday is not high, but I do think it's possible, Judge.

3            THE COURT:  All right.  Just looking ahead and trying

4    to make plans, obviously, the defense is under no obligation to

5    offer any case.  You've announced that you are going to have a

6    case, and now you're telling me that Mr. Chambers is going to

7    take the stand.

8            MR. BROUNSTEIN:  We anticipate that, sir.

9            THE COURT:  Of course, that's always subject to change

10   and reconsideration, because a trial's a dynamic event.

11           Are there any issues that counsel want to raise or

12   alert the Court to now before we recess for the evening?

13           MR. ROSSMILLER:  Just very briefly, your Honor.

14           With respect to the jury charge, this will depend on

15   the timing of the conclusion of testimony, of course.  Given

16   the relative lack of recent jury charges with these crimes, it

17   would be helpful, I think, to the parties to have a little bit

18   of time with a draft charge, if that's possible, not to rush

19   the Court.

20           THE COURT:  Right.  I'm working on it.  I will see

21   what I can do to get you a draft charge at some point tomorrow.

22           MR. STAVIS:  Don't you have lifetime tenure, your

23   Honor?

24           THE COURT:  It's not enough.  All right?

25           MR. ROSSMILLER:  Thank you to the Court and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I4hWcha7

1    hardworking clerks.  We appreciate it.

2                  THE COURT:  All right.  Anything further?

3                  MR. ROSSMILLER:  Not from the government, your Honor.

4                  MR. BROUNSTEIN:  Not from the defense.

5                  THE COURT:  All right.  I have another matter on, so

6    if you can clear from the well of the courtroom, I think

7    everyone would appreciate it.

8                  See you tomorrow morning.  Be here at 9:00.

9                  (Adjourned to April 18, 2018, at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2   Examination of:                           Page
 3   MICHAEL BARRETO
 4   Cross By Mr. Stavis . . . . . . . . . . . . 118
 5   Redirect By Mr. Rossmiller . . . . . . . . . 148
 6   BARD HUBBARD
 7   Direct By Mr. Monteleoni . . . . . . . . . . 161
 8   Cross By Mr. Stavis . . . . . . . . . . . . 275
 9   DAVID VILLANUEVA
10   Direct By Mr. Monteleoni . . . . . . . . . . 299
11                     GOVERNMENT EXHIBITS
12   Exhibit No.                             Received
13    2001   . . . . . . . . . . . . . . . . . . 154
14    601, 603, 604, 605, 606, 607, 608 and 609  . 154
15    350, 403-404, 408-414  . . . . . . . . . . 157
16    416, 419-421, 424-425, 427   . . . . . . . 158
17    430-438, 440-458, 460-461, 463-467 . . . . . 158
18    2005   . . . . . . . . . . . . . . . . . . 159
19    201-205  . . . . . . . . . . . . . . . . . 159
20    2004   . . . . . . . . . . . . . . . . . . 160
21    1201 and 1202  . . . . . . . . . . . . . . 160
22    101 and 101-1 through 101-11   . . . . . . 173
23    102 and 102-1 through 102-15 . . . . . . . 207
24    109  . . . . . . . . . . . . . . . . . . . 216
25    104 and 104-1 through 104-5  . . . . . . . 219
```

```
 1     111, 112, 113, 111-1-2, 112-1-2, 113-1-3   . 224

 2     1202-1    . . . . . . . . . . . . . . . . . 235

 3     122   . . . . . . . . . . . . . . . . . . . 240

 4     1401    . . . . . . . . . . . . . . . . . . 315

 5     103, 127, 103 1-5 and 127-1   . . . . . . . 333

 6     126   . . . . . . . . . . . . . . . . . . . 337

 7     105-108   . . . . . . . . . . . . . . . . . 347

 8     110 and 110-1   . . . . . . . . . . . . . . 349

 9     114, 114-1 and 114-2 . . . . . . . . . . . . 351

10     129-A and 129-B and 129-1 through 129-5   . . 353

11     120 and 120-1   . . . . . . . . . . . . . . 354

12     115-119, 115-1, 115-2, 116-1, 117-1. . . . . 355

13              118-1, and 119-1

14     301-350 . . . . . . . . . . . . . . . . . . . 157
```

15                     DEFENDANT EXHIBITS

16     Exhibit No.                          Received

```
17     A   . . . . . . . . . . . . . . . . . . 122

18     B through I   . . . . . . . . . . . . . 130

19     J   . . . . . . . . . . . . . . . . . . 143

20     K   . . . . . . . . . . . . . . . . . . 283

21     M-1   . . . . . . . . . . . . . . . . . 297
```

22

23

24

25