## STEVEN L. BROUNSTEIN PLLC
Attorney at Law

**32 Court Street**
**Suite 408**
**Brooklyn, New York 11201**
(718) 875-5700
FAX (718) 625-6837
sbattylaw@gmail.com

November 6th, 2018

VIA ECF

Hon. William H. Pauley III

United States District Judge

Southern District of New York

500 Pearl Street

New York, New York 10007

      Re:    <u>United States v. John Chambers</u>
            17-Cr-396(WHP)

Dear Judge Pauley:

    Along with my co-counsel Roger Stavis, I respectfully submit this letter and attached documents on behalf of our client, John Chambers, who is to be sentenced on November 20th 2018. Mr. Chambers exercised his right to jury trial and was convicted of Bribery pursuant to 18 USC 666; Conspiracy to Commit Bribery pursuant to 18 USC 371; Honest Services Fraud pursuant to 18 USC 1343 and 1346, and Conspiracy to Commit Honest Services Fraud pursuant to 18 USC 1349.

    We reviewed the initial Pre-Sentence Report ("PSR") and, by letter dated August 29th, raised several objections. In the revised PSR dated September 19th 2017, we raised objections to a two (2) level enhancement. The revised PSR found an adjusted guideline level of twenty two (22), which corresponds to a sentence of incarceration from forty one (41) to fifty one (51) months.

Sentencing Guidelines Issues

We have no objection to the base offense level of twelve (12) as delineated in Par. thirty two (32), pursuant to USSG 2C1.1(a)(2).  Similarly we have no objection finding that the base offense level is enhanced by two (2) pursuant to USSG 2C1.1(b)(1) because the offense involved more than one (1) bribe.  We do note, however, the unique nature of the ongoing  relationship between Mr. Villaneuva and Mr. Chambers and that there was no illegal involvement between Mr Chambers and any other individuals in the Pistol Licensing Division. This is contrasted with the fact that there were other officers alleged to have received bribes and Mr. Villaneuva was involved in a good deal of illegal activity, separate and distinct from that between him and our client .

Initially, we objected to the PSR's conclusions in Par. 34 (thirty four) and 27 (twenty seven) of a two (2) level enhancement imposed pursuant to USSG 2C1.1(b)(2) and Bb1.1(b)(1)(B) based on the value of the bribes between $6,500.00 to $15,000. That valuation was presumably based upon the mistaken belief that the Paul Picot watch given to Mr. Villaneuva was worth its full retail price of $8,000.00 (see PSR par. 20). While we disagreed with that finding initially, given the relatively low threshold $6,500, we will no longer pursue that objection.

We continue to object to the finding in Par. 35 of a four (4) level enhancement pursuant to USSG 2C1.1(b)(3), because the bribes were paid to a public official who held a "high level decision making position."  The trial evidence was that the bribes were paid to David Villaneuva, who cannot fairly be considered to have held such a high level position.  Indeed, by letter addressed to the Department of Probation on September 10, 2018, the Government agreed with our position that this four level (4) enhancement should not be applied.

David Villanueva was a New York City Police Sergeant working at the New York City Pistol Licensing Division Incident Section and the trial testimony revealed that he had limited discretion with the ultimate decisions being made by  superiors.  In fact, all of Mr. Villaneuva's decisions were merely "recommendations"; first reviewed by a Lieutenant, and then adopted or rejected by the Commanding Officer and, if warranted,

to a quasi judicial review within the New York City Police Department (an administrative hearing). Therefore, Sergeant Villaneuva cannot be deemed to have been in a high-level decision making position as the Guidelines require.

Just as the PSR overstates David Villanueva's role as a high level decision maker, it also overstates John Chambers' role as an attorney in this bribery case.  Para. thirty seven (37), of the PSR proscribes an enhancement of two (2) levels pursuant to USSG 3B1.13 because Mr. Chambers is a licensed attorney who abused his position of a public trust in a manner that significantly facilitated the commission or concealment of the offense.  However, at trial it was established there were a number of individuals involved in representing applicants before the New York City Police Department Pistol License Division.  These representatives who performed the same tasks as Mr. Chambers were NOT attorneys.  They held themselves out as so called "expediters"; individuals purporting to have the ability and knowledge to secure gun licenses and renewals.  Being an attorney was neither a requirement nor a pre-requisite to the functions Mr. Chambers performed at the License Division.  Mr. Chamber's expertise as an attorney only came into play representing individuals outside the NYPD in challenges to NYPD decisions through Article 78 Special Proceedings in New York State Supreme Court or Appellate Courts.  Moreover, in considering this adjustment, it was not his position as an attorney that facilitated his relationship with Mr. Villanueva, it was his personal relationship that had nothing to do with the fact that he was an attorney.  A review of the practice commentary for this provision establishes its applicability when the individual uses his position of public trust either to aid in the commission or concealment of the crime.  Mr. Chambers did neither.  His law license had nothing to do with the offenses of conviction.

### The Appropriate Sentence

In light of our well founded objections, one of which the Government agrees with, the appropriate offense level is sixteen (16) with a corresponding sentence of between 21 (twenty one) to 27 (twenty seven) months' incarceration.   The Department of Probation, which found an offense level of twenty two (22) corresponding to asentece of forty one (1) to fifty one (51) months and recommended twenty four (24) months of

incarceration. The PSR recommendation constitutes a variance premised on several factors, including Mr. Chambers age, his lack of a criminal record, and his very difficult upbringing punctuated by chronic alcoholism and sexual abuse. Moreover the Probation Department recognized that this conviction has resulted in his disbarment and inability to work at his chosen profession; indeed the only way he knows to make a living. But what Probation avoided any discussion of "the elephant in the room;" the fact that Mr. Chambers is transgender. Moreover, no consideration was given to the extraordinary peril he is likely to face as transgender inmate in a federal system that is considering redefining gender. While the Probation Report recommends a non-guidelines sentence, we ask this Court, in light of all the 18 USC 3553 (a) factors to go even further and consider a sentence which avoids the incarceration of our transgender client.

As this Court is well aware, the guidelines are only one factor which must be considered in making its sentence determination. 18 U.S.C. 3553(a) states, in relevant part:

> Factors to be considered in imposing a sentence --The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed;
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and

     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established for-....

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

Relying on those factors, several things become clear. First, at 63 years of age our slight in stature, transgender client poses no threat to the public safety. And any member of the public, seeing the horror and utter devastation experienced by John Chambers in the wake of this case, would certainly be deterred from engaging in similar conduct. Indeed, Mr. Chambers conviction does not exist in a vacuum; even more serious allegations and convictions have already occurred in this investigation. Individuals who may be inclined to engage in similar conduct have clearly been deterred. While this matter was not front page news it received sufficient attention to all who interact with the New York City Pistol License Division or conduct any business with the New York City Police Department are deterred by Mr. Chambers§ conviction, loss of employment and disbarment and the consequences to others who have been convicted.

<u>Unique Individual Circumstances</u>

We ask the Court to take special note of Mr. Chambers unique characteristics and background when considering 18 USC 3553 (a)(1). Mr. Chambers was born as Susan DeSanto. He was raised by a mother who had who abused drugs and alcohol and provided little love, affection or guidance. His father had no presence in his life and his mother had numerous suitors. As a child, Susan DeSanto was physically abused and threatened with a knife by drug- using companions of her mother and sexually abused

on several occasions by her companions. When Susan had the courage to inform her mother of the sexual abuse, she rebuked him and blamed it on Susan herself. Finally Susan's mother exiled Susan into foster care. Mr. Chambers has struggled with other members of his family his entire life. All the while he struggled fearfully with his gender identity. Although, Susan dropped out of high school, she recognized the importance of education and earned a GED. Mr. Chambers (although identified as Susan) attended City College while working as a bicycle messenger, and numerous and various odd jobs. Despite having little or no financial assistance or support and slugging with gender identity, graduated (cum laude) in 1980 and chose to attend law school. With no familial assistance Mr. Chambers incurred large student loans and worked summers and during the entire second and third year of law school. Mr. Chambers graduated from Temple Law School in 1983. His is truly a Horatio Alger story and a testament to the triumph of will in overcoming adversity.

Mr. Chambers obtained employment in the Kings County District Attorneys Office in 1983. While finding the work fulfilling, student loan responsibilities and other financial considerations required him to seek employment in the private sector after three years in public service. Mr. Chambers gender transition occurred in or around 2001. He opened his own office and over the years developed a unique specialized practice representing individuals who needed assistance with firearms licenses. Mr. Chambers practice consisted primarily of representing individuals with issues before the New York City Pistol License Division and representing individuals who litigated pistol licensing issues before the Courts of the State of New York. Mr. Chambers litigated over 200 matters pursuant to Article 78. Those actions were argued and litigated before the New York State Supreme Court, various Appellate Divisions and, ultimately a winning argument before New York's highest court, the Court of Appeals.

John Chambers' clients and adversaries both trusted and respected him. The Court may recall the trial testimony of Government witness, Inspector Barreto, the current Commanding Officer of the New York City Police Pistol License Division. He told the jury and this Court that Mr. Chambers was highly regarded and well respected. Mr. Chambers was a hard-working, dedicated advocate who cared deeply for his clients. Much of his work had little to do with Mr. Villanueva.

<u>Transgender Issues</u>

As previously noted, the Probation Department avoided discussion of "the Elephant in the room,"  Mr. Chamber's  transition from female to male. This is a very difficult subject and Mr. Chambers has always felt this was a very private matter.  While the jury was aware of this, it was not (and should not have been) an important or prominent factor at trial, except our attempt to explain how difficult it was for Mr. Chambers to maintain male friendships and the fact that he truly considered Mr. Villanueva his friend. However his gender reassignment is an extremely relevant factor in considering sentencing for several reasons.  This was an extremely private and solitary issue with which Mr. Chambers struggled throughout his entire life.  In fact, when we went to the Probation Office, Mr. Chambers struggled to speak about it and explained that he had not spoken about it to anyone in over fifteen (15) years. However, it must be addressed because of its relevance to sentence for this crime and proportionate punishment.

In order to maintain his gender identity, Mr. Chambers receives hormone treatments on a regular basis.  They are necessary in to maintain his identity as a male.  If he is incarcerated he will need to continue to receive that treatment during the time he is incarcerated. The Bureau of Prisons issued guidelines entitled "Transgender Offender Manual" related to the treatment of transgender inmates in January of 2017.  (We have annexed a copy).  This document recognized the special needs of transgender prisoners, physically, medically, psychologically, and it addresses the serious safety concerns. It recognized the complex issues transgender individuals AND the institutions confront when they are incarcerated for any length of time.  However, In May of 2018, the current administration issued an amended manual which in many ways upended the prior manual These revised rules shifted the focus more towards institutional concerns and away from the health, safety and welfare of incarcerated transgender individuals.  We have annexed an abbreviated copy of the May 2018 guidelines highlighting  these changes.

In fact, the January 2017 Manual was issued in response to the high number of transgender prisoners who were subject to both physical and sexual abuse while in

prison. Prison rape plagues the jails in this country. While incarceration is intended to deprive the inmate of liberty and separate the inmate from family and community, physical attack and sexual assault should not be part of the bargain. Unfortunately, members of the LBGTQ community are preyed upon and abused in our prisons. I have enclosed a Freedom of Information letter from the Lambda Legal Defense Fund and the Southern Poverty Law Center that addresses the changes made by the BOP and requests information and documentation from the Justice Department regarding them in their May of 2018 memo. It references the vulnerability to violence that transgender prisoners face and the heightened concern prompted by the new guidelines. Additionally the new guidelines have aroused public concern and I am enclosing several articles which discuss the changes.

Much of the concern heretofore revolves around the placement of individuals who have transitioned from Male to Female and the dangers they face if placed in a male facility. However, Mr. Chambers is small in stature and 63 years old. If placed in a male facility, we need not speculate as to his fate. And even if designated to a female facility, the risk of physical violence will still be acute as will the ridicule, bullying and isolation which are sure to follow him. By virtue of his gender, stature and age- he is extremely vulnerable. We ask the Court to weigh this factor heavily when determining a reasonable and fair punishment.

<u>Letters from Friends and Family</u>

We have enclosed numerous letters from friends, family and colleagues of Mr. Chambers. We will address just a very few, but those are representative of the sentiments expressed in the others appended to this letter. As the letters demonstrate, Mr. Chambers is highly charitable and giving- many of the letters detail his generosity to others in times of need, or his thoughtfulness at holidays, birthdays or special occasions.

Jessica Halfnight and Michael Asuncion are advocates of gun control. One might think they would avoid at all costs Mr. Chambers, a strong proponent of Second Amendment rights. Nevertheless, they were so moved by his kindness and generosity, that they join the chorus asking for leniency. Additionally many of the letters reflect

upon that fact that John and his wife Christina have been completely devastated by this conviction. We ask the Court to recall the testimony of Angelica Villaneuva, the former wife of David Villanueva, portraying John Chambers and his wife as her caring friends who showed genuine affection for her children and family. In fact their relationship endured and flourished after her divorce from David Villaneuva.  Ms. Villaneuva was so moved by the kindness and generosity John Chambers showed her in her time of greatest need that she submitted a letter supplementing her trial testimony.

Jessica High recounts the gifts that were given at Christmas by Mr. Chambers when her parents could not afford any and when she was struggling with finances. Mr. Chambers sent money to her to put food on the table.  Katharine High notes that John Chambers is constantly fund-raising and finding ways to help others: and suggests that the  world needs more people like John.  Amber Sperry recounts the many gifts that have been sent to her children by Mr. Chambers, making up for what she could not afford to do for them. Significantly, John Chambers paid for two years of karate school that so her son, who is on the Autism Spectrum, can continue his lessons.  She characterizes Mr. Chambers as "an angel to myself and children".  Charlotte Leary discusses the kind acts John has bestowed upon her family  including buying tickets for her elderly mother and arraigning private transportation so she could travel to and from Manhattan.  She states that John is the type of person who gives of himself on all levels despite being a dedicated worker never far from his work.  In fact, Mr. Chambers hasn't taken a vacation in twenty years.  Mr. Chambers is a dedicated friend, husband, and family member who is always considerate of others.   He cares deeply about all people with whom he interacts on a personal and professional basis.

Conclusion

John Chambers stands convicted of serious crimes as a result of his conduct.  His name is tarnished; he is disbarred; and at 63 years of age and with no money and no way to make a living, he must face the harsh reality of incarceration.  Prison is difficult for any one, but for this defendant it would be a living hell.  The  Court has complete discretion in determining the sentence as it relates to the individual before the Court and the criminal conduct. In exercising that discretion we ask the Court consider the

issues addressed in this submission; the trial testimony; the Court's own observations of Mr. Chambers and the outstanding character he has exhibited as evidenced by the attached letters.   For all of these reasons, we respectfully request this Court to consider a sentence which does not subject John Chambers to the utter torture he would experience as an incarcerated transgender individual.  We request instead that the Court fashion a just sentence that would include a period of home confinement, community service and supervise release.  We thank the Court for considering this application.

                                                          Respectfully submitted,

                                                                        /s/

                                                          _____

                                                          Steven L. Brounstein

SLB:clc

Attachments