# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

JOHN CHAMBERS,                                    )
                                                  )
                              Movant,             )    Case No. 17-cr-396
                                                  )
               -against-                          )
                                                  )
                                                  )
UNITED STATES OF AMERICA,                         )
                                                  )
                              Respondent.         )
-------------------------------------------------

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE,
## SET ASIDE THE CONVICTION

John Chambers
*Pro Se*
511 Avenue of the Americas, #216
New York, New York 10011
(212) 645-5279
Email: proudlypatriotic@yahoo.com

RECEIVED
SDNY PRO SE OFFICE
2021 MAR -9  AM 10: 09

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF CONTENTS....................................... ii-iii

TABLE OF AUTHORITIES...............................iv-v

INTRODUCTION...............................................1

BACKGROUND................................................1

OUTLINE OF SUPPORT FOR GRANTING OF THE
MOTION..................................................3

ARGUMENT..................................................6

The Court Should Vacate Chambers Conviction Due to Ineffective Counsel.

> A.   Counsels Failed to Prepare Movant For His Testimony, Even Becoming Overtly Angry And Aggressive During the Single Session Of Preparation (The Night Before Movant was To Testify), When Movant Answered Questions in Improper Hearsay Format.

> B.   Counsels Refused To Take the Time to Understand, or Delve Far Enough Into the NYPD, Pistol License Division Process To Mount Any Viable Defense For the Movant.

C. Counsels Ignored Multiple NYPD Documents Provided By the Movant Which Sorely Compromised the Movant's Chances of Acquittal, Including Documents Which Directly Contradicted The Testimony Of The Sole Individual Who Claimed Movant Gave Him Gifts, Not Out of Friendship, But To Bribe Him.

CONCLUSION..............................34

# __TABLE OF AUTHORITIES__

**US Constitution**

*U.S. Const. amend VI*……………………………….. 1, 7, 42

**Federal Cases**

**Page(s)**

*Strickland v Washington*,
    466 U.S. 668 (1984) …………………………...7, 33

*Harrington v Richter*,
    562 U.S. 86 (2011)………………………..…7

*Rayborn v United States*,
    489 F. App'x 871 (2012) ……..........................7, 8, 39

*Griffin v United States*,
    330 F.3d 733 (2003),…………………….……18

*People v Thompson*,
    92 N.Y. 2d. 957 (1998)…………………..………21

*Davis v United States*,
    417 U.S. 333 (1974)……………………….……30

*Matter of Figel v Dwyer*,
    75 A.D. 3d 802 (2010)…………….…………… 36

*Hamblen v United States*,
    591 F. 3d 471 (2009),…………………………..41

*Cannon v Mullin,*
     384 F. 3d 1152 (10th Cir. 2004)....................... 41

## TABLE OF AUTHORITIES
### (Continued)

### Federal Statutes

28 U.S.C. § 2255 ....................................................1,6

18 U.S.C. § 371..................................................1

18 U.S.C. § 666 ...................................................1

18 U.S.C. § 1343 ..................................................1

18 U.S.C. § 1346...................................................1

18 U.S.C. § 1349...................................................1

28 U.S.C. § 2255(f)(1) .............................................6

### NYS Statutes

NYS Penal Law § 400.00 ...............................................20

### NYC Regulations

38 RCNY § 5...........................................................20

# I. <u>INTRODUCTION</u>.

Defendant, JOHN CHAMBERS, hereby moves this Court to vacate his conviction pursuant to 28 U.S.C. § 2255 based upon an assertion that his Counsels were ineffective, and but for their omissions, missteps and ineffectualness, the trial results would have been different.

Chambers asserts that he has been deprived of his 6th Amendment right to counsel under the US Constitution.

# II. <u>BACKGROUND</u>.

A jury found Movant guilty of bribery, honest services fraud, and conspiracy, in violation of 18 U.S.C. §§ 371, 666, 1343, 1346, and 1349.   Judgement was entered by the District Court on November 21, 2018, on the jury verdict and it was sustained on appeal. <u>United States of America v John Chambers</u>, 18-3558-cr,  (2nd Cir. 2020).

Movant claims ineffective assistance of counsel at trial pursuant to his § 2255 claim for relief based upon the following:

1.    Counsels for the Movant failed to take sufficient time to learn this case, and to provide any real defense, even though the Movant had documents which would have unquestionably and seriously called into

question the entire government's case, including challenging the very heart of the case; that is, the veracity of their "star" witness, convicted felon and former NYPD sergeant, David Villanueva.

2.      Counsels for the Movant failed to provide adequate preparation for Movant's own testimony, which was critical in a case based only upon the testimony of a convicted felon whose lies were guaranteed to either give him a "get out of jail free" card or dramatically reduce the sentence for his various crimes to almost nothing.  Since the government could provide **no written policy memorandums** from the NYPD, Pistol License Division, documents from the law office files of the movant were absolutely essential in his defense. Yet, these documents were ignored by Counsels, thereby compounding the ineffectuality of representation.

3.      Villanueva made many claims that were never substantiated by anything other than his own testimony.   Counsels were provided with documents which showed Villanueva lied about many of the Pistol License Division policies that he said he deviated from because Movant gave him gifts. As merely one example, Villanueva claimed the time frame of incident investigations took between "8 to 18 months" to resolve, and yet Villanueva asserted he resolved Movant's cases in half that time. When

times on the conference table yelling hostilely at the Movant, "No, no, no, no!!" At this point, Chambers became frightened, teared up, and could not fully participate in the remainder of the meeting. Consequently, Movant was not only ill-prepared by his Counsels with only a single preparation session, but was also unnerved by the berating and verbal assault coupled with the physically aggressive act of multiple hits to the table - a sound that reverberated alarmingly throughout the small conference room.

6.   By the next day, Movant was still hoping to testify, despite not being able to sleep, and still emotionally anguished over the volatile and violent nature of the aforementioned disastrous session in the office of Counsels. The Movant knew that without his explanation and documentation that would establish that the many claims by the former Sergeant David Villanueva were outright lies, he would have little chance of success.

7.   In Court the next day, moments before Chambers would have taken the stand, and unbeknownst to him until announced, Counsels for the Movant called for a brief recess. Which this Honorable Court granted. During these few minutes, Counsels convinced the Movant not to testify. At this junction, Movant was already an emotional wreck and felt sufficient intimidation so that he simply acquiesced to Counsels and agreed to not testifying.

8.     In hindsight, it is clear that if the Movant had taken the stand, without any preparation to speak of, he would have been a "train wreck," which Counsels obviously were thinking when seeking the short recess to speak privately to the Movant about not testifying.   Over and over again his answers would have been subjected to an objection from the prosecutors. Over and over it would be very clear what an inadequate and ineffectual job Counsels did with regard to preparing this case, including the preparation of the Movant for his testimony.

## IV.  ARGUMENT

Movant's 28 U.S.C. § 2255 motion is timely if [1] filed within one year of "the date on which the judgment of conviction becomes final." The judgement against Chambers became final after the Second Circuit affirmed his conviction on March 11, 2020, in <u>United States of America v John Chambers</u>, 18-3558-cr,    (2nd Cir. 2020). (Exhibit "B," Chambers Appeal_Second Circuit).   Not more than one year has elapsed since this date.

Movant is aware that in order to prevail on any claim of "ineffective counsel" that the Movant must demonstrate that Counsels' performance

fell below a reasonable standard for defense lawyer, and that due to this ineffectiveness prejudice resulted.  See *Strickland v. Washington*, 466U.S. 668, 687–94 (1984).

The Movant is also aware that "[s]urmounting Strickland's high bar is never an easy task. . . . [T]he standard for judging counsel's representation is a most deferential one." *Harrington v. Richter,* 562 U.S. 86, 105 (2011).

Even with this high bar, there can be little question that Counsels for the Movant herein did not provide an effective and competent defense. And, the omissions and failures of Counsels herein prejudiced the Movant, in violation of the Sixth Amendment of the United States Constitution.

In discussing the aforementioned standard in *Strickland*, *Id*, the Honorable Court in *Rayborn v United States*, 489 F. App'x 871 (2012), held:

> In order to determine prejudice as a result of counsel's deficient performance, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different." *Id*. at 694, 104 S.Ct. 2052. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome" - certainty of a different outcome is not required. *Id*. "Thus analysis focusing solely on mere outcome determination, without attention to whether the proceeding was fundamentally unfair or unreliable is defective." *Lockhart v Fretwell*, 506 U.S. 364, 269. (1993).

_Rayborn v United States_, 489 F. App'x 871, 878 (2012),

In connection with the case against the Movant, the only witness to the erroneous assertion of bribery by Movant is a convicted felon, who was a uniformed member of the New York City Police Department having taken the oath of office[1], and having admitted to taking large cash bribes, and receiving other costly items, including luxury, all-expense paid trips to places like Cancun and Hawaii, in exchange for the sale of pistol licenses, mostly concealed carry licenses (known as Carry Business handgun licenses), and who was allowed to lie without challenge about the policies which do not exist in the Pistol License Division, and for which there were never any written documents produced.

Villanueva also lied about other things, like providing Movant with "revocation letters," as if a lawyer with 34 years in practice without a single mark against his record from the time of his admission to the First Department in 1984 would do something like this against his clients. As with so much of this miscarriage of justice, Villanueva's words were never

---

[1]Police Officer oath: "I do solemnly swear that I will support the constitution of the United States, and the constitution of the State of New York, and that I will faithfully discharge the duties as a police officer of the New York City Police Department to the best of my ability. So help me God."

backed up by a scintilla of evidence.  And, they were never challenged by Counsels.

Similarly to his claims of having "helped" in 7 of Movant's Nassau County cases.  In reality, there were only 4, and again, the fact that there is nothing in this record proving this, aside from Villanueva's testimony.  Not a fax cover between NYPD and Nassau County, not a text transcript, nothing.  Was this lack of any credible evidence challenged by Counsels? No.

Villanueva's credibility was never attacked, nor his lies ever exposed.

In regards to Villanueva's criminal enterprise, this witness even contrived a way to avert not only the NYS Safe Act, but the federal prohibition against gun possession by convicted felons. It was convoluted but it worked[2].

Yet armed with this knowledge did Counsels use this to impugn or impeach his testimony?  No.

---

[2] In his capacity as a sergeant with the Pistol License Division, he issued pistol licenses to a felon and his brother (a non-felon). At this juncture, the handgun license was useless to the felon, since he would have to undergo the FBI NICS background check in order to purchase a gun.  To work around this huge legal hurdle, Villanueva issued  two purchase authorizations to the non-felon brother, who easily passed the FBI NICS background check.   Villanueva then violated the NYS Safe Act when he allowed this non-felon brother to transfer one of these guns to the felon brother WITHOUT requiring a NICS check (which is required for all person to person transfers, unless the two are immediate family, which, under the state law, does not include brothers).

During the trial, the aforementioned disgraced sergeant claimed he and Chambers did not have a real friendship, but only a "transactional one."

This was another falsity, that should have been challenged. In addition, Movant had to testify to address all of these erroneous claims. Just why the Movant did not testify is another issue supporting this §2255 motion.

Villanueva claimed the following against Chambers:

- Villanueva claimed Chambers had 200 cases in the Incident Section and Villanueva gave Chambers favorable outcomes 50% of the time
- Villanueva also claimed that these investigations took between 8 and 18 months, but he resolved these for Chambers in 1/2 the time
- Villanueva claimed he gave Chambers renewals faster than the normal 30 to 40 days, sometimes same day
- Villanueva claimed he gave Chambers 7 revocation letters
- Villanueva claimed to have upgraded 5-6 of Chambers' client licenses
- Villanueva claimed to have helped Chambers on 7 Nassau County licensees

(See Complaint, Attached Exhibit "A").

In connection with these claims, they were all based solely upon the verbal testimony of Villanueva, and there were no written policy mandates offered. There could not be, as the License Division has no policies in

regards to any of the above.

In connection with these claims, there was just no documentary proof.

Movant attempted to give Counsels documents that would completely rebut much of what Villanueva claimed, but Counsels brushed these off to the great detriment of the Movant.

How could Movant be fairly and effectively represented if documents, which showed the complete opposite of what Villanueva testified to, were ignored, and never used at trial?

Aside from the above, the testimony throughout left the jury with the definitive impression that someone with a record, particularly with any claim of one or more "domestic incidents," could never, ever be licensed. Therefore, deductive reasoning left them believing that the **only** way someone with a criminal record, or a domestic incident could be licensed would be if there was some arrangement or, as the government claimed, bribery.

This is just not true.

Chambers provided Counsels with numerous NYPD, Pistol License Division, documents showing handgun licensing approved after administrative appeal for those with the following records:

- Burglary, Robbery, Attempted Murder, Criminal Use of a Firearm, Assault
- Criminal Possession of a Weapon, Resisting Arrest, Menacing
- Domestic incidents, with arrests, including for Assault and Harassment related to one domestic violent incident
- Assault 2, Assault 1, Attempted Murder, Criminal Possession of a Weapon
- Domestic Incidents and False Statements
- Rape 1st Degree
- Robbery 2, Menacing a Police Officer, Criminal Possession Weapon
- Grand Larceny 2nd, Burglary, Robbery, Assault
- Grand Larceny with Bench Warrants. Orders of Protection.
- Circumstances of prior domestic incident

(Attached Exhibit "C").

Counsels apparently saw no reason to highlight these, but clearly, in the face of a lying felon on the stand claiming that only the squeaky clean get licensed for gun possession in NYC, unless there is bribery involved, these were absolutely critical. Particularly the ones showing issuance of a gun license by the NYPD, Pistol License Division, to individuals with **serious** arrests in their past.

Included in these documents, in fact, is an applicant whose gun license was issued after Movant's law office appealed the initial denial despite have **two domestic violence incidents**, including one which resulted in his arrest for assault and harassment. (See Guedner Villette, *Notice of Disapproval* and *Notice of Approval After Appeal*, Exhibit "C,"

pages 5 & 6).

This is tremendously significant as Villanueva led the jury to believe that someone like Ed Ticheli, **who was at no time arrested, either when police responded to his home on a domestic call, or otherwise**, would never be licensed for gun ownership in NYC by the NYPD, Pistol License Division, but for a bribe.

This is an absolute falsehood which is clearly rebutted by these decisions of the Director of the Pistol License Division in response to Movant's administrative appeal submissions. Aside from these, there are documents provided also to Counsels of Movant's successful administrative hearing results for persons with serious arrests and/or domestic incidents.

Literally hundreds of documents were provided to Counsels from the law office files of the Movant, yet there were only **8 total exhibits (documents)[3] offered into evidence by the defense** (Those were trial Exhibits DX "B" through DX "I").

---

[3] Exclusive of a few photographs of Movant with Villanueva. As with everything else tied to this defense, however, even these were not characterized as they should have been. Unlike the ones the government showed the jury of Villanueva and his true bribers in their luxury vacations outside of America, these were photos of the Movant and Villanueva where they were engaged in play fighting and holding onto one another - at no time did Counsels distinguish these photos as demonstrative of a true, not transactional, friendship. One only need look closely at the photos and see the love and friendship in the eyes of each.

Compare that to the almost **300 exhibits offered by the government.**

Without a deep understanding of what these 8 signified and how they even tied into this case, even these measly 8 documents ended up being totally worthless in the defense of Movant, and were likely disregarded by the jury.

Another point to be made to further support the ineffectiveness of Counsels, even with these very few exhibits, Counsel still hurriedly, and with absolutely (and apparently) no preparation, marked them with exhibit labels for identification purposes, prior to ultimately entering these 8 into the Court record, in front the Honorable Court, and the jury.

This action, standing alone, with regard to these very few exhibits once again demonstrates Counsels unpreparedness.

Villanueva also erroneously and outrageously claimed that Movant sought his favors because, if the licensee's handgun license were to be revoked, Movant would then have to represent the client at an administrative hearing.  Villanueva claimed, "Chambers knew **he could not win at hearing**."

Movant provided many documentation to Counsels to show the falsity of this statement. Once again, Counsels had no use for these to the

determent of the Movant. (Attached herewith as Exhibit "D").

The attachments are proof of administrative hearings won by Movant on very difficult cases (and there are many more than this in the files of Movant, also provided to Counsels).

These demonstrate that Villanueva's false assertions regarding Movant's purported inability to win hearings was yet **another** bold-faced lie intended simply and clearly to bolster his claim, which was also a falsehood, that the relationship between he and the Movant was transactional. In other words, essentially asserting to the jury "Chambers needed me."

This is exemplified by the case of Ms. Maria Divison, who's carry guard handgun license was revoked. (Exhibit "E" herewith). It should be noted that Ms. Divison, who represented herself *pro se* until the time of administrative hearing, became an incident on December 27, 2013, and the case was resolved by the Incident Section on April 17, 2014. This *pro se* licensee's for the purpose of the Incident Section investigation's "time frame" for resolution on her incident was a mere **3 1/2 months, not the "8 to 18 months"** that Villanueva claimed was the norm.

Maria Divison's carry license was revoked. She hired the Law Offices of John S. Chambers to represent her at an administrative hearing. Despite

multiple arrests, orders of protection, failure to cooperate, and a failure to notify of change of address, Movant was indeed successful in procuring a continuation of Ms. Divison's concealed carry handgun license after administrative hearing. (Exhibit "F")

In another example of Counsels ineffectiveness, when the current Commanding Officer, Michael Barreto testified, Movant pointed out to Counsels that he had provided several documents to Counsels that would be relevant to attacking and damaging Villanueva's veracity.

These documents went to two main issues;   1) the claim that resolutions of Incident Section matters took between 8 and 18 months, and 2) the claim of domestic incidents preventing gun licensure in NYC.

Counsels refused to introduce this evidence with C.O. Barreto on the stand.

The documentation arose as follows:  Chambers had represented a client whose firearms licenses were suspended for "*failure to notify License Division in regards to Domestic Violence Incident…and C-Summons…*" by NYPD letter dated December 1. 2016. (See attached Exhibit "G").

According to Villanueva's testimony, the time-frame for resolution should not have been until between August 1, 2017, and June 1, 2018.

Additionally, according to Mr. Villanueva someone like Mr.

Greco would never receive his licenses back following a domestic violence incident. And, if he did, it would only be because of a bribe.

In fact, as the attachments demonstrate, this matter was resolved in **less than TWO MONTHS,** and signed off by Commanding Officer Michael Barreto. (See attached Exhibit "H" herewith).

More importantly, even with a claim of **domestic violence** against the licensee-Greco, as the attachments show, the matter was resolved in favor of the licensee (all firearms licenses were reinstated and firearms returned to Mr. Greco).

When Movant showed these documents to Counsel, he was rebuked and Counsel said to the Movant, "No good. Look at your jury.  You have 10 women."

In hindsight, this statement does not even make sense, and further depicts how deeply Movant was prejudiced by the failures of Counsels. In this instance, could it be any more clear that this would be precisely why documents like this should be brought before the jury?

After all, the jury was imbued by the government's case that "*domestic incidents*" would automatically result in revocation, unless bribery was involved. The jury was also erroneously told that investigations would normally take up to 18 months.   Both of these were **contradicted**

by these documents which should have come in through Commanding Officer Barreto.

The jury was never made aware of so many important things - things that would have likely changed the outcome of this case.

In *Griffin v United States*, 330 F.3d 733, (6th Cir., 2003), the Court held:

> To prevail on a claim of ineffective assistance of counsel....a petitioner must establish two elements: (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different. *Strickland v Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." id.

In another outrageous dismissal of documentation by Counsels, Movant provided to Counsels the "Incident Investigation- Final Report" from 18 different cases, proffering only the first page, which delineates the **exact** dates of a case is assigned in the Incident Section and when it is resolved.  (See attached Exhibit "I" ).

These were furnished by Movant to Counsels, and once again dismissed out-of-hand.

It should be strongly stressed that these are documents that Movant

only received from the NYPD, Pistol License Division, if the client's firearms license had been revoked, and Movant was retained to represent the licensee at the time of an administrative hearing.

To be clear, Chambers did not represent these individuals during their Incident Section investigations.  Each licensee came to Chambers for the sole purpose of being represented at administrative hearing only. They had been *pro se* representing themselves during the Incident Section investigation to the point of revocation.

Each of these official NYPD documents shows that the investigative time frames range was from **2 weeks to 2 months to 3 months, and the longest being 6 months.**

Obviously, these dramatically contradict the statement made by Villanueva that incident investigations took between *8 and 18 months*. Thereby calling into serious question Villanueva's further statement that he did "favors" for Movant by reducing the 8 to 18 month time-frame in half.

In fact, the Complaint against Chambers reads in part:

> 13  d. ….Incident investigations, which as noted above, involve an investigation to determine whether revocation or suspension of a gun license is appropriate, typically take from 8 to 18 months to be resolved.   Villanueva caused CHAMBERS' clients' investigations to be resolved in less than half that time, typically within about 3 to 4 months….

(Exhibit "A," page 8 )

Not only were these documents a direct hit on these claims, but there was another huge point that was not advanced. That is that Chambers' cases moved quickly through **all 8 units** in the License Division, not just the Incident Section. That is a product of the tenacity of a good advocate versus an "expeditor" like Alex "Shaya" Lichtenstein.

As with other documents delineated herein, Counsels refused to introduce them.

There was never an allegation that Villanueva printed a single initial pistol license for Movant's clients. His claims were much more vague and ambiguous and, as a result, were harder to tackle. How could a decision made on a licensee with an incident be quantified, or assessed, since there were **no written policies, there were no guidelines or guidance.** The only guidance left for the jury to ponder was that provided by the testimony of the convicted felon, Villanueva.

Penal Law § 400.00 does not provide direction in these matters. Even 38 RNYC § 5, the codification of the Pistol License Division's rules, does not give any specific guidance. Consequently, how can one assess whether a determination of a 6 month suspension was unusual or would not have occurred in a particular situation, but for a bribe? It is virtually

impossible to do so.

Counsels never argued this, or gave the jury a glimpse into the vastness of Movant's 30+ years experience with, and knowledge of, the inner workings of the Pistol License Division, much less Movant's practice (including 224 NYS Supreme Court cases against the NYPD, in the area of firearms licensing, not including Appellate Division matters handled over 30 years).  (Exhibit "J," herewith). The list of these cases from e-Courts was also offered to Counsels, and also rejected.

Counsel even argued a case in the NYS Court of Appeals successfully in 1998, People v. Thompson, 92 N.Y.2d 957 (1998).

Of course, simply because someone has an immense or successful practice does not foreclose the possibility of bribery.  Here, however, it never happened. And, here, however, without more than just **8 out of the hundreds of documents provided by the Movant to Counsels entered into evidence, and without his own explanation to the jury** - which was critical - Movant had no chance of successfully convincing the jury of the lie upon lie being spewed from Villanueva during trial.

And, even though it would be difficult to gauge whether the decisions made by Villanueva on the Movant's cases were reasonable and within the normal parameters of the License Division, based upon the

documentation which would have pinpointed his falsehoods, his testimony should have been easy to dismantle.  Again, Counsels failed to do so.

Also within the claims against Chambers were that Villanueva granted Chambers speedy license renewals.  The Complaint reads:

> 13d. ….First, Villanueva ensured the renewal applications submitted by CHAMBERS' clients, which typically take 30-40 days for approval were. renewed more expeditiously, sometimes as quick as within one day.

(Exhibit "A," page 8).

Without Chambers' testimony, the jury could not have heard that Chambers routinely, starting in about 1996, or so, received SAME DAY renewals on all the handgun licenses of his clients when he hand-delivered the renewal package to 1 Police Plaza.

Not only did the civilian clerks in the License Division provide a renewal license on the same day Movant brought in a pistol license renewal package, but Movant provided a 130 page transcript of text messaging between Movant and the then Commanding Office of the Pistol License Division, Deputy Inspector Michael Endall, from 04/03/2015 through 06/20/2016, showing many, many renewals granted same day via text.

In fact, Chambers would sometimes be at NYC Police Headquarters

when Commanding Officer Endall was **not even present**. Chambers would text the C.O., who would then direct Chambers who to see for the renewal (s), or other matters.

The point is that even when the Commanding Officer wasn't physically present at Police Headquarters, Movant could reach him by cell phone, and get things done that Villanueva claimed he alone did for Movant because he felt "obligated" due to gifts received.

As the highest ranking uniformed officer assigned to the Pistol License Division, the Commanding Officer would **on-the-spot** and **instantly** approve, as only the Commanding Officer of the License Division could, Movant's requests for the issuance of handgun purchase authorizations, renewal of gun licenses, upgrades of gun licenses, downgrades of gun licenses, and various other tasks that Movant sought on any given day.   (Exhibit "K," attached herewith).


Here is a single exchange from the above:

April 20, 2015. 9:14 AM

**Chambers**: Good morning, Mike. Will be down to see you in the AM tomorrow around 10.

**Commanding Officer Mike Endall:** Ok. April 21, 2015. 11:19 AM

**Chambers:** Here are you coming back?

April 21, 2015 11:20 AM (Other times are left out below. The conversation took place from 11:19 AM to 01:13 PM, when I left 1 Police Plaza, NYPD, Pistol License Division, with 2 renewed carry licenses and a conversion license based upon this conversation and Endall's authority and directives to his "people" at Headquarters).

**Endall:** I am sorry. I had to run out! I hope to get back soon! Check back with you shortly!

**Chambers:** Have other things to deal with- with you but can Michele do the biz prem conversion to res prem? I have the request letter you asked for

**Chambers**: Or I can just wait

**Endall:** Yes! I will text her.

**Chambers:** Ty

**Endall:** Go see Tommy [PO Barberio]. I just texted him re: downgrade.

**Chambers:** They have been mobilized in the auditorium.

**Chambers**: Just made announcement.

**Endall:** Ok. I will text Michele.

**Endall**: Ok. Must be a rally in the area.

**Endall:** Go see Tommy. I just texted him re: the downgrade.

**Chambers**: Done.

**Endall:** 10-4.

**Chambers:** Nobody here all in auditorium. lol. I have 2 rent [*sic*] renewals. Will wait for you.

**Endall:** Ok.

**Chambers:** They didn't get sent out- can Bernie do renewals? One special and one carry.

**Endall:** Yes! Texting him now!

**Chambers:** Perfect


**Chambers:** DONE Ty


**Chambers:** Be back Friday you here?

**Endall**: Yes!

**Chambers**: Al is fast OMG


**Chambers**: did both [carry renewals] in 60 secs

**Endall**: Yes!


(Exhibit "K," Pages 4-8 of texting transcript).

Two days later, Movant had attorney-Barry Slotnick's renewal package in hand in his law office.

On April 23, 2015, this was the text exchange between Movant and the C.O. regarding obtaining the renewal license for this client immediately:

April 23, 2015

10:31 AM

**Chambers:** Good morning, Mike. I should have Barry Slotnick's renewal in hand today. Can I pick up his renewal license tomorrow?

10:58 AM **Endall:** Yes.

(Exhibit "K," Page 9 of texting transcript).


And, here is another example:

January 21, 2016

11:25 AM

**Chambers:** Can I have Bernie [Detective Bernie Novins] do straight carry renewal?

11:32 AM

**C.O. Endall:** Yes

(Exhibit "K," Page 90 of texting transcript).

The jury never heard of Movant's extremely close professional relationship with the **very top man** in the Pistol License Division, Michael Endall, the Commanding Officer of that unit.

Nor did the jury hear that Movant had weekly (sometimes more often) meetings with the C.O. in the office of the C.O at Police Headquarters.   Also, that it was Commanding Officer Endall and **not** Villanueva, as Villanueva falsely claimed, that gave Movant results, including in connection with licensee-Ed Ticheli.

The relationship was so close between Movant and C.O, Endall, in fact, that on the weekend of June 12, 2015, as Movant and his wife were in their vehicle returning from a dog show in Pennsylvania, Commanding Officer Endall sent a text to Movant inquiring whether Movant had seen the news. (See Exhibit "K," pages 18-20)

The Movant texted the C.O. that he was out of the city.  The next text by C.O. came in telling the Movant that one of Movant's clients had screwed up "royally."  As it turned out, the licensee had taken his licensed handgun to a wedding at the Waldorf Astoria Hotel, and there was an accidental discharge (where as we both noted, thankfully nobody was seriously injured).

This text exchange, **initiated by C.O. Endall**, took place on Sunday morning, June 14, 2015, at approximately 11:00am.   During the texting Movant mentioned bringing in an applicant for a pistol license application submission that coming Thursday. Thus, D.I. Endall ended the text conversation by writing, "Ok. See you then! And we will talk!"  (Exhibit "K," page 20).

The jury should have been made aware of the fact that all the favorable things that Villanueva claimed he did for Movant within the Pistol License Division, he was doing because it was his job, and it was C.O. Endall who directed him to do so.   And, contrary to the falsehood perpetrated by Villanueva, not because Villanueva met with Endall, but after Movant personally met with Endall.

In the Ticheli matter, for example, Villanueva, as Endall's subordinate, was nothing more than a "secretary," printing out Ticheli's licenses, and purchase authorizations for Movant at the direction of Commanding Officer Michael Endall.

Movant met C.O. Endall in his office, describing Ticheli's situation, and Movant received 100% verbal approval for the continuation of the 2 business related firearms licenses, and a cancellation of the resident

permits (home defense and long arms). The latter 2 cancellations were based upon the fact that these licenses were related to his residence, and Mr. Ticheli was moving to Florida. The former 2 business related handgun licenses were continued by C.O. Endall because the licensee was going to continue his "distressed assets" business here in NYC.

During this meeting, Commanding Officer Endall told Movant to see Villanueva who would print out the licenses, and necessary purchase authorizations. Villanueva had nothing to do with this successful representation by Movant on behalf of Ticheli.

Again, although Villanueva's only responsibility was to follow the Deputy Inspector's directive to print out the 2 licenses, and the purchase authorizations, he lied and actually claimed that he was the one who orchestrated this continuation/cancellation because Chambers said, "There's a watch in it for you."

That statement never happened.  The watch was given, but not for any other reason than to attempt to repair a friendship after Villanueva became mad at the Movant.

Counsels were supplied with the aforementioned transcript of texting between the C.O. and the Movant and they knew about this relationship,

as well as the level of cooperation between Movant's law office and the Commanding Officer of the Pistol License Division.   All of this was again ignored by Counsels.

All of these omissions and failures of Counsels for Movant resulted in a wrongful conviction of Movant.  Thus, Movant seeks the relief herein.

The Honorable Court has held:

> Relief is warranted only where a petitioner has shown a fundamental defect which inherently results in a complete miscarriage of justice.

Davis v United States, 417 U.S. 333. (1974).

There was no way in which all of the important evidence could have been entered, except with regards to that which has been noted heretofore when Commanding Officer Barreto testified, since it all needed to come in through the Movant.

Returning for a moment to Ticheli.  The "watch" was an item that Movant had completely forgotten he had given to Villanueva. Consequently, when Movant was asked about it, Movant could not remember what the reason he gifted it to Villanueva. The government put on 2 significant emails, one of which jarred Movant's memory.

In one of the emails, Movant seemed to be guiding Ticheli as to the "reason" for the gift.  This surely seems nefarious, but it was not.  Movant just could not fathom why he had given Villanueva the watch at that time. Movant could not for the life of him remember why he would have taken a gift given to him for free from Ticheli and give it to Villanueva. The only thing Movant could think of was that it was because of his allergy to all metals but solid gold or titanium.

Before taking over the case, previous Counsel, Barry I. Slotnick, Esquire, stated that a medical doctor should have been called upon to testify to this fact.

Naturally, this never materialized with Counsels ultimately tried this case.

As stated above, this email to Ticheli looks nefarious, but it was innocent.

The second significant email that the government turned over to defense was one that was sent in 2013.   This completely jarred the Movant's memory of what happened so many years ago.   In this email, again between Movant and client-Ticheli, Movant writes to Ticheli that the watch was great for "**MENDING FENCES.**"

How is "mending fences" related to giving someone a watch as a bribe? It is not.

Indeed, the watch, which was part of Mr. Ticheli's "distressed assets" inventory, was purchased by Mr. Ticheli for **less than $600.00**, which was far less than the $8,500.00 price tag dangled before the jury.

Of course, this never came out at trial, either, although Counsels originally talked of hiring an expert to testify as to its value.

This watch was then given to Movant as a gift by Ticheli.

Movant could not wear it, as Movant would have had an allergic reaction which would have caused an itchy red rash on Movant's wrist.

Although Movant frequently went to the C.O. on the harder cases, as Movant did not want to put Villanueva in a position when it was much simpler just to meet with the Deputy Inspector and receive a same day answer (usually, an instant answer, in fact) than to wait for David Villanueva to mull it over, pull the file, and get back to Movant.  On this occasion, it seemed to bother Villanueva.

The client, Mr. Ticheli, in this case was anxious, as he was soon to move from NYC to Florida so he needed this resolved. Movant had to act quickly for him.

In looking back, Movant realized, at this juncture, that Villanueva, who, according to a client, was receiving large cash payments wrapped in a NY Times newspaper at his desk at Police Headquarters in exchange for selling pistol permits, was wound up and very tense.

When Movant finished my meeting with C.O. Endall and received his positive decision on the case, Movant started to leave Headquarters.

Chambers had not been able to reach Villanueva, either that day or for a few days before his meeting with the C.O.

Villanueva was coming in, as Chambers we leaving. Villanueva came at Chambers yelling and cursing. Chambers was perplexed and pretty upset.

Movant knew he had done nothing out of the ordinary.

Movant had no idea what was going on, he just knew that the friend he loved dearly at the time was furious with him.

Movant gave the watch to Villanueva out of friendship and to *mend fences*" with a friend that Movant loved, and for **no other reason.**

And, in fact, Movant texted Ticheli these very words ("mending fences") in 2013 after Movant gave the watch to Villanueva, as the email entered into evidence denotes.

Another point never made at trial, aside from Movant's very close professional relationship to the Commanding Officer, was Movant's relationship with the Director of the License Division, who was formerly a Hearing Officer, becoming Acting Director in 2001, and full Director at the end of that year.  Consequently, Movant had worked with the Director for in excess of 20 years.

As with Commanding Officer Michael Endall, Director Thomas M. Prasso and Movant had a close professional relationship.  In fact, like the CO, the Director had an "open door" policy with regards to Movant.

There were many things the Director did for the Movant over the years, but one of the most Herculean tasks involved an applicant for a concealed carry license who had been denied this license based upon the

following:

> Arrested 7/24/94 for Criminal Possession of a
> Weapon (Illegal handgun), Criminal Possession
> of a Controlled Substance, Driving while
> Intoxicated, Operation a Motor Vehicle impaired
> by drugs, unlawful possession of marijuana.

(Exhibit "L," attached herewith).

The disapproval was dated January 18, 2008.

The Movant administratively appealed on Mr. Figel's behalf.

Simultaneously, Movant filed upstate for a *Certificate of Relief from Civil Disabilities* in order to remove the legal bar to firearms ownership due to the **conviction** on the illegal gun charge.

Director Prasso telephoned the Movant to discuss the CRD. He informed the Movant that the application was being approved on administrative appeal and that he would "hold" the file whilst Movant's application to the Court upstate was being considered.

Movant never anticipated the length of time this would take, given how many of these Movant had successfully done throughout the years, throughout many of the NYS counties.

A full **two and a half years later,** after the original appeal submission to the Pistol License Division, Mr. Figel received Director Prasso's *Notice of Approval After Appeal,* dated September 17, 2010.   (See attached Exhibit "M")

Movant not only had to file for the *Certificate of Relief from Civil Disabilities*, he had to ultimately commence an Article 78 in NYS State Supreme Court, and when that was denied, Movant successful appealed that decision to the Appellate Division, Third Department. (Exhibit "N," <u>Matter of Figel v Dwyer,</u> 75 A.D. 3d 802 (2010)).

Finally, after all was said and done, it is notable that Director Prasso held the matter in abeyance for a two and half year period.  This is truly unheard of, and shows the depth of the consideration granted to the Movant at the highest level of the Pistol License Division.

Commanding Officer Endall being the highest ranking uniformed member of the Pistol License Division, and Director Prasso being the highest ranking non-uniformed member of the Pistol License Division.

What Director Prasso did in connection with the Figel matter for Chambers is none too surprising, as this was the nature of the

relationships between the Movant and the most powerful men at the Pistol License Division.

Yet, a low level sergeant, whose bonds with the Movant were rather of a personal and deep nature, was nonetheless allowed by Counsels, who did little by way of defending Movant, to fabricate a twisted story making it appear that gifts were exchanged for favors.

Counsels were sorely underprepared for this trial.   The verdict against Movant is a direct result of this failure to understand this case, and the intricacy of the License Division, the Movant's practice, and a refusal of Counsels to utilize the vast documentation in Movant's possession.

It is no surprise that it took the jury mere hours to convict the Movant on all counts.

By far, however, the most egregious component of this situation, is clearly the fact that Movant was 1) not properly prepared for his testimony, and 2) because of that, and the aggressive behavior exhibited by Counsel at the **one** preparation session he was offered, the Movant felt essentially coerced, and never voluntarily gave up his desire to testify on his on behalf.

On the sole night of preparation, April 18, 2018, after a long day in Court, Movant went to office of Counsels.   At the time, as described

heretofore, Counsel began asking Movant questions that Movant could expect on direct.

Things abruptly shut down, however, when it became crystal clear that Movant's thirty year history of practicing law in a type of law that allows "hearsay," was not going to be wiped out in a single session at 9:00pm the night before Movant was to take the stand.

In fact, to make the point clearer, one only needs to take a close look at the prepared list of questions Counsels handed to the Movant at this meeting.  This was a list of questions seen by Movant for the very first time at that moment. (See attached Exhibit "O").

These were the general inquiries to be made during the direct examination of the Movant the next day.

This list is singled spaced and 6 type written pages with questions numbered from 1 through 105.

Very early in this meeting, after the outburst of Counsel banging aggressively and violently on the table and screaming loudly at Movant, only the first few of the questions on the first page of this 6 page typed document were covered at this meeting.  After which, Counsels essentially tossed the list of questions at Movant and instructed Movant to "study them."

The Movant was left pondering pages of questions that he would

face the next day during his testimony on his own, with no help or guidance from Counsels at home, at 11:00pm at night.

The night was a rough one for Movant.  He knew that the preparation was useless.

The next day, after the testimony of only two witnesses for the defense, the Movant's wife and the ex-wife of Villanueva, Counsels were obviously ready to call an end to the abysmally deficient defense case.

Counsels requested that the Honorable Court grant a few minute recess so Counsels could speak with the Movant. During this meeting, Counsels pushed for the Movant not to testify and actually said:

"*we should leave the jury with the humanity.*"

Could this be chalked up to "trial strategy?"   Not given the overall ineffectiveness, and failures in this case.

In *Rayborn*, *id.*, the Honorable Court held

> However, labeling a trial tactic "strategic" does not insulate it, perforce, from *Strictland* review.  *Lovett v Foltz*, 884 F.2d 579 (6th Cir., 1989)( per curiam). "Even deliberate trial tactics may constitute ineffective assistance of counsel if they fall outside of the wide range of professionally competent assistance." *Martin v Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984) (internal citation omitted).

The Movant, during this meeting in a small room in the courthouse at the recess suddenly called for by Counsels which lasted only a few

minutes in length, was thrown a curve ball by Counsels. And, at that point, still seriously shaken from the night before, he acquiesced, knowing that his testimony would be reflective of the **total lack of preparation.**

Counsels said very little during this meeting. Aside from this, Counsels knew from the first time meeting Movant that Movant wished to testify because Movant knew full well there were many issues that he needed to explain, and he was always more than willing to do so before the disastrous single preparation session by Counsels. He also knew that documents would be needed in order to put on a defense case with any "teeth."

At this few minute session, the advice of Counsels regarding reliance upon the "humanity," in looking back, was more protective of their reputations - since there can be absolutely no question that the hearsay responses of Movant, as evidenced the night before, would have made his examination *(both on direct and cross)* a circus.

Movant decision not to testify was neither informed, nor truly voluntarily, given what had happened the evening before. And, given the

paltry, almost non-existent preparation.

> To ensure that a defendant receives adequate counsel, defense counsel must do more than merely inform defendant of his right to testify and his option to waive that right. Assuring that the defendant's decision is an informed one also necessitates that counsel discuss the strategic implications involved in the decision to testify. _Cannon v Mullin,_ 384 F. 3d 1152, 1171 (10th Cir, 2004).

At no time during the few minutes that Counsels essentially talked Movant into not testifying did Counsels explain the "strategic implications" involved in a decision not to testify.  This seems particularly outrageous, in and of itself, given the peculiarities of this case, and need for the jury to hear explanations from the Movant, many delineated herein, and to see the documents that would have indubitably cast more than a reasonable doubt on the veracity of the only witness to the claim Movant was a briber.

However, based upon the session the night before, it was fairly clear that NO documents were going to be offered during Movant's testimony.

In _Hamblen v United States_, 591 F. 3d 471, (6th Cir, 2009) the Honorable Court held:

> To warrant relief under §2255, the petitioner must demonstrate the existence of "an error of constitutional magnitude which had a substantial and injurious effect or influence" on the jury's verdict.  (citing _Griffin v United States_, 330 F.3d 733).

With all due respect, the hurdle required to demonstrate that Movant has been deprived of his Sixth Amendment right to counsel due to ineffectiveness, as described herein, have been met.

## CONCLUSION

The Court should grant Movant's motion under 28 U.S.§ 2255 for all of the foregoing reasons.

Dated: New York, New York
   March 4, 2021

      Respectfully Submitted,

      By John Chambers
      Pro Se
      511 Avenue of America #216
      New York, New York 10011
      212-645-6279
      proudlypatriotic@yahoo.com

**TO:**

Honorable Justice William H. Pauley III
Courtroom 20B
United States Federal Courthouse
500 Pearl Street
New York, NY 10007

Honorable Geoffrey S. Berman
Interim United States Attorney for the Southern District of New York
By: Messrs. Alex Rossmiller & Paul M. Montelioni
Assistant United States Attorneys
1 Saint Andrews Plaza
New York, New York 10007
(212) 637-2200