# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 17-cr-396 |
| | ) | |
| -against- | ) | |
| | ) | |
| | ) | |
| JOHN CHAMBERS, | ) | |
| | ) | |
| Defendant. | ) | |

-------------------------------------------------

## MOTION FOR EARLY TERMINATION OF PROBATION

John Chambers
*Pro Se*
511 Avenue of the Americas, #216
New York, New York 10011
(212) 645-5279
Email: proudlypatriotic@yahoo.com

**TO:**
Honorable Justice William H. Pauley III
Courtroom 20B
United States Federal Courthouse
500 Pearl Street
New York, NY 10007

Honorable Geoffrey S. Berman
Interim United States Attorney for the Southern District of New York
By: Messrs. Alex Rossmiller & Paul M. Montelioni
Assistant United States Attorneys
1 Saint Andrews Plaza
New York, New York 10007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,  )
            )
     Plaintiff,  )
            )
   v.       ) **Motion for Early Termination of**
            ) **Probation**
            )
JOHN CHAMBERS     ) **Case No. 17-cr-396**
            )
     Defendant,  )

-------------------------------------------------------

## I. INTRODUCTION.

Defendant, JOHN CHAMBERS, (hereinafter also referred to as "Movant") hereby moves this Honorable Court to terminate his term of supervised release pursuant to 18 U.S.C. § 3583(e)(1). The 3-year term of supervised release began on January 3, 2020.  As of April 3, 2021, Mr. Chambers will have completed 15 months of this supervisory term.

Mr. Chambers is being supervised in the Southern District of New York where he was born, raised, lived all of his life and where he attended college at the City College of New York. The only deviation from this was the three years he lived in Pennsylvania as he attended Temple University School of Law from 1980 to 1983.

Prior to the filing of this petition, *pro se* Movant provided it to his supervising probation officer (United States Probation Officer Zondra Jackson). Although the Movant is familiar with the customary practice of also seeking the acquiesces for this application from the United States Attorneys Office, the Movant, due to his *pro se* status, did not believe it to be prudent and did not feel comfortable in personally contacting the government attorneys directly.

The probation officer has indicated that Mr. Chambers is in full compliance in all areas of supervision.  She did not appear to oppose this petition, although she informed the Movant that the more typical timeframe for early termination would be 18 months, as opposed to 15 months.

## II. APPLICABLE LAW.

Title 18, section 3583(e)(1) of the United States Code authorizes the Court to terminate a defendant's term of supervised release at any time after the expiration of one year of supervision if the Court is "satisfied that such action is warranted by the conduct of the defendant released and the interest of justice."

It is respectfully submitted that Section 3583(e) directs the Court to consider the purposes of sentencing set forth in 18 U.S.C. §3553(a), (a)(2)

(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) in deciding whether to terminate a term of supervised release.

The Judicial Conference has identified the following criteria to assess eligibility for early termination:

Officers should consider the suitability of early termination for offenders as soon as they are statutorily eligible. The general criteria for assessing whether a statutorily eligible offender should be recommended to the court as an appropriate candidate for early termination are as follows:

1. stable community reintegration (e.g. residence, family, employment):

2. progressive strides toward supervision objectives and in compliance with conditions of supervision;

3. no aggravated role in the offense of conviction, particularly large drug or fraud offenses;

4. no history of violence (e.g. sexually assaultive, predatory behavior, or domestic violence);

5. no recent arrests or convictions (including unresolved pending charges), or ongoing, uninterrupted patterns of criminal conduct;

6. no recent evidence of alcohol or drug abuse;

7. no recent psychiatric episodes;

8. no identifiable risk to the safety of any identifiable victim; and

9. no identifiable risk to the public safety based on the Risk Predication Index (RPI) Guide to Judiciary Policy, Volume 8E, Ch. 3

§ 380.10(b), "Early Termination" (Monograph 109) (rev'd 2010).

Pursuant to the policy, "there is a presumption in favor of recommending early termination…" so long as supervisees are not "career violence, and/or drug offenders, sex offenders, or terrorists," and if they "present no identified risk to the public or victims." *Id.*, § 380.10 (g).

Further, on February 16, 2012, the Honorable Robert Holmes Bell, Chair of the *Committee on Criminal Law of the Judicial Conference*[1], issued a memorandum to all United State District Court Judges encouraging them to grant early termination of supervised release in appropriate cases as an effort the reduce expenditures in the probation and pretrial services programs.

The article states further:

> Early termination also saves money. In fiscal year 2012, the supervision of more than 7,000 offenders was terminated early, saving the Judiciary more than $7.7 million[2].

---

[1] https://www.uscourts.gov/news/2013/09/24/early-termination-supervision-cost-effective-and-safe

[2] Accounting for inflation, since this amount noted in an article in 2012, this amount would be $8,820,821.97 in 2021. See https://www.in2013dollars.com/us/inflation/2012?amount=4000

Terminating "appropriate cases before they reach their full term saves resources and allows officers to focus on offenders who continue to pose the greatest risk of recidivism." Judge Bell's 2012 memorandum notes that supervision costs approximately $4,000.00 per year per case[3].  Analysis by the Administrative Office of the Courts indicates that offenders who receive early termination were "arrested less often, for less serious charges, and were sentenced to terms of imprisonment less often." Accordingly, "[f]rom a policy standpoint, it appears that the above criteria, when properly applied, does not jeopardize public safety." Id.

## III.  MR. CHAMBERS SATISFIES THE CRITERIA AS SET FORTH FOR EARLY TERMINATION

Mr. Chambers satisfies all of the factors set forth for early termination. He has completed the single additional condition set by this Honorable Court and was deemed to not need further counseling or treatment following sessions with mental health professionals within the facility he was confined to.

The single condition set by this Honorable Court that was for the Movant to seek counseling.

---

[3] Accounting for inflation, since this amount noted in an article in 2012, this amount would be $4,582.25 in 2021.  See https://www.in2013dollars.com/us/inflation/2012?amount=4000

During his term of 1 year and a day at Danbury Federal Correctional Facility, he was originally seen by Chief Jessica Seaton, PhD., and then by a licensed psychologist, Dr. Rebecca Stacy, PsyD, on several occasions.

Dr. Stacy deemed it unnecessary for the defendant to continue any other psychological treatment. These medical records were provided to the Probation Department during the Movant's first meeting with his probation officer.    Throughout these reports, it states, "..Chambers continues to exhibit lack of mental health symptom." (See attached Exhibit "A").

He was informed, as a result of these findings whilst he was at Danbury FCI, he would not be required to engage in further counseling.

Harkening back to the criteria for any early termination, Mr. Chambers has no history of any violence, abusive behavior or domestic incidents in his past.

He will be 67 years old this year, and has been with his wife since 1997, they having been formally and legally married in the year 2001[4].  Mr. Chambers has lived in the same apartment since 1986.

Mr. Chambers spent 8 months in a correctional facility for women. Despite the added challenges for Mr. Chambers, given his inward identity, as well as outward appearance,  he was told by the Unit Manager of Danbury FCI, Mr. Neil Kohrs,  that he was an exemplary inmate during one of a number of meetings between the Movant and Mr. Kohrs.  He provided Mr. Chambers with his *Custody Classification Form*, and delineated the reasons for each rating or number. (See attached Exhibit "B").

---

[4] Mr. Chambers and his wife first, prior to his transition and their marriage in Las Vegas in 2001, tied the knot before friends and family in NYC which was officiated by a non-denominational  priest in 1999.

Mr. Kohrs explained that some of the inmates at the Federal Prison Camp had actually been sentenced to 15 or 20 years originally. Unlike male facilities where Camps will **not** allow male inmates in, even with good behavior, if their original incarceration sentence exceeded 10 years. That is not the same in Federal prison camps that house female inmates. A female inmate with a hefty sentence can work her way into a camp, with good behavior and an increase in her positive classification numbers. This is mentioned, as there were many housed in Danbury Federal Camp that were different than the typical defendant assigned to a camp facility. Some of these individuals bullied and harassed Mr. Chambers. And, although the staff at Danbury FCI, from officers all the way up to the Warden, were all very kind and professional to Mr. Chambers, these few inmates made day-to-day existence much more difficult for the Movant[5].

There can be little question that, as hard as it is for anyone to endure incarceration, particularly someone with no criminal background in their 60s, it was much more difficult for Mr. Chambers to do so, given his special circumstance. Yet, he kept his head down, as much as he could, and he worked hard cleaning the dining area and bathroom every weekday morning, he read, he wrote a letter each day to his Bride, and he wrote to others, as well, and he hugely looked forward to a visit from his wife every

---

[5] Among the hurtful and ugly insults hurdled at the Movant were: "you are a freak," "you're disgusting," "you're a certified creep," and "you're a fraud." In fact, on April 12, 2019, Movant was called into the CO Barasa's office and asked about an incident wherein he was attacked in the dining hall in front of dozens of others, and insults were hurled at him. Several inmates had to hold this particular inmate back from physically attacking the Movant.

single Sunday, and on the holidays that were permissible, to make it through.

He was released from Danbury FCI on October 29, 2020. He was then placed on house arrest, and tethered to an ankle bracelet. For some unfathomable reason, despite the fact that he was placed on an ankle bracelet by the halfway house in the Bronx (the Bronx Community Residential Center), the halfway house, nonetheless telephoned Mr. Chambers **every night, in the middle of the night** waking him up at least once every night.

This happened, despite the fact, that Mr. Chambers self surrendered to the Federal prison, as was directed by this Honorable Court, and in spite of the fact that there was no credible underlying reason to believe Mr. Chambers was anywhere but in bed next his Beloved at 2:00 AM in the morning. Not to mention, he was tied to an irremovable ankle bracelet monitoring, and notifying, the halfway house, if he moved even fifteen feet out of the range of the base unit.

The halfway house also required his constant presence in order to conduct urinalysis. Again, this despite the fact that Mr. Chambers, a man who will be 67 this year, has absolutely *no history of drug or alcohol abuse*. This draconian procedure, certainly understandable in *many* instances but not in connection with Mr. Chambers, continued until only one week before his release to probation on January 3, 2020.

And, this was only after Mr. Chambers wrote to the BOP, and the Director of the halfway house. Evidently, there was a consensus that these urinalysis testing were indeed excessive and unnecessary in John Chambers' situation, at least to the great degree that Mr. Chambers was subjected to, for someone with the Movant's history and background.

Upon entry into the Probation Department's supervision on January 3, 2020, Mr. Chambers was almost immediately transferred to "*Low Intensity*" supervision. This, of course, came after completing the necessary orientation.

Mr. Chambers has complied with all responsibilities in connection with his sentencing from the beginning of his surrender to the Bureau of Prisons in February of 2019, to his house arrest in October of 2019, through probation beginning January 3, 2020, and through the writing of this application without fail.

The few times he has left the jurisdiction, at any time during these last 15 months, he has, as required, sought permission from Probation Officer Jackson prior to leaving the jurisdiction.

At this juncture, the Movant's wife of over twenty years is moving to Florida, and naturally, the Movant seeks to accompany her.

Mr. Chambers is cognizant that if this application is not approved for early termination, he will be transferred to the Probation Department that covers Sarasota County, Florida, on the west coast.

If that is the order of this Honorable Court, Mr. Chambers will do as he has always done and continue to comply with directives.

This move has been prompted by two major considerations: the cost of living in NYC is too high, and the fact that the Movant was the victim of a robbery at the end of June, 2020.

On June 28, 2020, Mr. Chambers was out walking his daily mile in his Flatiron neighborhood order to keep off the almost 50lbs he lost while incarcerated at Danbury FCI[6].

Mr. Chambers walks approximately 3/4 of a mile before meeting up with his wife and Belgian Malinois. This Sunday morning, was not unlike any other, until he stopped to take a photograph of the 6 or 7 tables of people enjoying outdoor dining at Hollywood Diner on the corner of 16th Street and 6th Avenue.

He was across 6th Avenue, at the time.

The next thing he knew, he was being grabbed, spun around, punched in the chest, and the chain and pendant around his neck was robbed from him. He ended up flying backwards and landing hard on his back in the gutter, where he remembers he had the wherewithal to

---

[6] During this time, it was impossible to eat the prison food, as the vast majority of it was barely fit for human consumption. In fact, at one point, the prison posted an article about "rainbow" colored beef to assuage the fears of the inmates that the meats provided were unsafe. (See attached Exhibit C). After finding himself sickened after one of the dinner meals served, Movant stopped going to dinner, altogether. During this 8 month period, he bought peanut butter from the commissary, and took morning bread from the 6:00am breakfast time, to be eaten later in the day. He drank milk, and fortified his diet by drinking a 1,000mg Super "C" drink offered at the commissary, as well. If there was a salad offered at evening meal, Mr. Chambers would go. Those he had befriended would "trade" their salad for whatever the meat/high carb offering was for the nightly meal.

keep his head forward, and his chin tucked tight, so he did not crack his skull on the concrete.

Laying there in the bike lane on a beautiful, sunny Sunday, in the City that he has loved his entire life, he knew it was time to think seriously about leaving.  He knows he was extremely fortunate that he was not seriously hurt in this robbery.

Kind people came from the diner to help him, bringing him a glass of ice water and another calling 911 for him.  And, although Mr. Chambers later looked at a photo array at the 013 precinct house to identify the perpetrator, with face being almost entirely covered with a mask, and the perpetrator also wearing a baseball cap pulled down low over so as to almost cover his eyes, it was impossible to accurately point out the criminal who had attacked him without warning on that bright Sunday morning.

Now, neither Mr. or Mrs. Chambers venture out after dark.  Even though this happened during the day, they are both concerned for their continued safety in New York City whether in daylight or at night.  This is no way to live, and now has nothing to do with the pandemic.

Mrs. Chambers has been awaiting to ascertain whether she can rely upon her Mother in Texas to assist in the costs of moving.  The move will take place next month in April.

If Mr. Chambers did not accompany his wife, he would be rendered homeless, as he is unable to afford even a modest apartment in the five boroughs.

# IV.  ALTERNATIVE TO EARLY RELEASE

The Movant sincerely hopes that this Honorable Court will seriously consider him for early release from probation.

In the event that this Honorable Court is not inclined to grant this application for early release, the Movant respectful requests that this be done without prejudice for Movant to renew his application at a later date.

In addition, if this Honorable Court is not inclined to grant this motion, the Movant respectfully requests that the Court direct the Probation Department to permit the move to Florida, with transfer the the appropriate authority in Sarasota County, and without the immediate necessity of a "home visit," as was originally required before the start of probation in NYC.

The issue with the latter is: when there was a home visit here in Mr. Chambers' home in New York City before January of 2020, his wife was in the apartment. By requiring a home visit before the move out of New York City in April, there is no way this can take place unless his wife goes to Florida first and then comes back to pick up Mr. Chambers.

With all due respect, this would place a tremendous amount of both stress and great burden on the couple, particularly, in light of the fact that neither one of them wishes to fly due to continuing concerns over Covid-19 (and various strains), and thus it would require Mr.

Chambers' wife to drive 1,200 miles alone there and 1,200 alone back, and then 1,200 there with Mr. Chambers, for a total of almost 4,000 miles.

Based upon Mr. Chambers' overall compliance, in the event that this Honorable Court is disinclined to grant this motion, the Movant respectfully asks that he be granted 4 days to get to Florida with his wife, and that a home visit take place anytime thereafter, if required.

## V. CONCLUSION

Given Mr. Chambers' commendable reentry into the community and performance from start of sentencing through this motion, he respectfully requests that the Court order that his term of supervision be terminated under 18 U.S.C. § 3583(e).

Dated:  New York, New York
        March 15, 2021

Respectfully Submitted,
/s/John Chambers
By John Chambers
*Pro Se*
511 Avenue of America #216
New York, New York 10011

212-645-5279
proudlypatriotic@yahoo.com

TO:

Honorable Justice William H. Pauley III
Courtroom 20B

United States Federal Courthouse
500 Pearl Street
New York, NY 10007

Honorable Geoffrey S. Berman
Interim United States Attorney for the Southern District of New York
By: Messrs. Alex Rossmiller & Paul M. Montelioni
Assistant United States Attorneys
1 Saint Andrews Plaza
New York, New York 10007
(212) 637-2200

# Exhibit A

TRULINCS 79033054 - CHAMBERS, JOHN - Unit: DAN-O-A

---

FROM: Chambers, Christina
TO: 79033054
SUBJECT: Language from Judgment
DATE: 10/07/2019 06:21:19 PM

Special Conditions of Supervision

The defendant shall participate in a mental health program b the U.S. Probation Office.  The defendant shall continue to take any prescribed medications unless otherwise instructed by the health care provider.  The defendant shall contribute to the costs of services rendered not covered by third-party payment, if the defendant has the ability to pay..  The Court authorizes the release of available psychological evaluations and reports to the health care provider.

**SENSITIVE BUT UNCLASSIFIED**

### Bureau of Prisons
### Psychology Services
### General Administrative Note

| | | | | | Reg #: | 79033-054 |
|---|---|---|---|---|---|---|
| | | | | | Unit Team: | C |

| Inmate Name: | CHAMBERS, JOHN | | | | |
|---|---|---|---|---|---|
| Date of Birth: | 09/08/1954 | Sex: | F | Facility: | DAN |
| Date: | 09/10/2019 15:26 | Provider: | Stacy, Rebecca PsyD | | |

<u>**Comments**</u>

See attached for CMA Sentry Assignment for Transgender Inmates.

Completed by Stacy, Rebecca PsyD on 09/10/2019 15:29

Generated 09/10/2019 15:29 by Stacy, Rebecca PsyD          Bureau of Prisons - DAN

**SENSITIVE BUT UNCLASSIFIED**

## Bureau of Prisons
## Psychology Services
## Diagnostic and Care Level Formulation

| | | | | Reg #: | 79033-054 |
| --- | --- | --- | --- | --- | --- |
| | | | | Unit Team: | C |

| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility: | DAN |
| --- | --- | --- | --- | --- | --- |
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | | |
| Date: | 06/17/2019 13:19 | | | | |

### Relevant Historical Information

Inmate Chambers reported he was born and raised in New York. He stated he has been married for 22 years and does not have children. He advised his wife is his most positive support.

Inmate Chambers earned is GED in 1974. On June 8, 1980, Inmate Chambers received a Bachelor of Arts degree from City College in New York. In 1983, Inmate Chambers graduated from Temple University Beasley School of Law. On July 30, 1984, Inmate Chambers became a licensed attorney and was admitted to practice law in New York State. He last worked as a lawyer.

Inmate Chambers reported history of sexual abuse by two men at age 6 (separate instances). One was an ongoing occurrence and the other was a one-time situation. Inmate Chambers was offered programming in Resolve and declined to participate.

### Presenting Problem/Symptom

Inmate Chambers reported this is his first incarceration. He is transgender female to male. Inmate Chambers reported he transitioned to a male name in 2000 and in the same year, had a mastectomy. Inmate Chambers continues to have female genitalia. He has taken hormones on a regular basis for numerous years and continues to have active prescriptions while incarcerated.

Inmate Chambers was designated CARE2-MH prior to his arrival to FPC-DAN. This writer has met with Inmate Chambers for the past four months to determine his adjustment to incarceration. He has appropriately utilized sessions to discuss feeling bullied by other inmates and ways to handle such situations. Inmate Chambers has noted this type of behavior has "calmed down" recently and he remains disengaged from "immature inmates." He has consistently noted he feels accepted by most of his peers and comfortable around most women at the camp. Inmate Chambers reported engaging in healthy coping skills on a regular basis including talking to his wife, reading, and meeting new people.

### Diagnostic Reconciliation

In formulating a diagnosis, reconcile discrepancies between diagnostic impressions.

( X ) N/A.  There is no discrepancy between diagnostic  impressions in the record.

( ) Discrepancies with past BEMR diagnoses were identified and resolved. See diagnostic formulation below.

( ) Discrepancies between current Psychology-rendered and Health Services-rendered BEMR diagnoses were noted but were unable to be resolved due to differing clinical opinions. See diagnostic formulation below.

### Diagnostic Formulation

Inmate Chambers was designated CARE2-MH prior to his arrival at FPC-DAN. He was interviewed for possible gender dysphoria. Inmate Chambers reported he has felt like he wanted to be male since "I can remember." He noted, "I always felt out of place. In women's dressing rooms, I turned around because I felt like I was invading their privacy. I waited until I was 46 to transition. I had a supportive wife and knew it was the right time. I feel good about the person I am now and I felt like I've always wanted to be this way. I have absolutely no regrets."

This writer also assessed for symptoms of mental illness such as depression, anxiety, or psychosis. He advised he maintains a positive attitude and does not experience any anxiety. This writer does not observe any active mental healthy symptoms (gender dysphoria, depression, anxiety, psychosis) and it appears Inmate Chambers is adjusting adequately, engaging in healthy coping, and has a positive outlook on his sentence. No diagnosis will be given at this time.

### Care Level Formulation

Inmate Chambers appears to have no acute mental illness and is experiencing fairly normal adjustment to incarceration.

Page 1 of 2

| Inmate Name: | CHAMBERS, JOHN | | | | Reg #: | 79033-054 |
|---|---|---|---|---|---|---|
| | | Sex: | F | Facility: DAN | Unit Team: | C |
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | | | |
| Date: | 06/17/2019 13:19 | | | | | |

While he discusses some issues related to other inmates "getting used to me since I'm transgender," these concerns have mostly subsided and he has developed positive ways of coping. Inmate Chambers maintains a positive attitude and future orientation. He will be decreased to CARE1-MH at this time and is receptive of the cop-out system. Inmate Chambers was reminded of how to contact Psychology Services in routine and emergency situations. He was receptive of this information.

**Diagnosis:**

No Diagnosis, No Dx - Current

Completed by Stacy, Rebecca PsyD on 06/17/2019 14:22

**SENSITIVE BUT UNCLASSIFIED**

## Bureau of Prisons
## Psychology Services
## Clinical Intervention - Individual Therapy

| | | | | Reg #: | 79033-054 |
|---|---|---|---|---|---|
| | | | | Unit Team: | C |

| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility: | DAN |
|---|---|---|---|---|---|
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | | |
| Date: | 06/17/2019 13:15 | | | | |

### Focus of Session

Inmate Chambers was seen on today's date (6/17/19) for a CARE2-MH contact.

### Subjective/Objective Presentation

Subjective: Inmate Chambers reported "Things have been good since [X inmate] left. She was the bane of my existence. I get along with most everyone else. People that have a problem with me just don't talk to me. I can handle that better than the bullying." Inmate Chambers stated he met with staff regarding bullying but "I had to walk a fine line since I don't want to get sent to protective custody. I'm not afraid here, but I don't like to be bullied." Inmate Chambers then discussed his case and stated, "I think I put the guy away who screwed me. He got 4 months and was telling everyone he'd never get any jail time."

Objective: Inmate Chambers was alert and oriented. He was calm and cooperative throughout the contact. Inmate Chambers maintained good eye contact. Rapport was easily established and maintained. Inmate Chambers was appropriately groomed and dressed. His speech was normal in rate, volume, and tone. He described his mood as "pretty good," which was congruent with his affect. Inmate Chambers's thoughts were linear, logical, and goal-directed. He appeared to have good judgment and insight. Inmate Chambers did not appear to be exhibiting symptoms of psychosis such as delusions or hallucinations. He denied suicidal/homicidal ideation, plan, or intent.

### Intervention(s)

Supportive counseling was offered. Adjustment to the camp was evaluated. Healthy coping skills including visiting with his wife, spending time with positive peers, and doing legal work were reviewed.

### Progress/Plan

Inmate Chambers appears to have no acute mental illness and is experiencing fairly normal adjustment to incarceration. While he discusses some issues related to other inmates "getting used to me since I'm transgender," these concerns have mostly subsided and he has developed positive ways of coping. Inmate Chambers maintains a positive attitude and future orientation. He will be decreased to CARE1-MH at this time and is receptive of the cop-out system. Inmate Chambers was reminded of how to contact Psychology Services in routine and emergency situations. He was receptive of this information.

### Diagnosis:

No Diagnosis, No Dx - Current

Completed by Stacy, Rebecca PsyD on 06/17/2019 14:17

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

## Bureau of Prisons
## Psychology Services
## Clinical Intervention - Individual Therapy

| | | | | Reg #: | 79033-054 |
|---|---|---|---|---|---|
| | | | | Unit Team: | C |

| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility: | DAN |
|---|---|---|---|---|---|
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | | |
| Date: | 05/20/2019 10:15 | | | | |

### Focus of Session
Inmate Chambers was seen on today's date (5/20/19) for a CARE2-MH contact.

### Subjective/Objective Presentation
Subjective: Inmate Chambers discussed ongoing issues at the camp with his peers accepting his transgender status. He noted another inmate make an inappropriate remark during the line for lunch. Inmate Chambers advised, "I didn't look at her. I said she was being disgusting and I didn't escalate it from there. This happened about a month ago. Yesterday, I walked up to her and asked if she had a problem with me and she said no." Inmate Chambers discussed how some inmates are shunning him, likely due to listening to other inmates talk badly about him. He reported he spends time with peers of all races and ages and "most everyone likes me." Inmate Chambers discussed his continual engagement in positive activities and consistent optimistic mood.

Objective: Inmate Chambers was alert and oriented. He was calm and cooperative throughout the contact. Inmate Chambers maintained good eye contact. Rapport was easily established and maintained. Inmate Chambers was appropriately groomed and dressed. His speech was normal in rate, volume, and tone. He described his mood as "okay," which was congruent with his affect. Inmate Chambers's thoughts were linear, logical, and goal-directed. He appeared to have good judgment and insight. Inmate Chambers did not appear to be exhibiting symptoms of psychosis such as delusions or hallucinations. He denied suicidal/homicidal ideation, plan, or intent.

### Intervention(s)
Supportive counseling was offered. This writer and Inmate Chambers discussed the positive ways he has handled uncomfortable situations (i.e., not escalating the situation, confronting peers later, spending time with positive peers, not internalizing negative comments, maintaining a positive attitude, calling/writing his wife). This writer and Inmate Chambers discussed how he is projected onto by others.

### Progress/Plan
Inmate Chambers will maintain his CARE2-MH status and he will continue to be seen for rapport building and adjustment concerns. Inmate Chambers was reminded of how to contact Psychology Services in routine and emergency situations. He was receptive of this information.

**Diagnosis:**
No Diagnosis, No Dx - Current

Completed by Stacy, Rebecca PsyD on 05/20/2019 10:56

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

**Bureau of Prisons**
**Psychology Services**
**CCARE Team Note**

| | | | | Reg #: | 79033-054 |
|---|---|---|---|---|---|
| | | | | Unit Team: | C |

| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility: | DAN |
|---|---|---|---|---|---|
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | | |
| Date: | 05/07/2019 13:23 | | | | |

**Participants**

Chief Psychologist
FIT Coordinator
Resolve Coordinator
Staff Psychologist (primary clinician)

The following staff were invited, but elected not to attend: HSA, SOE, SOR, Chaplain, Social Worker, and Unit Team. We currently do not have a Clinical Director on staff. The Chief Pharmacist has a current staff assist and the Skills Coordinator and psychiatrist were on leave today.

**Comments**

Inmate Chambers was discussed today during this month's CCARE meeting. He currently does not have a mental health diagnosis and is not prescribed psychotropic medication although was designated CARE2-MH prior to his incarceration, likely due to his transgender status. Goals for current treatment have focused on rapport building, attending sessions, and any adjustment concerns. Inmate Chambers' adjustment to incarceration has been largely positive although there have been some concerns with peer respect, likely due to his transgender identification and experience as a lawyer. Inmate Chambers has handled these challenges well and maintained a positive attitude. The CCARE team decided to consider lowering his care level, given positive adjustment, overall stable mental health, and engagement in positive activities. This will be considered during his next appointment. No other recommendations are offered at this time.

**Diagnosis:**

No Diagnosis, No Dx - Current

Completed by Stacy, Rebecca PsyD on 05/07/2019 13:33

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

**Bureau of Prisons**
**Psychology Services**
**Clinical Intervention - Individual Therapy**

| | | | | Reg #: | 79033-054 |
|---|---|---|---|---|---|
| | | | | Unit Team: | C |

| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility: | DAN |
|---|---|---|---|---|---|
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | | |
| Date: | 04/15/2019 11:13 | | | | |

## Focus of Session

Inmate Chambers was seen on today's date (4/15/19) for a CARE2-MH contact.

## Subjective/Objective Presentation

Subjective: Inmate Chambers discussed an incident over the weekend in which he felt bullied by another inmate. Specifically, the other inmate (who is reportedly a lawyer) believed Inmate Chambers had his wife look her up and spread rumors around the camp that the other inmate is not truly a lawyer. Inmate Chambers stated, "She just came at me in the chow hall. Two other inmates had to hold her back. I didn't look her up, I just told people there is no dual degree in finance and law. She told me I was disgusting several times. She said I was ugly and a freak. I felt like she was watching me afterward. Waiting outside my dorm and making comments when I walked by." Inmate Chambers stated, "I talked to some of the girls about it here and I think they talked with her because she has been fine today. She hasn't said anything to me, but she never did before either. I'm fine with that. I feel safe around her. I just don't want any problems." Inmate Chambers reported she was called to the CO's office after the incident happened and stated to the officer it was a disagreement. Inmate Chambers indicated, "She seems okay now. I just want to go home and not get anyone in trouble or myself in trouble. I decided this is all on her. It's her ignorance and confusion."

Objective: Inmate Chambers was alert and oriented. He was calm and cooperative throughout the contact. Inmate Chambers maintained good eye contact. Rapport was easily established and maintained. Inmate Chambers was appropriately groomed and dressed. His speech was normal in rate, volume, and tone. He described his mood as "better now," which was congruent with his affect. Inmate Chambers's thoughts were linear, logical, and goal-directed. He appeared to have good judgment and insight. Inmate Chambers did not appear to be exhibiting symptoms of psychosis such as delusions or hallucinations. He denied suicidal/homicidal ideation, plan, or intent.

## Intervention(s)

Supportive counseling was offered. This writer and Inmate Chambers discussed the incident over the weekend and his goals of keeping a low profile, returning to the community, maintaining a strong relationship with his wife, and keeping a positive attitude. This writer praised Inmate Chambers for maintaining a calm attitude throughout the incident. Healthy coping skills including talking to positive peers, visiting with his wife, and engaging in recreation were reviewed.

## Progress/Plan

Inmate Chambers will maintain his CARE2-MH status and will continue to be seen for individual sessions focusing on adjustment to incarceration and positive coping skills. Inmate Chambers was reminded of how to contact Psychology Services in routine and emergency situations. He was receptive of this information.

**Diagnosis:**

No Diagnosis, No Dx - Current

Completed by Stacy, Rebecca PsyD on 04/15/2019 11:28

| | | | | Reg #: | 79033-054 |
|---|---|---|---|---|---|
| | | | | Unit Team: | C |

Inmate Name: CHAMBERS, JOHN
Date of Birth: 09/08/1954    Sex:    F    Facility: DAN
Date: 03/11/2019 13:27    Provider:  Stacy, Rebecca PsyD

**Diagnosis:**

No Diagnosis, No Dx - Current

Completed by Stacy, Rebecca PsyD on 03/11/2019 15:14

Generated 03/11/2019 15:14 by Stacy, Rebecca PsyD    Bureau of Prisons - DAN

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

**Bureau of Prisons**
**Psychology Services**
**General Administrative Note**

| | | | Reg #: | 79033-054 |
|---|---|---|---|---|
| | | | Unit Team: | C |

| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility: | DAN |
|---|---|---|---|---|---|
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | | |
| Date: | 03/11/2019 13:27 | | | | |

**Comments**

The case manager approached the Chief Psychologist and reported inmates are concerned about Inmate Chambers hygiene. This writer met with Inmate Chambers for an intake screening on today's date and his hygiene was discussed.

Inmate Chambers reported (due to his size) having a hard time cleaning himself after using the toilet. He indicated he has found "favorite toilets" to do so. He stated he is taking several showers per day. Inmate Chambers also noted he didn't realize he could change his uniform throughout the day or into another outfit after hours (thought he would get in trouble). He stated he is generally a hot/sweaty person and his hormones/dorm temperature amplify this. He indicated he did not realize he can change his bed sheets on a certain day. Inmate Chambers also reported his roommate "doesn't like me" and has threatened to move or have him moved.

This writer believes Inmate Chambers he is attempting to adjust to a new environment and needs time to do so. No hygiene recommendations were given at this time and no serious mental illness is apparent.

Completed by Stacy, Rebecca PsyD on 03/11/2019 13:53

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

**Bureau of Prisons**
**Psychology Services**
**Diagnostic and Care Level Formulation**

Reg #:    79033-054
Unit Team:   C

| | | | |
|---|---|---|---|
| Inmate Name: | CHAMBERS, JOHN | Sex: | F     Facility:  DAN |
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD |
| Date: | 03/11/2019 13:27 | | |

### Relevant Historical Information

Inmate Chambers reported he was born and raised in New York. He stated he has been married for 22 years and does not have children. He advised his wife is his most positive support.

Inmate Chambers earned is GED in 1974. On June 8, 1980, Inmate Chambers received a Bachelor of Arts degree from City College in New York. In 1983, Inmate Chambers graduated from Temple University Beasley School of Law. On July 30, 1984, Inmate Chambers became a licensed attorney and was admitted to practice law in New York State. He last worked as a lawyer.

Inmate Chambers reported history of sexual abuse by two men at age 6 (separate instances). One was an ongoing occurrence and the other was a one-time situation. Inmate Chambers was offered programming in Resolve and declined to participate.

### Presenting Problem/Symptom

Inmate Chambers reported this is his first incarceration. He is transgender female to male. Inmate Chambers reported he transitioned to a male name in 2000 and in the same year, had a mastectomy. Inmate Chambers continues to have female genitalia. He has taken hormones on a regular basis for numerous years and continues to have active prescriptions while incarcerated.

Inmate Chambers discussed his adjustment to incarceration and noted some normal issues with his roommates and getting used to hygiene in prison (i.e., bed linen changing times, when/where he can change out of his uniform and into sweatpants). He noted he feels accepted by most of his peers and comfortable around the women at the camp. Inmate Chambers reported engaging in healthy coping skills on a regular basis including talking to his wife, reading, and meeting new people.

### Diagnostic Reconciliation

In formulating a diagnosis, reconcile discrepancies between diagnostic impressions.

( X ) N/A.  There is no discrepancy between diagnostic impressions in the record.

( ) Discrepancies with past BEMR diagnoses were identified and resolved. See diagnostic formulation below.

( ) Discrepancies between current Psychology-rendered and Health Services-rendered BEMR diagnoses were noted but were unable to be resolved due to differing clinical opinions. See diagnostic formulation below.

### Diagnostic Formulation

Inmate Chambers was designated CARE2-MH prior to his arrival at FPC-DAN. He was interviewed for possible gender dysphoria. Inmate Chambers reported he has felt like he wanted to be male since "I can remember." He noted, "I always felt out of place. In women's dressing rooms, I turned around because I felt like I was invading their privacy. I waited until I was 46 to transition. I had a supportive wife and knew it was the right time. I feel good about the person I am now and I felt like I've always wanted to be this way. I have absolutely no regrets."

This writer also assessed for symptoms of mental illness such as depression, anxiety, or psychosis. He advised he maintains a positive attitude and does not experience any anxiety. This writer does not observe any active mental health symptoms (gender dysphoria, depression, anxiety, psychosis) and it appears Inmate Chambers is adjusting adequately, engaging in healthy coping, and has a positive outlook on his sentence. No diagnosis will be given at this time.

### Care Level Formulation

Inmate Chambers was designated CARE2-MH prior to his arrival at FPC-DAN. This classification will remain in an abundance of caution and in order to ensure positive adjustment to incarceration and stable mental health.

Generated 03/11/2019 15:14 by Stacy, Rebecca PsyD

Bureau of Prisons - DAN

**SENSITIVE BUT UNCLASSIFIED**

**Bureau of Prisons**
**Psychology Services**
**Risk of Sexual Victimization**

Reg #:  79033-054
Unit Team:  C

| | | | | |
|---|---|---|---|---|
| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility:  DAN |
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | |
| Date: | 03/11/2019 13:27 | | | |

**Comments**

Inmate Chambers reported history of sexual abuse by two men at age 6 (separate instances). One was an ongoing occurrence and the other was a one-time situation.

**Risk Factors**

Based on the PREA Intake Objective Screening Instrument conducted by Unit Team Inmate Chambers was identified as:

( X ) History of prior sexual victimization
( X ) Criminal History is exclusively nonviolent
( X ) First incarceration
(  ) Prior convictions for sex offense against adult/child
( X ) Perceived LGBTI or gender non-conforming
(  ) Small physical stature
(  ) Under 21 yrs old, older than 65 yrs old
(  ) Hx of developmental/mental/medical disabilities
(  ) Being at risk based on cumulative factors
(  ) Other:

Protective factors were also reviewed and the following were noted:

( ) Multiple incarcerations without history of victimization
( ) No history of childhood sexual victimization
( X ) Large build
( X ) Over 21 years old
( ) Assertive presentation
( ) Violent criminal history
( X ) No developmental/mental/medical disabilities
( X ) No current mental health concerns, including excessive worry about sexual victimization
( ) Does not self-identify as LGBTI
( X ) Denies being fearful of general population
( ) Other:

**Findings**

As required by PS 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, Inmate Chambers was seen by Psychology Services on today's date and was offered follow-up per their above noted risk factors.

Based on this clinical assessment, the inmate is considered at this time to be at:

( X )  Low Risk of Victimization at this facility.  There are no recommends regarding housing, work, or education assignments

(  )  Moderate Risk of Victimization.  The Unit Team and Correctional Staff have been notified regarding Psychology staff's recommendations that the inmate not be housed with any inmates identified as at risk for sexual abusiveness. Psychology also recommends a greater level of supervision regarding work and education assignments.

(  )  High Risk of Victimization.  It is recommended this inmate be housed in the Special Housing Unit in accordance with P5324.12 until Correctional Services and Program staff can assess the appropriateness of placement on the general compound at this facility.  This inmate should not be housed with any inmates judged to be at increased risk for sexual abusiveness.

Page 1 of 2

Bureau of Prisons - DAN

Generated 03/11/2019 15:16 by Stacy, Rebecca PsyD

| | | | | Reg #:   79033-054 |
|---|---|---|---|---|
| | | | | Unit Team:  C |

| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility:  DAN |
|---|---|---|---|---|
| Date of Birth: | 09/08/1954 | Provider: | Stacy, Rebecca PsyD | |
| Date: | 03/11/2019 13:27 | | | |

## Recommendations

Inmate was informed of the Federal Bureau of Prison's Zero Tolerance policy regarding sexual abuse and how to report incidents of sexual abuse to staff both inside and outside of the facility.

Inmate was offered participation in the Resolve Program and declined interest.

Inmate Chambers was informed on how to reach Psychology Services should a need arise.  No follow-up necessary at this time.

Completed by Stacy, Rebecca PsyD on 03/11/2019 15:16

**SENSITIVE BUT UNCLASSIFIED**

# Bureau of Prisons
## Psychology Services
### Intake Screening

Reg #:   79033-054
Unit Team:   C

| | | | |
|---|---|---|---|
| Inmate Name: | CHAMBERS, JOHN | Sex: F | Facility:  DAN |
| Date of Birth: | 09/08/1954 | Provider: Stacy, Rebecca PsyD | |
| Date: | 03/11/2019 12:31 | | |

## Limits of Confidentiality

Limits of confidentiality were reviewed with Inmate Chambers.  She expressed an understanding of the limits of confidentiality and consented to be interviewed accordingly.

Inmate Chambers was made aware of the BOP's Sexual Assault Prevention Policy and expressed an understanding of this policy.

## Data Source(s)

The following data sources were reviewed in conjunction with this Initial Intake Evaluation: Self-Report, PSR, SENTRY.

## Mental Health History and Current Symptoms

No history of mental health issues was noted.

No history of prior mental health treatment was noted.

No current mental health symptoms were noted.

No suicidal ideation, attempts, or self-harm were noted.

## Substance Abuse

No history of substance abuse was noted.

No history of substance abuse treatment was noted.

## Sex Offenses

No sexual offense convictions were noted.

No history of sexual predation in a correctional setting was noted.

## Relevant Psychosocial History

Noteworthy psychosocial issues: Marital/Family History, Educational History, Employment History, History of Sexual Victimization.

Inmate Chambers reported he was born and raised in New York. He stated he has been married for 22 years and does not have children. He advised his wife is his most positive support.

Inmate Chambers earned is GED in 1974. On June 8, 1980, Inmate Chambers received a Bachelor of Arts degree from City College in New York. In 1983, Inmate Chambers graduated from Temple University Beasley School of Law. On July 30, 1984, Inmate Chambers became a licensed attorney and was admitted to practice law in New York State. He last worked as a lawyer.

Inmate Chambers reported history of sexual abuse by two men at age 6 (separate instances). One was an ongoing occurrence and the other was a one-time situation. Inmate Chambers was offered programming in Resolve and declined to participate.

## Adjustment to Incarceration

Adjustment to incarceration concerns were identified: First Incarceration.

Inmate Chambers reported this is his first incarceration. He is transgender female to male. Inmate Chambers reported he transitioned to a male name in 2000 and in the same year, had a mastectomy. Inmate Chambers continues to have female genitalia. He takes hormones on a regular basis.

## Findings

Care Level:    CARE2-MH

Inmate Chambers was designated CARE2-MH prior to his arrival at FPC-DAN. This classification will remain in an abundance of caution and in order to ensure positive adjustment to incarceration and stable mental health.

## Recommendations

The following psychological services are recommended: Mental Health Treatment Program, Follow-Up Appointment.

Given his history of sexual abuse, Inmate Chambers was offered participation in the Resolve Program and declined at this time.

Given his CARE2-MH status, an appointment will be scheduled for next month.

| | | |
|---|---|---|
| | | Reg #:  79033-054 |
| | | Unit Team:  C |
| Inmate Name: | CHAMBERS, JOHN | Sex:  F      Facility:  DAN |
| Date of Birth: | 09/08/1954 | Provider:  Stacy, Rebecca PsyD |
| Date: | 03/11/2019 12:31 | |

Completed by Stacy, Rebecca PsyD on 03/11/2019 14:28

**SENSITIVE BUT UNCLASSIFIED**

## Bureau of Prisons
## Psychology Services
## Mental Health Services

| | | | | |
|---|---|---|---|---|
| Inmate Name: | CHAMBERS, JOHN | | Race: WHITE | Reg #: 79033-054 |
| Date of Birth: | 09/08/1954 | Sex: F | Status: Complete | Facility: DAN |
| Open Date: | 03/11/2019 | Closed Date: 06/18/2019 | | Discussed: Yes |

**PGI Title:** Other Mental Health Service

**Last Updated:** 06/18/2019   **Last Provider:** Stacy, Rebecca PsyD

**Status:** Complete

**Problem:** Inmate Chambers was designated CARE2-MH prior to his arrival to FPC-DAN, like due to F to M transgender status.

**Goal:** Ensure adequate adjustment to incarceration

**Interventions:** -Attend monthly CARE2-MH sessions
-Process any issues that arise
-Develop rapport
-Discuss home life/transition back into the community

**Progress Notes:**

**Date:** 06/18/2019   **Provider:** Stacy, Rebecca PsyD

Symptoms Eliminated
Inmate Chambers continues to exhibit lack of mental health symptoms. He had adjusted adequately to incarceration although has some concerns related to feeling bullied by others. In response to these situations, he has remained calm and maintains his assertiveness. He engages with positive peers and visits with his wife every weekend. This writer and Inmate Chambers agreed his needs are better served via cop-out rather than ongoing sessions. Reduced to CARE1-MH at this time.

**Comments:**

Inmate Chambers continues to exhibit lack of mental health symptoms. He had adjusted adequately to incarceration although has some concerns related to feeling bullied by others. In response to these situations, he has remained calm and maintains his assertiveness. He engages with positive peers and visits with his wife every weekend. This writer and Inmate Chambers agreed his needs are better served via cop-out rather than ongoing sessions. Reduced to CARE1-MH at this time.

**SENSITIVE BUT UNCLASSIFIED**

**Bureau of Prisons
Psychology Services
Brief R&D Screening**

| | | | | | |
|---|---|---|---|---|---|
| | | | | Reg #: | 79033-054 |
| | | | | Unit Team: | C |

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | CHAMBERS, JOHN | Sex: | F | Facility: | DAN |
| Date of Birth: | 09/08/1954 | Provider: | Seaton, Jessica PhD/Chief | | |
| Date: | 02/27/2019 15:27 | | | | |

## Mental Health History

Inmate has no mental health history.  He denies past suicidal ideation, plan, or intent.  He is a transgender (female to male), but does not meet criteria for Gender Dysphoria.  He arrived as a voluntary surrender already coded as MH Care 2 and so will initially receive monthly sessions from psychology services.

## Mental Status

CHAMBERS presented as calm and cooperative.  His thought process was clear and rational, he denied any suicidal ideation, plan, or intent.  No evidence of mood or thought disorder.  He was oriented in all spheres.

## Current Concerns

Due to CHAMBERS having transitioned to a male 20 years ago, he has a very masculine appearance- to include a full beard.  His female genitalia remain in tact, which is why he was designated to a female facility.  CHAMBERS acknowledged feeling relieved that he will be among females as he felt he may be unsafe around male inmates, since he has female genitalia.  Writer spent some time educating inmate on the daily routine of the Camp and how he would receive male commissary items, as well as male undergarments.  Inmate was informed that staff and inmates may appear startled at first glance, as he walks around the female Camp, but that staff will remain professional and inmates will likely welcome him.

He was informed on how to report should he feel harassed or discriminated by either staff or inmate.  He is cleared for general population.

## Recommendations

Inmate is cleared for general population.  He will be seen within 14 days for his regular psychology intake screening.  CHAMBERS was informed on how to reach psychology services, should a need arise in the interim.

Completed by Seaton, Jessica PhD/Chief Psychologist on 02/27/2019 15:34

# Exhibit B

PPG7

DANCP  606.00 *        FEMALE CUSTODY CLASSIFICATION FORM        *        10-15-2019
                                                                          10:29:03
PAGE 001 OF 001

                              (A) IDENTIFYING DATA
                                  FORM DATE: 05-30-2019            ORG: DAN

REG NO..: 79033-054
NAME....: CHAMBERS, JOHN                     MGTV: NONE
                                             MVED:
PUB SFTY: NONE
                              (B) BASE SCORING
                                    SEVERITY........: (3) MODERATE
DETAINER: (0) NONE                  CRIM HIST SCORE: (00) 0 POINTS
MOS REL.: 7                         VIOLENCE.......: (0) NONE
ESCAPES.: (0) NONE                  AGE CATEGORY...: (0) 55 AND OVER
VOL SURR: (3) VOL SURR              DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
EDUC LEV: (0) VERFD HS DEGREE/GED
                              (C) CUSTODY SCORING
TIME SERVED.....: (4) 26-75%        PROG PARTICIPAT: (2) GOOD
LIVING SKILLS...: (1) AVERAGE       TYPE DISCIP RPT: (5) NONE
FREQ DISCIP RPT.: (3) NONE          FAMILY/COMMUN..: (4) GOOD

                    --- LEVEL AND CUSTODY SUMMARY ---

                         SEC TOTAL  SCORED LEV MGMT SEC LEVEL   CUSTODY  CONSIDER
BASE  CUST  VARIANCE                                             OUT     DECREASE
0     +19    -4          0          MINIMUM    N/A

       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED

G0005

PPG7

DANCP  606.00 *      FEMALE CUSTODY CLASSIFICATION FORM      *    10-15-2019
                                                                   10:29:03
PAGE 001 OF 001
                              (A) IDENTIFYING DATA
                              FORM DATE: 05-30-2019             ORG: DAN

REG NO..: 79033-054
NAME....: CHAMBERS, JOHN                     MGTV: NONE
                                             MVED:
PUB SFTY: NONE
                              (B) BASE SCORING
                                  SEVERITY.......: (3) MODERATE
DETAINER: (0) NONE                CRIM HIST SCORE: (00) 0 POINTS
MOS REL.: 7                       VIOLENCE.......: (0) NONE
ESCAPES.: (0) NONE                AGE CATEGORY...: (0) 55 AND OVER
VOL SURR: (3) VOL SURR            DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
EDUC LEV: (0) VERFD HS DEGREE/GED
                              (C) CUSTODY SCORING
                                  PROG PARTICIPAT: (2) GOOD
TIME SERVED.....: (4) 26-75%      TYPE DISCIP RPT: (5) NONE
LIVING SKILLS...: (1) AVERAGE     FAMILY/COMMUN..: (4) GOOD
FREQ DISCIP RPT.: (3) NONE

                    --- LEVEL AND CUSTODY SUMMARY ---

BASE  CUST  VARIANCE   SEC TOTAL   SCORED LEV MGMT SEC LEVEL   CUSTODY  CONSIDER
0     +19    -4        0           MINIMUM    N/A              OUT      DECREASE
                                                                       DECREASE

G0005       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED

# Exhibit C

HEALTH

# What Causes Beef Rainbows?

TAYLOR ORCI  FEB 28, 2013

*The USDA says "iridescent beef" is perfectly okay.*



Tim Dustrude/Friday Harbor, WA

People are like moths to the flames that are rainbows. The next time there's a rainbow outside, notice how many people drop everything, even important things, to Instagram it. It would be a perfect time for aliens to take over Earth. Rainbows where rainbows shouldn't be, however, cause alarm. Take beef, for example.

How many times have you (if you eat beef) foregone a package of sliced roast beef for a different package because said beef was slightly iridescent? If you don't eat beef, perhaps you've seen a package of

theatlantic.com/health/archive/2013/02/what-causes-beef-rainbows/273534/

5/17/2019

What Causes Beef Rainbows? - The Atlantic

said rainbow meat and it reminded you why you no longer eat it. The Internets are clogged with threads like, "Why does deli roast beef look like a rainbow?," and the ever gravid concern, "Subway shiny roast beef?" And while everyone should be spared urbandictionary.com's definition of what a "Beef Rainbow" is, the truth of the matter is, there's nothing inherently wrong with rainbow meat.

Beef rainbows aren't a sign of spoiled, tainted, or (sorry) magical beef. There's enough speculation over the integrity of rainbow beef that the USDA's website has a section on "Iridescent Color of Roast Beef" near similar topics like "What does 'natural?' mean" and "what is beef?" According to the USDA, "When light hits a slice of meat, it splits into colors like a rainbow." This is something called a "diffraction grating," essentially what happens when light waves bend or spread around a surface and create a pattern. It's the same thing that happens to make rainbows on the surface of a DVD. It's understandable that folks mistake diffracted light as a sign of spoilage, especially since the main color created by meat diffraction gratings is green. There is a reason why in Dr. Seuss's *Green Eggs and Ham,* the central conflict of the protagonist is his strong apprehension against eating green meat.

Speaking of ham, beef is not the only meat known to have rainbows. However, when cooked beef is sharply sliced against the grain of the muscle fiber, this, coupled with the moisture in the beef, creates an excellent surface for producing rainbows. "In my opinion," Dr. Thomas Powell, Executive Director of the American Meat Science Association, told me, "The reason it shows up in roast beef is because the cuts of meat that are used in most roast beef are more prone to iridescence, particularly in the round," hence the reason why the USDA singles out roast beef as being especially colorful.

RECEIVED
SDNY PRO SE OFFICE

2021 MAR 19  PM 2: 10

USM SDNY

SDNY - 500 Pearl St.

Pro Se Films)

Pro Se  Unit

Case 17·cr·396

Motion For Early Termination

First Class Mail

FIRST · CLASS