UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :

JOHN CHAMBERS,                  :

                      Petitioner,      :        17 Cr. 396 (WHP)

                                  :        21 Civ. _____ (WHP)

           v.                     :

                                  :

UNITED STATES OF AMERICA,     :

                                  :

                    Respondent.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE HIS CONVICTION

 

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

Alex Rossmiller
Paul Monteleoni
Assistant United States Attorneys
*Of Counsel*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 3

BACKGROUND .................................................................................................................... 4

    A.      The Offense Conduct.............................................................................................4

    B.      The Government's Case .........................................................................................4

    C.      The Defense Case .................................................................................................16

    D.      The Jury Verdict and Sentencing.........................................................................17

    E.      Chambers's Appeal and Petition .........................................................................18

DISCUSSION ........................................................................................................................ 18

    A.      Defense Counsel at Trial Was Not Ineffective...................................................18

        1.    Applicable Law.............................................................................................. 18

        2.    Discussion...................................................................................................... 22

CONCLUSION...................................................................................................................... 29

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the *pro se* petition of Petitioner John Chambers ("Chambers" or the "Petitioner") to vacate his conviction and to vacate, set aside, or correct his prison sentence pursuant to Title 28, United States Code, Section 2255 (the "Petition").

Indictment S1 17 Cr. 396 (WHP) (the "Indictment") was filed on March 15, 2018.   The Indictment charged Chambers in four counts: bribery in violation of 18 U.S.C. §§ 666 and 2 (Count One), conspiracy to commit bribery in violation of 18 U.S.C. § 371 (Count Two), honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Count Three), and conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349 (Count Four).

Trial commenced on April 16, 2018, and Chambers was convicted by the jury on all counts on April 24, 2018, following approximately three hours of deliberation.   On November 20, 2018, this court imposed upon Chambers a significantly below-Guidelines sentence in a thorough proceeding that is not challenged in the Petition.   This court calculated Chambers's advisory Sentencing Guidelines range as 41 to 51 months, and sentenced Chambers to a sentence of a year and a day of imprisonment, together with a three-year term of supervised release, explaining the variance as based on Chambers's loss of his law license, his difficult upbringing, and his personal generosity.

The Petition seeks to vacate Chambers's sentence on the sole grounds of ineffectiveness of counsel.   Specifically, Chambers alleges that his counsel failed to prepare him and call him to the stand for trial testimony, and that counsel failed to sufficiently advance certain arguments and offer certain potential exhibits at trial.

The petition should be denied.   Chambers's claim of ineffective assistance is meritless, and it also fails to prove that but for counsel's alleged errors, the result of the trial would have been different.   The proof at trial overwhelmingly established Chambers's guilt, including in connection with, in part, the very kinds of information and evidence Chambers now claims were lacking.   Defense counsel provided robust advocacy at trial, counsel's performance was not objectively unreasonable, and Petitioner does not demonstrate that he suffered any prejudice as a result of the claimed deficiencies.   For these reasons, and for the reasons stated in detail below, the Petition should be denied.

## BACKGROUND

### A. The Offense Conduct

John Chambers, an attorney whose practice consisted exclusively of representing individuals in matters involving firearms licenses, paid numerous bribes from approximately 2006 to approximately 2015 to Sergeant David Villanueva, a New York City Police Department ("NYPD") supervisor, in exchange for favorable outcomes for Chambers's clients before the NYPD License Division.   In exchange for these bribes, which took the form of cash, gift cards, designer wristwatches, tickets to theater and sporting events, and other items, Villanueva undertook various official actions for Chambers's clients, most commonly giving them favorable treatment in connection with investigations into whether those clients' gun licenses should be revoked or suspended subsequent to an "incident" such as an arrest or accidental firearm discharge.

### B. The Government's Case

The proof at trial overwhelmingly established that Chambers engaged in bribery and fraud to induce Villanueva to undertake official acts of behalf of Chambers's clients.

1.  <u>The License Division and Chambers's Law Practice</u>

The NYPD's Pistol License Division (the "License Division") administers New York City's comprehensive and strict gun license laws.   (Tr. 40, 43).   The License Division issues several types of licenses, including premises licenses (requiring the gun to be kept in a business or residential premises), limited carry licenses (permitting the carrying of the firearm on certain dates or to certain places only), full carry licenses (permitting the carrying of the firearm anywhere within New York City at any time of day),[1]  special carry licenses (issued to individuals with out-of-city carry licenses to allow them to bring their firearms into New York City), and certain types of licenses issued to armed security guards or retired police officers.   Although the requirements to obtain a premises license are not very stringent (Tr. 49), the requirements to obtain less restrictive licenses are progressively stricter, with a full carry license being the most difficult to obtain (Tr. 51-54, 63, 87).   Moreover, the licenses are tied to specific handguns, and license-holders are required to obtain written purchase authorizations to obtain each handgun.   (Tr. 49-50).

In addition to processing new applications for gun licenses, the License Division also conducts investigations to determine whether previously-issued licenses should be revoked or suspended.   These investigations, which are conducted upon the occurrence of a triggering incident—such as an arrest, a police report regarding a domestic dispute, or an accidental discharge of a firearm—are known as "incident investigations."   (Tr. 74-76).   Upon the commencement of an incident investigation, the individual's firearms licenses are automatically suspended and the individual must temporarily surrender the firearms to NYPD custody.   (Tr. 74-76).

---

[1] The full carry license is also called a "carry business" or business carry license.

The License Division determines the appropriate disposition for an incident investigation. An incident investigation can result in the continuation of a license (*i.e.*, the lifting of the automatic suspension and return of the firearms to the license-holder), its suspension for a period of time following the automatic suspension, or its revocation.   (Tr. 80).   The License Division investigator assigned to an incident investigation recommends a disposition at the conclusion of an investigation, though this recommendation can be overruled by the recommendation of the sergeant assigned to the incidents unit—Villanueva, at all relevant times—which can in turn be overruled by a more senior officer in the License Division, who makes the final determination, subject to the right of the individual to file an administrative appeal.   Although the recommendation of the incidents sergeant, *i.e.*, Villanueva, can be overruled, as a practical matter it is significantly more influential than the recommendation of the investigator and is usually followed.   (Tr. 322-23; *see also* Tr. 82-83).

As an attorney, Chambers specialized his practice exclusively on gun license matters. (Tr. 162).   His law firm's website identified him as a former Assistant District Attorney, billed him as "the only lawyer specializing in gun licensing exclusively" (Tr. 235), and boasted that he had been "regularly appearing for clients at 1 Police Plaza [*i.e.*, NYPD headquarters, where the License Division was located] since 1986."   (Tr. 236).   The website advised that Chambers had litigated in excess of 200 gun licensing cases, (Tr. 235), and it included summaries of instances in which Chambers's law firm had provided services for clients and achieved positive results, as well as testimonials from satisfied clients (Tr. 233-34).

Unlike most private attorneys, Chambers spent extensive time in the License Division's offices and socialized with License Division personnel.   (Tr, 235-37, 339-40).   Indeed, his law

firm website described Chambers's belief in the value of "knowing the personnel within the Pistol License Division."   (Tr. 236).

One of the Government's witnesses was Inspector Michael Barreto, a high-ranking NYPD supervisor who was brought in to reform the License Division in May 2016 after reports of a corruption scandal involving Villanueva and others.   (Tr. 40, 42).   Inspector Barreto testified about the License Division procedures before his appointment (which he learned in the process of familiarizing himself with the workings of the division) and about changes that he made to those procedures, in part to make improper license grants more difficult.   (Tr. 85-88).   Inspector Barreto also testified about his interactions with Chambers, including requests that Chambers made for a continuation of the preferential treatment that he had enjoyed under previous License Division leadership but that Inspector Barreto refused to give.   (Tr. 90-97).   On cross-examination, Inspector Barreto testified about a number of instances in which Chambers had won favorable dispositions for his clients in administrative appeals following Villanueva's arrest (and thus during a period in which Villanueva was unable to provide him with assistance).   (Tr. 128-37).

   2.   Chambers's Bribes to Villanueva

Chambers cultivated a corrupt relationship with Villanueva over the course of years, befriending him and offering him a growing stream of increasingly blatant bribes.   Shortly after Villanueva became the incidents sergeant, Chambers took steps to befriend Villanueva, socializing with him at work and suggesting they meet outside of work.   (Tr. 324).   Although Chambers and Villanueva did become friends, their relationship was a "transactional friendship."   (Tr. 388).

Chambers began offering Villanueva things of value in or about 2006, when he and his wife treated Villanueva and his wife to dinner for Villanueva's birthday.   (Tr. 326-27).   At the dinner, Chambers surprised Villanueva with gifts and tickets to a Broadway show immediately

following the dinner.   (Tr. 326-27).   The tickets were for Villanueva and his wife only, not for Chambers or his wife.   (Tr. 326-27).   Villanueva, who was experiencing financial difficulty, accepted this opportunity for free entertainment.   (Tr. 328-29).   When Chambers repeated the free entertainment in the same manner (dinner for both couples, followed by a Broadway show for Villanueva and his wife only) for Villanueva's wife's birthday, however, Villanueva began to realize that he would be asked for official acts in return.   (Tr. 327-28).

Chambers continued providing birthday dinners and Broadway shows for Villanueva and his wife[2] in this manner every year until 2014, and in addition expanded his gifts to Villanueva to include other entertainment.   (Tr. 330-36).   He began providing tickets for Villanueva and his family to attend the Radio City Music Hall Christmas Spectacular every year from 2006 to 2015 —an event Chambers did not attend at all—and also provided tickets for Villanueva to attend other Broadway shows, other theatrical performances, or baseball games on sporadic occasions (not holidays or birthdays).   (Tr. 215-26, 330-41).   The frequency of Chambers's gifts to Villanueva was so great that on one occasion he inadvertently offered Villanueva baseball tickets for the same day for which he had already given Villanueva theater tickets.   (Tr. 215-16).

Chambers also, over time, provided Villanueva with gift cards, boxes of toys and baseball memorabilia for Villanueva's son, several articles of clothing, over $2000 in cash (principally for Nassau County-related license matters described below, as well as occasional smaller amounts of cash for Villanueva to spend on souvenirs at the outings Chambers sponsored), and two designer wristwatches, one of which had a list price of $8500.   (Tr. 475-76).

---

[2]  Villanueva divorced and remarried during this time period, and Chambers continued to sponsor such outings for Villanueva and his second wife in the same manner as soon as he learned they were dating.

Chambers was well aware of the impropriety of these gifts.   He kept on his phone a running ledger of the Broadway show tickets he had given Villanueva, and would sometimes show the list to Villanueva while the two were arguing about whether Villanueva should give one of Chambers's clients favorable treatment in a gun license matter.   (Tr. 222-23, 343-44). Moreover, Chambers concealed his social relationship and gifts from other NYPD employees. Indeed, another officer who worked at the License Division from 2012 to 2017 testified that he did not know that Chambers and Villanueva had any social relationship at all.   (Tr. 684-85; *see also* Tr. 340, 666).   On one occasion, Chambers sent an email to Villanueva saying he had tickets for Villanueva but did not want to "leave them with ANYONE" if Villanueva was not at his desk, a striking precaution considering that the other people near Villaneuva's desk would all be NYPD employees.   (Tr. 218 & GX 455).

The gifts Chambers provided Villanueva were not reciprocated, other than through official acts as discussed below.   Throughout the course of their relationship, Villanueva never gave Chambers any cash, gift cards, entertainment, or other gifts (besides Villanueva's wife once buying Chambers a tie for his birthday), never paid for any meals for Chambers, and indeed never split the cost of any restaurant meals with Chambers or covered the tip.   (Tr. 476-77).

### 3.  Villanueva's Official Actions Related to New York City Gun Licenses

In exchange for these bribes, Villanueva performed a variety of official acts for Chambers with respect to gun licenses issued by the NYPD.   Most commonly, Villanueva, as incidents sergeant, would cause an incident investigation concerning a client of Chambers's to conclude quickly—itself a significant benefit to the client given that their licenses would have been automatically suspended during the investigation—and in many cases with more a favorable disposition than would otherwise have resulted.

Among the most blatant examples of Chambers's bribes concerned an incident investigation into a client of Chambers's named Edward Ticheli. Ticheli was a watch dealer with a full carry license and several other lesser gun licenses, and in the spring of 2013 he became the subject of an incident investigation arising from a series of police calls due to a domestic dispute with his wife, including allegations that he had threatened to hit her. (Tr. 164-66). Due to the seriousness of the allegations, as well as Ticheli's improper handling of his firearms during the investigation (selling them to a gun range without permission instead of surrendering them to the NYPD), Villanueva believed that the appropriate disposition was the revocation of all of Ticheli's licenses. (Tr. 361-63). However, Chambers called Villanueva and promised him a designer wristwatch with a list price of $8500 (obtained from Ticheli through his watch dealing business) if he allowed Ticheli to keep his full carry license. (Tr. 175, 364-65). Villanueva, after conferring with a superior in the License Division, agreed to allow Ticheli to keep his full carry license and one of his other licenses and surrender two lesser gun licenses. (Tr. 365). Villanueva even actually personally returned Ticheli's license to him before the incident investigator had completed the report. (Tr. 190-92). By the time the incident investigator completed the investigation and recommended revocation, unbeknownst to her, Ticheli already had regained his license. Villanueva's later overruling of the investigator's recommendation, and his superior's final determination concurring with him, were just after-the-fact formalities.

Chambers's emails made his corrupt intent regarding this bribe explicit. On May 30, 2013—during the pendency of the incident investigation—Chambers sent Villanueva photographs of the particular model of watch, describing it as "Stunning" and saying he would "have it in hand tomorrow." (Tr. 172). At the same time, Chambers was emailing Ticheli about the details of obtaining the watch, as well as its box and papers (which were shipped separately for business

reasons relating to the watch trade).   (Tr. 178-81).   Chambers was explicit that this watch was intended to be a gift for the relevant NYPD officer—that is, Villanueva—and that he thought it would look "richer" if presented in its box and with papers.   (Tr. 181 ("possible to have the box and papers by the end of next week? can that be expedited? don't want to give the watch without them…I think it makes the watch look that much richer with the box and papers, don't you?")).

Chambers also was explicit that the watch was intended to be given in a quid pro quo for official action by Villanueva with respect to Ticheli's licenses.   In the email to Ticheli during which he informed Ticheli which watch he wished to provide Villanueva, he also asked Ticheli to meet and "settle up," referencing the amount of time he spent "mending fences and making sure that next week wi[ll] be a go, with 2 guns to stay on your [*i.e.*, Ticheli's] carry, as well." (Tr. 176).   Chambers was quite direct about the role the watch would play in bringing about this desired resolution, writing on May 31, 2013—*i.e.*, the day after he had sent Villanueva photographs of the watch—"text[ed] & sent photo of watch[.] he loves it[.] looking like we are on the right road[.] btw, did you tell me how fast you can get box and papers?"   (Tr. 182). Chambers went on in a subsequent email to be even more explicit with Ticheli about the quid pro quo: "yes, the watch is beautiful and very classy . . . will work wonders to repair the damage done, as well as get us on the track we need to be on for you[.]"   (Tr. 183).

About a week and a half after this exchange, and after the watch had changed hands but before Ticheli's incident investigation had been closed by the investigator, the bribe to Villanueva had its desired effect: Ticheli was allowed to get his gun license back.   In an exchange on June 11, 2013 leading up to the return of the guns, Ticheli balked at the possibility that he might be allowed to only obtain permission to get one firearm back.   Writing an email to Chambers with the subject line "Re: deal with NYPD," Ticheli complained "We were guaranteed today[.] 2 guns[.] Carry[.]

I did my part." (Tr. 186). On June 12, 2013—the next day—Chambers wrote Ticheli to confirm that the license and purchase authorization had been retrieved, writing "get some cash from the bank for me..lol DEAL DONE," and adding "plus I expect 'tip' that we discussed at YOUR discretion [. . .] this has been just the slightest of nightmares, plus this is a MIRACLE[.] trust me." (Tr. 187 & GX 345). When Ticheli asked Chambers how much of a tip he was expecting, complaining that he had already spent "[w]ell over 10,000," (Tr. 188), Chambers repeatedly stressed the results he had obtained:

> All that was done for you was a miracle. NO OTHER lawyer could have saved you from revocation—let alone got your concealed carry reinstated almost immediately. . . . TIP I LEAVE IN YOUR DISCRETION—just know MANY were involved to get all of this done, and done so quickly. Honestly, any other lawyer would've charged you more and been unsuccessful. And no other lawyer would be allowed to do what I am doing for you—allowing you to avoid re-inspection of the weapons.

(Tr. 188-89 & GX 347).

As Chambers had repeatedly reminded Ticheli, these results were abnormal—at the time at which Chambers had obtained the license back and was negotiating with Ticheli over the tip, Ticheli's incident investigation was still pending with the line-level investigator. That investigator would not recommend revocation of Ticheli's licenses until almost a week later, not knowing the license had already been restored. (Tr. 190-92). Villanueva then officially overruled the investigator a month after that (Tr. 193-94, 197), and his supervisor formally approved this disposition almost two months after the license had been returned. (Tr. 200).

Years later, following his arrest, Chambers tried to create a fraudulent paper trail for this bribe, emailing Ticheli with a false pretext for the watch episode. On May 9, 2017, several weeks after he was arrested in a complaint identifying the watch as a bribe he paid Villanueva, Chambers emailed Ticheli asking for the wholesale price on watches from that designer, remarking "You gave me one and I couldn't wear it because I can only Wear gold . . . allergic to all else . . . gave

it away . . . now it is coming back to haunt me."   (Tr. 200-01).   In fact, this was blatantly false, as shown by the extensive email traffic demonstrating that Chambers was presenting this watch to Villanueva well before he had it in hand.

In addition to Ticheli, Villanueva provided a number of other of Chambers's clients with expedited and more favorable resolutions to incident investigations.   Villanueva caused the closure of approximately 100 incident investigations faster than he otherwise would have for Chambers's clients, allowing the clients to more quickly benefit through the return of their licenses, which were suspended during the investigations—and of these, he recommended that approximately half receive more favorable dispositions than he believed were warranted. (Tr. 474-75).   In some instances Villanueva modified negative dispositions that had already been issued, changing them to be more favorable to Chambers's clients, such as changing a revocation that had already been issued to a suspension.   (Tr. 211-13).

Villanueva also extended Chambers's clients other forms of favorable treatment.   He processed approximately six license renewals for Chambers's clients faster than he otherwise would have, and he upgraded approximately five or six licenses to carry status (the least restrictive form of license) without proper cause.   (Tr. 475).   At Chambers's request, Villanueva on occasion revoked the licenses of clients who would not pay Chambers. (Tr. 424-26, 475).   On two occasions, Villanueva sent these letters to the clients, but on the other approximately five occasions Chambers—after receiving a draft of the letter from Villanueva—told Villanueva not to send the letter because the client had subsequently paid Chambers.   (Tr. 425).

4.   Villanueva's Official Actions Related to Nassau County Gun Licenses

In addition to the actions he took regarding matters pending before the NYPD's License Division, Villanueva also used his influence as an NYPD sergeant to seek favors from counterparts

at the Nassau County Police Department's license section.[3]   Villanueva asked professional contacts of his in the Nassau County unit to renew or modify the licenses of three of Chambers's clients who were each encountering difficulties in renewing their licenses, and in exchange received the $2,000 in cash from Chambers described above.   (Tr. 428-33).   Of this $2,000 in total cash, $500 was provided in person and $1,500 was mailed to Villanueva hidden in magazines. The cash in magazines consisted of $500 per mailing on three occasions, each including a $100 bill being taped to each of five pages of a magazine being mailed.   (Tr. 431, 449-50).

For these Nassau County cases, the quid pro quo was also explicit.   For the first Nassau County renewal, Chambers emailed Villanueva to set forth plainly the terms of the corrupt exchange: "He is only paying me, if he gets his license renewed. I will in turn pay you as my 'consultant' on the case, as we talked about :)[.]"   (Tr. 241-42).   Similarly, in the case of two other Nassau County clients, Chambers discussed in detail a similar bribe with Villanueva (Tr. 246-49, 251-61), repeatedly texting with Villanueva about the status of his attempts to cultivate a contact in Nassau County (*see, e.g.*, Tr. 247 (John Chambers: "how is your relationship going out there? You think we have a shot at this"); *id.* (John Chambers: "Ok have you been doing things for him?")), the contingency of payment on Villanueva's success in Nassau County (*id.* at 248 (John Chambers: "just want to make sure you[r] contact 'looked' at files and everything is a [go] before I get $$$ cash."); *id.* at 256 (John Chambers: "I have a payment in hand for your consultation services")), and discussing the cover story the licensees should provide to the Nassau County officers about their supposed relationship to Villanueva (*see id.* at 259 (John Chambers:

---

[3] It was not uncommon for NYPD officers involved in gun licensing to seek favors from their Nassau County counterparts, or vice versa, particularly given the geographical proximity between the two jurisdictions, so Villanueva had a measure of de facto influence arising from his ability to grant or withhold favors requested by Nassau County officers.   (Tr. 426-27).

"How much should they actually [know] about you? I mean if they are seeing Tom, they should know you are sgt at PLD in NYC, right?")).

Chambers and Villanueva were well aware of the illicit nature of the exchange.   Chambers told Villanueva, regarding the first Nassau County client, "I am going to tell him to KEEP HIS MOUTH SHUT when he goes to get his license . . . not to mention me or ANYTHING." (Tr. 241 & GX 122).   And in discussing an unconsummated bribe offer Villanueva received from a separate individual for similar services, Chambers said that accepting the money "could blow up in [Villanueva's] face" because Villanueva didn't "know [the bribor] from Adam."   (Tr. 454).

Gerald Aquilina, one of Chambers's Nassau County clients, retained Chambers to assist in transferring his New York City and Nassau County licenses from one business to another.[4] Aquilina spoke with Chambers by telephone, met with him in person, and emailed with him; entered into a retainer agreement and paid Chambers a substantial sum of money (together with his brother, for several licenses over the course of several years, a total of $35,000-$40,000) by various means for different stages of the work; and ultimately achieved success in the renewal. (Tr. 639-63).   Aquilina did not testify that he was aware that Chambers was bribing Villanueva to exercise his influence to approve the transfer in Nassau County, though he did testify about an email Chambers sent him in which Chambers told Aquilina to falsely tell the Nassau County officers that Villanueva was his "very good friend"—the same cover story that Chambers and Villanueva had worked out by text message.   (Tr. 656-57).[5]

---

[4] Given that his carry license was predicated on the specific nature of his original business, the transfer of the license to a new business was not merely ministerial.

[5] Aquilina did not in fact tell this to the Nassau County officers but was still able to transfer his license.   (Tr. 657).

## C. The Defense Case

### 1. The Undercover Operation

The defense attempted to introduce evidence of an undercover operation undertaken on or about March 10, 2017, after Villanueva's June 2016 arrest for accepting bribes from a different bribe-payer, Alex "Shaya" Lichtenstein, and during a period of significant media attention to allegations of bribery at the License Division.   (Tr. 7).   In this operation, an undercover officer arranged a meeting for an initial consultation at Chambers's law office. In setting up and participating in the meeting, the undercover officer spoke only to Christina Chambers, who acted as a paralegal in the law office and is married to Chambers.   The meeting, which lasted approximately 25 minutes and consisted of a discussion about the process of applying for a gun license in New York City, involved only the undercover officer and Christina Chambers. (A. 207-18).   Chambers was not present at the meeting.   The transcript of the video of the meeting reflects the limited and largely mundane nature of the interactions between the undercover officer and Christina Chambers.

The Government moved to preclude evidence of this operation in a pretrial motion in limine, noting that the only apparent purpose of this evidence was as good-act evidence—*i.e.*, to attempt to establish that because Chambers's law practice did not employ bribery in the case of the undercover, Chambers purportedly did not engage in bribery toward other clients in the charged instances.   (A. 39-51).   Chambers opposed this motion, arguing that evidence of this undercover operation was not offered to prove good acts but rather to show that Chambers was engaged in the practice of law.   (A. 52-58).   The Government noted that this fact would not be in any dispute but that in any event the evidence was not well-suited to this stated purpose and appeared to be offered instead to establish good acts.   (A. 59-67).

On April 16, 2018, on the first day of trial, the District Court precluded this evidence, ruling that the evidence of the undercover operation in 2017, approximately a year after Villanueva's arrest, was not probative of Chambers's conduct during the charged 2010 to 2015 period and appeared to be cumulative of Christina Chambers's testimony, given that the defense had already advised the Government that it intended to call her regardless.   (A. 69).   The Court also ruled that the evidence was inadmissible due to the risk it would be interpreted by the jury as impermissible good-act evidence.   (A. 69).   The Court noted that this ruling was without prejudice to reconsideration if a basis for admissibility arose during trial.   (A. 70).

2.   The Defense Witnesses

Chambers called two witnesses, Angelica Villanueva and Christina Chambers.   Angelica Villanueva, David Villanueva's ex-wife, testified about her friendship with John and Christina Chambers and the fact that this friendship continued after her divorce from David Villanueva. (Tr. 712-32).   Christina Chambers, the defendant's wife and paralegal, testified in detail regarding the operation of Chambers's law practice, including the types of services provided, her duties as a paralegal, the firm's fee structure, and the procedures for applying for certain types of licenses.   (Tr. 735-50).   Christina Chambers also testified about her unawareness of Chambers's seeking revocation letters for his own clients (Tr. 749-50), and about her and Chambers's friendship with the Villanueva family, characterizing some gifts they provided to Villanueva as motivated by friendship (Tr. 751-63).

**D.  The Jury Verdict and Sentencing**

The jury began its deliberations on the afternoon of April 23, 2018.   On April 24, 2018, after approximately three hours of deliberation in total, the jury unanimously convicted Chambers on all counts.   On November 20, 2018, this Court imposed upon Chambers a below-Guidelines

sentence in a proceeding that is not challenged in the Petition.    This Court calculated Chambers's

total offense level as 22 and his criminal history category as I, corresponding to a 41- to 51-month

Guidelines range.    The Court then sentenced Chambers to a year and a day of imprisonment,

together with a three-year term of supervised release.

### E.  Chambers's Appeal and Petition

Chambers appealed his conviction to the Second Circuit, arguing that the evidence of the

2017 undercover operation should have been admitted.    In a Summary Order issued on March

11, 2020, the Court of Appeals rejected Chambers's arguments—holding that the evidence was

irrelevant, confusing and cumulative, and improper good-act evidence—and affirmed the

conviction and sentence.    *See United States v. Chambers*, 800 F. App'x 43, 45-46 (2d Cir. 2020).

The instant petition pursuant to 28 U.S.C. § 2255 was filed on March 8, 2021.    Chambers

seeks to vacate his conviction on the alleged ground that his counsel was constitutionally

ineffective.

### DISCUSSION

### A.  Defense Counsel at Trial Was Not Ineffective

1.    Applicable Law

To prevail on a claim of ineffective assistance of counsel, a defendant must (i) demonstrate

that counsel's performance fell below an "objective standard of reasonableness" under "prevailing

professional norms," and (ii) "affirmatively prove prejudice" from the alleged dereliction in

counsel's performance.    *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *see*

*Hernandez v. United States*, 202 F.3d 486, 488 (2d Cir. 2000) ("Under the *Strickland* standard, a

petitioner must establish both (1) that counsel made errors so serious that defendant was deprived

of reasonably competent representation and (2) that counsel's deficient performance prejudiced the

defense").    Only if both elements are satisfied can a defendant demonstrate that his counsel "was

not functioning as the 'counsel' guaranteed by the Sixth Amendment," and that the defendant was, as a result, deprived of a fair proceeding.   *Strickland*, 466 U.S. at 687.

"The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard."   *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).   "[C]riminal defendants asserting ineffective assistance of counsel have a high threshold to meet in order to deter a baseless attack on the performance of counsel in a last-ditch effort to avoid a conviction or reduce the sentence."   *Reese v. United States*, No. 12 Cr. 0629 (VM), 2016 WL 462555, at *1 (S.D.N.Y. Jan. 29, 2016) *reconsideration denied*, No. 12 Cr. 0629 (VM), 2016 WL 751063 (S.D.N.Y. Feb. 24, 2016) (internal quotation marks omitted).   A claim of ineffective assistance of counsel fails unless the petitioner (i) overcomes a "strong presumption" that his counsel's conduct was reasonable and shows that his representation "fell below an objective standard of reasonableness" under "prevailing professional norms," and (ii) "affirmatively prove[s] prejudice," that is, shows that "but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 687-88, 693-94 (1984); *accord United States v. De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001); *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000).   Only if both elements of the test are satisfied can a reviewing court conclude that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and it is the petitioner's burden to establish both elements. *Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* analysis, the reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client

in the same way.'"   *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting

*Strickland*, 466 U.S. at 689).   Petitioners must show "'that counsel made errors so serious that

counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"

*Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 687).

In particular, a defendant cannot prevail on a claim of ineffective assistance merely because

he believes that his counsel's strategy was inadequate.   *United States v. Sanchez*, 790 F.2d 245,

253 (2d Cir. 1986).   Counsel's reasonably prudent decisions concerning, *e.g.*, the "selective

introduction of evidence, stipulations, objections, and pre-trial motions" are generally upheld as

matters of strategy.   *See United States v. Plitman,* 194 F.3d 59, 63–64 (2d Cir. 1999).   Likewise,

tactical decisions concerning which witnesses to introduce, if any, are "ordinarily not viewed as a

lapse in professional representation."   *Best,* 219 F.3d at 201 (quoting *United States v. Schmidt,*

105 F.3d 82, 90 (2d Cir. 1997)).   The Court's scrutiny of counsel's strategic choices is "highly

deferential," and "there are countless ways to provide effective assistance in any given case."

*See Strickland*, 466 U.S. at 689.   "[I]t is not sufficient for the habeas petitioner to show merely

that [appellate] counsel omitted a nonfrivolous argument, for counsel does not have a duty to

advance every nonfrivolous argument that could be made."   *Clark v. Stinson*, 214 F.3d 315, 322

(2d Cir. 2000) (internal quotation marks omitted).   A petitioner must show that counsel made a

significant omission or error or advanced a significantly weaker argument.   *Id.*

Under the second prong, a defendant must meet the "heavy burden" of showing "actual

prejudice."   *Strickland*, 466 U.S. at 692.   To satisfy the prejudice prong, the defendant must

demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."   *Strickland,* 466 U.S. at 693-94; *see, e.g.*,

*United States v. Levy*, 377 F.3d 259, 264 (2d Cir. 2004).   "It is not enough 'to show that the errors

had some conceivable effect on the outcome of the proceeding.'"    *Harrington*, 131 S. Ct. at 787

(quoting *Strickland*, 466 U.S. at 693).    "[N]ot every error that conceivably could have influenced

the outcome undermines the reliability of the result of the proceeding."    *Strickland*, 466 U.S. at

693.    "'A reasonable probability is a probability sufficient to undermine confidence in the

outcome.'"    *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (quoting *Strickland*, 466 U.S.

at 694).    Moreover, "an analysis focusing solely on mere outcome determination, without

attention to whether the result of the proceeding was fundamentally unfair or unreliable, is

defective."    *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).    Thus, "the prejudice component

of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders

the result . . . unreliable or the proceeding fundamentally unfair."    *Id.* at 372.

Only where both prongs of the *Strickland* test are satisfied can it be concluded that "counsel

was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment."

*Strickland*, 466 U.S. at 687.    "Courts are not required to address both *Strickland* elements if the

petitioner makes an insufficient showing in one."    *Aller v. United States*, No. 11 Civ. 9089 (TPG),

2015 WL 1963611, at *4 (S.D.N.Y. Apr. 30, 2015) (internal quotation marks omitted).    When

considering these two prongs, the Supreme Court has provided commonsense instructions,

explaining that "[t]he object of an ineffectiveness claim is not to grade counsel's performance.    If

it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,

which we expect will often be so, that course should be followed."    *Strickland,* 466 U.S. at 697.

Applying that teaching, the Second Circuit often has rejected ineffectiveness claims by

determining that, in view of the strength of the prosecution's case, the defendant is unable to

establish prejudice.    *See, e.g., Rosario v. Ercole,* 601 F.3d 118, 136 (2d Cir. 2010) ("*Strickland*

makes clear that 'a verdict or conclusion only weakly supported by the record is more likely to

have been affected by errors than one with overwhelming record support.'" (quoting *Strickland*, 466 U.S. at 696)).

2.   Discussion

Construing Chambers's *pro se* motion liberally and interpreting it to raise the strongest arguments it suggests, he argues that trial counsel provided ineffective assistance in two general ways: through preventing him from testifying, and by failing to investigate or introduce certain facts and exhibits that were purportedly exculpatory.   *See generally* Br. at 1-2, 12-14.   These assertions, whether taken separately or together, are meritless, and fall well short of the high bar that Chambers must meet in order to demonstrate that trial counsel was constitutionally ineffective under *Strickland*.

i.  *Purported Failure to Have Chambers Testify and Prepare Testimony*

Chambers complains that he was not called to testify, and he asserts that he was insufficiently prepared for testimony and was caused by his counsel to be anxious about testifying. Notably, Chambers does not assert that his trial counsel prevented him from testifying, or even that he wanted to testify.   However, assuming those are Chambers's arguments, interpreting them to raise the strongest arguments they suggest, each fails.   It is true that the right to testify is "personal" to a defendant and can be waived only by him.   *See Chang* v. *United States*, 250 F.3d 79, 82 (2d Cir. 2001) (citing *Brown* v. *Artuz*, 124 F.3d 73, 77 (2d Cir. 1997)).   Defense attorneys therefore have the obligation "to inform their clients of that right and to ensure that clients understand that the ultimate decision belongs to them, not counsel."   *Id.* at 83.   Here, however, Chambers has not alleged—nor presented any evidence—that counsel denied any request to testify, nor is Chambers's argument supported in any way by the record.   In fact, conversely, the Court specifically and on the record advised Chambers of his right to testify, confirmed that Chambers had conferred with counsel about his decision, and himself had decided not to testify:

THE COURT:    All right.    Everyone may be seated.    Any issues?

MR. STAVIS:    Yes, your Honor.    I know that your Honor keeps a ten-minute break that's exactly ten minutes.    We have a consequential decision to make here on the defense team, and perhaps we can extend the break time.

THE COURT:    What would you like?

MR: BROUNSTEIN:    15, 20.

MR. STAVIS:    20 minutes, your Honor.

THE COURT:    All right.    20 minutes.

MR. STAVIS:    Thank you, your Honor.

[. . .]

THE COURT:    Everyone may be seated.

MR. STAVIS:    Your Honor, I indicated before the break that we had a consequential decision to make.    It's a very fluid situation, and we have decided that we are in a position to rest our case at this juncture, your Honor.

THE COURT:    All right.    Mr. Chambers, you understand, sir, that you have the right to testify at this trial; do you understand that?

THE DEFENDANT:    Yes, I do, your Honor.

THE COURT:    And have you conferred with your counsel about this decision?

THE DEFENDANT:    I have, your Honor.

THE COURT:    And is it your decision, sir, not to testify in the trial?

THE DEFENDANT:    Absolutely.

THE COURT:    All right.    You may be seated.

(Tr. at 765-67.)    Chambers has offered no support for his self-serving assertion that trial counsel somehow erred in not calling him to testify—much less that he was prevented from testifying by counsel.    Indeed, he said it was "*absolutely*" his decision not to testify.    Chambers made no

reference to any dissatisfaction or issues in his having conferred with counsel, and he expressed no reluctance or uncertainty about the decision; rather, he acknowledged his right to testify and asserted that he had made the decision not to take the stand.   Chambers, having conferred with counsel, made the strategic decision not to testify.   Indeed, even if counsel had *actively convinced* Chambers not to testify, that still would not constitute ineffectiveness.   *See Harris v. United States*, 999 F. Supp. 578, 583 (S.D.N.Y. 1998) (citing *United States v. Castillo*, 14 F.3d 802, 804-05 (2d Cir.)) ("Where a defendant is not ignorant of his right to testify, but is dissuaded from testifying by his attorney, there is no claim of ineffective assistance of counsel.").   Additionally, the defendant's claim that the preparation he says did occur went poorly hurts, rather than advances, his argument—it suggests, in addition to the colloquy cited above, that Chambers was aware of his right to testify, and it also suggests that any advice by his counsel not to testify was strategic and in Chambers's interests.

Furthermore, like other ineffective assistance claims, a claim that defense counsel prevented a defendant from testifying can succeed only if both prongs of the Strickland test are met. *See Brown*, 124 F.3d at 74 (holding that the Strickland two-part test governs claims that defense counsel failed to advise of the right to testify, and finding that the petitioner had failed to satisfy the prejudice prong); *Bennett* v. *United States*, 663 F.3d 71, 84-85 (2d Cir. 2011) (same); *Chang* v. *United States*, 250 F.3d 79, 84 (2d Cir. 2001) (same).   Here, Chambers has not demonstrated— because he cannot—that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 694; *see also Chang*, 250 F.3d at 84.   Chambers does not specifically describe what testimony he would have offered had he taken the stand, much less how that testimony would have made a difference. Construing the motion liberally, and interpreting it to argue that Chambers would have testified to

*all* of the assertions about his conduct made in the Petition, Chambers merely rehashes arguments already advanced by his counsel at trial, which the jury rightly rejected, or that would have been inadmissible, unpersuasive, or both.

This was not a close case.   As the Government emphasized at length in closing argument, the case against Chambers was proven through extensive documentary evidence, including documentary evidence of the bribe in connection with Ticheli's incident investigation.   The emails of Chambers sending photographs of the watch to Villanueva before he had it in hand (Tr. 172), arranging the handoff from Ticheli (Tr. 178-81), telling Ticheli Villanueva loved the watch and that they were on the "right road" (Tr. 182), telling him that the watch would "work wonders" and "get [them] on the track [they] need to be on" (Tr. 183), and then trying to manufacture a false cover story about it after his arrest (Tr. 200-01), are incontrovertible and damning.   As the Government argued explicitly to the jury at the outset of its closing, these documents alone, together with certain stipulations related to jurisdictional elements, sufficed for conviction.   (*See* Tr. 837-38 ("Even if there was nothing more than these and the other exhibits you just looked at, even if you threw out every single other gift that Chambers gave Villanueva, even if you threw out every single dollar of cash that Chambers gave Villanueva, even if you threw out every single other piece of favorable treatment that Chambers asked for from Villanueva, every single charge would still be proven beyond a reasonable doubt.")).

Not only was the government's evidence of Chambers's guilt overwhelming, but defense counsel did in fact argue points Chambers now claims went unadvanced.   Among other things, defense counsel argued at trial that the relationship between Chambers and Endall was exculpatory.   *See* Tr. at 881.   Defense counsel argued that the wristwatch from Ed Ticheli had nothing to do with the decision regarding a continuance for his gun permits.   *See* Tr. at 882.

Defense counsel argued that the testimony of Inspector Barreto showed that Chambers was a legitimate gun licensing attorney.   *See* Tr. at 886.   Defense counsel argued that Chambers was a "consummate professional" and that "no one kn[ew] the licensing division like John Chambers . . . . he is preeminent in his field."   *See* Tr. at 886-87.   These arguments were advanced based on the record at trial, including extensive and thorough cross-examinations of Government witnesses, the testimony of Chambers's wife and Villanueva's ex-wife as defense witnesses, and exhibits offered by both the Government and defense counsel.   Chambers has not demonstrated how his ability to testify at trial would have made any difference in light of the fact that his counsel and witnesses on his behalf made the very same points he now claims were neglected or bungled. Nor does Chambers meaningfully confront the obvious risk that in testifying he would have opened himself to vigorous cross-examination from the government.   Accordingly, Chambers cannot show that there is a "reasonable probability" that had he testified the outcome of the trial would have been any different.

### ii.  *Purported Failure to Make Various Arguments*

In alleging that his counsel failed to sufficiently investigate and advance certain arguments regarding, for example, Chambers's law practice, his relationship with Villanueva, and the meaning of various documents, Chambers's arguments largely consist of restating his trial defense and misstating the record.

For example, Chambers complains that the statements of Villanueva during his testimony were "never challenged by Counsels."   Br. at 8-9.   In fact, defense counsel cross-examined Villanueva at great length, comprising approximately more than 150 transcript pages, *see* Tr. at 478-631, and on a wide variety of topics—including many Chambers now says were never covered.   Defense counsel also argued extensively during summation that Villanueva's testimony was false, unreliable, and motivated by an effort to curry favor with the Government

26

following Villanueva's own arrest.   *See* Tr. at 856-63.[6]   Defense counsel similarly cross-examined Villanueva at length on the issue of his friendship with Chambers, *see* Tr. 497-99, and Christina Chambers testified that the relationship between Chambers and Villanueva was one of friendship rather than being transactional, *see* Tr. 761-762.   The jury heard these arguments, which were advanced thoroughly and professionally, and found them unpersuasive in the face of the overwhelming evidence of Chambers's guilt.

Chambers also argues that his counsel should have introduced evidence of Chambers's representation of individuals before the Pistol License Division that did *not* involve bribery.   *See generally* Br. at 11-13, 15-18.   Chambers is mistaken in two significant ways.   First, none of the purported facts he describes regarding other clients, even if taken as true, eliminate or override the instances of bribery proven overwhelmingly by the Government at trial.   And second, evidence of any "good acts" in which the defendant did not commit bribery or honest services fraud would have been inadmissible defense propensity evidence.   The Second Circuit has held—including *in this case*—that evidence that a defendant engaged in legal, honest business conduct is irrelevant to the question of whether the defendant engaged in charged offenses involving bribery or fraud. *See Chambers*, 800 F. App'x at 46; *see also United States v. Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. 2003) (summary order) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." (quoting *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978))); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming the district

---

[6] Villanueva's credibility was hardly the linchpin of the Government's case in any event.   While it is true that Villanueva provided valuable testimony, the evidence aside from Villanueva—largely in the form of Chambers's own texts and emails and the gifts he provided to Villanueva—spoke for itself and stood independent of Villanueva's testimony.   The Government even stressed this point to the jury in the final section of its summation.   (*See* Tr. 850 ("Now, you may notice there's one thing I haven't mentioned until now. That's a single word of testimony from David Villanueva. Nothing I have said until now has relied on a single word of testimony from David Villanueva.")).

court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"). Defense counsel's failure to attempt to offer inadmissible evidence at trial manifestly is not ineffective assistance. As described above, counsel's prudent decisions concerning evidence are generally upheld as matters of strategy. *Plitman*, 194 F.3d at 63-64. Here, counsel advanced many if not all of the arguments Chambers now claims were neglected, and to the extent counsel made strategic decisions to focus on certain defenses rather than others, those strategic decisions certainly were not lapses in professional representation.

Finally, as with respect to the argument about his potential testimony, Chambers does not and cannot meet the prejudice prong of *Strickland*. None of the arguments made by Chambers in his petition are meritorious, and certainly none of them would have made a dent in the overwhelming evidence set forth by the Government. As this Court noted at Chambers's sentencing proceeding, Dkt. 105 at 21, the jury's verdict was "fully supported by the evidence in the case." Indeed, it is a rare case in which a quid pro quo is stated as explicitly in documentary evidence as here. (*See, e.g.*, Tr. 183 ("yes, the watch is beautiful and very classy . . . will work wonders to repair the damage done, as well as get us on the track we need to be on for you[.]"); *id.* at 241-42 ("He is only paying me, if he gets his license renewed. I will in turn pay you as my 'consultant' on the case, as we talked about :)[.]")).

Even if defense counsel had erred as Chambers claims, there is no reasonable probability that his current arguments—or the additional documents, or further explanations of the licensing process, or instances in which Chambers did not commit bribery—would have affected the outcome of the trial. There is no reason to believe, nor has Chambers argued, that the information

he asserts would have been more credible than the Government's witnesses, or would have refuted the Government's evidence, or that the verdict would have otherwise been affected by his current claims.

## CONCLUSION

For the reasons set forth above, the Petition should be denied in its entirety without a hearing.[7]

Dated: New York, New York
May 14, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____
Alex Rossmiller
Paul Monteleoni
Assistant United States Attorneys
(212) 637-2415

Cc:    John Chambers (via ECF, *see* Dkt. 117)

---

[7] Petitioner does not appear to be requesting an evidentiary hearing, *see* Pet. at 26, and none is warranted.   A court may deny a § 2255 motion "without a testimonial hearing where (1) the allegations of the motion, accepted as true, would not entitle the petitioner to relief or (2) the documentary record, including any supplementary submissions such as affidavits, render a testimonial hearing unnecessary."  *Rosa v. United States,* 170 F. Supp. 2d 388, 398 (S.D.N.Y. 2001) (citing *Chang v. United States,* 250 F.3d 79, 85–86 (2d Cir. 2001)).   Moreover, where, as here, a petitioner's § 2255 motion is before the same court as the original criminal proceeding, the court "may rely on its own familiarity with the case and deny the motion without a hearing" if the motion lacks "meritorious allegations that can be established by competent evidence."  *Stokes v. United States,* No. 00 Civ. 1867, 2001 WL 29997, at *2 (S.D.N.Y. Jan. 9, 2001) (quoting *United States v. Aiello,* 900 F.2d 528, 534 (2d Cir. 1990)); *see also Mittal v. United States,* No. 02 Civ. 8449, 2005 WL 2036023, at *4 (S.D.N.Y. Aug. 24, 2005).